IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

JUN 1 5 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:10-CR-200 |
| | ) | |
| v. | ) | Count 1: Conspiracy |
| | ) | (18 U.S.C. § 1349) |
| LEE BENTLEY FARKAS, | ) | |
| | ) | Counts 2-7: Bank Fraud |
| Defendant. | ) | (18 U.S.C. §§ 1344 and 2) |
| | ) | |
| | ) | Counts 8-13: Wire Fraud |
| | ) | (18 U.S.C. §§ 1343 and 2) |
| | ) | |
| | ) | Counts 14-16: Securities Fraud |
| | ) | (18 U.S.C. §§ 1348 and 2) |
| | ) | |
| | ) | Forfeiture Notice |
| | ) | (18 U.S.C. §§ 981, 982) |
| | ) | |
| | ) | **Under Seal Pursuant to** |
| | ) | **Fed. R. Crim. P. 6(e)(4)** |

JUNE 2010 TERM - AT ALEXANDRIA, VIRGINIA

INDICTMENT

1

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

INTRODUCTION

## I.    Relevant Entities

### A.    Taylor, Bean & Whitaker Mortgage Corp.

1.    Taylor, Bean & Whitaker Mortgage Corp. (TBW), based in Ocala, Florida, was founded in 1982 and was one of the largest privately held mortgage lending companies in the United States. TBW was principally involved in the origination, purchase, sale, and servicing of residential mortgage loans. TBW generally sold these loans in the secondary mortgage market to third-party investors, including the Federal Home Loan Mortgage Corporation (Freddie Mac) and commercial financial institutions, either individually, pooled, or as part of mortgage-backed securities that received guarantees by Freddie Mac or the Government National Mortgage Association (Ginnie Mae). TBW originated and purchased billions of dollars in new residential loans on an annual basis. To fund its mortgage loan originations and acquisitions, TBW relied on various purchase facilities, credit lines, and financing vehicles, primarily with Colonial Bank and, starting in or about January 2005, Ocala Funding, LLC. On or about August 24, 2009, TBW filed for bankruptcy in the United States Bankruptcy Court for the Middle District of Florida in Jacksonville.

2.    TBW's principal source of income came from servicing mortgage loans it sold to Freddie Mac and it sold as part of securities guaranteed by Ginnie Mae. TBW's loan servicing responsibilities required it to, among other things, collect principal and interest payments on mortgage loans from borrowers and disburse those "pass-through" payments to the third-party

2

investors in the loans. TBW earned a servicing fee, which amounted to a small portion of a borrower's payment. As a loan servicer for Freddie Mac and Ginnie Mae, TBW was generally obligated to advance the pass-through payments to investors in the mortgage loans even where borrowers failed to make principal and interest payments in a timely manner. If TBW failed to advance the required pass-through payments, it risked losing its right to act as a loan servicer, and thus the associated fees, on behalf of Freddie Mac and Ginnie Mae.

**B.     Ocala Funding**

3.     Ocala Funding, LLC, was a TBW wholly owned entity formed on or about January 14, 2005. TBW formed Ocala Funding as a financing vehicle to provide it additional funding for mortgage loans. Ocala Funding was managed by TBW and had no employees of its own. Ocala Funding sold commercial paper to financial institution investors and used the funds raised to acquire mortgage loans originated or purchased by TBW. Generally, Ocala Funding then sold the loans to Freddie Mac. As of on or about June 30, 2008, Ocala Funding had two dedicated financial institution investors: Deutsche Bank, which agreed to purchase up to $1.25 billion of commercial paper, and BNP Paribas Bank, which agreed to purchase up to $500 million of the commercial paper. Ocala Funding, in turn, was required to maintain collateral in the form of cash and/or mortgage loans at least equal to the value of outstanding commercial paper.

4.     LaSalle Bank, N.A., was headquartered in Illinois and was retained by Ocala Funding to, among other things, maintain custody of mortgage loan files for mortgage loans purchased by Ocala Funding, and to operate bank accounts for Ocala Funding. LaSalle Bank was purchased in or about October 2007 by Bank of America, N.A.

3

### C. Colonial BancGroup and Colonial Bank

5. Colonial BancGroup, Inc., was a Delaware corporation organized in 1974 as a bank holding company that managed Colonial Bank and other, smaller subsidiaries. Colonial BancGroup, headquartered in Montgomery, Alabama, derived most of its income from Colonial Bank. Colonial BancGroup's securities were registered pursuant to § 12(b) of the Securities and Exchange Act of 1934 and traded on the New York Stock Exchange under trading symbol "CNB." On or about August 25, 2009, Colonial BancGroup filed for bankruptcy in the United States Bankruptcy Court for the Middle District of Alabama in Montgomery.

6. Colonial Bank was headquartered in Montgomery, Alabama, and since in or about June 2008 was an Alabama state-chartered bank with the Federal Deposit Insurance Corporation (FDIC) as its primary federal regulator. Colonial Bank was primarily involved in retail and commercial banking. As of December 31, 2008, Colonial Bank held approximately $26 billion in assets, which accounted for nearly all of Colonial BancGroup's consolidated assets. As of on or about December 31, 2008, Colonial Bank had approximately 350 branches in Florida, Alabama, Georgia, Nevada, and Texas, with deposits of approximately $19 billion. On or about August 14, 2009, the Alabama State Banking Department, the state regulator for Colonial Bank, seized Colonial Bank and appointed the FDIC as receiver.

7. Colonial Bank's Mortgage Warehouse Lending Division (MWLD) was based in Orlando, Florida, and provided short-term, secured funding to mortgage lending companies. MWLD's largest customer was TBW. During 2008, MWLD provided approximately $70 billion in interim funding to mortgage companies to fund approximately 400,000 residential mortgages.

4

MWLD accounted for at least 20% of Colonial Bank's pre-tax income from 2005 through 2009, and in 2008 and 2009 was one of Colonial Bank's few banking segments that reported a profit.

### D.    Freddie Mac and Ginnie Mae

8.    Freddie Mac was a government-sponsored enterprise established by Congress to provide liquidity and stability to the housing market in the United States. Freddie Mac purchased residential mortgages in the secondary mortgage market, securitized those mortgages, and then sold them to investors as mortgage-backed securities. Freddie Mac also purchased mortgages and mortgage-backed securities for its own mortgage-related investment portfolios. Freddie Mac guaranteed the timely payment of principal and interest for its mortgage-backed securities. Freddie Mac was headquartered in McLean, Virginia.

9.    Ginnie Mae was a government-owned corporation within the United States Department of Housing and Urban Development. Ginnie Mae did not buy or sell loans or issue mortgage-backed securities. Rather, Ginnie Mae guaranteed mortgage-backed securities issued by companies such as TBW that were backed by federally insured or guaranteed loans. Ginnie Mae was headquartered in Washington D.C.

### E.    TARP

10.    The Troubled Asset Relief Program (TARP) was created by the Emergency Economic Stabilization Act of 2008 and was designed, among other things, to restore liquidity and stability to the financial system in the wake of the financial crisis. One of the sub-programs created under TARP was the Capital Purchase Program (CPP), in which government funds would be invested in financial institutions in exchange for preferred shares in those institutions. Financial institutions seeking TARP funds under CPP would apply through their primary federal

bank regulator, and both an institution's eligibility and the amount of the CPP investment would depend, in part, upon information reflected in the institution's financial statements.

## II.    The Defendant and Co-Conspirators

11.    LEE BENTLEY FARKAS, the defendant, resided in Ocala, Florida, and was the chief executive officer of TBW until in or about July 2003 and the chairman thereafter. FARKAS was the majority shareholder of TBW.

12.    Co-conspirators included executives and employees of TBW and Colonial Bank.

## III.   The Scheme to Defraud

13.    Beginning in or about early 2002, TBW began to experience significant cash flow problems and was unable to cover adequately, among other things, its operating expenses. In an effort to cover the shortfalls, FARKAS and co-conspirators devised a scheme to misappropriate funds from Colonial Bank, Ocala Funding accounts, and eventually the United States government. The scheme evolved over the years as FARKAS and co-conspirators sought to misappropriate more money and to hide the misappropriations from, among others, certain Colonial Bank and Colonial BancGroup management, Freddie Mac, Ginnie Mae, the FDIC, financial institution investors in Ocala Funding, auditors, regulators, and shareholders. The scheme ultimately led to the misappropriation of more than $1 billion.

14.    Initially, the scheme involved TBW and Colonial Bank co-conspirators hiding millions of dollars of TBW overdrafts in its primary bank account at Colonial Bank, which arose from TBW's operating deficits, through frequent transfers of funds back and forth between that account and another. After the overdrafts reached into the tens of millions of dollars, however, FARKAS and co-conspirators revised the scheme and misappropriated hundreds of millions of

6

dollars more by selling Colonial Bank what amounted to fictitious assets. To do this, FARKAS and co-conspirators engaged in sales to Colonial Bank of mortgage loans that did not exist, that TBW already had sold to others, or that had significantly impaired value. As a result, FARKAS and co-conspirators caused Colonial Bank to falsely report the value of mortgage loans in its accounting records.

15.     As part of their scheme, FARKAS and co-conspirators also misappropriated hundreds of millions of dollars from Ocala Funding accounts through improper fund transfers, fraudulent transactions, and false documentation. Beginning in or about late 2008 through in or about mid-2009, as TBW's funding shortfalls became even more severe and Colonial BancGroup struggled to stay solvent, FARKAS and co-conspirators expanded the scheme in an effort to defraud the United States government. The conspirators fraudulently sought to acquire a major stake in Colonial BancGroup and to gain access to over $500 million in taxpayer money through Colonial BancGroup's application for TARP funding under the CPP program. FARKAS and co-conspirators never obtained any TARP funds.

A.     **Overdrafts in TBW's Master Account at Colonial Bank – The Sweeping Scheme**

16.     In or about early 2002, TBW began running overdrafts in its master bank account at Colonial Bank due to TBW's inability to meet its operating expenses, such as mortgage loan servicing payments owed to investors in Freddie Mac and Ginnie Mae securities, payroll, and other obligations. Conspirators at TBW and Colonial Bank covered up the overdrafts by transferring, or "sweeping," overnight money from another TBW account with excess funds into the master account to avoid the master account falling into an overdrawn status. This sweeping of funds gave the false appearance to other Colonial Bank employees that TBW's master account

7

was not overdrawn. The day after sweeping funds, the conspirators would cause the money to be returned to the other account, only to have to sweep funds back into the master account later that day to hide the deficit again.

17.     By in or about December 2003, the size of the deficit due to overdrafts had grown to tens of millions of dollars. In response, FARKAS and co-conspirators devised a plan to disguise the deficit as payments for mortgage loan assets purchased by Colonial Bank.

**B.     Plan B/COLB**

18.     In or about December 2003, FARKAS and co-conspirators caused the deficit in TBW's master account at Colonial Bank to be transferred to "COLB"—a mortgage loan purchase facility at MWLD. Through the COLB facility, Colonial Bank purchased interests in individual residential mortgage loans from TBW pending resale of the loans to third-party investors. The purpose of the COLB facility was to provide mortgage companies, like TBW, with liquidity to generate new mortgage loans pending the resale of the existing mortgage loans to investors. The COLB facility was designed such that Colonial Bank would recoup its outlay only after TBW resold a mortgage loan to a third-party investor, which generally was supposed to take place within 90 days after being placed on the COLB facility.

19.     In this part of the scheme, which the conspirators called "Plan B," the conspirators sought to disguise the tens of millions of dollars of overdrafts as payments related to Colonial Bank's purchase through the COLB facility of legitimate TBW mortgage loans. FARKAS and co-conspirators accomplished this by causing TBW to provide false mortgage loan data to Colonial Bank under the pretense that it was selling the bank interests in mortgage loans. As FARKAS and co-conspirators knew, however, the Plan B data included data for loans

that TBW had already committed or sold to other third-party investors or that did not exist. As a result, these loans were not, in fact, available for sale to Colonial Bank.

20.     As TBW continued to experience operating losses, FARKAS and co-conspirators engaged in additional sales of Plan B loans to Colonial Bank, causing Colonial Bank to advance to TBW tens of millions of additional dollars from the COLB facility. In reality, the Plan B loans could not be resold to recoup Colonial Bank's outlay for its interests in the loans. As a result, FARKAS and co-conspirators sold tens of millions of dollars worth of what amounted to fake assets to Colonial Bank and caused Colonial Bank to falsely record the value of these assets in its accounting records.

**C.     Recycling Plan B Loans**

21.     To avoid scrutiny from regulators, auditors, and Colonial Bank management of Plan B loans sold to Colonial Bank, FARKAS and co-conspirators devised a plan that gave the false appearance that TBW was periodically selling the Plan B loans off of the COLB facility. The conspirators referred to this aspect of the scheme as, among other things, "recycling," and the method for recycling evolved over time. One way FARKAS and co-conspirators effectuated a recycle was that they caused new Plan B data to be sent to Colonial Bank to replace old Plan B data. By doing so, FARKAS and co-conspirators created a document trail that gave the false appearance that mortgage loans had been sold to investors and that Colonial Bank, in turn, had purchased interests in new mortgage loans in their place.

**D.     Fictitious AOT Trades**

22.     In or about mid-2005, FARKAS and co-conspirators caused the deficit created by Plan B to be moved from the COLB facility to MWLD's Assignment of Trade (AOT) facility.

9

The AOT facility was designed for the purchase of interests in pools of loans, which were referred to as "Trades," that were in the process of being securitized and/or sold to third-party investors. The conspirators moved the deficit to the AOT facility in part because, unlike the COLB facility, Colonial Bank generally did not track in its accounting records loan-level data for the Trades held on the AOT facility, thus making detection of the scheme by regulators, auditors, Colonial Bank management, and others less likely.

23.    Unlike with the COLB facility, Colonial Bank only extended financing through the AOT facility to TBW. Colonial Bank purchased Trades to provide TBW with immediate liquidity while TBW sought to finalize sales of the pools of loans backing the Trades, or mortgage-backed securities formed from them, to third-party investors. This interim funding provided TBW liquidity to originate or purchase new mortgage loans pending the resales. At settlement with a third-party investor, Colonial Bank was to have recouped its investment in a Trade.

24.    In an effort to transfer the deficit caused by the Plan B loans on the COLB facility to the AOT facility, FARKAS and co-conspirators caused TBW to engage in sales to Colonial Bank of fictitious Trades purportedly backed by pools of Plan B loans. In fact, the Trades had no collateral backing them. As FARKAS and co-conspirators knew, Colonial Bank held these fictitious Trades in its accounting records at the amount Colonial Bank paid for them.

25.    After moving the Plan B deficit from the COLB facility to the AOT facility, TBW continued to experience significant operating losses. From in or about mid-2005 through in or about 2009, FARKAS and co-conspirators continued to cause TBW to sell hundreds of millions

of dollars of additional fictitious Trades to Colonial Bank through the AOT facility. Like the

Trades described in paragraph 24 above, these Trades had no pools of loans collateralizing them.

26.    To support these fraudulent transactions, FARKAS and co-conspirators caused

false data and documentation to be sent from TBW to Colonial Bank. For example, TBW co-

conspirators sent Colonial Bank co-conspirators schedules listing fictitious Trades with unique

identifying numbers that TBW co-conspirators reused from Trades previously sold to other

investors. The Trades also included pricing information not based on the value of any

underlying mortgage loans but instead made up to meet TBW's funding needs. TBW co-

conspirators also sent Colonial Bank co-conspirators fabricated agreements purporting to reflect

commitments by investors to purchase the Trades in the near future, generally in 30 to 60 days.

**E.    Trades Backed by Impaired-Value Loans and REO**

27.    In addition to causing Colonial Bank to purchase fictitious Trades, FARKAS and

co-conspirators caused significant numbers of impaired-value mortgage loans that TBW had

been unable to sell to be hidden on the AOT facility by using them to collateralize Trades that

Colonial Bank purchased through the AOT facility. These impaired-value loans included,

among other things, loans in default and significantly "aged" loans. In general, significantly

aged loans were considered impaired, and thus of lesser value, because TBW had been unable to

sell them to investors. These Trades were also sometimes collateralized by bank-repossessed

properties associated with foreclosed mortgage loans, known as real estate owned (REO). As

REO no longer had mortgage loans associated with them, REO could not properly be included in

mortgage-backed securities.

28.     Because TBW was generally unable to sell these Trades containing impaired-value loans and REO, FARKAS and co-conspirators caused these pools to be repackaged as new Trades with fabricated agreements purporting to reflect commitments by third parties to purchase the mortgage loan assets. As a result, some of the impaired-value loans and REO remained disguised on the AOT facility for a period of years, despite the AOT facility being designed for assets to be resold within 30 to 60 days.

**F.     Recycling of Fictitious and Impaired AOT Trades**

29.     As with the Plan B loans, FARKAS and co-conspirators recycled the fictitious and impaired Trades on AOT. The conspirators did this by engaging in sham sales to hide the fact that the vast majority of assets backing the AOT Trades could not be resold because the assets were either wholly fictitious or consisted of impaired-value loans and REO and, in either case, had no corresponding, legitimate commitment to be purchased by third parties. For example, after co-conspirators provided fabricated documents to Colonial Bank, Colonial Bank advanced money from its bank accounts to TBW-controlled bank accounts, which gave the false appearance that Colonial Bank had purchased new AOT Trades. Near in time, co-conspirators directed payments back to Colonial Bank to give the false appearance that the expiring Trades had been sold to investors. These advances and paydowns amounted to round-trip transactions, which generally left TBW and Colonial Bank in a similar financial position as before the transactions. In Colonial Bank's accounting records, however, it falsely appeared that old Trades had settled and had been replaced with new, legitimate Trades.

30.    Numerous wire transfers between Colonial Bank and TBW involved transfers to LaSalle Bank, which had been purchased by Bank of America, and as a result, some of these wires were processed through a Bank of America server located in Richmond, Virginia.

### G.    Colonial Bank's Accounting of the Fictitious and Impaired AOT Trades

31.    On or about July 28, 2009, Colonial Bank accounting records identified approximately 120 purportedly unique Trades held for resale on the AOT Facility. Colonial Bank reported in its accounting records that these Trades had a total value of approximately $1.47 billion. Nearly all of the Trades held on AOT at this time were recycled Trades that re-used identifying information for Trades that TBW previously had sold to other banks. Moreover, nearly all of the approximately 120 Trades held for resale on Colonial Bank's AOT facility had fabricated agreements generated by co-conspirators purporting to reflect commitments by legitimate third-party investors to buy the Trades in the near future.

32.    As a result of the fraud scheme, approximately one-third of the Trades on the AOT facility were fictitious and had no mortgage loans backing them. These Trades represented fraudulent advances made to TBW to cover its cash shortfalls. In its accounting records, Colonial Bank recorded these fictitious Trades as Securities Purchased under Agreements to Resell.

33.    As a result of the fraud scheme, nearly all of the mortgage loans backing the remaining Trades on the AOT facility consisted of impaired-value loans and REO. Moreover, Colonial Bank records showed that nearly all of the impaired-value loans and REO backing the Trades on the AOT facility on or about July 28, 2009, had already been part of different Trades listed in Colonial Bank's accounting records in or about April 2009. According to Colonial

Bank records, those different Trades, and thus the impaired-value loans and REO backing them, had purportedly been sold to investors in or about April 2009. In fact, those sales never took place. Instead, FARKAS and co-conspirators created fabricated documents and transactions to give the false appearance that the third-party resales were taking place when in fact FARKAS and co-conspirators were merely moving the impaired-value loans and REO into different Trades over time to hide the fact that TBW could not sell the impaired-value loans and REO.

34.    As a result, FARKAS and co-conspirators caused Colonial Bank to record fabricated purchases and sales on the AOT Facility of Trades backed by impaired-value loans and REO, which were held in Colonial Bank's accounting records as Securities Purchased under Agreements to Resell. In fact, TBW had been unable to resell the impaired-value mortgage loans and REO backing the Trades, and there were no legitimate agreements for resale to third-party investors.

35.    FARKAS and co-conspirators also caused audit confirmations to be sent to Colonial Bank's outside auditors that falsely attested that the balances on the COLB and AOT facilities were accurate.

**H.    Ocala Funding**

36.    In addition to misappropriating funds from Colonial Bank through the COLB and AOT facilities, FARKAS and TBW co-conspirators caused TBW to misappropriate money from Ocala Funding. FARKAS and TBW co-conspirators caused the diversion of hundreds of millions of dollars from Ocala Funding bank accounts, located at LaSalle Bank, to pay down TBW operating expenses, such as mortgage loan servicing payments owed to investors in Freddie Mac and Ginnie Mae securities, payroll, and other unrelated obligations. As a result of

14

these diversions, Ocala Funding experienced significant shortfalls in the amount of collateral it

possessed to back the outstanding commercial paper owned by its financial institution investors,

primarily Deutsche Bank and BNP Paribas. In addition, FARKAS and co-conspirators caused

Ocala Funding to sell loans owned by Colonial Bank to Freddie Mac without paying Colonial

Bank for the loans. As a result, FARKAS and co-conspirators caused at least Freddie Mac and

Colonial Bank to each believe it had an undivided ownership interest in thousands of the same

loans.

37.     To cover up the collateral shortfalls, FARKAS and co-conspirators caused false

information to be sent to the financial institution investors, including Deutsche Bank and BNP

Paribas, in documents that inaccurately and intentionally inflated figures representing the

aggregate value of the loans held in the Ocala Funding facility or under-reported the amount of

outstanding commercial paper. By doing so, FARKAS and co-conspirators sought to mislead

investors into believing that there was sufficient cash and mortgage loan collateral to back the

outstanding commercial paper owned by the investors. FARKAS and co-conspirators also sent

LaSalle Bank falsified collateral lists that misrepresented the ownership status of mortgage loans

held by Ocala Funding. In total, the misappropriated funds and double-sold mortgage loans

amounted to more than $1 billion.

**I.     TARP Funding**

38.     In or about October 2008, Colonial BancGroup submitted an application to the

FDIC seeking $570 million in TARP funding under the CPP program. In connection with the

application, regulators and the United States Treasury Department reviewed Colonial

BancGroup's financial data and filings, including the materially false information related to

15

mortgage loan and securities assets held by Colonial Bank's MWLD resulting from the

fraudulent conduct of FARKAS and co-conspirators. In or about December 2008, Treasury

conditionally approved $553 million of TARP funding to Colonial BancGroup if, among other

things, Colonial BancGroup could first raise $300 million in private capital.

39.    FARKAS, aware of Colonial BancGroup's TARP application and its contingent

approval, sought to lead a group of investors to raise the $300 million in private capital. In or

about March 2009, FARKAS and co-conspirators represented that TBW would invest $150

million in Colonial BancGroup. Additionally, FARKAS and co-conspirators represented to

Colonial BancGroup that two other investors had agreed to contribute $50 million each and

solicited MWLD "friends and family" for the remaining $50 million. FARKAS and co-

conspirators misrepresented the commitments of some investors.

40.    On or about April 1, 2009, FARKAS and co-conspirators caused Colonial

BancGroup to file with the United States Securities and Exchange Commission (SEC) a Form

8-K, which was filed electronically with the EDGAR Management Office of Information and

Technology, in Alexandria, Virginia. This Form 8-K announced that Colonial BancGroup had

secured definitive agreements from investors, pending due diligence, to satisfy the $300 million

private capital contingency requirement.

41.    The Form 8-K attached a stock purchase agreement that, among other things,

represented that each purported investor had already deposited into an escrow account set up for

the capital raise 10% of its proposed investment. To give the appearance that the escrow

requirement had in fact been satisfied, FARKAS and a TBW co-conspirator caused $25

million—which purportedly represented the 10% deposit for TBW's $150 million investment

16

($15 million) and for the two purported $50 million investors ($5 million each)—to be deposited into the escrow account at Platinum Community Bank, a wholly owned subsidiary of TBW.

42.     FARKAS and a TBW co-conspirator had in fact diverted that $25 million from an Ocala Funding bank account. Further, FARKAS and other co-conspirators supplied the 10% down payment on behalf of the two $50 million investors without the investors' knowledge or consent. The $25 million wire transfer from an Ocala Funding bank account to Platinum Community Bank was processed through a Bank of America server located in Richmond, Virginia.

43.     Colonial Bank never received TARP funding.

**J.     False Financial Filings with SEC and Ginnie Mae**

44.     FARKAS and co-conspirators caused Colonial BancGroup to file materially false financial data with the SEC regarding the assets in Colonial Bank's MWLD in its annual and quarterly reports, Forms 10-K and 10-Q respectively, which were filed electronically with the SEC's EDGAR Management Office of Information and Technology, in Alexandria, Virginia. The fraudulent Plan B loans on the COLB facility were reflected as assets in the financial data as "Loans Held for Sale," and the fictitious and impaired Trades on the AOT facility were reported as assets in the financial data as "Securities Purchased under Agreements to Resell."

45.     For example, in its Form 10-K for the year ending December 31, 2008, which was filed on or about March 2, 2009, Colonial BancGroup reported that MWLD had total assets under management of approximately $4.3 billion, of which approximately $1.55 billion, or 36%, were held as AOT Trades reported as Securities Purchased under Agreements to Resell. In its last Form 10-Q filed with the SEC, for the period ended March 31, 2009, which was filed on or

about May 8, 2009, Colonial BancGroup reported that MWLD managed assets valued at approximately $4.9 billion, with approximately $1.6 billion, or approximately 33%, held as AOT Trades reported as Securities Purchased under Agreements to Resell.

46.     As a result of the fraudulent scheme perpetrated by FARKAS and co-conspirators, approximately several hundred million dollars of the $1.6 billion worth of assets purportedly held on the AOT facility, and thus reported in the 2008 Form 10-K and March 31, 2009, Form 10-Q as Securities Purchased under Agreements to Resell, did not exist. FARKAS and co-conspirators also knew that the vast majority of the remaining Trades held on AOT were backed by impaired-value loans and REO. Further, FARKAS and co-conspirators knew that most, if not all, of the Trades held on the AOT facility did not have legitimate agreements to be resold to third-party investors as required for Trades held on the AOT facility and as reported in the Forms 10-K and 10-Q.

47.     In addition, FARKAS and co-conspirators caused Colonial BancGroup on or about April 1, 2009, to file with the SEC a Form 8-K, which was filed electronically with the EDGAR Management Office of Information and Technology, in Alexandria, Virginia, announcing that Colonial BancGroup had secured definitive agreements from investors, pending due diligence, to satisfy the private capital contingency requirement.

48.     FARKAS and co-conspirators also caused TBW to file materially false financial data with Ginnie Mae relating to TBW's overall economic viability. Ginnie Mae used this financial data as a factor when determining whether TBW's status as an approved issuer of Ginnie Mae securities would be extended. TBW sent the financial data for Ginnie Mae's review to a location in McLean, Virginia. In part as a result of its unwitting reliance upon TBW's

18

materially false financial data, Ginnie Mae continued to approve TBW on an annual basis as an issuer of Ginnie Mae securities. Ginnie Mae also increased the amount of securities TBW could issue, and, as a result, from in or about July 2008 to in or about August 2009, TBW increased the amount of Ginnie Mae securities it issued from approximately $14.8 billion to approximately $26.8 billion. Ginnie Mae terminated TBW as an issuer and servicer of Ginnie Mae securities in or about August 2009, and Ginnie Mae assumed TBW's entire Ginnie Mae portfolio at that time.

COUNT 1

(Conspiracy to Commit Bank Fraud, Wire Fraud, and Securities Fraud)

**I.    The Conspiracy**

49.    The allegations in paragraphs 1 through 48 in the Introduction section are realleged as if fully set forth herein.

50.    From in or about early 2002 through in or about August 2009, in the Eastern District of Virginia and elsewhere, defendant

LEE BENTLEY FARKAS

did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit certain offenses against the United States, namely:

a.    bank fraud, that is, to knowingly and intentionally execute, and attempt to execute, a scheme and artifice to defraud a financial institution, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, § 1344;

19

b.      wire fraud, that is, having intentionally devised and intending to devise a scheme and  artifice to defraud a financial institution, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, § 1343;

c.      securities fraud, that is, to knowingly and intentionally execute a scheme and artifice to defraud any person in connection with any security of an issuer with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, § 78l), in violation of Title 18, United States Code, § 1348;

## II.    Manner and Means of the Conspiracy

51.     Among the manner and means by which defendant FARKAS and others known and unknown to the Grand Jury would and did carry out the conspiracy included, but were not limited to, the following:

a.      FARKAS and co-conspirators caused the transfer of funds between TBW accounts in an effort to hide TBW overdrafts.

b.      FARKAS and co-conspirators caused TBW to sell to Colonial Bank mortgage loan assets, via the COLB facility, that included loans that did not exist or that had been committed or sold to third parties.

c.      FARKAS and co-conspirators caused TBW to sell to Colonial Bank, via the AOT facility, fictitious Trades that had no mortgage loans collateralizing them and that had fabricated agreements reflecting commitments by investors to purchase them in the near future.

20

     d.     FARKAS and co-conspirators caused TBW to sell to Colonial Bank, via the AOT facility, Trades backed by impaired-value loans and REO that had fabricated agreements reflecting commitments by investors to purchase them in the near future.

     e.     FARKAS and co-conspirators periodically "recycled" the Plan B loans on the COLB facility and the fictitious and impaired Trades on the AOT facility to give the false appearance that old loans and Trades had been sold and replaced by new loans and Trades.

     f.     FARKAS and co-conspirators covered up their misappropriations of funds from the COLB and AOT facilities by providing false documents and information to Colonial Bank.

     g.     FARKAS and TBW co-conspirators misappropriated funds from Ocala Funding bank accounts.

     h.     FARKAS and TBW co-conspirators covered up shortfalls in collateral held by Ocala Funding to back commercial paper by sending investors and others documents containing material misrepresentations.

     i.     FARKAS and TBW co-conspirators caused mortgage loans held by Ocala Funding to be sold to both Colonial Bank and Freddie Mac.

     j.     FARKAS and co-conspirators caused Colonial BancGroup to file with the SEC materially false annual reports contained in Forms 10-K and quarterly reports contained in Forms 10-Q that misstated the value and nature of assets held by Colonial BancGroup.

     k.     FARKAS and co-conspirators caused TBW to submit materially false information to Ginnie Mae to obtain an extension of authority to issue Ginnie Mae mortgage-backed securities.

l.      FARKAS and co-conspirators caused Colonial BancGroup to submit materially false information to the FDIC and to the SEC in furtherance of its application for TARP funds.

(All in violation of Title 18, United States Code, § 1349.)

## COUNTS 2 - 7

### (Bank Fraud)

THE GRAND JURY FURTHER CHARGES:

52.     On or about the dates set forth below, in the Eastern District of Virginia and

elsewhere, defendant

### LEE BENTLEY FARKAS,

knowingly and intentionally executed, and attempted to execute, a scheme and artifice to defraud

Colonial Bank, a financial institution with deposits insured by the FDIC, and to obtain any of the

moneys, funds, credits, assets, securities, and other property owned by, and under the custody

and control of Colonial Bank, by means of materially false and fraudulent pretenses,

representations, and promises, as set forth in Counts 2 - 7 below.

53.     The scheme and artifice to defraud is described in paragraphs 13 through 48 of

this Indictment, which are re-alleged and incorporated, along with paragraphs 1 through 12, as if

fully set forth herein.

| Count | Date | Description |
|-------|------|-------------|
| 2 | November 19, 2008 | Wire payment of approximately $76,603,100.00 from Colonial Bank to LaSalle Bank |
| 3 | January 6, 2009 | Wire payment of approximately $66,400,000.00 from Colonial Bank to LaSalle Bank |
| 4 | May 29, 2009 | Wire payment of approximately $154,927,380.54 from Colonial Bank to LaSalle Bank |
| 5 | June 18, 2009 | Wire payment of approximately $46,081,431.04 from Colonial Bank to LaSalle Bank |
| 6 | June 30, 2009 | Wire payment of approximately $59,655,985.97 from Colonial Bank to LaSalle Bank |

| Count | Date | Description |
|-------|------|-------------|
| 7 | July 6, 2009 | Wire payment of approximately $31,933,110.73 from Colonial Bank to LaSalle Bank |

(All in violation of Title 18, United States Code, §§ 1344 and 2.)

## COUNTS 8 - 13

### (Wire Fraud)

THE GRAND JURY FURTHER CHARGES:

54.     On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, defendant

### LEE BENTLEY FARKAS,

having intentionally devised and intending to devise a scheme and artifice to defraud TARP (counts 8-9, 13) and Colonial Bank, a financial institution (counts 10-12), and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as set forth in Counts 8 - 13 below.

55.     The scheme and artifice to defraud is described in paragraphs 13 through 48 of this Indictment, which are re-alleged and incorporated, along with paragraphs 1 through 12, as if fully set forth herein.

| Count | Date | Description |
|-------|------|-------------|
| 8 | March 30, 2009 | $25 million wire from LaSalle Bank in Illinois to Platinum Community Bank in Florida, which was routed to a Bank of America server in Richmond, Virginia |
| 9 | April 1, 2009 | Email from CEO of Platinum Community Bank, in Florida, to the Deputy Regional Director of the FDIC, which email was routed to FDIC servers located in Arlington, Virginia |

| Count | Date | Description |
|-------|------|-------------|
| 10 | May 13, 2009 | Wire payment of approximately $46,751,197.85 from Colonial Bank in Florida to LaSalle Bank in Illinois, processed by servers in Richmond, Virginia, and transmitted to the Federal Reserve Bank of Richmond, Virginia |
| 11 | May 18, 2009 | Wire payment of approximately $46,608,205.11 from Colonial Bank in Florida to LaSalle Bank in Illinois, processed by servers in Richmond, Virginia, and transmitted to the Federal Reserve Bank of Richmond, Virginia |
| 12 | May 19, 2009 | Wire payment of approximately $51,016,179.69 from Colonial Bank in Florida to LaSalle Bank in Illinois, processed by servers in Richmond, Virginia, and transmitted to the Federal Reserve Bank of Richmond, Virginia |
| 13 | May 22, 2009 | Email from a "friends and family" investor located in McLean, Virginia, to FARKAS's assistant in Florida |

(All in violation of Title 18, United States Code, §§ 1343 and 2.)

## COUNTS 14 - 16

### (Securities Fraud)

THE GRAND JURY FURTHER CHARGES:

56.     On or about the dates set forth below, in the Eastern District of Virginia and

elsewhere, defendant

### LEE BENTLEY FARKAS,

knowingly and intentionally executed a scheme and artifice to defraud any person in connection

with any security of Colonial BancGroup, an issuer with a class of securities registered under

§12 of the Securities Exchange Act of 1934 (Title 15, United States Code, § 78l), as described in

Counts 14 - 16 below.

57.     The scheme and artifice to defraud is described in paragraphs 13 through 48 of

this Indictment, which are re-alleged and incorporated, along with paragraphs 1 through 12, as if

fully set forth herein.

| Count | Date | Description |
|-------|------|-------------|
| 14 | March 2, 2009 | Form 10-K for the period ending December 31, 2008, filed electronically by Colonial BancGroup with the SEC's EDGAR Management Office of Information and Technology Alexandria, Virginia |
| 15 | April 1, 2009 | Form 8-K current report, filed electronically by Colonial BancGroup with the SEC's EDGAR Management Office of Information and Technology Alexandria, Virginia |
| 16 | May 8, 2009 | Form 10-Q for the period ending March 31, 2009, filed electronically by Colonial BancGroup with the SEC's EDGAR Management Office of Information and Technology Alexandria, Virginia |

(All in violation of Title 18, United States Code, §§ 1348 and 2.)

## FORFEITURE NOTICE

58.     Pursuant to Rule 32.2(a), the defendant is hereby notified that, if convicted of any

of the charges in this Indictment, the defendant shall forfeit to the United States, pursuant to Title

18, United States Code, §§ 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, § 2461,

any property, real or personal, which constitutes or is derived from proceeds traceable to the

count of conviction including wire fraud, in violation of Title 18, United States Code, § 1343;

bank fraud, in violation of Title 18, United States Code, § 1344;  securities fraud, in violation of

Title 18, United States Code, § 1348; as well as conspiracy to commit such offenses, in violation

of Title 18, United States Code, § 1349.  Such forfeitable property includes a sum of money

equal to at least $22 million in United States currency, representing the amount of proceeds

obtained as a result of the offenses alleged in the Indictment, for which the defendant is jointly

and severally liable.

59.     Pursuant to Title 21, United States Code, § 853(p), as incorporated by Title 18,

United States Code, § 982(b)(1), and by Title 28, United States Code, § 2461(c), the defendant

shall forfeit substitute property, up to the value of the amount described, i.e., $22 million in

United States currency, if, by any act or omission of the defendant, the $22 million in United

States currency or any portion thereof, cannot be located upon the exercise of due diligence; has

been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction

of the Court; has been substantially diminished in value; or has been commingled with other

property which cannot be divided without difficulty.  The property subject to forfeiture as

substitute assets includes, but is not limited to, the following:

      a.     A sum of money equal to the amount of proceeds obtained as a result of the conspiracy, bank fraud, securities fraud and wire fraud offenses;

      b.     real property known as 480 SW 87th Place, Ocala , Florida;

      c.     real property known as 2010 NE 18th St, Ft. Lauderdale, Florida;

      d.     real property known as 7785 SW 62nd Ct, Ocala, Florida;

      e.     real property known as 950 Peachtree St., N.W. #18903, Atlanta, Georgia;

      f.     real property known as 2711 S.E. 17th St., Ocala, Florida;

      g.     a 1963 Rolls Royce bearing VIN: LSCX11;

      h.     a 1929 Ford Model A bearing VIN: A1766832;

      i.     a 1973 Triumph TR6 bearing VIN: CF10020U;

      j.     a 1970 Cadillac El Dorado bearing VIN: H0270364;

      k.     a 1958 Mercedes Benz Cabriolet 220 bearing VIN: 128030N8500042;

      l.     a 2008 Infiniti bearing VIN: 5N3AA08C18N900648;

      m.     a 1961 Porsche CV bearing VIN: 89466;

      n.     a 1937 Pack CV bearing VIN: 1019334;

      o.     a 2005 Marc CV bearing VIN: SA9RA260150A11055.

(Pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A),  28 U.S.C. § 2461, and 21 U.S.C. § 853.)

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

FOREPERSON OF THE GRAND JURY
DATE: June 15, 2010


DENIS J. MCINERNEY
Chief, Fraud Section
Criminal Division
United States Department of Justice

Patrick F. Stokes
  Deputy Chief
Brigham Q. Cannon
Charles D. Reed
Robert A. Zink
  Trial Attorneys


NEIL H. MACBRIDE
United States Attorney

Charles F. Connolly
Paul J. Nathanson
  Assistant United States Attorneys