

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
www.flmd.uscourts.gov



**MEMORANDUM**

**UNITED STATES OF AMERICA**

-vs-

**LEE BENTLEY FARKAS**

**Case No.  5:10-mj-1028-GRJ**

---

DATE:        June 28, 2010          **Your Case No.: 1:10-CR-200**

TO:          United States District Court
             Eastern District of Virginia
             Attn:  Clerk's Office
             401 Courthouse Square
             Alexandria, Virginia  22314

FROM:        Donna DeNicola, Courtroom Deputy for
             Gary R. Jones, United States Magistrate Judge
             (352) 369-4864
             Golden-Collum Memorial Federal Building and U.S. Courthouse
             207 N.W. Second Street
             Ocala, Florida  34475

SUBJECT:     Rule 5(c) Proceedings

The above-styled case originated in your division.  Enclosed please find certified copies of original documents regarding proceedings held in the Middle District of Florida in Ocala, Florida wherein the following action was taken:

INITIAL APPEARANCE:          June 17, 2010

RELEASE/DETENTION:           The Defendant was released on bond.

SCHEDULED HEARING:           July 2, 2010 at 9:00 a.m. before the Honorable Leonie
                             M. Brinkema, United States District Judge.

CHARGING DOCUMENT:           Indictment

Kindly acknowledge receipt of this letter with the copy provided.

Enclosures

BOND, CUSTODY

# U.S. District Court
## Middle District of Florida (Ocala)
### CRIMINAL DOCKET FOR CASE #: 5:10-mj-01028-GRJ All Defendants
### Internal Use Only

Case title: USA v. Farkas

Other court case number: 1:10-CR-200 Eastern District of
Virginia, Alexandria Division

Date Filed: 06/16/2010

Assigned to: Magistrate Judge Gary R.
Jones

**Defendant (1)**

**Lee Bentley Farkas**                                represented by   **Lee Bentley Farkas**
480 SW 87 Place
Ocala, FL 34476
352/854-0273
PRO SE

**Brian F. McEvoy**
Chilivis, Cochran, Larkins & Bever,
LLP
3127 Maple Dr NE
Atlanta, GA 30305-2503
404/233-4171
Fax: 404/261-2842
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Gerald John Houlihan**
Houlihan & Partners, PA
2332 Galiano St., Second Floor
Miami, FL 33134
305/460-4091
Fax: 305/397-0955
Email: houlihan@houlihanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Pending Counts**

None

**Disposition**

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By
Deputy Clerk

## Highest Offense Level (Opening)
None

| Terminated Counts | Disposition |
|---|---|
| None | |

## Highest Offense Level (Terminated)
None

| Complaints | Disposition |
|---|---|
| Indictment: Conspiracy, Bank Fraud, Wire Fraud, and Securities Fraud in violation of 18 U.S.C. §§ 1349, 1344, 1343, and 1348. | |

## Plaintiff

| USA | represented by | Patrick F. Stokes |
|---|---|---|

U.S. Dept. of Justice
Fraud Section, Criminal Division
1400 New York Ave., NW, Fourth
Floor
Washington, DC 20005
202/305-4232
Fax: 202/514-7021
Email: Patrick.stokes2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/16/2010 | 1 | Arrest - Rule 5(c)(2) of Lee Bentley Farkas from the Eastern District of Virginia, Alexandria Division, on charges of conspiracy, bank fraud, wire fraud, and securities fraud. (DFD) (Entered: 06/16/2010) |
| 06/16/2010 | 2 | GOVERNMENT'S MOTION for Pre-Trial Detention by USA as to Lee Bentley Farkas. (DFD) (Entered: 06/16/2010) |
| 06/16/2010 | 3 | First MOTION to continue *Initial Appearance* by Lee Bentley Farkas. (Houlihan, Gerald) (Entered: 06/16/2010) |
| 06/16/2010 | 4 | ORDER granting 3 Defendant Lee Farkas' Motion For Continuance of Initial Appearance as to Lee Bentley Farkas (1). The initial appearance is rescheduled for June 17, 2010 at 2:30 p.m. Signed by Magistrate Judge Gary R. Jones on 6/16/2010. (grj) (Entered: 06/16/2010) |

| 06/17/2010 | 5 | Minute Entry for proceedings held before Magistrate Judge Gary R. Jones: Initial Appearance in Rule 5(c)(3) Proceedings as to Lee Bentley Farkas held on 6/17/2010. Court Reporter: Kelly Owen from Owens & Associates (DFD) (Entered: 06/17/2010) |
| --- | --- | --- |
| 06/17/2010 | 6 | WAIVER of Rule 5 & 5.1 Hearings by Lee Bentley Farkas filed in open court. (DFD) (Entered: 06/17/2010) |
| 06/17/2010 | 7 | ORDER OF TEMPORARY DETENTION as to Lee Bentley Farkas. Detention Hearing set for 6/23/2010 at 09:30 AM in Ocala Courtroom 1 A before Magistrate Judge Gary R. Jones. Signed by Magistrate Judge Gary R. Jones on 6/17/2010. (grj) (Entered: 06/17/2010) |
| 06/22/2010 | 8 | First MOTION for bond, First MOTION for detention *Opposition* by Lee Bentley Farkas. (Houlihan, Gerald) (Entered: 06/22/2010) |
| 06/23/2010 | | (Court only) ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Brian F. McEvoy appearing on behalf of Lee Bentley Farkas. (Filing fee $10.00 receipt number C-8505) (MJT) (Entered: 06/23/2010) |
| 06/23/2010 | 9 | Minute Entry for proceedings held before Magistrate Judge Gary R. Jones: Detention Hearing as to Lee Bentley Farkas held on 6/23/2010. Court Reporter: Dennis Miracle (DFD) (Entered: 06/23/2010) |
| 06/23/2010 | 10 | RECEIPT for surrender of passport as to Lee Bentley Farkas. Passport Number 450736503 issued by USA. (DFD) (Entered: 06/23/2010) |
| 06/23/2010 | 11 | ORDER denying 2 Government's Motion For Pre-Trial Detention; granting 8 Defendant's Motion For Release On Bail with Conditions as to Lee Bentley Farkas (1). Conditions of Release are established by a separate Order Setting Conditions of Release. Signed by Magistrate Judge Gary R. Jones on 6/23/2010. (grj) (Entered: 06/23/2010) |
| 06/23/2010 | 12 | SECURED BOND entered as to Lee Bentley Farkas in the amount of $2,000,000.00. Receipt #'s C-8510 and C-8511. Signed by Magistrate Judge Gary R. Jones. (DFD) (Entered: 06/24/2010) |
| 06/23/2010 | 13 | ORDER Setting Conditions of Release. Signed by Magistrate Judge Gary R. Jones on 6/23/2010. (DFD) (Entered: 06/24/2010) |
| 06/23/2010 | 14 | AGREEMENT to forfeit property by Lee B. Farkas as to Lee Bentley Farkas. (DFD) (Entered: 06/24/2010) |
| 06/23/2010 | 15 | AGREEMENT to forfeit property by Sean A. Murla as to Lee Bentley Farkas. (DFD) (Entered: 06/24/2010) |
| 06/23/2010 | 16 | AGREEMENT to forfeit property by Terri A. Huber as to Lee Bentley Farkas. (DFD) (Entered: 06/24/2010) |
| 06/24/2010 | 17 | ORDER directing the Marshals to release the defendant from custody as to Lee Bentley Farkas. Signed by Magistrate Judge Gary R. Jones on 6/24/2010. (DFD) (Entered: 06/24/2010) |
| 06/24/2010 | | TRANSCRIPT of Detention Hearing as to Lee Bentley Farkas held on |

| | 18 | 6/23/10 before Judge Gary R. Jones. Court Reporter/Transcriber Dennis Miracle, Telephone number 352/342-0414. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 7/15/2010, Redacted Transcript Deadline set for 7/26/2010, Release of Transcript Restriction set for 9/22/2010. (DM) (Entered: 06/24/2010) |
| 06/24/2010 | 19 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Lee Bentley Farkas. Court Reporter: Dennis Miracle (DM) (Entered: 06/24/2010) |
| 06/25/2010 | 20 | FINDINGS AND ORDER ON REMOVAL PROCEEDINGS PURSUANT TO RULE 5, FED. R. CRIM.P. as to Lee Bentley Farkas. Signed by Magistrate Judge Gary R. Jones on 6/25/2010. (grj) (Entered: 06/25/2010) |
| 06/25/2010 | 21 | ORDER That Defendant Appear In District of Prosecution And Transferring Bail as to Lee Bentley Farkas. Signed by Magistrate Judge Gary R. Jones on 6/25/2010. (grj) (Entered: 06/25/2010) |
| 06/28/2010 | 22 | TRANSFER Rule(5)(c)(3) to the Eastern District of Virginia, Alexandria Division, as to Lee Bentley Farkas. (DFD) (Entered: 06/28/2010) |

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**UNITED STATES OF AMERICA**

-vs-                                                              **Case No.  5:10-mj-1028-GRJ**

**LEE BENTLEY FARKAS**

---

# ORDER SETTING
# CONDITIONS OF RELEASE

**IT IS ORDERED** that the release of the defendant is subject to the following conditions and provisions:

(1)    The defendant **shall not commit** any offense in violation of federal, state or local law while on release in this case.

(2)    The defendant **shall immediately advise** the Court, Pretrial Services Office, defense counsel and the U.S. Attorney in writing of any change in address and telephone number.

(3)    The defendant **shall appear** at all proceedings as required and shall surrender for service of any sentence imposed as directed.  The defendant shall next appear in the United States Courthouse, 401 Courthouse Square, Alexandria, Virginia in the courtroom as directed upon notice.

## ADDITIONAL CONDITIONS OF RELEASE

In order reasonably to assure the appearance of the defendant and the safety of other persons and the community, it is **FURTHER ORDERED** that the release of the defendant is subject to the conditions marked below:

### Secured Financial Conditions

- execute a bond in the amount of $2,000,000.00 to be secured with a mortgage on the defendant's residence located at                        , Ocala, Florida and a mortgage on Sean Murla's residence located at                        , Fort Lauderdale, Florida.  The Court shall be provided with a copy of each of the deeds and evidence    that each mortgage has been recorded in favor of the United States.  Both defendant and Sean Murla shall also each execute an agreement to forfeit property.

- bond shall also be secured with an agreement to forfeit property on Terri Huber's residence located at                        Albuquerque, New Mexico.  The Court shall be provided with a copy of Terri Huber's deed.  A racsimile copy of the executed agreement to forfeit property shall be allowed subject to providing the Court with the original by overnight mail.

- report as directed by the Pretrial Services Office.

- surrender passport to the Clerk, U.S. District Court.

- avoid all contact, directly or indirectly, with the individuals listed by the government which shall be filed under seal on June 24, 2010 in the Eastern District of Virginia.

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By: _____
Deputy Clerk

- abide by the following restrictions on personal association, place of abode, or travel:   Defendant is restricted in residence and travel to the Middle District of Florida. Defendant is also permitted to travel to the Eastern District of Virginia for court appearances, and to Atlanta, Georgia and Miami, Florida for meetings with counsel.  Defendant must notify Pretrial Services in advance of any travel outside of the Middle District of Florida.

- participate in a GPS monitoring program as directed by Pretrial Services.  You shall pay all or part of the cost of the program based upon your ability to pay as determined by Pretrial Services.

- refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of the GPS monitoring which is required as a condition of release.

- prohibited from disposing of any assets whose value is in excess of $1000.00 without first obtaining permission from the Court or prior approval by the Government and Pretrial Services.

- shall not engage in any financial services or apply for any lines of credit without obtaining prior approval from Pretrial Services.

- report as soon as possible, to the Pretrial Services Office any contact with law enforcement personnel, including, but not limited to, any arrest, questioning, or traffic stop.

## ADVICE OF PENALTIES AND SANCTIONS

**TO THE DEFENDANT:**

### YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

A violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of release, an order of detention, and a prosecution for contempt of court and could result in a term of imprisonment, a fine, or both.

The commission of a Federal offense while on pretrial release may result in an additional sentence to a term of imprisonment of not more than ten years, if the offense is a felony; or a term of imprisonment of not more than one year, if the offense is a misdemeanor.  This sentence shall be in addition to any other sentence.

Federal law makes it a crime punishable by up to ten years of imprisonment, and a $250,000 fine or both to obstruct a criminal investigation.  It is a crime punishable by up to ten years of imprisonment, and a $250,000 fine or both to tamper with a witness, victim or informant; to retaliate or attempt to retaliate against a witness, victim or informant; or to intimidate or attempt to intimidate a witness, victim, juror, informant or officer of the court.  The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If after release, you knowingly fail to appear as required by the conditions of release, or to surrender for the service of sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed.  If you are convicted of:
(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more, you shall be fined not more than $250,000 or imprisoned for not more than ten years, or both;
(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, you shall be fined not more than $250,000 or imprisoned not more than five years, or both;
(3) any other felony, you shall be fined not more than $250,000 or imprisoned not more than two years, or both;
(4) a misdemeanor, you shall be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be in addition to the sentence for any other offense. In addition, a failure to appear may result in the forfeiture of any bond posted.

## ACKNOWLEDGMENT OF DEFENDANT

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
Signature of Defendant

_____
Address

Ocala, FL 34476  (352) 854-0273
City and State                Telephone

## DIRECTIONS TO THE UNITED STATES MARSHAL

☐ The defendant is **ORDERED** released after processing.
☑ The United States marshal is **ORDERED** to keep the defendant in custody until notified by the Clerk or Judicial Officer that the defendant has posted bond and/or complied with all other conditions for release. The defendant shall be produced before the appropriate judicial officer at the time and place specified, if still in custody.

Date:   June 23, 2010

_____
GARY R. JONES
UNITED STATES MAGISTRATE JUDGE

Copies to:

U.S. Marshal
U.S. Attorney
U.S. Probation
U.S. Pretrial Services
Counsel for Defendant
Clerk, Eastern District of Virginia
Defendant

AO 199A Order Setting Conditions of Release        -3-

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**UNITED STATES OF AMERICA**

**-vs-**                                        **Case No.  5:10-mj-1028-GRJ**

**LEE BENTLEY FARKAS**

---

### FINDINGS AND ORDER ON REMOVAL PROCEEDINGS
### PURSUANT TO RULE 5, FED.R.CRIM.P.

**LEE BENTLEY FARKAS**, having been arrested and presented before me for

removal proceedings pursuant to Rule 5, Federal Rules of Criminal Procedure, and having

been informed of the rights specified in Rule 5 (c)(3) thereof, the following has occurred of

record.

> An Initial Appearance on the Rule 5 Indictment from the Eastern District of
> Virginia was held on June 17, 2010.

> After hearing the evidence, and based on the defendant's waiver of identity
> hearing, I find that **LEE BENTLEY FARKAS** is the person named in the
> warrant for arrest, a copy of which has been produced.

> It is, therefore,

> **ORDERED** that **LEE BENTLEY FARKAS** be held to answer in the district court in

which the prosecution is pending.

> **DONE** and **ORDERED** in Ocala, Florida, on June 25, 2010.

**GARY R. JONES**
**United States Magistrate Judge**

Copies furnished to:

United States Attorney
United States Marshal
Counsel for Defendant
Clerk, Eastern District of Virginia
Defendant

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.

Case No.: 5:10-mj-1028-GRJ

LEE BENTLEY FARKAS

### ORDER

The Court has received and reviewed the documentation required for posting

bond and complying with the conditions for release. The Court finds that the Defendant

has posted bond in form satisfactory to the Court and has complied with all other

conditions of release. Accordingly, the United States Marshal is directed to release the

Defendant from custody forthwith and the Defendant shall remain on release subject to

the terms and conditions of the Order Setting Conditions of Release and the

Appearance and Compliance Bond.

**DONE AND ORDERED** in Ocala, Florida, on June 24, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:

U.S. Attorney
U.S. Marshal
U.S. Pretrial Services
Counsel for Defendant
Clerk, Eastern District of Virginia

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U.S. DISTRICT COURT
By:
Deputy Clerk

AO 467 (Rev. 9/03) Order for Defendant to Appear

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**UNITED STATES OF AMERICA**

-vs-

**LEE BENTLEY FARKAS**
_____

**Case No. 5:10-mj-1028-GRJ**

**ORDER THAT DEFENDANT APPEAR IN DISTRICT OF PROSECUTION AND TRANSFERRING BAIL**

The defendant having appeared before this Court and proceedings having been concluded and the defendant released;

**IT IS ORDERED** that the defendant be held to answer in the United States District Court for the Eastern District of Virginia, Alexandria Division. The Clerk of Court shall transfer any bail deposited into the Registry of this Court to the Clerk of the Eastern District of Virginia for deposit into the registry of that Court.

The defendant shall appear at all proceedings as required. The defendant shall next appear for an Arraignment on July 2, 2010 at 9:00 a.m. before the Honorable Leonie M. Brinkema, United States District Judge, at the United States Courthouse, 401 Courthouse Square, Alexandria, Virginia.

June 25, 2010

**GARY R. JONES**
**United States Magistrate Judge**

Copies furnished to:

United States Attorney
United States Marshal
United States Pretrial Services
Counsel for Defendant
Clerk, Eastern District of Virginia
Defendant

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U.S. DISTRICT COURT
By:
Deputy Clerk

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
Golden-Collum Memorial Federal Building
and United States Courthouse
Office of the Clerk
207 N.W. Second Street
Ocala, Florida 34475
352-369-4860
www.flmd.uscourts.gov

Sheryl L. Loesch
Clerk

Jim Leanhart
Ocala Operations Supervisor

## UNITED STATES OF AMERICA

**-vs-**

**Case No. 5:10-mj-1028-GRJ**

## LEE BENTLEY FARKAS

---

## NOTICE OF SURRENDERED PASSPORT

To:    U.S. Department of State-Passport Services
Office of Citizenship Appeals and Legal Assistance
Attn: Deborah Solum
2100 Pennsylvania Ave., N.W., 3rd Floor
Washington, D.C. 20037

**PURSUANT** to Court order entered on June 23, 2010 in the above styled case, the Defendant's passport, number 450736503, was surrendered to the custody of the Clerk of Court on June 23, 2010. The defendant is not permitted to apply for the issuance of another passport during the pendency of this action.

| | |
|---|---|
| Defendant's date of birth: | August 22, 1952 |
| Defendant's place of birth: | New Mexico |
| Received by Clerk from: | Gerald Houlihan, Esq. |

SHERYL L. LOESCH, CLERK

*D. DeNicola*
By: D. DeNicola, Deputy Clerk

c:    Counsel of Record
Defendant
Pretrial Services (if before Judgment)
Probation Office (if after Judgment)
Appropriate Agency Listed Above
Passport Coordinator

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By:
Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.

Case No. 5:10-mj-1028-GRJ

LEE BENTLEY FARKAS
_____/

## ORDER

Pending before the Court are: (1) The Government's Motion For Pre-Trial
Detention (Doc. 2) and (2) Defendant's Opposition To Pretrial Detention And Motion For
Release On Bail With Conditions. (Doc. 8.) On June 23, 2010 the Court conducted a
detention hearing, at the request of the Defendant,[1] to address the Government's
motion for detention pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3142.

Defendant is charged in a sixteen count indictment in the Eastern District of
Virginia with conspiracy to commit bank fraud, wire fraud, and securities fraud in
violation of 18 U.S.C. § 1349, six counts of bank fraud in violation of 18 U.S.C. § 1344
and 2, six counts of wire fraud in violation of 18 U.S.C. § 1343 and 2, and three counts
of securities fraud in violation of 18 U.S.C. § 1348 and 2. The indictment describes a
complex scheme that – according to the government – resulted in a loss in excess of
$1.9 billion. If the Defendant is convicted of the charges in the indictment the penalties
are severe and would result in a very substantial term of imprisonment.

_____

[1] The Defendant was arrested during the early evening on June 15, 2010. Counsel for Defendant
requested a continuance of the initial appearance until June 17, 2010 so that counsel would have
additional time to meet with the Defendant. The initial appearance was conducted on June 17, 2010. At
the initial appearance counsel for the Defendant requested that the Court continue the detention hearing
until June 23, 2010 so that counsel would have sufficient time to prepare for the hearing.

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By_____
Deputy Clerk

The Government and the Defendant proceeded by proffer, as they were entitled, rather than presenting any witnesses or documentary evidence. [2]

The Government requested that the Court detain the Defendant arguing that he has both the motive and the means to flee. The scheme allegedly orchestrated by the Defendant is detailed by the Government in their motion and will not be repeated here. The Government emphasized at the hearing that the conduct of the Defendant in the scheme included actions designed to obstruct justice and resulted in the Defendant diverting ten of millions of dollars to himself. The Government described a lavish lifestyle enjoyed by the Defendant, which the Government contends was financed by the Defendant's criminal conduct alleged in the indictment. The Government characterized the Defendant as the architect, leader and chief beneficiary of the alleged conspiracy.

While the scope of the alleged fraud described by the Government is massive and extends over a seven year period of time, the Government did not proffer or point to any evidence suggesting that the Defendant maintained secret accounts, had access to foreign bank accounts or assets or even that the Defendant engaged in foreign travel. The Government's primary focus in support of its position that there is a high likelihood the Defendant would flee was on the severity of the penalties the Defendant would face if convicted and the large sums of money allegedly diverted to the Defendant as part of the alleged fraud.

---

[2] Section 3142(f) states that defendants may "present information by proffer or otherwise." The Government may also proceed by proffer. *See, e.g.* United States v. Gaviria, 828 F.2d 667, 669 (11th Cir. 1987).

2

The investigation of the alleged scheme has been ongoing since at least August 2009 when a federal search warrant was executed on the premises of Taylor, Bean & Whitaker Mortgage Corp. ("TBW"). At that time federal agents seized the business records and other items from TBW and began questioning the Defendant and other TBW employees concerning the operations of the Company. Around the same time, Colonial Bank, TBW's primary warehouse lender, was seized by the FDIC. TBW filed for bankruptcy shortly thereafter and seized doing business. Thus, since August 2009 the Defendant has not had any involvement with TBW.

According to counsel for Defendant, Defendant retained counsel in September 2009. Defendant's counsel made contact with the Government in September, and although the Government did not advise that the Defendant was a target, there is little question that the Defendant has been well aware of the criminal investigation and the strong possibility that he would be indicted. Indeed, according to counsel for Defendant, counsel provided the Defendant in October 2009 with legal advice detailing the possible nature of the charges which might be brought and the lengthy term of imprisonment the Defendant would face if convicted. Notably, despite knowing full well of the serious charges and penalties the Defendant might be facing, the Defendant did not flee, and there was no evidence presented that the Defendant took any action designed to prepare to flee to avoid prosecution. Rather, the Defendant continued to reside in Ocala and carry-on his normal life style.

The Government did, however, proffer evidence that the Defendant transferred at least two real estate assets to an individual with whom the Defendant previously had been in a long term committed relationship. One of the real estate assets was a million

3

dollar plus property in Silver Springs Shores, in Marion County, Florida and the other property was an apartment building located in Ocala, Florida. While the timing and circumstances of these transfers is highly suspicious the Defendant explained that the assets were transferred as part of a type of "marital settlement" with the Defendant's ex-significant other. A mortgage was placed upon one of the properties but according to the government the proceeds were invested by the Defendant's ex-boyfriend in a mortgage business, United Funding, located in Atlanta, Georgia. The Government advised that United Funding was not presently implicated in the investigation in this case and that the Defendant was only a passive investor in the business.

The Court was advised at the hearing that a temporary restraining order was entered by the Court in the Eastern District of Virginia which broadly enjoins the transfer of any assets by the Defendant or any individual(s) in concert with the Defendant. As the Court expressed at the detention hearing the entry of the restraining order is a significant factor in the Court's decision that detention is not appropriate and that there are conditions of release the Court can impose which would assure that the Defendant would appear and which would eliminate any concerns that the Defendant would be a flight risk. Because the Government has the effective control of the Defendant's assets through the issuance of the restraining order, any concerns raised by the Government that the Defendant has the means to flee the jurisdiction are speculative and certainly not sufficient to justify the entry of an order of detention.

As part of the determination of whether the Defendant should be detained or released, the Court is required to consider all reasonable, less-restrictive alternatives to detention and consider the factors listed in § 3142(g). While the charges are serious

4

and the government has proffered that it possess quality evidence in support of the charges against the Defendant – consisting of the Defendant's own emails and recorded conversations between the Defendant and the co-conspirators – the fact remains that the Defendant's assets effectively have been frozen and the government did not proffer any evidence suggesting that the Defendant had access to hidden or foreign assets. The Government also did not proffer any evidence demonstrating that the Defendant has any pre-disposition to flee other than the Government's reliance upon the severe penalties which would likely result if the Defendant was convicted.

A review of the Defendant's history and personal characteristics support the Defendant's request for bond. Defendant does not have any criminal history and he has resided in Marion County, Florida for over twenty-four years. Until recently the Defendant was well known in the community as a business leader and as an avid supporter of charitable causes. While the Defendant no longer enjoys the business relationships that he had prior to the collapse of TBW and the criminal investigation in this case, he has continued to reside in Marion County and apparently continues to carry-on his same daily routine, which includes frequenting the health club he owns. The Defendant's long and extensive business and community ties to Marion County strongly weigh in the Defendant's favor in the calculus of determining whether the Court can impose conditions of release sufficient to eliminate the risk of flight.

Accordingly, for the reasons summarized above, and for the reasons discussed by the Court in detail at the hearing, which are fully incorporated into this Order, the Government's Motion For Pre-Trial Detention is due to be **DENIED** and the Defendant's

Motion For Release on Bail With Conditions is due to be **GRANTED**. By separate order the Court has set the Conditions of Release deemed necessary and sufficient to assure the appearance of the Defendant at further proceedings including: (1) the execution by the Defendant of a $2,000,000.00 Appearance and Compliance Bond secured by mortgages on the Defendant's residence located in Ocala, Florida and further secured by a mortgage on real property located in Ft. Lauderdale, Florida owned by Defendant's ex-boyfriend and further secured by an agreement executed by Defendant's sister to forfeit her residence in the event the Defendant fails to abide by the terms of release; (2) a restriction on Defendant's travel; (3) supervision by pretrial services; (4) the monitoring of the Defendant through a GPS monitoring device, which will enable the supervising pretrial services officer to track the location of the Defendant at all times and in all geographic locations; (5) a prohibition on disposing of any assets in excess of $1,000.00 without court authorization; (6) a prohibition on engaging in any financial services or applying for any lines of credit without approval; and (7) prohibiting any contact directly or indirectly with witnesses, alleged co-conspirators or any individuals identified (under seal) by the Government who may be material to the prosecution of this case.

**DONE AND ORDERED** at Ocala, Florida this 23rd day of June 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:
United States Attorney
United States Marshal
Pretrial Services
Counsel for Defendant

6

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**UNITED STATES OF AMERICA**

-vs-

**Case No. 5:10-mj-1028-GRJ**

**LEE BENTLEY FARKAS**

**AUSA:** Patrick Stokes
**Deft. Attys.:** Gerald Houlihan (ret.), Brian McEvoy (ret.)

| JUDGE | Gary R. Jones | DATE AND TIME | June 23, 2010<br>9:30 a.m. - 12:30 p.m. |
|-------|---------------|---------------|------------------------|
| DEPUTY CLERK | Donna DeNicola | TAPE/REPORTER | Dennis Miracle |
| INTERPRETER | None Required | PRETRIAL/PROBATION | Bryan Coomer |

## CLERK'S MINUTES - DETENTION HEARING

Court GRANTS attorney Brian McEvoy's oral motion to appear *Pro Hac Vice*.

Argument by government.

Defendant's response.

Government's rebuttal.

Court DENIES government's motion for detention and sets bond at $2,000,000.00 secured with three properties. **ORDER SETTING CONDITIONS OF RELEASE TO ENTER.**

Court DENIES government's oral motion for the Court to stay its ruling.

**FILED IN OPEN COURT:**
Special Admission Attorney Certification Form

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

Case No.: 5:10-mj-1028-GRJ

UNITED STATES OF AMERICA,
                        Plaintiff

v.

LEE BENTLEY FARKAS,
                        Defendant.
_____/

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By
                    Deputy Clerk

## DEFENDANT'S OPPOSITION TO PRETRIAL DETENTION AND MOTION FOR RELEASE ON BAIL WITH CONDITIONS

The Defendant, Lee B. Farkas, moves to be released on bond pending trial.

The Bail Reform Act clearly favors non-detention. See, *United States v. Byrd,* 969 F.2d 106, 109 (5th Cir. 1992). For this reason, any doubts about the release of Lee B. Farkas on bail, with conditions, should be resolved in his favor. In support of this, Defendant Farkas shows as follows:

**I.      Introduction:**

Lee B. Farkas is not a flight risk. The government's evidence of "risk of flight" is sparse and conclusory and, in fairness, is based upon a "perceived danger" rather than a real serious risk of flight. The thrust of its case is related, not to evidence of a risk of flight, but primarily based upon an alleged pattern of fraudulent conduct. This is not enough under the Bail Reform Act.

Bryan Coomer, the U.S. Pretrial Services Officer, has evaluated the details of the indictment, the history and issues relating to Lee Farkas and has noted his significant residential and family ties with Ocala, Florida and does not suggest that Mr. Farkas is a physical danger to the community. Except for possession of a passport, which will be readily surrendered, the report does not seem to regard Mr. Farkas as a risk of flight. To the extent that there is any danger from any continuing fraud, sufficient restrictions can be placed upon Mr. Farkas' conduct to eliminate this issue. In

essence, although it does not make affirmative recommendations, the Report of the U.S. Pretrial Service does not support pre-trial detention and seems to favor release on bond with conditions.

Despite knowledge of and opportunity, Mr. Farkas has not prepared for, nor attempted any arrangements for relocation outside the jurisdiction of the United States. Except for infrequent cruise-ship vacations, Mr. Farkas has never been a frequent traveler to foreign countries. Furthermore, the sale and transfer of assets outlined by the government are consistent with his need to hire legal counsel to defend the anticipated charges, pay his ongoing living expenses despite having lost his employment and with maintaining his ongoing business interests.

Mr. Farkas has been aware he was a target of the criminal investigation as well as the likelihood of serious criminal charges since about August 2009, when there was a series of significant events including the FBI dramatic execution of a search warrant on Taylor Bean & Whitaker Mortgage Corp.; the seizure of Colonial Bank by the FDIC and the well-publicized investigation by the special SIGTARP unit of the Department of Justice.

When he was unexpectedly arrested on June 15, 2010, Mr. Farkas was going about his normal, day-to-day routine in Ocala: exercising in a gym - - - he was not fleeing.

## II. Pre-Trial Detention is Rarely Appropriate:

The Bail Reform Act at 18 U.S.C. §3142 governs the procedure that must be followed at a bail/detention hearing. If the prosecution seeks detention, it must establish that no condition or combination of conditions will reasonably assure the safety of the community and the defendant's appearance at trial. *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985); 18 U.S.C. 3142(f). It is a very heavy burden for the prosecution. If that burden is not met, bail must be set. "The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention." *Orta*, 760 F.2d at 891. As the *Orta* Court explained: "[T]he legislative history stresses that the decision to provide for pretrial detention is in no way a derogation of the importance

of the defendant's interest in remaining at liberty prior to trial. <u>It is anticipated that pretrial release will continue to be appropriate for the majority of Federal defendants.</u>" <u>Id</u>. at 890 (citing S.Rep. No. 225, 98th Cong., 1st Sess. p. 12) (emphasis in original).

Because the Bail Reform Act "limits the circumstances under which a district court may order pretrial detention," the Second Circuit has observed that unless the defendant has been charged with certain crimes enumerated in 18 U .S.C. § 3142(1), the government may move to seek such detention only "when there is a *serious risk* that the defendant will flee, or obstruct or attempt to obstruct justice."" *U.S. v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (emphasis added) (citing § 3142(1)(2)); see also, S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in 1984*U.S.C.C.A. 3182, 3189 (stating that "there is a small but identifiable group of particularly *dangerous* defendants as to whom neither the imposition of stringent release nor the prospect of revocation or release can reasonably assure the safety of the community or other persons").

Consistent with this, the statutory scheme continues to favor release over pretrial detention, providing the judicial officer with alternatives to structure an appropriate pretrial release. <u>Id</u>. at 890. "<u>Doubts regarding the propriety of release should be resolved in favor of the defendant.</u>" *United States v. Motamedi*, 767 F.2d at 1405 (9th Cir.1985) (emphasis added). "Even in presumptuous cases, the statutory presumption . . . is one factor but is not conclusive in the judicial officer's determination." *United States v. Sazenski*, 806 F.2d 846 (8th Cir. 1986). See *also United States v. Motamedi*, supra, 767 F.2d at 1407.

In *United States v. Salerno*, 481 U.S. 739, 755 (1987), the Supreme Court recognized that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception . . . ." See also *Parretti v. United States*, 122 F3.d 758, 778 (9th Cir. 1997).

Release conditions available include curfews, travel restrictions, reporting requirements and the use of electronic monitoring systems. See 18 U.S.C. Section 3142(D)(B); *United States v. Ojeda*

*Rios*, 846 F.2d 167, 169 (2d Cir. 1988).

### III. Burden of Proof:

This is a white collar case that involves charges of fraud which do not raise any statutory presumption favoring pre-trial detention. Accordingly, the Government is thus entitled to move for detention only on the argument, with proof by a preponderance of the evidence, that the defendant poses a serious risk of flight under 18 U.S.C. § 3142(f)(2)(A).

The defendant was arrested pursuant to the Grand Jury's Indictment that charged him with sixteen (16) counts of conspiracy, bank fraud, wire fraud, and securities fraud in violation of 18 U.S.C. §§ 2, 1343, 1344, 1348 and 1349. The defendant is not charged with a crime of violence or a narcotic crime, nor does he have any past criminal history, which are essential predicates for a presumption of detention and necessary for the government to seek to detention of this defendant as a danger to the community under 18 U.S.C. § 3142(f)(1).

The government has the burden to prove *both* that the defendant presents a risk of flight *and* that no condition or combination of conditions will reasonably assure the defendant's appearance as required. Allegations that the defendant has the incentive and resources to flee do not suffice to meet the requirements of the statute, and that is all that the government has relied upon in this case. For detention to be valid under the Bail Reform Act, the government's proof must be taken a critical step further: no matter how great the flight risk may appear to be, the government still must demonstrate, as a second element of the proof required of it, that that there are *no* conditions or combination of conditions which will reasonably assure the defendant's appearance. Even where the risk of flight is shown to be severe, and nothing of the sort has been alleged against Mr. Farkas, the defendant must, nonetheless, be released on conditions where, as here, there exists a combination of conditions which will reasonably assure the defendant's appearance.

### IV. The Bail Reform Act of 1984

4

The Bail Reform Act, Title 18 U.S.C. §§3141-3150, requires that the Court release Lee B. Farkas on personal recognizance or upon the execution of an unsecured appearance bond unless the Court determines that such release will not reasonably assure his appearance as required or will endanger the safety of any other person or the community. See, 18 U.S.C. §3142 (b); *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992).

If the Court finds that personal recognizance or bond will not reasonably assure appearance or will endanger safety, then the Court must consider attaching conditions to the release order. 18 U.S.C. §3142 (c); *Byrd* at 109. The Court may not detain Lee Farkas unless the Court, after a hearing, finds that no condition or combination of conditions will reasonably assure Mr. Farkas' appearance as required and the safety of any other person and the community. 18 U.S.C. §3142 (e); *Id* at 109. In determining whether there are conditions of release that will satisfy these requirements, the Court shall take into account the available information concerning the following issues:

## A. the nature and circumstances of the offense charged:

The nature and circumstances of the offense charged weigh in favor of pretrial release. Because the allegations against Lee B. Farkas do not involve violence or illegal narcotic drugs, there is no presumption for detention. 18 U.S.C. §3142 (g)(l).

This next consideration is important. In reviewing notorious cases of fraud, it appears the nature and circumstances of the financial fraud charges in our case are of the nature in which even an infamous defendant is typically granted pre-trial release, with conditions. These cases are as follows: *United States v. Bernard Madoff* (Defendant Madoff was charged with a $50 Billion fraud scheme in the Southern District of New York and was granted pre-trial release with conditions.); *United States v. Gregory Bell* (Defendant Bell, a

hedge fund manager, was charged with conspiracy to orchestrate what the government called a $3.5 billion Ponzi scheme from 1995 to 2008 in the District of Minnesota and he was granted pre-trial release with conditions.); *United States v. Scrushy* (Defendant Scrushy, the CEO of HealthSouth Corporation, was charged with a $1 Billion fraud scheme in the Northern District of Alabama and was granted pre-trial release with conditions.); *United States v. Henry T. Nicholas and William J. Reuhle* (These Broadcom Executives were charged with $1 Billion fraud scheme in the Central District of California and were granted pre-trial release with conditions.); *United States v. Jeffrey Skilling and Kenneth Lay* (These Defendants, the President and CEO of Enron, were charged with multi-billion dollar fraud schemes in the Southern District of Texas and were granted pre-trial release with conditions.); *United States v. John Rigas* (Defendant, an executive with Adelphia Communications, was charged with a $2.3 Billion fraud scheme in the Southern District of New York and was granted pre-trial release with conditions.); *United States v. Bernard Ebbers* (Defendant, the CEO of WorldCom, was charged with an $11 Billion fraud scheme in the Southern District of New York and was granted pre-trial release with conditions.

**B.** **the weight of the evidence against the person:**

This "weight of the evidence" factor is arguably the least important of the factors to be considered when considering bail. *See, United States v. Gebro,* 948 F.2d 1118 (9th Cir. 1991) (the weight of the evidence is the least important of the factors); *United States v. Motamedi,* 767 Fold 1403, 1408 (9th Cir. 1985) (Bail Reform Act neither requires nor permits a pretrial determination of guilt); *see also United States v. Barnett,* 986 F. Supp. 385,393 (W.D. LA. 1997) (favorably citing *Gebro* and *Motamedi* for the propositions stated).

At this stage of the proceedings, Lee B. Farkas is presumed innocent. In addition,

Lee B. Farkas denies that he was knowingly and intentionally involved in an illegal and fraudulent scheme either at his business at TBW or with regard to Colonial Bank. When given the opportunity, he will enter a plea of not guilty.

In the indictment and in its motion, the government uses inflammatory rhetoric and hyperbole to obscure the context that the allegations are calculated to justify pre-trial detention. The Indictment reveals that the government's allegations against Mr. Farkas will depend upon proof of complex and sophisticated factual and legal theories. The nature of the factual basis stated in the Indictment suggests that much of the government's case has been generated through the use of persons cooperating with the government in the building of a case against Lee Farkas, with the hope that they may, by cooperating, lessen the consequences of their own misconduct. Clearly, the" weight of the evidence" factor requires intelligent consideration beyond a perfunctory determination of probable cause. Moreover, Congress at any time since 1984 could have easily exempted indicted cases from application of this §3142 (g) factor, but Congress has not done so. The complex character and uncertain source of key aspects of the government's prospective proof argue against assessing any substantial weight to the evidence in favor of detention. Because the Bail Reform Act clearly favors non-detention, *United States v. Byrd,supra,* at 109, any doubts about resolution of this factor should be resolved in Lee Farkas' favor.

**C.      the history and characteristics of the person:**

The history and characteristics of Lee Farkas weigh in favor of pretrial release. These are summarized as follows:

**(a) Character.**

Contrary to the government's suggestion, Mr. Farkas does not have or maintain a foreign bank account. Mr. Farkas, a citizen only of the United States, has no

criminal background or history of flight. He enlisted in the New Mexico Air National Guard in 1971 and was honorably discharged in 1977. He does not speak any foreign languages and has maintained strong family and community ties in Ocala, Florida where he has resided for nearly 24 years.

Throughout the course of his lifetime, Lee Farkas has exhibited strong character and solid work ethic; a dedication to charity and compassionate understanding of the less fortunate. Mr. Farkas always maintained financial responsibility for his sister and his other dependents. While living in Ocala for nearly 24 years, Mr. Farkas has been on the forefront of charitable activities that have become the standard for good works within the community.

**(b) Physical and mental condition.**

Lee Farkas is physically and mentally healthy. There is no condition exists that would prevent him from appearing in court or from complying with any condition of release that the Court may impose. The Court can be assured that Mr. Farkas will deal with the stress of indictment and impending trial in a healthy and responsible manner. During the stress of his sudden arrest on June 15, 2010, Mr. Farkas was responsive to federal agents and calmly complied with their instructions.

**(c) Family ties.**

Lee Farkas maintains solid relationships with Terri Huber, his sister, his colleagues, his close friends and those with whom he shares a special relationship. In 1973, upon the unexpected death of his father, Mr. Farkas left college and started to work to support his mother and family.

**(d) Employment and financial resources.**

Lee Farkas is unemployed and has been selling his assets to maintain his life. He has substantial assets and, although the Court in the Eastern District of Virginia has issued a temporary restraining order, he is likely to be able to have adequate financial support to maintain a residence in Ocala and meet the cost of any conditions of release that the Court may impose.

However, Mr. Farkas no significant means for flight. Mr. Farkas has little cash and no foreign bank accounts. Although Mr. Farkas has substantial assets and ongoing business interests, those assets and business interests are solely within the United States, they are easily monitored and require his presence and attention in the United States. Moreover, the assets have been frozen by Court Order.

**(e) Length of residence in the community and community ties.**

Lee Farkas grew up in New Mexico. He has lived in Ocala, Florida for nearly 24 years. He maintains several businesses in Ocala, Florida and has been a valued member of the community. For many years Mr. Farkas based much of his business in Ocala, Florida and has maintained significant community ties through his business relationships. Understandably, many of Mr. Farkas' business relationships have ceased to exist or suffered due to the closing of TBW and the investigation. However, he continues to enjoy the support of a number of local friends and former employees. More important for these issues, Mr. Farkas does not maintain any residence, or a foreign bank account, or have any community ties in any other country whatsoever. He is not widely travelled and does not speak a foreign language. He is easily recognizable and does not have any relationships in any foreign country.

**(f) Past conduct.**

Throughout his life, Lee Farkas has conducted himself in a legal and dignified manner.

**(g) History relating to drug or alcohol abuse.**

Mr. Farkas has no history of alcohol or drug abuse. Although Mr. Farkas has consumed alcohol in social settings throughout his adult life, he is not dependent upon alcohol or drugs for any reason and has no other substance abuse history.

**(h) Criminal history.**

Lee B. Farkas has no criminal history. The allegations in the Indictment are unproven and Lee B. Farkas maintains his innocence.

**(i) Record concerning appearance at court proceedings.**

The government has not given Lee Farkas an opportunity to voluntarily

appear at any court proceedings on his own. Since he retained counsel, and counsel was in consistent communication with the government, there would have been voluntary surrender upon notice. Instead, the government elected a grandstand arrest in his home town to generate massive adverse publicity. If the government had afforded Mr. Farkas the opportunity, he would have appeared as required.

**D.    Lee B. Farkas' release will pose no danger to the community**

This factor weighs in favor of release. The offense charged does not involve any acts of violence or any other conduct that would constitute a danger to the community or any individual. There is no other evidence exists to indicate that Mr. Farkas would be a physical danger to anyone. The Report of Pretrial Services supports this statement.

**V.    The Penalty:**

The government has used statutory maximums to the various charges in an attempt to compound the implications of a massive penalty. This is an effort to claim a "life sentence" to qualify for the statutory presumption. This is not permitted under the Bail Reform Act. In addition, the Court is well aware of the fact that statutory maximums in sentencing guidelines are rarely, if ever, controlling and hardly realistic.

In addition, the potential penalty under the Sentencing Guidelines, even though now advisory, is dependent upon a number of factors not present in this case. In addition, they are dependent upon findings by the Court, so therefore, the government calculations are not controlling .

**VI.    Pre-Trial Detention Will Deny Due Process:**

As a matter of fact and law, pre-trial detention will substantially interfere with Lee Farkas' ability to assist in the preparation of his defense. The criminal proceedings against Lee B. Farkas will be substantial and preparation of his defense will involve many hundreds of meetings with Lee B. Farkas, financial experts, and other lawyers. The majority of these meetings will require examination of documents and the use of computers. If Lee Farkas is detained pending trial, his

lawyers and financial experts will be severely constricted in their ability to prepare a meaningful defense

The government's argument about the complexity of the alleged scheme is the highest and best evidence of why Mr. Farkas needs to be able to participate in his own defense. If he were to be confined, that would be tantamount to "tying his hands behind his back" before trial so he cannot adequately defend himself.

In short, if Mr. Farkas is not released, a fair trial of this case will be doubtful. *See* Albert W. Alschuler, *Preventive Pretrial Detention and the Failure of Interest-Balancing Approaches to Due Process*, 85 Mich. L. Rev. 510, 516 (Dec. 1986) ("incarceration affects a defendant's appearance and impedes his ability to consult lawyers, locate witnesses, and otherwise prepare a defense. The available empirical studies of effects of detention may not be conclusive, for perfect controls are unattainable. Nevertheless, these studies strongly suggest that pretrial incarceration makes both conviction and a severe sentence more likely").

That burden becomes even greater when pretrial detention severely compromises a defendant's ability to prepare for trial, particularly one, as here, which will be a complex and financially sophisticated case, involving millions of pages of documents that have not yet been provided by the government. Since Mr. Farkas voluntarily relinquished control of TBW in August 2009, he has been consistently denied access to documents and information necessary for his defense. If he is in jail, his ability to assist his lawyers will be severely compromised.

The assistance of counsel during the period of pretrial preparation is particularly critical. Indeed, it is indispensable to a defendant's ability to obtain a fair trial. As the Supreme Court has recognized:

> "the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself."

*Maine v. Moulton*, 474 U.S. 159, 170 (1985). *See Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel . . . When this interest is inadequately respected during pretrial confinement the ultimate fairness of their eventual trial can be compromised"); *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978)("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense"), *rev'd on other grounds, Bell v. Wolfish*, 441 U.S. 520 (1979); *see also Basciano v. Martinez*, 2007 WL 2119908 (E.D.N.Y. 2007) (recommending that district court grant relief based on infringement of Sixth Amendment right caused by institution's requirement that meetings with counsel be non-contact ones, where detainee's counsel "vividly described the volume of documents they must review with their client during a typical meeting and the lengthy and burdensome process entailed by the requirement that this review be conducted through a screen with two sets of documents, rather than side by side," and "repeatedly emphasized that the time lost through this cumbersome procedure was impairing their ability to prepare for trial").

### VII. There is No Evidence of a Flight Risk:

There is no evidence of a flight risk. The government is unable to show any reasonable likelihood of the propensity, ability or inclination to flee the jurisdiction of the Court. Even if the government could show that Mr. Farkas presented a flight risk, *and there is no evidence of this*, the government has already taken control of his assets, thereby depriving him of the means to do so.

Furthermore, even if the government could adduce some evidence to suggest that Mr. Farkas is a flight risk - *and it cannot* - Mr. Farkas is willing to agree to reasonable restrictions on his freedom. Specifically, we propose that Mr. Farkas be released on a personal recognizance bond, secured by Mr. Farkas's house in Ocala, Florida and that Mr. Farkas be subject to electronic home

monitoring. The statistics of electronic monitoring has demonstrated it to be an effective means to eliminate the risk of flight. Accordingly, such conditions would provide more than reasonable assurance that Mr. Farkas will appear for trial in this matter.

In reality, the government cannot meet its burden of proving that Mr. Farkas is a flight risk, much less that there are no conditions that will provide reasonable assurance that Mr. Farkas will appear for trial in this matter. Furthermore,

1.  He is not a "serious risk" of flight, within the meaning of 18 U.S.C. §3142(f)(2)(A);

2.  He poses no "serious risk" of danger to the community within the meaning of 18 U.S.C. §3142(f)(2)(B);

3.  There are appropriate conditions that can be structured which will assure Mr. Farkas' appearance at all proceedings as required, and will protect the safety of the community, within the meaning of 18 U.S.C. §3142(c).

4.  The government proffer fails to make the threshold showing to allow for a consideration of detention and that it failed to make any showing under the law that Mr. Farkas is a flight risk of the caliber mandating pre-trial detention.

**VIII. Conclusion:**

In sum, it is recognized under the Bail Reform Act that pretrial detention is a remedy of last resort. Unlike other cases in which risk of flight has been found, such as the cases cited by the government and *United States v. Coonan*, 826 F.2d 1180 (2nd Cir. 1987), this defendant was never a fugitive, does not have foreign contacts, does not maintain a foreign band account and, in fact, has previously responded in a diligent and appropriate manner to issues related to the investigation. Here, despite direct and meaningful instruction from his lawyer about the likelihood of indictment and the significance of a lengthy sentence, Mr. Farkas continued to conduct his life in a normal manner without any hint of an inclination to flee the jurisdiction. At the time of his arrest, he was working out in the gym in Ocala, Florida, part of his usual routine. In this case, release on bond is mandatory under 18 U.S.C. §3142(c) unless danger or flight risk have been properly shown. Also,

under the statute, a release on conditions must be with the "least restrictive" conditions possible.

WHEREFORE, we respectfully request that Lee Farkas be released on bond with reasonable conditions. These conditions, together with a complete analysis of the defendant's background, including his previous responsible behavior while under investigation and throughout his life, when measured against the insistence of the Bail Reform Act that pretrial detention be used as a remedy of last resort, justify the release of Mr. Farkas on bond, with conditions.

Respectfully submitted,
    s/Gerald J. Houlihan
Gerald J. Houlihan (Florida Bar Number 0458430)
Email: houlihan@houlihanlaw.com
HOULIHAN & PARTNERS, P.A.
2332 Galiano Street, Second Floor
Miami, Florida 33134
Telephone:    (305) 460-4091
Facsimile:    (305) 397-0955
Co-Counsel for Defendant Lee B. Farkas

CO-COUNSEL:
Anthony L. Cochran
Ga. Bar No. 172425
Brian F. McEvoy
Ga. Bar No. 490845
CHILIVIS, COCHRAN, LARKINS & BEVER, LLP
3127 Maple Drive, NE
Atlanta, Georgia 30305
Telephone:    (404) 233-4171
Facsimile:    (404) 261-2842
alc@cclblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those who are not authorized to receive electronically Notice of Electronic Filing.

s/ Gerald J. Houlihan
Gerald J. Houlihan

## SERVICE LIST

**Patrick F. Stokes**
Deputy Chief, Fraud Section
United State Department of Justice
1400 New York Avenue, NW
Fourth Floor
Washington, DC 20005
Telephone: 202-305-4232
Facsimile: 202-514-7021
Email: Patrick.stokes2@usdoj.gov

AO 470 (01/09) Order Scheduling a Detention Hearing

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

## UNITED STATES OF AMERICA

-vs-                                        Case No.  5:10-mj-1028-GRJ

## LEE BENTLEY FARKAS

### ORDER SCHEDULING A DETENTION HEARING

A detention hearing is scheduled as follows:

| Place: | United States Courthouse 207 N.W. Second Street Ocala, Florida  34475 | Courtroom No: 1A |
|--------|--------|--------|
| | | Date and Time:  June 23, 2010 at 9:30 AM |

**IT IS ORDERED:**  Pending the hearing, the defendant is to be detained in the custody of the United States Marshal or any other authorized officer.  The custodian must bring the defendant to the hearing at the time, date, and place set forth above.

Date:  June 17, 2010

GARY R. JONES
**United States Magistrate Judge**

Copies furnished to:

United States Attorney
United States Marshal
United States Pretrial Services
Counsel for Defendant
Defendant c/o U.S. Marshal

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By
Deputy Clerk

AO 466A (Rev 12/09) Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**FILED IN OPEN COURT**
OCALA, FLORIDA

JUN 17 2010

**UNITED STATES OF AMERICA**

CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

-vs-

**Case No. 5:10-mj-1028-GRJ**

**Charging District's Case No. 1:10-CR-200**

**LEE BENTLEY FARKAS**

## WAIVER OF RULE 5 & 5.1 HEARINGS
### (Complaint or Indictment)

I understand that I have been charged in another district, the Eastern District of Virginia.

I have been informed of the charges and of my rights to:

   (1)   retain counsel or request the assignment of counsel if I am unable to retain counsel;
   (2)   an identity hearing to determine whether I am the person named in the charges;
   (3)   production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;
   (4)   a preliminary hearing within 14 days of my first appearance if I am in custody and 21 days otherwise - unless I am indicted - to determine whether there is probable cause to believe that an offense has been committed;
   (5)   a hearing on any motion by the government for detention;
   (6)   request transfer of the proceedings to this district under Fed.R.Crim.P. 20, to plead guilty.

**I agree to waive my right(s) to:**

   ☒   an identity hearing and production of the warrant.

   ☐   a preliminary hearing

   ☐   a detention hearing

   ☐   an identity hearing, production of the warrant, and any preliminary or detention hearing to which I may be entitled in this district. I request that those hearings be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

June 17, 2010

_____
Defendant's signature

_____
Signature of defendant's attorney

Gerald J. Houlihan
_____
Printed name of defendant's attorney

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By _____
Deputy Clerk

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**UNITED STATES OF AMERICA**

**-vs-**                                                    **Case No. 5:10-mj-1028-GRJ**

**LEE BENTLEY FARKAS**                       **AUSA: Patrick Stokes, Sam Armstrong**
                                                              **Deft. Atty.: Gerald Houlihan (ret.)**

| JUDGE | Gary R. Jones | DATE AND TIME | June 17, 2010 2:30 p.m. - 3:15 p.m. |
|---|---|---|---|
| DEPUTY CLERK | Donna DeNicola | TAPE/REPORTER | Kelly Owen from Owens & Associates |
| INTERPRETER | None Required | PRETRIAL/PROBATION | Bryan Coomer |

## CLERK'S MINUTES - INITIAL APPEARANCE (RULE 5(c))

Defendant arrested __6/15/10__ on an Indictment from the Eastern District of Virginia, Alexandria Division.

Defendant appearing with retained attorney Gerald Houlihan.

Defendant advised of rights, charges, penalties and special assessment.

Defendant waives his right to an identity hearing. **ORDER TO ENTER.**

Court advises defendant of his rights pursuant to Rule 20.

Government has filed a Motion for Pre-Trial Detention (Doc. 2).

Defendant requests a continuance of the detention hearing.

Court GRANTS defendant's request for a continuance and schedules the Detention Hearing for Wednesday, 6/23/10 at 9:30 a.m. **ORDER OF TEMPORARY DETENTION TO ENTER.**

**FILED IN OPEN COURT:**
Waiver of Rule 5 & 5.1 Hearings

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By_____
Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                                              5:10-mj-1028-GRJ

LEE BENTLEY FARKAS
_____/

## ORDER

Pending before the Court is Defendant Lee Farkas' Motion For Continuance of

Initial Appearance. (Doc. 3.) The Defendant was recently arrested in the Ocala Division

on an indictment from the Eastern District of Virginia Motion. The Defendant requests

that the Court continue his initial appearance from June 16, 2010 to June 17, 2010 so

that he may have time to consult with counsel, Gerald J. Houlihan.

Accordingly, with the Defendant's consent, and upon due consideration,

Defendant Lee Farkas' Motion For Continuance of Initial Appearance is **GRANTED**. The

initial appearance is rescheduled before Magistrate Judge Gary R. Jones for **Thursday,**

**June 17, 2010 at 2:30 p.m.** at the United States Courthouse, Courtroom 1A, 207 N.W.

Second Street, Ocala, Florida.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on June 16, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel
    Pretrial Services
    United States Marshal

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By:
Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

Case No.: 5:10-mj-1028-GRJ

UNITED STATES OF AMERICA,
                Plaintiff
v.

LEE BENTLEY FARKAS,
                Defendant.
_____/

## DEFENDANT LEE FARKAS' MOTION FOR CONTINUANCE
## OF INITIAL APPEARANCE

The Defendant, Lee B. Farkas, moves for a continuance of his initial appearance from

June 16, 2010 until June 17, 2010. Mr. Farkas so moves in order to consult with counsel as Mr.

Farkas was taken into custody last night, June 15, and under the circumstances will be unable to

consult with counsel before an initial appearance today, June 16.

Respectfully submitted,

    s/Gerald J. Houlihan
Gerald J. Houlihan (Florida Bar Number 0458430)
Email: houlihan@houlihanlaw.com
HOULIHAN & PARTNERS, P.A.
2332 Galiano Street, Second Floor
Miami, Florida 33134
Telephone: (305) 460-4091
Facsimile: (305) 397-0955
Co-Counsel for Defendant Lee B. Farkas

CO-COUNSEL:
Anthony L. Cochran
Ga. Bar No. 172425
CHILIVIS, COCHRAN, LARKINS & BEVER, LLP
3127 Maple Drive, NE
Atlanta, Georgia 30305
(404) 233-4171
(404) 261-2842 (facsimile)
alc@cclblaw.com

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By: _____
    Deputy Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those who are not authorized to receive electronically Notice of Electronic Filing.



s/ Gerald J. Houlihan
Gerald J. Houlihan

## SERVICE LIST

**Patrick F. Stokes**
Deputy Chief, Fraud Section
United State Department of Justice
1400 New York Avenue, NW
Fourth Floor
Washington, DC 20005
Telephone:    202-305-4232
Fascimile:    202-514-7021
Email: Patrick.stokes2@usdoj.gov

FILED

IN THE UNITED STATES DISTRICT COURT FOR THE 2010 JUN 16 AM 10: 27

MIDDLE DISTRICT OF FLORIDA            CLERK U.S. DISTRICT COURT
                                              OCALA FLORIDA

Ocala Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 5:10-mj-1028-GRJ |
| | ) | |
| LEE BENTLEY FARKAS, | ) | Magistrate Judge Gary R. Jones |
| | ) | |
| Defendant. | ) | |
| | ) | |

### The Government's Motion
### for Pre-Trial Detention

The United States of America, by and through its undersigned attorneys, moves this

Court, pursuant to the Bail Reform Act, to detain Defendant Lee Bentley Farkas pending trial.

The defendant orchestrated a seven-year, nearly $2 billion fraud scheme that contributed to the

failure of Colonial Bank, one of the 50 largest banks in the United States, and Taylor, Bean &

Whitaker Mortgage Corp. ("TBW"), one of the largest, privately held mortgage lending

companies in the United States. The defendant and his co-conspirators disguised this massive

and complex scheme in part by creating false documents and moving hundreds of millions of

dollars between TBW, Colonial Bank and other entities. And after learning of the government's

investigation into TBW, the defendant instructed a co-conspirator to destroy evidence and sought

to cover up the scheme. The defendant, if convicted, is likely facing a sentence that would result

in him spending the rest of his life in prison, and he has amassed substantial wealth that would

enable him to flee to avoid prosecution. He has both the motive and the means to flee, and no

1

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT
By
              Deputy Clerk

condition or combination of conditions will reasonably assure his appearance at future judicial proceedings in this case.

I. **BACKGROUND**

A. **Indictment & Charges**

On June 15, 2010, a duly empanelled federal grand jury sitting in the Eastern District of Virginia returned a sixteen-count indictment charging the defendant with one count of conspiracy to commit bank fraud, wire fraud, and securities fraud, in violation of Title 18, United States Code, Section 1349; six counts of bank fraud, in violation of Title 18, United States Code, Sections 1344 and 2; six counts of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2; and three counts of securities fraud, in violation of Title 18, United States Code, Sections 1348 and 2.

As a result of the indictment, the defendant faces a total statutory maximum sentence of 435 years, fines of at least $13.75 million and forfeiture of at least $22 million. More directly, a preliminary Sentencing Guidelines calculation results in a sentencing range of life in prison. As discussed in more detail below, for the defendant, who is in his late fifties, this factor alone creates a substantial risk of flight.

B. **Investigation**

In February 2009, the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") commenced an investigation into Colonial BancGroup ("BancGroup"), a public company that was the parent of Colonial Bank. SIGTARP's investigation initially focused on the accuracy of statements made by BancGroup to its regulators, as well as the accuracy of statements made to the United States Treasury Department in connection with BancGroup's application to receive over $550 million from the Troubled Asset Relief Program ("TARP"). In

2

April 2009, SIGTARP served subpoenas on both BancGroup and TBW. Shortly thereafter, the

investigation expanded to include agents from the FBI, FDIC-OIG, and HUD-OIG. The

expanded investigation led to the execution in August 2009 by federal agents of search warrants

at Colonial Bank's Mortgage Warehouse Lending Division ("MWLD") in Orlando, Florida, and

at TBW in Ocala, Florida.

On August 14, 2009, the Alabama State Banking Department seized Colonial Bank and

the FDIC was appointed as receiver. Through the FDIC, Branch Banking & Trust Co.

("BB&T") assumed most of Colonial Bank's deposits and purchased approximately $22 billion

of Colonial Bank's assets. Following Colonial Bank's seizure and subsequent sale to BB&T,

BancGroup filed for bankruptcy in the Middle District of Alabama. On August 24, 2009, TBW

filed for bankruptcy in the Middle District of Florida.

### C.    Underlying Fraud Scheme

The government has gathered substantial evidence of the charged scheme, including

emails and other electronic communications, financial records detailing the fraud scheme,

recorded phone calls between co-conspirators, and statements from many former TBW and

Colonial employees, including from key co-conspirators that are cooperating with the

government's investigation. The following description of the fraud scheme, as well as the

evidence related to the government's argument for pre-trial detention, is based both on the

indictment and on the government's proffer. *See United States v. Gaviria*, 828 F.2d 667, 669

(11th Cir. 1987) ("We hold that the government as well as the defense may proceed by

proffering evidence subject to the discretion of the judicial officer presiding at the detention

hearing.").

3

From in or about 2002 and continuing through in or about 2009, the defendant was the chairman and largest shareholder of TBW. TBW was principally involved in the origination, purchase, sale, and servicing of residential mortgage loans. TBW generally sold these loans in the secondary mortgage market to third-party investors, including the Federal Home Loan Mortgage Corporation ("Freddie Mac") and commercial financial institutions. TBW originated and purchased tens of billions of dollars in new residential loans on an annual basis. To fund its mortgage loan originations and acquisitions, TBW relied on various purchase facilities, credit lines, and financing vehicles, primarily with Colonial Bank and, starting in or about 2005, Ocala Funding, LLC, a wholly owned special purpose subsidiary of TBW.

Beginning in or about early 2002, however, TBW began to experience significant cash flow problems due to, among other things, operating deficits. In an effort to cover the shortfalls, the defendant and co-conspirators devised a number of different means to accomplish the same goal: to misappropriate money for TBW's benefit and for the personal benefit of the defendant and his co-conspirators. The defendant and his co-conspirators misappropriated nearly $2 billion from Colonial Bank, from Ocala Funding accounts, and eventually attempted to misappropriate over $500 million in additional funds from the U.S. government through TARP. The different means employed by the conspirators included the: (i) sweeping scheme; (ii) Plan B; (iii) fake AOT Trades; (iv) "Crap" loans; (v) recycling; (vi) Ocala Funding diversion; and (vii) TARP and Project Squirrel.

### 1.    *The Sweeping Scheme*

Beginning in 2002, TBW began running overdrafts in its master bank account at Colonial Bank due to TBW's inability to meet its operating expenses. Conspirators at TBW and Colonial Bank covered up the overdrafts by transferring, or "sweeping," overnight money from a TBW

4

account with excess funds into the master account to avoid the master account falling into an overdrawn status. This sweeping of funds covered up the fact that TBW's master account was overdrawn. The day after sweeping funds, the conspirators returned the funds to the other account, only to repeat the process that day to hide the deficit again.

As a result of this sweeping scheme, the size of the deficit due to overdrafts grew to tens of millions of dollars. In response, the defendant and co-conspirators devised Plan B, a scheme designed to disguise the deficit as mortgage loan assets purchased by Colonial Bank.

### 2. *Plan B*

In this part of the scheme, which the defendant and his co-conspirators called "Plan B," the conspirators sought to disguise the tens of millions of dollars of overdrafts as payments related to the purchase by Colonial Bank through its COLB facility of legitimate TBW mortgage loans.[1] In late 2003, the defendant and his co-conspirators caused the deficit in TBW's master account at Colonial Bank to be transferred to COLB. The defendant and co-conspirators accomplished this by causing TBW to provide false mortgage loan data to Colonial Bank under the pretense that it was selling the bank interests in mortgage loans. But, as the defendant knew, TBW had already committed or sold the Plan B mortgage loans to other third-party investors. As a result, these loans were not available for sale to Colonial Bank.

This late 2003 transfer did not solve TBW's problem with operating losses and as TBW continued to experience funding shortfalls, the defendant and co-conspirators engaged in additional sales of Plan B loans to Colonial Bank causing Colonial Bank to advance to TBW tens of millions of additional dollars. In reality, the underlying Plan B loans were worthless to

---

[1] COLB was a mortgage loan purchase facility at MWLD. Through the COLB facility, Colonial Bank purchased an interest in residential mortgage loans from TBW pending resale of the loans to third-party investors.

5

Colonial Bank. The Plan B stage of the scheme caused Colonial to buy tens of millions of dollars worth of fake assets and to falsely record the worthless assets in its accounting records at face value.

The defendant frequently communicated with his co-conspirators about the use of Plan B loans to cover shortfalls at TBW. For example, on or about December 22, 2003, the defendant emailed a Colonial Bank co-conspirator ("CC1"), who tracked the Plan B loans, that "[w]e did $6 [million] and change of additional Plan B which should advance today. This is to cover the negative we expect through Jan 31. I am the only person at TBW involved in this transaction. Thanks." In another email communication in March 2004, the defendant responded to an inquiry from another Colonial Bank co-conspirator ("CC2") who asked whether certain loans were "real," by saying "[t]hey are plan b loans." And in a June 2004, email, the defendant told a TBW co-conspirator ("CC3"): "We need to recycle the Plan B loans. We need recently purchased WAMU [Washington Mutual] loans that are not in the Colonial vault yet. They want to replace all the plan B stuff with this as soon as possible."

While Plan B did in large part conceal the deficit caused by the Sweeping Scheme, it did not eliminate TBW's continuing overdrafts of its accounts held at Colonial. For example, in July 2004, CC2 emailed the defendant about overdrafts in TBW tax and insurance accounts, stating: "You need to wire money into this account to get it off the OD [overdraft] report. It does not look good to have a T&I [tax & insurance] account on the OD report." The defendant responded: "when [sic] I get an adjoining suite with martha stewart [sic], it will be worse. i [sic] never should have used that money in the first place."

6

### 3.  *Fake AOT Trades*

The Plan B loans, however, became more and more difficult to hide, and in 2005 the

defendant and co-conspirators caused the deficit created by Plan B to be moved from the COLB

facility to MWLD's Assignment of Trade ("AOT") facility.[2]  The conspirators moved the Plan B

deficit to the AOT facility in part because, unlike with the COLB facility, Colonial Bank

generally did not track in its accounting records loan-level data for the Trades held on AOT.

Therefore, it was more difficult for regulators, auditors, bank management, and others to detect

the scheme.

In an effort to transfer the deficit caused by the Plan B loans on the COLB facility to the

AOT facility, the defendant and co-conspirators caused TBW to engage in sham sales to

Colonial Bank of fabricated Trades purportedly backed by pools of Plan B loans.  In fact, the

Trades had no collateral backing them and thus were worthless.  Colonial Bank held these fake

Trades in its accounting records at face value, that is, the amount Colonial paid for them.

After moving the Plan B deficit from COLB to AOT, TBW continued to experience

significant operating losses, and from in or about 2005 through in or about 2009, the defendant

and co-conspirators continued to cause TBW to sell hundreds of millions of dollars of additional

fabricated Trades to Colonial Bank through the AOT facility.  In total, the conspirators sold

Colonial Bank more than $400 million in fabricated Trades.

To support these fraudulent transactions, the defendant and co-conspirators caused false

data and documentation to be sent to Colonial Bank.  For example, TBW co-conspirators sent

Colonial Bank co-conspirators schedules listing fabricated Trades with unique identifying

numbers that TWB co-conspirators reused from Trades previously sold to other investors.

---

[2]  The AOT facility was designed for the purchase of an interest in a pool of loans—referred to as
a "Trade"—that was in the process of being securitized and/or sold to a third-party investor.

### 4.    The "Crap" loans

In addition to causing Colonial Bank to purchase fabricated Trades, the defendant and co-conspirators caused significant numbers of impaired-value mortgage loans that TBW had been unable to sell to be hidden on the AOT facility by using them to collateralize Trades that Colonial Bank purchased through the AOT facility.  These loans included, among other things, loans in default and loans that were considered "aged" and thus of lesser value because TBW had been unable to sell them in the secondary mortgage market.  These Trades were also sometimes collateralized by bank-repossessed properties associated with foreclosed loans, known as real estate owned (REO).  Co-conspirators referred to these impaired-value loans and REO as, among other things, "Crap."

Because TBW was generally unable to sell the Trades containing Crap, the defendant and co-conspirators caused these pools to be repackaged as new Trades with fabricated agreements purporting to reflect commitments by third parties to purchase the mortgage loan assets.  These fabricated agreements were often signed by the defendant, or, by a TBW co-conspirator ("CC4") on behalf of the defendant.  As a result, some of the Crap remained disguised on the AOT facility for a period of years, despite the AOT facility being designed for assets to be resold within 30 to 60 days.

### 5.    Recycling

In a continuing effort to hide the fraudulent scheme, the defendant and co-conspirators recycled the fake and impaired Trades on AOT by engaging in sham sales to hide the fact that the vast majority of assets backing the Trades could not be resold because the assets were either wholly fabricated or consisted of Crap.  For example, conspirators provided fabricated documents to Colonial Bank that purported to represent new AOT Trades.  These documents

8

caused Colonial Bank to advance money from its bank accounts to TBW-controlled bank accounts. Near in time, conspirators directed payments from the TBW-controlled bank accounts back to Colonial bank accounts to give the false appearance that expiring Trades had been sold to investors. These advances and paydowns amounted to round-trip transactions, which generally left TBW and Colonial Bank in a similar financial position as before the transactions.

The defendant was well aware of the recycling. For example, during the execution of search warrants by federal agents at Colonial Bank's MWLD and TBW's main office on or about August 3, 2009, the defendant sent an electronic communication to CC2, stating that the federal agents "will figure out that the agency stuff was recycled if they get [CC1's] laptop[.]"

### 6. *Ocala Funding Diversion*

The defendant and his co-conspirators defrauded Colonial Bank of over $400 million in funds through the COLB and AOT facilities alone. Yet this was still not enough money to keep TBW in business, so the defendant and his co-conspirators caused TBW to misappropriate money from Ocala Funding. The defendant and co-conspirators caused the diversion of hundreds of millions of dollars from Ocala Funding bank accounts, located at LaSalle Bank, to cover TBW's mounting operating losses. As a result of these diversions, Ocala Funding experienced significant shortfalls in the amount of collateral it possessed to back the commercial paper it had issued to financial institution investors, primarily Deutsche Bank and BNP Paribas.

To cover up the collateral shortfalls, the defendant and co-conspirators caused false information to be sent to the financial institution investors, including Deutsche Bank and BNP Paribas, in documents that inaccurately and intentionally inflated figures representing the aggregate value of the loans held in the Ocala Funding facility or under-reported the amount of outstanding commercial paper. By doing so, the defendant and co-conspirators sought to

9

mislead investors into believing that there was sufficient cash and mortgage loan collateral to back the outstanding commercial paper owned by the investors. The defendant and co-conspirators also caused Ocala Funding to sell mortgage loans that they knew belonged to Colonial Bank to Freddie Mac. As a result, conspirators caused Colonial Bank and Freddie Mac to have disputed ownership interests in the same approximately 4,800 mortgage loans worth more than $700 million.

As a result of the misappropriations, cover up, and double-selling of mortgage loans, in or about August 2009, Deutsche Bank and BNP Paribas had purchased in total approximately $1.68 billion in asset-backed commercial paper without knowing that there was only about $150 million in cash and collateral actually backing it. This resulted in a shortfall in collateral of approximately $1.5 billion, and Deutsche Bank and BNP Paribas were not able to redeem their commercial paper to recover their investment when the commercial paper matured in or about August 2009.

### 7. *TARP and Project Squirrel*

In October 2008, Colonial BancGroup submitted an application to the FDIC seeking $570 million in TARP funding. In connection with the application, regulators and the United States Treasury Department reviewed Colonial BancGroup's financial data and filings, including the materially false information related to mortgage loan and securities assets held by Colonial Bank's MWLD resulting from the fraudulent conduct of the defendant and co-conspirators. Based in part on these false and misleading financial statements, Treasury conditionally approved $553 million of TARP funding to Colonial BancGroup if, among other things, Colonial BancGroup could first raise $300 million in private capital.

Recognizing that Colonial Bank was critical to TBW's survival, the defendant sought to lead a group of investors to raise the $300 million in private capital. The defendant and co-conspirators represented that TBW would invest $150 million in Colonial BancGroup. Additionally, the defendant and co-conspirators represented to Colonial BancGroup that two other investors had agreed to contribute $50 million each and that a group of MWLD "friends and family" had agreed to contribute the remaining $50 million. In fact, however, the defendant and co-conspirators misrepresented the commitments of some investors.

Nevertheless, on or about April 1, 2009, the defendant and co-conspirators caused Colonial BancGroup to file with the United States Securities and Exchange Commission ("SEC") a Form 8-K announcing that Colonial BancGroup had secured definitive agreements from investors, pending due diligence, to satisfy the $300 million private capital contingency requirement. The Form 8-K attached a stock purchase agreement that, among other things, represented that each purported investor had already deposited into an escrow account set up for the capital raise 10% of its proposed investment. To give the appearance that the escrow requirement had in fact been satisfied, the defendant and a TBW co-conspirator caused $25 million—which purportedly represented the 10% deposit for TBW's $150 million investment ($15 million) and for the two purported $50 million investors ($5 million each)—to be deposited into the escrow account at Platinum Community Bank, a wholly owned subsidiary of TBW.

The defendant and a TBW co-conspirator had in fact diverted that $25 million from an Ocala Funding bank account as part of a plan dubbed "Project Squirrel." Further, the defendant and other co-conspirators supplied the 10% down payment on behalf of the two $50 million investors without the investors' knowledge or consent. Ultimately, BancGroup did not receive TARP funds.

### D. Cumulative Effects of the Fraud

As a result of these schemes, by mid-2009, the defendant and co-conspirators had misappropriated more than $400 million from Colonial Bank and an additional approximately $1.5 billion from Ocala Funding, and had attempted to defraud the United States government of over $550 million. Moreover, the fraud orchestrated by the defendant caused Colonial BancGroup to make material misstatements in its filings with the SEC and mislead BancGroup investors, and contributed to the failure of Colonial BancGroup, Colonial Bank, and TBW.

### E. The Defendant Diverted to Himself Tens of Millions of Dollars of Fraudulent Proceeds

In addition to the fraudulent activity explained above, the defendant unlawfully misappropriated over $20 million in TBW funds for his personal use. Beginning in or about 2003, the defendant obtained approximately $7 million in proceeds through fraudulent mortgage loans from TBW. TBW maintained a list of loans described as "Do Not Sell" loans. Loans on this list were not available to be either resold as individual loans or packaged as securities that could be resold to third-party investors. A number of the loans on the "Do Not Sell" list were made to or at the request of the defendant and were merely a way for the defendant to siphon money from TBW. These loans, moreover, were taken out for properties that did not exist, for properties the defendant did not own, or in the names of others without their knowledge or consent. We have not uncovered any evidence that the defendant ever made payments on any of these loans.

For instance, in or about November 2006, seven loans were taken out in the defendant's name for non-existent units in a development in Ocala, Florida. Each of these loans was in the amount of $382,000, and the defendant used the approximately $2.7 million in proceeds to make a payment on a Dassault Falcon 2000 private jet registered to a non-TBW company owned by

the defendant. Another of these fraudulent loans—taken out on the same day as the seven fraudulent loans—was recorded on TBW's systems with a fake borrower name and a fake address. In another example, in or about August 2004, the defendant signed notes for $300,000 on each of three properties in Gulf Breeze, Florida. At all relevant times, these properties were owned by others.

Three other loans were placed on the "Do Not Sell" list with the notation "per Lee Farkas" and were issued with confidential witness 1 ("CW1") listed as the borrower. One loan, for $295,000, was on a property the defendant had purchased from CW1 the day before. A second loan, for $280,000, was purportedly taken out on the building housing CW1's office. The third, for $170,000, was taken out on an address for which Marion County, Florida, has no apparent ownership record. CW1 has told law enforcement that he has no knowledge of these loans. TBW has electronically-imaged documents for only one of these loans, and the documents contain false information and what appears to be a forged signature for CW1.

The defendant also extracted millions of dollars from TBW through purported personal loans made to him by the company and reflected in a TBW account as "due from shareholder." In or about April 2007, for his direct benefit, the defendant caused Colonial Bank to make a fraudulent transfer of $15 million to TBW to be applied as a pay-down of this "due from shareholder" account.

F.    **The Defendant Has Obstructed Justice in this Case**

1.    **Destruction of documents after learning of investigations by SIGTARP and outside counsel**

In or about mid-2009, TBW employees received an email from the company's outside counsel instructing them to preserve documents in connection with a contentious audit by TBW's outside auditors. In April 2009, the company was also served with a SIGTARP

subpoena requesting, among other things, documents and communications concerning business between Colonial Bank and TBW.

After receiving both the request from outside counsel and the SIGTARP subpoena, CC4 approached the defendant and expressed concern about the incriminating nature of electronic files located on CC4's computer. In response, the defendant instructed CC4 to delete incriminating spreadsheets and other electronic files in contravention of corporate counsel's preservation request. CC4 followed the defendant's direction and deleted the information. Similarly, on the day federal law enforcement officers executed a search warrant at TBW's corporate offices, the defendant instructed CC4 not to report to work, in an effort to prevent that individual from interacting with the officers.

### 2.    Hiding the hole in AOT from auditors and outside counsel

In response to TBW's outside counsel's investigation, the defendant and other co-conspirators devised a scheme to deceive auditors by covering the more than $400 million hole in the collateral backing the Trades held on AOT. They did this by compiling a list of nearly 20,000 mortgage loans that did not belong on AOT and providing that list to Colonial to include in its AOT accounting records to give the false appearance that there was sufficient collateral backing the Trades on AOT. In late July 2009, the defendant personally delivered to CC1 a thumb drive that contained the loan-level data assembled to hide the fraud.

In connection with the delivery of this fraudulent loan-level data, the defendant explained in a telephone call to CC1 that the government recorded: "So we're going to have to change what's in AOT to look like this [the contents of the thumb drive] because you're not going to have to talk to those auditors anymore, and it'll just have to change and look like this. But what

we did is we put it in basically the same structure that it's in now, just with different loans, and the trades really different – a little different trade numbers."

### 3. Conspirators used PINs—"peer-to-peer" Blackberry messages—that were not saved in either Colonial's or TBW's systems

To discuss their fraudulent scheme, the defendant and his co-conspirators often used a feature on their Blackberry phones that allowed them to send to each other what are called PIN messages, which are essentially text messages. According to co-conspirators, they did this in part because PIN messages were not routed through or saved on a Colonial or TBW computer server; instead, PIN messages were saved only on the users' Blackberries.

The defendant's actions on the day the search warrant was executed at TBW's offices illustrate the conspirators' use of PINs. That day, the defendant participated in a voluntary interview with federal law enforcement agents, in which he denied knowledge of the scheme alleged in the indictment. Almost immediately after the conclusion of the interview, however, the defendant began communicating by PIN with CC2 regarding how to deal with the investigation. As part of this PIN exchange, and only minutes after denying his involvement in the unlawful activity to federal agents, the defendant sent a PIN message to CC2 stating: "They will figure out that the agency stuff was recycled if they get [CC1's] laptop[.]"

## II. ARGUMENT

There is a serious risk that the defendant, if released, will flee. The defendant has directed a seven-year fraud that caused losses of nearly $2 billion. If convicted, the defendant effectively faces a life sentence. Moreover, to execute the fraud, the defendant and co-conspirators engaged in elaborate financial transactions and fabricated documents to deceive Colonial Bank, Colonial BancGroup, internal and external auditors, government regulators, investors, and external corporate counsel. The defendant and co-conspirators continually refined

their scheme to make its detection increasingly difficult. And, after learning of the SIGTARP

and outside counsel investigations, the defendant and co-conspirators obstructed those

investigations. The defendant has demonstrated that no condition or combination of conditions

is adequate to secure the defendant's appearance at future court proceedings.

### A.     Bail Reform Act

Under the Bail Reform Act, Title 18, United States Code, Section 3141, *et seq.*, federal

courts are empowered to order a defendant's detention pending trial upon a determination that

the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e)

("no condition or combination of conditions would reasonably assure the appearance of the

person as required and the safety of any other person and the community"). A finding of risk of

flight must be supported by a preponderance of the evidence. *United States v. Quartermaine*,

913 F.2d 910, 917 (11th Cir. 1990); *United States v. King*, 849 F.2d 485, 489 (11th Cir. 1988);

*see also United States v. Stewart*, No. 01-4537, 2001 WL 1020779 (4th Cir. Sept. 6, 2001)

(unpublished) (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985)).

The Bail Reform Act lists four factors for courts to consider in the detention analysis: (1)

the nature and circumstances of the crimes charged; (2) the history and characteristics of the

defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the

evidence of the defendant's guilt. *See* 18 U.S.C. § 3142(g). These factors are considered in turn

below and indicate that the defendant is prepared to flee the jurisdiction and has the means to do

so.

16

**All Four § 3142(g) Factors Support Pre-trial Detention of the Defendant**

1.  **The Nature and Circumstances of the Crimes Charged**

    a.  **The length of sentence**

The charges alleged in the Indictment subject the defendant to significant criminal exposure. Given the far-reaching nature of the charged conduct, the defendant's role in the fraudulent scheme, and the nearly $2 billion in losses, the defendant, if convicted, is likely to face a significant period of incarceration. Indeed, a preliminary Sentencing Guidelines calculation places the defendant well above the maximum Offense Level, leading to a Guidelines sentence of life in prison. Because the defendant is in his late fifties, it is likely that whatever sentence he would receive would effectively be a life term. *See e.g., United States v. Okun*, No. 3:08-cr-00132, Docket Entry No. 328 (E.D. Va. Sept. 2, 2009) (sentencing defendant to 100 years' imprisonment for charges related to theft of more than $120 million); *United States v. Rothstein*, No. 0:09-cr-60331, Docket Entry No. 290 (S.D. Fl. June 9, 2010) (sentencing defendant to 50 years' imprisonment for charges related to defrauding investors of over $1.2 billion). This fact in and of itself leads to a serious risk that the defendant will flee. *See United States v. Stanford*, 341 Fed. Appx. 979, 982 (5th Cir. 2009) (affirming district court's detention order where "the district court properly took into account the daunting sentence – 375 years of imprisonment – Stanford faces if found guilty on all twenty-one counts [including conspiracy, wire and mail fraud, securities fraud, and money laundering] in determining that he presents a risk of flight"); *United States v. Poulsen*, No. 8:07-MJ-1472, Docket Entry No. 4 (M.D. Fla. Oct. 19, 2007) (ordering defendant detained where "there is every reason to think that the defendant would flee in order to avoid the severe sentence [on conspiracy, wire fraud, securities fraud,

17

money laundering and obstruction charges] that he is facing, which, in view of the defendant's age, would essentially be a life sentence").

> **b.** **The Indictment charges a lengthy and complex criminal conspiracy that resulted in billions of dollars of loss**

The manner in which the defendant and co-conspirators executed their fraud indicates a level of sophisticated activity that weighs in favor of detention. As explained in detail above, the defendant spearheaded a wide-ranging, complex, and ever-evolving fraudulent scheme that unlawfully misappropriated funds from Colonial Bank and Ocala Funding and ultimately attempted to defraud U.S. taxpayers through TARP. The scheme resulted in nearly $2 billion in actual losses, and more than $500 million in attempted losses. The scheme also contributed to the failures of Colonial Bank, Colonial BancGroup, and TBW.

> **2.** **The History and Characteristics of the Defendant**

> **a.** **The defendant's tendency to deceive and obstruct justice**

To execute this scheme, the conspirators moved hundreds of millions of dollars among TBW, Colonial and other entities, both in an effort to divert funds for their unlawful purposes and to conceal their activities. The defendant and co-conspirators also fabricated documents and falsified the books and records of both Colonial and TBW. And they were successful for seven years, despite regular monitoring by inside and outside auditors, federal regulators, and other employees within Colonial BancGroup, Colonial Bank and TBW.

Moreover, as described above, the defendant actively sought to obstruct the SIGTARP and outside counsel investigations. He suggested that CC4 destroy documents, and he delivered to CC1 a drive with fraudulent loan data that he hoped would hide the fraud. The defendant's success in managing the charged conspiracy and his demonstrated tendency to obstruct justice

make it unlikely that any combination of conditions will reasonably assure his presence at future proceedings.

      b.    **The defendant has the financial resources to successfully flee and has been liquidating assets and transferring assets to others**

      The defendant has significant financial resources, many of which have not been located by law enforcement, and the defendant has been liquidating assets and "parking" others with known close associates over the past months. As chairman of TBW, the defendant earned approximately $2 million in salary, wages, and commissions in 2006, nearly $3 million in 2007, and over $3 million in 2008.[3] As discussed above, in addition to this substantial salary, the defendant unlawfully misappropriated over $20 million in TBW funds for his personal use.

      Since law enforcement executed the search warrant at TBW's offices in August 2009, the defendant has undertaken efforts to liquidate and hide his assets. In or about February 2010, the defendant and a known companion of the defendant, KC1, sold a property located in Pensacola, Florida. The defendant recently sold 1959 and 1964 Cadillacs, which had been insured for a total of $225,000, and which are part of a much larger classic car collection.

      More significantly, the defendant has recently quit claim deeded multiple properties to close associates for seemingly inadequate consideration. For example, in or about October 2009, the defendant quit claim deeded a property in Key West, Florida, to a known close friend for $125,000. In 2008, this property was valued at $350,000. The defendant has also quit claim deeded, for nominal consideration, two valuable properties to another known companion of the defendant, KC2. KC2 then sold or encumbered the properties to entities related to the defendant. In or about February 2010, the defendant quit claim deeded a property in Ocala,

---

[3] These numbers represent the defendant's income from TBW and do not include the amounts reported on tax returns as income or loss from other entities.

Florida to KC2 for $10. Shortly thereafter, KC2 took out a $500,000 mortgage on the property

from a lender associated with the defendant. In or about March 2010, a company controlled by

the defendant and that managed his Dassault jet quit claim deeded another Ocala, Florida

property to KC2, again for only $10. KC2 then quit claim deeded the property to an Atlanta-

based mortgage company also for $10. The government has evidence that the defendant, with

other TBW co-conspirators, is now involved with this mortgage company.

Investigators have also identified a TBW offshore account. Moreover, the defendant

travels frequently and has recently used a credit card and cellular telephone registered in the

name of another. The defendant recently traveled on airline tickets purchased using an American

Express card in the name of a mortgage company associated with KC2, and he is believed to be

using a cellular telephone subscribed to by that mortgage company.

In short, the defendant's income, fraudulent activities, and standard of living strongly

suggest that he has amassed significant wealth and has the means to flee.

### 3. The Danger Posed by Defendant's Release

The Bail Reform Act directs the Court to also consider "the nature and seriousness of the

danger to any person or the community that would be posed by the person's release." 18 U.S.C.

§ 3142(g)(4). As the Eleventh Circuit has recognized, "[t]he term 'dangerousness,' as used in

the Bail Reform Act of 1984, has a much broader construction than might be commonly

understood in everyday parlance." *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988).

While "danger to any person" is intended to address physical danger to a particular individual,

danger to the community "refers to the danger that the defendant might engage in criminal

activity to the detriment of the community." *Id.* Thus, "the concern about safety [is] given a

broader construction than merely danger of harm involving physical violence." *Id.*; *see also*

20

*United States v. LeClerq*, No. 07-80050-CR, 2007 WL 4365601, at \*4 & n.5 (S.D. Fla. Dec. 13, 2007) (unpublished).

Anything short of pretrial detention in this case would allow the defendant to remain a danger to the community. The defendant's longstanding pattern of fraudulent activity, history of continually modifying his fraudulent scheme to avoid detection, ongoing distribution of assets to known companions, and believed involvement in the Atlanta-based mortgage company to which he is funneling assets indicate that that there is a significant danger the defendant may engage in future criminal activity. As explained above, the defendant's demonstrated tendency to obstruct justice makes it unlikely that any condition or combination of conditions will adequately protect the community's interest in resolving this case free from the defendant's obstructive conduct.

### 4. The Evidence of the Defendant's Guilt is Strong

The strength of the evidence also weighs in favor of pre-trial detention. To prove the charges contained in the indictment, the government must prove, among other things, that the defendant knowingly and intentionally joined the criminal scheme. The government has collected substantial evidence that the defendant not only knew of the criminal purpose of the scheme, but directed it. The electronic communications discussed above make clear that he was aware of the overdrafts, Plan B, recycling and fictitious AOT agency trades. The government has also secured the cooperation of many of the defendant's co-conspirators, including CC1, CC2, CC3 and CC4. These co-conspirators were central to the scheme and have described to the government the defendant's leadership role in the fraud. Moreover, the allegations in the indictment are supported by the defendant's own emails, the defendant's own PIN messages, and recorded conversations between the defendant and co-conspirators, as described above.

And, as chairman of TBW and TBW's largest shareholder, the defendant gained the most

from the charged scheme, not only in his disclosed salary, but also in the substantial

misappropriation of funds for his own benefit. TBW had over 1,000 employees, but it was the

defendant that sought to ensure that "I am the only one at TBW involved in this transaction."

In addition to the evidence already collected, the government is continuing its

investigation into the allegations contained in the indictment. This continuing investigation is

likely to develop even more evidence of the defendant's role.

## III.    CONCLUSION

The government respectfully requests that, based on the foregoing, and pursuant to 18

U.S.C. § 3142(f)(2), the court order that the defendant be detained pending trial because no

condition or combination of conditions will reasonably assure his appearance as required at

future court proceedings.

Respectfully submitted,

Denis J. McInerney
United States Department of Justice
Chief, Criminal Division, Fraud Section

By:

Patrick F. Stokes
Deputy Chief
Brigham Q. Cannon
Charles D. Reed
Robert A. Zink
Trial Attorneys
U.S. Department of Justice
1400 New York Avenue, NW
Fourth Floor
Washington, DC 20005
202-305-4232 [Phone]
202-514-7021 [Fax]
Patrick.stokes2@usdoj.gov

22

## CERTIFICATE OF SERVICE

This is to certify that a copy of the government's motion will be furnished to counsel listed below by electronic mail and by facsimile:

Thomas D. Bever, Esq.
Anthony L. Cochran, Esq.
Chilivis, Cochran, Larkins & Bever, LLP
3127 Maple Drive, NE
Atlanta, GA 30305
Facsimile: 404-261-2842
Email:  tbever@cclblaw.com; alc@cclblaw.com

Dated: June 16, 2010

Patrick F. Stokes
Deputy Chief, Fraud Section

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
Golden-Collum Memorial Federal Building
and United States Courthouse
Office of the Clerk
207 N.W. Second Street
Ocala, Florida 34475
352-369-4860
www.flmd.uscourts.gov

Sheryl L. Loesch
Clerk

Jim Leanhart
Ocala Operations Supervisor

## UNITED STATES OF AMERICA

-vs-

**Case No.  5:10-mj-1028-GRJ**

## LEE BENTLEY FARKAS

_____

## NOTICE OF SURRENDERED PASSPORT

To:   U.S. Department of State-Passport Services
Office of Citizenship Appeals and Legal Assistance
Attn:  Deborah Solum
2100 Pennsylvania Ave., N.W., 3rd Floor
Washington, D.C.  20037

**PURSUANT** to Court order entered on June 23, 2010 in the above styled case, the Defendant's passport, number 450736503, was surrendered to the custody of the Clerk of Court on June 23, 2010.  The defendant is not permitted to apply for the issuance of another passport during the pendency of this action.

Defendant's date of birth:        August 22, 1952

Defendant's place of birth:       New Mexico

Received by Clerk from:          Gerald Houlihan, Esq.

SHERYL L. LOESCH, CLERK

*D. DeNicola*
_____
By:  D. DeNicola, Deputy Clerk

c:   Counsel of Record
Defendant
Pretrial Services (if before Judgment)
Probation Office (if after Judgment)
Appropriate Agency Listed Above
Passport Coordinator