1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .        Criminal No. 1:10cr200
                              .
    vs.                       .        Alexandria, Virginia
                              .        September 10, 2010
LEE BENTLEY FARKAS,           .        9:19 a.m.
                              .
            Defendant.        .
                              .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:           CHARLES F. CONNOLLY, AUSA
                              PAUL J. NATHANSON, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              PATRICK F. STOKES, ESQ.
                              United States Department of Justice
                              Criminal Division, Fraud Section
                              1400 New York Avenue, N.W.
                              Washington, D.C. 20005


FOR THE DEFENDANT:            WILLIAM B. CUMMINGS, ESQ.
                              William B. Cummings, P.C.
                              P.O. Box 1177
                              Alexandria, VA 22313


OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                              U.S. District Court, Fifth Floor
                              401 Courthouse Square
                              Alexandria, VA 22314
                              (703)299-8595


(Pages 1 - 43)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

P R O C E E D I N G S

(Defendant present.)

THE CLERK:  Criminal Case 10-200, United States of America v. Lee Bentley Farkas.  Would counsel please note their appearances for the record.

MR. CONNOLLY:  Good morning, Your Honor.  Charles Connolly, Patrick Stokes, and Paul Nathanson for the United States.

THE COURT:  Good morning.

MR. CUMMINGS:  Good morning, Your Honor.  William Cummings for the defendant, Mr. Farkas, who is here with me at counsel table.

THE COURT:  All right.  There are several motions on the docket this morning.  There's a defendant's motion for leave to file additional motions.  The government does not oppose that motion, and it is therefore granted, but obviously, I don't want hundreds of motions coming in, and I don't want them coming in all at different dates, so I'll leave it open at this point, with the understanding that I don't expect to see multiple motions on, you know, multiple different motions dates, all right?

MR. CUMMINGS:  I understand, Your Honor.

THE COURT:  There's also a motion to continue the trial date in this case.  Given the amount of discovery that's going on here, I agree that that's a reasonable motion.  The only thing is the date that you have suggested, which is February 15, is not

1    good on our calendar.  There's a Fourth Circuit conference that

2    most of the judges are going to be going to, so I am suggesting

3    that the trial begin on Tuesday, February 22.

4             Is there any problem that that raises for anyone?

5             MR. CONNOLLY:  Not for the government, Your Honor.

6             MR. CUMMINGS:  No, Your Honor, not for the defense.

7             THE COURT:  All right.  So that will be reflected in the

8    order.

9             The last matter we have then is the defendant's motion

10   to transfer venue from this district to the Middle District of

11   Florida, and both sides have quite thoroughly briefed that issue.

12   As you know, there's no question -- and the defense recognizes

13   this -- there's no question that this Court does have -- that

14   venue is proper in this Court.

15            Frankly, venue would be proper in many districts, as

16   often happens in criminal cases, but the plaintiff -- the

17   defendant has moved for a change of venue, which is his right, to

18   a more convenient court for him, which would be the Middle

19   District of Florida.  The Middle District of Florida, I guess, has

20   two divisions, the Orlando Division and the Ocala Division.  The

21   defendant is located closest to Ocala and requests either Ocala or

22   Orlando as the location for his trial.

23            The Court has looked at this case carefully, in

24   particular looking at the factor, the what are called the *Platt*

25   factors set out by the United States Supreme Court, and as you

1 know, those ten factors are what are usually used in making an

2 analysis of this issue.

3       The evaluation of a motion to transfer is left to the

4 sound discretion of the court, and unless there is a clear abuse

5 of that discretion, it's not a reversible decision. The factors

6 that we look at are the location of the defendant. That factor

7 would tip in favor of the defendant, because he is located in

8 Ocala.

9       The location of witnesses is a factor that one looks at.

10 The government has pointed out that in its view -- and I know the

11 defense disputes this -- but one of the key players in the

12 defendant's company which is involved in this case has a residence

13 in Oakton and that some of the activities were carried out either

14 by e-mail or telephone from Oakton. There are certainly many

15 government witnesses who are located either in the Eastern

16 District of Virginia or Washington, D.C., and there may very well

17 be witnesses from other institutions in other places.

18       The location of witnesses is a close one. The defendant

19 has listed a series of witnesses and alleges that all of those are

20 in the Alabama or Florida or that general southeastern area, which

21 might put them closer to that court, but there's also clear

22 evidence that the airports, the public transit arrangements for

23 this district are actually much better than Orlando and that, for

24 example, folks from Alabama would probably take about as much time

25 to get to the Eastern District of Virginia up here as they would

1  to Orlando.

2          I'll not satisfied that the plaintiff, who has the

3  burden of establishing these *Platt* factors, is able to actually

4  win on that issue.  It's close, but I don't feel that there's

5  enough evidence that satisfies me that the location of witnesses

6  necessarily tips in the defendant's favor.

7          The location of events likely to be an issue, as the

8  government points out and I agree, this is a case with national

9  implications.  There's a bank in Chicago which has some

10  involvement here.  Clearly, Freddie Mac, which is located in the

11  Eastern District of Virginia, is involved in the sense that these

12  mortgages were being -- that the defendant and his company were

13  doing work for Freddie Mac.  The TARP funds which were being

14  administered out of Washington, D.C., are much closer to this

15  district than they would be in Florida.

16          Although much of the activity did occur in Florida, the

17  effects of that activity were directly hitting the Eastern

18  District of Virginia and other locations as well, and so I find

19  that the location of events to be in issue are just as much

20  involved in the Eastern District of Virginia as they are in the

21  Middle District of Florida.

22          The location of documents and records -- and I'm going

23  to address this issue down the road in another context -- is again

24  a factor that plaintiff -- the defendant cannot win on, because

25  the majority, if not all, of the evidence in this case is, as I

1  understand it, now in digital form and has been made available to

2  defense counsel, and while it may be a little difficult to discuss

3  that information with Mr. Farkas if he's not at your elbow, with

4  modern technology, I think that problem could easily be overcome.

5          The fifth element, disruption of the defendant's

6  business, is very controversial, because the defendant has listed

7  some businesses, including a car wash and a restaurant, etc., that

8  he claims he's involved with.  The government, of course, has

9  argued that the evidence does not support that at all, and it's

10 still unclear as to what the defendant's daily involvement in

11 those businesses is.  Simply owning a business doesn't mean that

12 one has to be on the scene every day.  I don't think, therefore,

13 the defendant has made his burden on that issue.

14         Expense to the parties, right now the defendant

15 qualifies under the Criminal Justice Act.  Any witnesses that he

16 has to call, their expenses are going to be covered by the U.S.

17 government, so in terms of whether the witnesses have to come to

18 the Middle District of Florida or Virginia is not going to be any

19 kind of an issue for him, and the witnesses don't pay their own

20 expenses, so the expense to the parties right now is not a factor

21 at all.

22         In terms of location of counsel, the only counsel this

23 defendant has of record is you, Mr. Cummings, and you're in this

24 district.  Now, I do find it interesting that apparently the

25 defendant was given an opportunity, what we call a time-out from

1   his supervised release, to visit with an attorney in Kentucky.

2   When one is arguing inconvenience and one of the issues in

3   inconvenience is that location of counsel, why a Florida resident

4   would be looking to work with a Kentucky attorney, that still

5   involves almost all of the logistical problems that Mr. Farkas is

6   complaining about in having you up here in Virginia, so I find

7   that that argument completely is not established.

8          The relative accessibility of the place of trial, as I

9   said, clearly with National Airport about 5 miles from here and

10  Dulles about -- a little bit further and with the Metro, both the

11  Eisenhower and the King Street Metro stations connecting directly

12  to National Airport, the accessibility of this courthouse for

13  witnesses and attorneys is much better than the Orlando or Ocala

14  courts.

15         The Ocala court, I also note, only has a resident

16  magistrate judge and a senior judge, so in terms of judicial

17  resources, the Ocala courthouse would be absolutely inappropriate.

18  The Orlando courthouse, I don't know what the structure is there,

19  but I would assume there are far more judges.

20         And in terms of docket conditions in each district, you

21  can see from the paperwork that although the caseload may be

22  higher in this Court per judge in terms of felony cases, we try

23  our cases a lot faster, and the time between filing and

24  disposition is faster than the Middle District.  So docket

25  conditions, certainly the defendant does not prevail on that

1    issue.

2           And any other specific elements which might affect the

3    issue of transfer, I don't find that the defendant has been able

4    to make his burden on these *Platt* factors, and I'm therefore going

5    to deny the motion for transfer.

6           Mr. Cummings?

7           MR. CUMMINGS:  Your Honor, there were some things I

8    wanted to elaborate on that were not in our memorandum, and I

9    would hope the Court would allow me to speak --

10          THE COURT:  Go ahead.

11          MR. CUMMINGS:  -- before you actually rule on the

12   motion.

13          THE COURT:  Go ahead.

14          MR. CUMMINGS:  First of all, with regard to Mr. Farkas's

15   involvement in his business, I had to go down there to see him and

16   meet Mr. Houlihan this week, and I did have occasion to have lunch

17   in the restaurant that he owns, Ipanema I think it's called, and

18   it was quite obvious during lunch that Mr. Farkas is quite

19   involved in the management of the restaurant.

20          He knew all the staff, he knew the manager, and he told

21   me that he has spent a lot of time since he's now no longer

22   working with TBW trying to make sure that restaurant survives and

23   has done a lot of things to improve the management of the

24   restaurant.

25          He also drove me down the main road in Ocala.  The

1   restaurant is on one end of it, and there is a shopping center

2   where the Compass, which is the one remaining branch of the health

3   club, and that health club was purchased and started back when he

4   was running TBW, and it was purchased by him in large part to make

5   sure that his staff had access to a good, healthy lifestyle

6   because of employee health concerns and less absenteeism and lower

7   health care costs.  As a result, many of the employees were

8   members there.  First they started off by giving free membership

9   in order to encourage them to come, and then, of course, they had

10   to pay a little bit.

11            Since a lot of employees lost their jobs, a lot of the

12   membership has dropped off in one of the branches of that club, so

13   he's spent a lot of time working with the management there to make

14   sure they offer new methods of marketing to help it stay alive,

15   because it was an asset there for the community in general.

16            And the car wash, he's very active with the car wash.

17   That's a franchisee, by the way, not the franchisor.  The Cactus

18   Car Wash is a franchise company out of Atlanta, and they operate

19   under that name, but it's not owned by, by -- he doesn't own the

20   franchisor, and he's very active in that with promotional

21   activities and things of that nature.  He is a businessman, after

22   all.  He knows how to sit down and work out business.

23            So in terms of the businesses that he operates there and

24   owns and manages there, he is very active in all of them, Your

25   Honor.  That's just an aside on a very small issue that's before

1    the Court on the factors.

2          The factor that's the most important here, Your Honor,

3    and the one overlooked, I think -- we mention it in both our

4    opening and our closing memorandums, but you can only just say so

5    much in a memorandum in a short period of time, and that is the

6    location of Mr. Farkas and the witnesses and the volume of

7    material in this database.

8          When I filed that motion initially, Your Honor, I had

9    not yet had access to the database.  We got -- we were here two

10   weeks ago on a Monday, on the 30th, and the Court then entered the

11   final protective order, which opened the door for me to have

12   access.

13         THE COURT:  Well, I'm glad we're talking about the

14   database.  Can you explain to me how it's set up?  How do you

15   access the information on the database?

16         MR. CUMMINGS:  First of all, it's a mess, Your Honor.

17         THE COURT:  I'm sorry?

18         MR. CUMMINGS:  It's a mess.  19 million pages, Your

19   Honor, 6-million-and-some-odd documents, a lot of which, of

20   course, in the typical government fashion, they package everything

21   up, photocopy it, and put it on the database, and you don't know

22   what's good or what's bad, what's personal e-mails or what's

23   actual relevant material, and it's all there, and you can't

24   distinguish it until you go point by point by item by item to look

25   at it.

1          In fact, the way sometimes the things are titled, it's

2    misleading.  For example, as you know in the indictment, they talk

3    about "Plan B."  That's sort of the essence of one of the charges

4    in the indictment.  So right there on one of the, one of the

5    labels, they have labeled a document "Plan B Cycle."  You say,

6    "Oh, my gosh, that's it.  That's the document we really want to

7    see."

8          It's two people that are e-mails, there's two of these,

9    exchanged information about Saturday's bike ride, and Plan B is in

10   case they don't get to where they're supposed to be.  I mean, it's

11   the kind of thing like that that all that stuff is thrown in

12   there, and I know that's the way it happens when you get discovery

13   from the government:  a lot of duplication.

14         They have files, about 30 or 50 file folders, I think it

15   is, on what they call the tag list.  The tag list, when you open

16   it up and you go to that, there's about anywhere from 2 to 100

17   different folders.  Because you don't know what's in any of them

18   and because you may find the jewel or the gem that you're looking

19   for, as opposed, as opposed to a personal e-mail, you have to go

20   one by one by one by one, open it up and look at it.

21         When you're finished, you have the opportunity to make a

22   comment if you want about what's in there or even put some kind of

23   a key word like "relevant" or "not relevant" or "hot stuff" or

24   whatever you want to say.  The problem is there's no way to then

25   separate those files out for the attorney, because the paralegals

now are going down and doing some of this preliminary review, no way for them to, to separate that out.  I've been to two training sessions now to see if we could work this out, and you can't put them in a separate file, you can't highlight them to say, "Mr. Cummings, why don't you go back there and go to this file?"

THE COURT:  Can you print them out in hard copy?

MR. CUMMINGS:  You can, Your Honor, but it's an enormous task to do that, and some of these documents, of course, might be very lengthy.  The printing situation is not the best.  We're trying to work on that.

But you can't just say, "Mr. Cummings, this afternoon when we get through, why don't you go and look through this file? I've highlighted the ones you should look at."  You can't do that.

Now, they can painstakingly write down each Bates stamp number, and I could go back and look under the Bates stamp. That's again a much more time-consuming task for the paralegals to do.

Having said that -- and we've asked -- we sent an e-mail pursuant to the suggestion of the trainer to the people who created the system to try and see if we can't find a way where we can highlight in yellow or black or blue or green or some other way to mark something so I can just go -- I or David Williams or somebody else can go right down the list and pinpoint what I should see and not have to go through all that chaff that they have gone through and say this is totally personal or irrelevant

1  or not worth looking at.

2        I mean, TBW took over a lot of foreclosed houses, as you

3  probably saw or can imagine that they would have, and so there's

4  dozens and dozens of files that are photographs of a busted toilet

5  or vines growing up on somebody's house and things like that that

6  are in these REO, real estate-owned folders, properties that were

7  foreclosed.  All of that is in there, and so you go through point

8  by point, 19 million pages, 6 million documents.

9        Now, the point of all that is not that it's not a large

10 task for counsel and the staff to go through, but when you get to

11 a document that may or may not be relevant or helpful, you don't

12 have Mr. Farkas there.  That's why it's so important to have this

13 case in that area where the paralegals and the lawyer can screen

14 these things and then ask him, "What about this?"  Share this with

15 me right on the spot so we can now forward our -- change our

16 direction of what we're looking for and begin to gather the

17 intelligence and the knowledge and the awareness of the system,

18 what the issues were that may or may not have caused some of these

19 transactions to take place, if he was involved in them at all.

20        The government has shared with me a couple of e-mails or

21 series of e-mails with regard to Counts 2 or 3, for example.

22 Mr. Farkas's name does not appear on those e-mails and rightfully

23 so.  They're done by other people.  Was he aware of them?  Did he

24 understand that?  We expect some people may testify that he was,

25 but there's nothing in writing about that.  When you get to those

1   areas where things were done, you really need him right there on

2   the spot.

3           Now, all this talk about location has all been about the

4   trial, which now is in February, and, you know, one can understand

5   Mr. Farkas having to come up here for three weeks for trial.  It's

6   another thing to be here for four or five months while I and my

7   staff are going through these materials and trying to communicate

8   with him on a daily basis, where he is 800 miles away by telephone

9   or some other method.

10          Not that it can't be done, you're right, it can be, but

11  it's not the same as talking to somebody in person.  Look at this,

12  share this, have the lawyer here, have the paralegals here, and

13  find out from the only person so far that we know that we can deal

14  with who knew what's going on, is Mr. Farkas.

15          Now, they talk about the person up here in Northern

16  Virginia as a possible witness.  I suggest to Your Honor that Paul

17  Allen is not a witness for either side.  He's sitting there

18  protecting himself, because I think he thinks he may well be

19  either a subject or target or later on indicted, so he's not going

20  to cooperate with me or with the government at this stage.  So

21  he's not a witness in the sense that he's somebody I can

22  communicate with and understand what went on back a year or two

23  ago.

24          There are people, Mr. Farkas has identified a couple of

25  people that he knows are there in his community who he can't talk

1  to because of the "no contact" order, but I could or my

2  investigator could if I was down there to share some of these

3  documents with them and ask them how, how this document fits into

4  the overall activity of the company, whether it's significant or

5  not, and there are some additional documents which we think are

6  not on the database.

7       The accounting system is there in the TBW building, we

8  understand, because the bankruptcy people are still operating the

9  company in bankruptcy, trying to clean up all, all the activities,

10  and somebody, a forensic accountant, if we get permission from the

11  Court to go in and look at that system under the auspices of a

12  forensic accountant with permission of the Court and the

13  bankruptcy people, there may be information in there that will

14  help us develop again the defense to this case.

15       It's a very complex business, Your Honor, that was going

16  on.  They were servicing 500,000 mortgages a year out of that

17  business.  It's a tremendously complex operation, and to have to

18  try and have people up here, myself, not that I'm not competent or

19  qualified to understand eventually what went on, but I can't

20  communicate with him in the same way I can -- I was down there in

21  Florida, and, you know, in 30 minutes, he and I had a better

22  understanding than I've had, you know, in three or four phone

23  calls.  I mean, just the personal contact and seeing the documents

24  and discussing it means -- words can't express how much better

25  that is in terms of communication.

1        We're talking about six months now from trial, and the

2   three weeks of inconvenience for the trial itself pales by

3   comparison to the inconvenience of not being able to have the

4   prime and only at this time witness to the events available to

5   counsel on a, on a daily basis.

6        THE COURT:  All right.

7        MR. CUMMINGS:  That's something which we can't really

8   put into a memorandum and explain.  I didn't know that two weeks

9   ago, when I filed this motion, because I hadn't seen the

10  documents, hadn't seen the complexity of it, and hadn't really

11  begun to understand how important it is for counsel to be close to

12  his client in this kind of a case.

13       THE COURT:  Well, I have also been very concerned about

14  the amount of information that you've been given.  19 million

15  pages, you know, in some respects, too much information is no

16  information.

17       MR. CUMMINGS:  I agree with Your Honor.

18       THE COURT:  If this were a civil case, we would be

19  absolutely all over the plaintiff to refine that kind of a

20  discovery production, and I don't think it's inappropriate in a

21  case like this to make a similar -- put a similar burden on the

22  government.

23       Now, it's been my thought that it would significantly

24  help you and, frankly, wouldn't hurt the government because they

25  should be ready to try this case, for each count of this

1  indictment, the government should have already, because you

2  indicted the case, should have already clearly identified all of

3  the documents that you intend to introduce to support that count,

4  and pinpointing those specific documents would be a significant

5  help, the same way in which in a civil case you could properly ask

6  in pretrial discovery, you know, all -- any and all documents that

7  support this particular allegation.

8           MR. CUMMINGS:  Right.

9           THE COURT:  And I think that would significantly reduce

10 some of that problem.

11           MR. CUMMINGS:  Well, yes and no, and I appreciate what

12 you're saying.

13           THE COURT:  Wait.  But let me add one more thing.

14           MR. CUMMINGS:  Sure.

15           THE COURT:  It is the government's obligation to turn

16 over as quickly as they find it *Brady* material.  It's not your job

17 to search for it, and so within those 19 million pages, it has

18 been, always has been the government's obligation to be sure that

19 nothing in those 19 million pages could arguably be *Brady*

20 material.  If it is, you've got to identify -- you can't just dump

21 it on the defense.  You've got to identify it and say Bates No.

22 3253, 6578, 2030, potential *Brady* material.

23           If the government is required to do those two things,

24 that should give you a significant help in getting your discovery

25 under control.

1          MR. CUMMINGS:  Well, yes and no in all due respect, Your

2    Honor.  Mr. Stokes and his staff did sit down with me about ten

3    days ago and present me with a folder which includes what they

4    consider to be sufficiently -- sufficient documents to set out the

5    various charges, and I asked if that was all, and he said no, not

6    necessarily, but these are the key documents.

7          So first of all, trying to find those documents with the

8    word search was impossible, okay?  This is supposed to be word

9    searchable, and those documents, one out of many I found with the

10   word search.  The rest of them don't show up.  In other words, you

11   have to still go down through item by item to find them.

12         The ones he gave me did not have a Bates stamp number on

13   them, so in order to go back and try and find those, I'd have to

14   go item by item, and I'm sure they would be willing if I asked

15   them, I guess, to give me the Bates stamp, but they didn't come

16   with Bates stamp.

17         And the point about this, though, Your Honor, is that

18   yes, those are what they consider to be the documents that will,

19   that will make their case, but in a complex financial situation

20   like this, a lot of times what's helpful to the defense is to

21   understand and lay out the overall financial situation, as opposed

22   to finding something which is a smoking gun for the defense is

23   more documents and understanding those documents to explain the

24   situation other than just the narrow things about these documents

25   show that, you know, a wrongful act was done by itself in

1   isolation, as opposed to in the whole context of the situation

2   that was going on at the time.

3          So that I don't, I don't necessarily know that there is

4   any, quote, smoking gun or *Brady* document -- *Brady*-type document

5   that does exist.  If the government has them, fine.  They haven't

6   given them to me yet, but they did give me this layout of not

7   necessarily all they would use but the essential documents, and

8   that's what's helpful to understand their theory of the case, more

9   refined, but it doesn't stop the need -- or impact the need for

10  defense to be able to share, to share with Mr. Farkas, at this

11  stage the only witness we know who's familiar with the

12  transactions and available, to share the overall documents with

13  him and begin to understand and lay out the financial situation

14  and the transactions and interactions of very complex business

15  that was going on, and that, I think, is going to have to be the

16  approach we take to understand the case.

17         And it's -- in all due respect to Your Honor, to pick up

18  the phone and call him and ask him about a document which he can't

19  see unless I fax it down to him since he doesn't have access to

20  the database because the government's concerned that we might

21  share -- I would love to lay these documents on somebody else and

22  give them the burden of it, Your Honor.  Nobody else wants these

23  documents, I can tell you that, at this stage, because they're so

24  difficult to wade your way through.  It's an unbelievable task.

25         I mean, I would much rather have a roomful of file

1  folders with paper.  I could take them by, when I'm finished with

2  them, I know they're no good, I'd put them in a different room and

3  narrow down what I need to work on.  I can't really do that yet

4  here with this.

5       We've asked the people at CACI to input into the system

6  a way that we can mark these documents, and they haven't responded

7  yet.  We just got that -- we were just turned down Wednesday at

8  our second training session, when we thought maybe the trainer

9  could explain to us how to do that, and she said it's not, it's

10  not there.

11       Again, it's -- if you focus on the issue of what

12  location the case is being tried in for the purpose of the time of

13  getting witnesses to trial, you miss the point of this case.

14       You know, it's not like someone drove up here or flew up

15  here from Missouri and then robbed a 7-Eleven and then went home

16  and said, "I want to be tried in Missouri for that crime."  I

17  mean, nobody would, would dispute the fact that that's not the way

18  it should be.  He or she should come here and stand trial, because

19  the 7-Eleven witnesses are here and the police officers are here

20  and the car rental shop is here and all that kind of thing are

21  here, where the 7-Eleven was robbed, and you have no right to be

22  tried in Missouri for that kind of a crime committed here.

23       But all the behavior took place -- 99 percent of the

24  behavior took place either in Ocala or Orlando, Florida.  We have

25  no problem with the case if it goes down to Florida being tried in

1   Orlando as opposed to Ocala.  There's no question that it's a

2   smaller community and there's a smaller court staff, but that is

3   so much more convenient, because counsel can work with Mr. Farkas

4   in Ocala and have to be in Orlando in an hour, hour-and-a-half

5   drive.  Their highways are a little more efficient down there than

6   ours are up here; I could tell you that.  I was amazed to be on a

7   major interstate highway and actually not be bumper to bumper all

8   the way back and forth to Ocala.

9           But the -- but it's just, it's the pretrial preparation

10  of this case where the location has its most impact, and that's

11  very essential to the defendant developing a defense.  It really

12  is.

13          I mean, I don't mean to try and -- I know the Court has

14  thought through all these factors, and I was hoping to have a

15  chance to articulate in person today the points I -- if you give

16  me a chance to make, because I don't think you really can read

17  that or pick that up, the impact of that from reading the

18  memorandum as well as we tried to lay it out.  It's there in our

19  memo, but it just doesn't come out as well.

20          THE COURT:  Well, if I require the government to provide

21  all of the documentary support they have for each and every count

22  in the indictment in paper to you, that can easily be shared with

23  Mr. Farkas, and you can certainly talk about that.  If he's got

24  the document in front of him and you have the document in front of

25  you, you can clearly talk about each and every one of those,

1   right?

2           MR. CUMMINGS:  Well, that would be helpful, Your Honor.

3   I don't know if Your Honor noticed that in the government's

4   response to our, to our motion, they added facts in there that do

5   not appear to be anywhere in the indictment or the sense of the

6   indictment, and so where those are coming from we're not really

7   sure.  They suggest a whole lot more activity here than appears in

8   the indictment.

9           As we state in our memorandum, the kind of witnesses

10  from Freddie Mac or Ginnie Mae or SEC or people like that are

11  going to be just perfunctory witnesses who said that, you know, we

12  got these here and things of that nature or we relied upon this

13  type of document to be truthful, and end of questioning.

14          We're not talking about witnesses who participated or

15  had anything to do with any alleged misrepresentations.  All those

16  people are still in Florida.

17          THE COURT:  All right.  Well, Mr. Connolly, let me hear

18  from the government.  I assume you're -- who's speaking on this

19  issue?  Mr. Stokes?

20          MR. CONNOLLY:  It depends if it's the transfer issue,

21  Your Honor, or the database issue.  Mr. Stokes is in a better

22  position to address --

23          THE COURT:  Well, let me hear on the database issue

24  first.  Mr. Stokes?  First of all, let me ask you this:  Does the

25  government at this time, have you pulled together all of the

1  documentary evidence that supports each and every one of the

2  allegations in the indictment?

3         MR. STOKES:  No, Your Honor, we've not pulled together

4  all.  We certainly have pulled together much.  If I can give the

5  Court a little bit of context, that will certainly address this

6  issue and some of the others.

7         First of all, Your Honor, these complaints, this is the

8  first time we've heard these complaints.  This is why under rule

9  16 it requests that -- directs parties to address discovery issues

10 before coming to court.

11        Many of these issues are eminently solvable, and we

12 are -- I want to be very clear with the Court, we are bending over

13 backwards and willing to bend over backwards to help Mr. Cummings,

14 and we've left the door open, we've told him we will assist him,

15 we sat down with him for more than two hours, walked through our

16 theory of the case, walked through our documents, explained

17 everything in the indictment well beyond what we would ever do in

18 the normal case, and we continue to make that resource available

19 to him to identify documents.

20        His inability to locate certain of our documents, we

21 weren't aware of that.

22        THE COURT:  But you have them.

23        MR. STOKES:  We've given them to him, and so we've given

24 him what we've identified as key documents supporting the

25 indictment, but, Your Honor, we are happy -- and I should point

1   out that there are other sources of documents that we've given

2   him.

3         For example, there is an over-100-page document filed in

4   the TBW bankruptcy by a law firm that was put together by forensic

5   accountants that lays out in tremendous detail the sort of

6   accounting of the assets and the assets that were missing from

7   Colonial Bank from Ocala Funding.  It lays out the scheme in many

8   ways.  We've provided that to the defense.

9         So -- but again, we are happy to sit with him and walk

10  him through.  We're not trying to hide the ball on this, and so we

11  are more than happy to walk him through, identify these things.

12        If I could just give you a better understanding of some

13  of the issues with the database, it's a searchable database.  I

14  understand that Mr. Cummings has just begun using the database,

15  and as with any database user, you become more facile with it over

16  time and better able to locate documents.

17        It is organized, the way it's organized is by source.

18  There are a tremendous amount of documents in this case in part

19  because TBW and Colonial Bank failed because of this scheme, and

20  so there was not subpoena response but rather copying of wholesale

21  servers at times.

22        But the documents are organized by whether they're

23  provided by Freddie Mac, whether they're provided by TBW, whether

24  they're provided by individuals, whether they're provided to us

25  through the SEC subpoena process, whatever it is.  So there are --

1  there's a tree, a structure to the database that allows one to

2  search within just particular databases, to look at just

3  particular types of documents, so on and so forth.

4          One can, for example, with e-mails, one can sort the

5  database and look at only e-mails to Mr. Farkas or from Mr. Farkas

6  containing certain words.  So there are a number of different

7  ways.  It's much like Westlaw, and so Westlaw has, I don't know

8  how large the database is for Westlaw, but one runs searches, one

9  finds pertinent documents.  That's how this database works.

10         I understand that learning the database can be

11 difficult, and we're certainly willing to assist Mr. Cummings.

12 What we have done to date, though, is we have not -- we have

13 intentionally placed a firewall between us and CACI, which is the

14 administrator of the database, and Mr. Cummings' dealings with the

15 database so that we are not aware of any of his actions, so to the

16 extent that he's having a problem, he needs to let us know.  We

17 think it would be inappropriate for us to go to CACI to find out

18 what he's doing with the database or problems that he's having.

19         So we're happy to resolve these issues and to discuss

20 them with him and, since we're paying for the database, go to CACI

21 and try to resolve these issues.  The database does have a tagging

22 system where you are able to tag particular documents to save them

23 so that you don't have to keep searching for them.  One can print

24 out the documents, and one can download them as a PDF.  If they're

25 downloaded as a PDF, which is very easy, one can highlight them on

1   the computer, manipulate them on the computer.  One can then

2   e-mail them on the computer to Mr. Farkas or otherwise.

3          So we think this is, this is the nature of these sorts

4   of cases where corporate crimes are -- the discovery in them as in

5   civil cases and now as in many criminal cases, there's a

6   tremendous amount of electronic data, and the databases are

7   perhaps not perfect, but this is a state-of-the-art database.

8          THE COURT:  All right.  But nevertheless, if and when

9   this case goes to trial, you may present the evidence

10  electronically, but you will have paper copies of every exhibit --

11         MR. STOKES:  Yes.

12         THE COURT:  -- because the jury doesn't have the

13  computers in the jury room.

14         MR. STOKES:  Yes.

15         THE COURT:  And so the government should at this point,

16  because, you know, the case was set for trial fairly soon, in the

17  fall, have all the documents that support Count 1, Count 2, Count

18  3, etc., pretty much together.

19         MR. STOKES:  Your Honor, I can make this commitment to

20  the Court:  We will certainly -- I hesitate to make a commitment

21  that by a specific date in the near future, we will provide him

22  everything, because that's such a daunting task, and there may be

23  important documents that we find later, but we will on an ongoing

24  basis provide Mr. Cummings, whether in paper or electronically,

25  documents that we find that are relevant to the counts and

1  important to the counts.

2          Again, we are happy -- we recognize that the 19 million

3  documents is over-inclusive.  The relevant documents in the case

4  is far smaller, and we've begun that process of identifying for

5  him the types of documents -- what I mean by -- and so we will

6  continue to do that and provide him the documents that we think he

7  needs to understand our case.

8          To give the Court an idea of what this means, for

9  example, there are within one of the areas, the allegations, is

10 with a facility called AOT, the assignment of trade facility, in

11 which there were a number of fake securities, these trades that

12 were sold between TBW and Colonial Bank.

13         We have provided Mr. Cummings with a string of e-mails

14 and documents that support the creation of the fake security and

15 the sale of the fake security to Colonial Bank as well as the

16 money back from Colonial Bank to TBW at that point in time, and so

17 we have walked through for the counts of indictment and shown him

18 those documents.

19         There are additional transactions of that nature that we

20 would present as part of our conspiracy count as establishing the

21 enormity of the loss, approximately $500 million worth of

22 securities that were sold that had absolutely no loans backing

23 them.

24         So we have documents that we will provide to him to

25 assist him, but Mr. Cummings now has the template, it's literally

1 | just a template of how these transactions work, and is able to

2 | identify those as well, but we've identified the fake securities,

3 | and so we will pull together documents to show these things.

4 | So the point I'm making to the Court is that there are a

5 | lot of documents here, but we're -- we will do our best to narrow

6 | the universe for him of what the government wants.  It's a little

7 | difficult for us, of course, without knowing what his theory is to

8 | try to assist him in any way and perhaps inappropriate.

9 | THE COURT:  Well, the defense has no obligation to give

10 | you their theory.

11 | MR. STOKES:  Understood.  My point is we're simply

12 | limiting ourselves to our theory of the case and what we're trying

13 | to prove.

14 | THE COURT:  All right.

15 | MR. STOKES:  But I do want to emphasize to the Court,

16 | though, that we are very happy to work with Mr. Cummings to try to

17 | work through these issues, and that's something we've done, and

18 | just if he picks up the phone and calls us, we'll do that.

19 | THE COURT:  All right.  Let me hear you, Mr. Connolly,

20 | on the issue about the transfer.

21 | MR. CONNOLLY:  Your Honor, I think most of the position

22 | is set forth in our brief, but to follow up to a point that

23 | Mr. Cummings made both in his brief and orally, I'd like to hand

24 | up to the Court -- and this will also help from a discovery

25 | perspective as well -- what's been marked as Government Exhibits 1

1  through 8.

2         THE COURT:  Give them to Mr. Wood, and then he'll bring

3  them up.

4         MR. CONNOLLY:  Mr. Wood?

5         I'm providing a copy to counsel.

6         Your Honor, this is just a -- one example, it's not the

7  universe, but what these documents represent, Government Exhibits

8  1 through 7 represent seven meetings between 2006 and 2009 that

9  Mr. Farkas personally attended at Freddie Mac in McLean, Virginia,

10  to discuss TBW's dealings with Freddie Mac.

11         He made them -- he brought himself into this district,

12  met with Freddie Mac, which was the lifeblood of TBW's business,

13  in person, and these are meetings which show those meetings

14  occurred and some of the topics that were discussed.

15         And so, for example, in our papers, when we say there

16  will be substantive witnesses from Freddie Mac, these are the

17  types of witnesses we would call to talk about what was discussed

18  and the financials that were discussed and the representations

19  that were made.

20         Government Exhibit 8, Your Honor, another one, is just

21  an example of an e-mail, an escrow agreement that is forwarded to

22  an individual whose company was based in Arlington, Virginia, as

23  part of the capital raised.  In the indictment, there is a -- the

24  TARP scheme is referred to as a capital raise overall scheme --

25  and it's information that's being forwarded into this district by

1    Mr. Farkas pursuant to his attorneys who were based in D.C.

2            So I just wanted to raise these, because there was

3    representation in defendant's briefing that he never, ever set

4    foot in the Eastern District of Virginia with respect to his

5    scheme.

6            As this Court pointed out, it's a national impact case.

7    There are significant ties.  Witnesses are throughout the country.

8    Mr. Farkas, you know, came into this district on many occasions.

9    He sent information to this district, and for the reasons that the

10   Court articulated as it was running through the *Platt* factors with

11   which the government agrees and the general presumption that cases

12   should be tried where they are brought, Your Honor, we'd ask the

13   Court to deny the motion to transfer.

14           THE COURT:  All right.  Despite Mr. Cummings' articulate

15   argument that it certainly puts a burden on counsel to work at a

16   distance from his client, I'm not changing my view that the

17   plaintiff -- sorry, that the defendant has not met his burden of

18   establishing that the trial should be transferred either because

19   of inconvenience or because of the interests of justice.  I think

20   that the case definitely has significant ties to this jurisdiction

21   and that many of the obstacles can be overcome.

22           The bigger concern I have is this discovery issue.  What

23   I'm going to do at this point is just put both sides on notice

24   that I am open to further proceedings on the discovery issues.

25           Mr. Cummings, I've had other cases where there have been

these problems with these databases, and I want to make sure that

they're resolved as quickly as possible.  I want to make sure that

the government does provide you as soon as they have it available

any and all documents that are supporting their counts, and the

way in which that is to be done, do you want that in paper or

electronically?

MR. CUMMINGS:  I'm sorry, do I want what in paper?

THE COURT:  The exhibits, the documents which the

government is using to support their counts, do you want those

documents presented to you electronically or in paper?

MR. CUMMINGS:  It's better for me, Your Honor, if they

come in paper.  If they're also on the database, they could

identify the Bates number.

What I was commenting about earlier, Mr. Stokes did give

me these documents, as I mentioned to the Court, that he said were

the essence, not all but the essence of the -- with the exception

of Count 1, which is the conspiracy count, and we'd like to see

some documents on that, but because those pages were not Bates

stamped, last weekend, the holiday weekend, I spent all three

days, eight hours or nine hours a day, using the word search,

trying to find those documents by word search because I didn't

have a Bates stamp.  I was not going down through the, you know,

item by item, and I couldn't find them.  That's my point.

MR. STOKES:  And, Your Honor, we'll provide them in

Bates stamp.

1          MR. CUMMINGS:  And so I don't know how ingenious you

2    have to be to know how to find things in a word search when I used

3    several different words for each of those documents and they

4    didn't show up.  So --

5          THE COURT:  All right.  Now, in terms of the way the

6    data is organized, is there some, is there some logic to it in

7    this respect:  If Bates stamp 255 is a document, will document 256

8    be related to it or connected to it?

9          MR. CUMMINGS:  Yes and no.  I mean, we've been through

10   it enough to know that it may be but not necessarily.

11         THE COURT:  But at least if you had 255, you could go to

12   that portion of the database --

13         MR. CUMMINGS:  Clearly.

14         THE COURT:  -- and do a quickie search maybe from 250 to

15   260 to see --

16         MR. CUMMINGS:  Oh, right.

17         THE COURT:  All right.

18         MR. CUMMINGS:  But not necessarily that the next one or

19   two would, would be related.  It could be somewhere else, because

20   I don't think they were put in in that order.  As Mr. Stokes said,

21   I mean, it was sort of grab them, take them, identify where they

22   came from, and then take them to CACI, who just puts them in a

23   scanner and puts a Bates number on them.

24         So CACI is not -- was not doing anything with any

25   decision-making process in terms of what's relevant.  They're not,

1 | they're not trained to do that.

2 |       I don't think the FBI was looking over their shoulder

3 | when they gave them to us.  There may have been some sense of

4 | organization, but it's clear to me that there was a lot that was

5 | not well organized when they put them together.

6 |       THE COURT:  Mr. Stokes is indicating that there's not a

7 | problem doing this, but I will direct the government to

8 | immediately provide Mr. Cummings with paper copies of all exhibits

9 | you have at this point that are supporting the counts in your

10 | indictment, with the Bates stamp numbers on those documents.

11 |       Now, if there are some documents that are not in that

12 | database, I think Mr. Cummings needs to know that.

13 |       MR. CUMMINGS:  We do, because their intent they've

14 | expressed to me is to have all the documents that they have on the

15 | database, and so I know that's what they're trying to do.

16 |       THE COURT:  All right.

17 |       MR. CUMMINGS:  In fact, we just got some audiotapes

18 | which I had previously had in audio only, and they now have been

19 | added to the database.

20 |       THE COURT:  All right.  And obviously, that will be a

21 | rolling production in the sense that all that you have at this

22 | point, as you develop more, obviously, they should forthwith be

23 | sent over to counsel.

24 |       MR. STOKES:  Absolutely, Your Honor.  And if I could,

25 | just to clarify two issues:  One is we'll certainly provide them

1   to him in paper if that's what he wants.  I would just ask for a

2   little flexibility, because I suspect at a certain point

3   Mr. Cummings may prefer to have them electronically, and we can

4   provide --

5         THE COURT:  You two can work that out, but at this

6   point, it's paper.

7         MR. STOKES:  Yes.  Some of the nature of this evidence

8   is that the supporting evidence are information in databases, so

9   there's accounting databases and so forth.  There just simply

10  aren't printouts of those data, but instead, there are databases

11  and then summaries and reports run off of those databases, and so

12  we will provide them, but I point that out only because in some

13  instances, Mr., Mr. Cummings actually has but also needs the

14  database, and there really isn't a printout that we can give him

15  of that --

16        THE COURT:  Well, then you need to point to the Bates

17  number for that particular database so he can get to it.

18        MR. STOKES:  Absolutely.

19        THE COURT:  All right.

20        MR. STOKES:  And we have, Your Honor.  We have that

21  information.  We've provided him maps of the database and so

22  forth.

23        THE COURT:  Well --

24        MR. STOKES:  But we'll work with him on all of this

25  and --

1          THE COURT:  And if you're not already doing this, both

2    sides should be doing these discovery exchanges in writing so that

3    there is a record for down the road if there are significant

4    problems in the discovery production, that certainly is a

5    potential issue for an appellate court, depending upon what

6    happens ultimately in this case, and there's no record if there

7    hasn't been a clear, you know, written demand from defense

8    counsel, a clear written response from the government, all right?

9    It helps this Court, too, if we have any further discovery

10   disputes.  All right.

11         MR. CUMMINGS:  Point of clarification, Your Honor:

12   Mr. Stokes, I think, was suggesting that there is some accounting

13   data database.  We understood those accounting records were still

14   in Ocala.  Are they now on the database?

15         MR. STOKES:  No.  We've provided and have had ready for

16   some time, it was the protective order issues and the counsel

17   issues that precluded the defense from receiving certain

18   documents, but, for example, Troutman Sanders, a law firm in

19   Atlanta, bankruptcy counsel for TBW, prepared a database.  That

20   database has been provided to Mr. Cummings.  He's had it since the

21   moment he gained access to the database.

22          That allows him to search various, I believe, I could be

23   wrong on the number, but there are 19 different databases in

24   there.  It allows him to search servicing information, sale

25   information, various documents of -- from Colonial Bank that it

1    received, various types of spreadsheets that it received.

2         So Mr. Cummings has those databases.  Again, we're happy

3    to walk him through and explain the nature of the database.  The

4    database is such that when Mr. Cummings runs a search, it doesn't

5    return documents in any -- necessarily in any sequential order.

6    It pulls documents from throughout the database and provides

7    relevant hits, just like a Westlaw database.

8         So it doesn't -- it's not particularly meaningful to go

9    to the database from document 1 to document 19 million, but

10   rather, to run searches, but we'll, we'll explain to him in more

11   detail what the architecture of the database is so that he can

12   pinpoint the areas that he's interested in, and we'll give him our

13   own recommendations for areas that perhaps are of interest so that

14   he can conduct whatever searches he wants in those areas.

15        THE COURT:  But this database was created by a law firm

16   involved in the bankruptcy proceeding.

17        MR. STOKES:  To be clear, I think I may have caused some

18   confusion.  The, the database that we are operating is created by

19   the government.  In other words, it's documents we've collected

20   and --

21        THE COURT:  Well, I understood that.  I thought you said

22   that Troutman Sanders --

23        MR. STOKES:  Yes, created its own smaller databases, a

24   series of databases that assembled a number of different documents

25   at TBW into approximately 19 different databases, and so those

1  individual databases can also be queried and run to look for

2  particular information related to the transactions at issue.

3          THE COURT:  All right.  Now --

4          MR. CUMMINGS:  Are they, are they on the CACI database?

5          MR. STOKES:  Yes, yes.

6          THE COURT:  All right, you need to identify those by

7  Bates stamp, but let me ask you this:  Mr. Farkas is not himself

8  named in the bankruptcy proceeding, is he?

9          MR. STOKES:  Mr. Farkas is not.  In other words, TBW is

10 the debtor --

11         THE COURT:  The company.

12         MR. STOKES:  The company is the debtor in possession;

13 that's right.

14         THE COURT:  Well, Mr. Cummings -- and this is just a

15 question to you, and you don't have to answer it if you don't want

16 to or if you can't -- I would assume that Mr. Farkas is being

17 advised to some degree about what's going on in the bankruptcy

18 proceeding.  Does he have counsel that are representing his

19 interests in that proceeding?

20         MR. STOKES:  He does have bankruptcy counsel, Your

21 Honor, that has filed a notice of appearance on his behalf and

22 appeared before the bankruptcy judge in Jacksonville, Florida.

23         MR. CUMMINGS:  He says the court never notices him on

24 any of the proceedings in the bankruptcy court, Your Honor.

25         THE COURT:  But Mr. Stokes has just said that he has

1    counsel.  He wouldn't get a notice if he has counsel.

2           MR. CUMMINGS:  Your Honor, not in general, Your Honor.

3           THE COURT:  Well, I mean, that would be part of his

4    bankruptcy counsel's obligation would be to keep him informed.

5    So, I mean, your client may actually have access to some of this

6    information, too.  But I'm not going to spend any more time on

7    this discovery issue.  I expect you-all to start immediately

8    working on it, all right?

9           MR. STOKES:  Yes, Your Honor.

10          THE COURT:  I think that the degree to which the

11   discovery is made more, made more available to counsel, better

12   organized for counsel, significantly undercuts the argument

13   Mr. Cummings makes that it's going to be difficult to prepare for

14   trial because of a geographical distance from his client.

15          Again, I have found that you can teach classes by

16   distance.  I teach at Syracuse Law School every now and then via

17   video hookup from this courthouse.  We have technology that allows

18   people to communicate very effectively over distances, and all

19   communication does not have to be done face to face, but the

20   primary problem in this problem -- in this case is that the

21   physical discovery is just out of control at this point.

22          So, Mr. Cummings, keep on top of it.  Let us know if

23   there's a problem.  We'll hold a hearing on it again, all right?

24          MR. CUMMINGS:  I will, Your Honor.  Mr. Farkas -- what I

25   addressed moments ago and perhaps it got lost in the shuffle

1   addresses what you were just talking about with Mr. Stokes and

2   with Mr. Farkas.  We don't necessarily know that what the

3   bankruptcy trustee, that is to say, the counsel for the trustee,

4   Troutman Sanders, what they pulled off and assembled for their

5   purposes may not be the full accounting system and may not

6   therefore serve all our purposes, but we may want to have to apply

7   for access to to have a forensic accountant go on the premises,

8   because that accounting system to our knowledge is still there at

9   the TBW headquarters there in Ocala, and have access to that if we

10  find that we need to have the native data as opposed to what's

11  been selected.

12          THE COURT:  All right.  That's something you can apply

13  for down the road, all right?

14          MR. CUMMINGS:  Thank you.

15          THE COURT:  Now, I need to take up one matter with

16  Mr. Cummings ex parte.  It has to do with CJA funding, and so I'll

17  ask you to approach the bench.

18          (Pages 40 through 42 filed under seal.)

19          *        *        *        *        *

20

21

22

23

24

25

1          *          *          *          *          *

2          THE COURT:  All right, that should complete -- that

3   finishes this case.  All motions have been addressed now, correct?

4          MR. CUMMINGS:  Thank you, Your Honor.

5          THE COURT:  All right.  Mr. Farkas, you're free to go.

6          MR. CONNOLLY:  Your Honor, is the Court considering

7   issuing a written opinion setting forth what it orally said in

8   court?

9          THE COURT:  On the *Platt* factors, yes.

10          MR. CONNOLLY:  Yes.  Thank you, Your Honor.

11                         (Which were all the proceedings

12                          had at this time.)

13

14                    CERTIFICATE OF THE REPORTER

15      I certify that the foregoing is a correct transcript of the

16   record of proceedings in the above-entitled matter.

17

18

19   _____
                         /s/
20                Anneliese J. Thomson

21

22

23

24

25