UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .        Criminal No. 1:10cr200
                              .
    vs.                       .        Alexandria, Virginia
                              .        April 7, 2011
LEE BENTLEY FARKAS,           .        2:05 p.m.
                              .
             Defendant.       .
                              .
. . . . . . . . . . .         .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME 4 - P.M.

APPEARANCES:

FOR THE GOVERNMENT:              CHARLES F. CONNOLLY, AUSA
                                PAUL J. NATHANSON, AUSA
                                United States Attorney's Office
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                  and
                                PATRICK F. STOKES, ESQ.
                                ROBERT ZINK, ESQ.
                                United States Department of Justice
                                Criminal Division, Fraud Section
                                1400 New York Avenue, N.W.
                                Washington, D.C. 20005


FOR THE DEFENDANT:              WILLIAM B. CUMMINGS, ESQ.
                                William B. Cummings, P.C.
                                P.O. Box 1177
                                Alexandria, VA 22313


(APPEARANCES CONT'D. ON FOLLOWING PAGE)


(Pages 887 - 1038)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1    APPEARANCES:   (Cont'd.)

2    FOR THE DEFENDANT:              BRUCE S. ROGOW, ESQ.
                                     Bruce S. Rogow, PA
3                                    500 East Broward Boulevard
                                     Suite 1930
4                                    Fort Lauderdale, FL 33394
                                       and
5                                    CRAIG KUGLAR, ESQ.
                                     Law Office of Craig Kuglar, LLC
6                                    1130 Piedmont Avenue, Suite 913
                                     Atlanta, GA 30309
7                                      and
                                     ZAHRA S. KARINSHAK, ESQ.
8                                    Krevolin & Horst
                                     1201 West Peachtree Street
9                                    One Atlantic Center, Suite 3250
                                     Atlanta, GA 30309
10

11   ALSO PRESENT:                   JENNIFER GINDIN
                                     LISA PORTER
12                                   SA SCOTT TURNER
                                     JUDSON VAUGHN
13

14   OFFICIAL COURT REPORTERS:       ANNELIESE J. THOMSON, RDR, CRR
                                     NORMAN B. LINNELL, RMR, FCRR
15                                   U.S. District Court, Fifth Floor
                                     401 Courthouse Square
16                                   Alexandria, VA 22314
                                     (703)299-8595

17

18

19

20

21

22

23

24

25

889

1                          I N D E X

2                     DIRECT   CROSS   REDIRECT   RECROSS

3  WITNESS ON BEHALF OF
   THE GOVERNMENT:

4
   Cathie Kissick          891    909
5    (Resumed)

6

7                         EXHIBITS

8                                RECEIVED    WITHDRAWN

9  GOVERNMENT'S:

10 No. 1-13                        985
       1-262                       891
11     1-264                       897
       22-2A                       918
12     22-32                       903
       22-33                       903
13

14 DEFENDANT'S:

15 No. 1                           914         918
       2                           926
16     3                           932
       5                           935
17     185                         980

18     186                         980
       187                         980
19     188                         980
       202                         988
20     203                         957

21     204                         991
       205                        1009
22     206                        1021
       207                         969
23     209                        1027

24     210                        1019
       211                        1024
25     212                         952
       213                        1003

890

EXHIBITS (Cont'd.)

|  | RECEIVED | WITHDRAWN |
|---|---|---|

DEFENDANT'S:

| | RECEIVED |
|---|---|
| No. 215 | 1006 |
| 251B | 981 |
| 251C | 981 |
| 251D | 947 |
| 551 | 910 |
| 552 | 1017 |
| 560 | 1012 |
| 561 | 1016 |

1                    A F T E R N O O N   S E S S I O N

2                      (Defendant and Jury present.)

3    CATHIE KISSICK, GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED, RESUMED

4                      DIRECT EXAMINATION (Cont'd.)

5    BY MR. STOKES:

6    Q.   Ms. Kissick, I believe we left off talking about PINs, and

7    would you please tell us what a PIN is?

8    A.   It's a peer-to-peer communication between a BlackBerry and a

9    BlackBerry.  It doesn't go through the server.

10   Q.   And did you communicate with the defendant and Teresa Kelly

11   and Desiree Brown at times through PINs?

12   A.   Yes.

13   Q.   And why did you do so?

14   A.   Because they didn't go through the bank server.

15   Q.   What types of information did you communicate through PINs

16   with those individuals?

17   A.   Plan B.

18   Q.   Would you also have other private or personal matter

19   communications on your, on your BlackBerry through PINs?

20   A.   Yes.

21   Q.   Now, Ms. Kissick, can you take a look at Government's Exhibit

22   1-262?

23             MS. KARINSHAK:  No objection, Your Honor.

24             THE COURT:  All right, it's in.

25             (Government's Exhibit No. 1-262 was received in

1    evidence.)

2    BY MR. STOKES:

3    Q.    When the, when the government agents met with you on July 31

4    and then after that, did you provide the government agents some of

5    your PINs?

6    A.    I provided them all of my PINs.

7    Q.    Well, had you over the years been PIN-ing with the

8    defendants?

9    A.    Yes.  I provided them all the PINs that were in my

10   BlackBerry.

11   Q.    Okay.  So you didn't have all of your PINs over the years

12   preserved?

13   A.    No.

14   Q.    So whatever you had in your BlackBerry in other words you

15   provided?

16   A.    Yes.

17   Q.    Okay.  So if you'd look at 1-262, do you see, what is it --

18   is this one of the PINs?

19   A.    Yes.

20   Q.    Okay.  And so does it look like just a normal e-mail or a

21   text message?

22   A.    Yes.

23   Q.    When you receive it on your BlackBerry?

24   A.    Yes.

25   Q.    Okay.  And so this is from you to Lee Farkas on July 23,

1    2009?

2    A.    Yes.

3    Q.    Was this prior to you meeting with the, the agents and

4    talking to them?

5    A.    Yes, it was.

6    Q.    Okay.  And so what do you say to him?

7    A.    "Any way with some deposits that you could move some of the

8    AOT in question to Platinum and we can be done with it?"

9    Q.    And what does Lee Farkas respond to you?

10   A.    "Yes."

11   Q.    What are you talking about there?

12   A.    We had to get down half a billion dollars in assets,

13   Colonial, and if we let him move some of his deposits over, could

14   he move some of the, I think it was the agency, agency loans that

15   were mislabeled over there?

16   Q.    So that's the AOT in question are the -- are these the fake

17   agency trades with loans behind them?

18   A.    Yes.

19   Q.    Now, Ms. Kissick, on July -- do you recall on July 25 of 2009

20   having a telephone conversation with the defendant or having some

21   conversations with the defendant and Teresa Kelly about a, a disk

22   of data?

23   A.    Yes.

24   Q.    And what, what was this disk of data?  What did you

25   understand the disk of data to be that you were talking about?

1   A.   Originally, I thought it was supposed to be the list of loans

2   to show that everything fit and we could get AOT to be in proper

3   order with private label trades.

4   Q.   Now, Ms. Kissick, where was this list supposed to come from?

5   A.   Taylor Bean.

6   Q.   And how did you, how did you come into possession of it?

7   A.   Well, I actually never possessed it, but Lee Farkas was going

8   to drive it down to Orlando.

9   Q.   Do you know if he did?

10  A.   He did.

11  Q.   And who did he provide it to?

12  A.   Teresa Kelly.

13  Q.   And so what did you say that you thought it was going to be?

14  A.   We thought it was supposed to be -- we were getting ready for

15  our FDIC exam, and we thought it was the list of loans that we had

16  so we could put all the trades in proper order on AOT.

17  Q.   Now, let me be clear about this:  You thought that these were

18  going to be loans --

19  A.   As of July -- as of the time frame we were in right then.

20  Q.   The list of loans that you were provided, did you think that

21  those were loans that were already listed on AOT?

22  A.   It was to fill the hole.

23  Q.   Okay.  So these are loans to fill the hole.

24  A.   Yes.

25  Q.   And why were you trying to fill that hole at that moment?

1   A.   Because we had FDIC coming in the following week.

2   Q.   Now, did, did you talk to Ms. Kelly about that, that list of

3   loans the defendant provided her?

4   A.   Yes.

5   Q.   And then did you talk to the defendant?

6   A.   Yes.

7   Q.   And what did you come to understand that list of loans

8   actually was?

9   A.   It was as of their March 31 fiscal year end.

10  Q.   So in other words, was this data related to filling the hole

11  for you at Colonial Bank?

12  A.   No.

13  Q.   And so why -- did you -- did the defendant explain to you why

14  he was providing you data for March 31?

15  A.   He had said just to kind of hold on to it.

16  Q.   Do you know why he was giving you, though, this data -- or

17  why he was giving Colonial Bank this data?

18  A.   No.

19  Q.   Do you know what purpose it was supposed to serve for Taylor

20  Bean?

21  A.   It was his fiscal year end information.

22  Q.   Do you know if there was anything going on at Taylor Bean --

23  A.   He was trying to get his audit done, but there was -- there

24  were problems.

25  Q.   Did you talk to him about his audit?

1   A.    Yes.

2   Q.    Okay.  And so did he explain to you what he -- what these

3   auditors were doing at Taylor Bean with regard to AOT?

4   A.    No.  At first, he told me that there was a problem on COLB

5   with wet loans, and then later on, he said there was an issue with

6   REO on AOT, and they were just trying to reconcile their assets.

7   Q.    Well, did you have Teresa take a look at those loans that he

8   provided you?

9   A.    Yes, we did.

10  Q.    Okay.  Did those loans match Colonial Bank's records for AOT

11  from March 31?

12  A.    No.

13  Q.    Were those loans that were on this list representing loans as

14  of March 31, were they actually eligible to be on AOT as of March

15  31?

16  A.    No, I don't -- no.

17  Q.    Why not?

18  A.    Because we showed them being shipped off to somebody else.

19  Q.    Had they already been sold to another bank?

20  A.    Bank of America.

21  Q.    Now, Ms. Kissick, after you met with the FBI, did you then go

22  to Ohio?

23  A.    Yes.

24  Q.    And did you return before the, before you left the bank

25  permanently?  Did you return to the bank after you went to Ohio?

Kissick - Direct                                                        897

1   A.   No.

2   Q.   And, Ms. Kissick, while you were in Ohio, did you continue to

3   have communications with people at the bank?

4   A.   Yes.

5   Q.   And with Mr. Farkas?

6   A.   Yes.

7   Q.   Ms. Brown?

8   A.   No.  I didn't talk to her again.

9   Q.   Well, did you communicate by PIN or e-mail after that, do you

10  recall?

11  A.   To Desiree?

12  Q.   Yes.

13  A.   No.  We couldn't find her.

14  Q.   Okay.  If you'd take a look at Government's Exhibit 1-264?

15           MS. KARINSHAK:  No objection, Judge.

16           THE COURT:  All right, it's in.

17           (Government's Exhibit No. 1-264 was received in

18  evidence.)

19  BY MR. STOKES:

20  Q.   Okay.  Ms. Kissick, what is 1-264?

21  A.   "Please have Mike get the info to Teresa" --

22  Q.   Is that an e-mail?

23  A.   It's an e-mail, yes.

24  Q.   And is that from August 4, 2009?

25  A.   Yes.

1  Q.   And is that an e-mail from you to Lee Farkas?

2  A.   Yes.

3  Q.   Now, had there been a search warrant at Colonial Bank prior

4  to this?

5  A.   Yes.

6  Q.   On what date?

7  A.   I think the day before.

8  Q.   And how about at TBW, do you know?  Were you aware of whether

9  there was a search warrant?  Had a search warrant been executed at

10 TBW?

11 A.   I think it was the day before as well.

12 Q.   Okay.  And so what do you tell Lee Farkas?

13 A.   "Please have Mike get the info to Teresa ASAP.  Thanks."

14 Q.   What info are you trying to get the defendant to send to --

15 I'm sorry, are you trying to get, have the defendant have provide

16 Mike to Teresa?

17 A.   Well, this was after I heard that they got terminated by HUD,

18 and so I wanted to get the list of loans, because I knew they were

19 going to go down after that.

20 Q.   What list of loans?

21 A.   The list of loans that he had promised me forever.

22 Q.   List of loans for what facility?

23 A.   The AOT.

24 Q.   Okay.  So are you trying to fill the hole still after the

25 search warrant?

1   A.    At this point, I'm trying to get the loans, period.

2   Q.    Are you trying to fill the hole at that point, Ms. Kissick?

3   A.    Yes, I guess.

4   Q.    Well, did you have a hole at that point?

5   A.    Yes, on the facility.

6   Q.    And did you try to get a set of loans to take care of that

7   hole?

8   A.    At this point when I saw HUD, I was trying -- I knew that

9   they were going to be in big trouble, so I was just trying to get

10  loans.  Earlier, I had tried to get loans the day before, Monday,

11  to fill the hole.

12  Q.    Okay.  Now we're on Tuesday.  You're still trying to get a

13  list of loans to fill -- are you trying to get a list of loans to

14  fill that hole, Ms. Kissick?  Were you going to take those loans

15  and use them for something else?

16  A.    It was for a different reason.  It was because they were

17  going to be -- they got terminated by HUD.

18  Q.    Were those loans going to be used on another facility?

19  A.    They were just going to be used to protect us.

20  Q.    Were they going to be put on AOT?

21  A.    I guess.  I'm not sure.

22  Q.    Well, the question is whether you were going to -- were you

23  seeking these loans to put them on AOT?

24  A.    That was, that was not my intent then at all, because I just

25  heard they were going down.  I wanted to just get the loans,

1   period.  The day before, I was trying to get loans, but once the,

2   the, everything changed, then I was just trying to grab

3   collateral.

4   Q.    For whom?

5   A.    For Colonial.

6   Q.    And why were you trying to grab collateral for Colonial?

7   A.    Because we would be in a loss position.

8   Q.    Why would you be in a loss position?

9   A.    Because we had a hole.

10  Q.    Now, Ms. Kissick, had Mr. -- Special Agent Scott Turner

11  talked to you prior to this date about trying to obtain any

12  collateral for the bank?

13  A.    He said, he said, "Don't do something that would be out of

14  the ordinary, but run business as ordinary."

15  Q.    Did he tell you not to change anything on AOT?

16  A.    Yes.

17  Q.    And, Ms. Kissick, in the course of your cooperation -- or

18  after you met with the government, did the government -- on July

19  31, did the government ask you to forward various PINs that you

20  had had previously with Mr. Farkas?

21  A.    Yes.

22  Q.    And did you send some of those PINs to Mr. Turner?

23  A.    I did, yes.

24  Q.    And did you provide explanations for some of those PINs?

25  A.    Some of them, yes.

1    Q.   And in those explanations you provided to the government,

2    were you completely truthful about what the discussions were in

3    those PINs?

4    A.   No, I was not.

5    Q.   Did you -- in those PINs that you forwarded to the

6    government, did you tell Mr. -- Special Agent Turner that, that

7    the only problem was that there were these fake agency trades with

8    actual loans behind them?

9    A.   Yes.

10   Q.   These aged loans?

11   A.   Yes.

12   Q.   Did you describe it as an aged loan problem?

13   A.   Yes.

14   Q.   Did you tell Mr. Turner that there was Plan B pools on AOT at

15   that time?

16   A.   No.

17   Q.   Why didn't you?

18   A.   I was scared, very scared.

19   Q.   Were you trying to minimize your role in the scheme at that

20   point?

21   A.   I guess, yes.

22   Q.   Were you trying to protect yourself?

23   A.   Yes.

24   Q.   Now, Ms. Kissick, while you were out of town in Ohio and --

25   but were still in communication with folks from the bank, did you

1  receive any reports of any problems on the COLB facility at

2  Colonial Bank?

3  A.    I did, yes.

4  Q.    And what did you learn, just in general?

5  A.    I learned that there had been some double-pledging with the

6  Ocala Funding facility.

7  Q.    What was the Ocala Funding facility?

8  A.    It was a financing vehicle that was owned by Taylor Bean and

9  funded by two other banks.

10  Q.    And who controlled Ocala Funding?

11  A.    Taylor Bean.

12  Q.    And what was the double-pledging problem you've learned of?

13  A.    That loans that we had on our books were also on Ocala

14  Funding's books.

15  Q.    Approximately how much in value?

16  A.    Over a billion.

17  Q.    How much?

18  A.    Over a billion.

19  Q.    Is that a billion with a "B"?

20  A.    With a "B," yes.

21  Q.    And, Ms. Kissick, is there a problem with double-pledging?

22  A.    Yes, there is.

23  Q.    What's the problem with double-pledging?

24  A.    Only one has value.

25  Q.    Only one --

Kissick - Direct                                                              903

1   A.    Only one entity will actually have value.

2   Q.    So in other words, can a loan be owned by both Colonial

3   Banks -- Colonial Bank and Ocala Funding at the same time?

4   A.    No.

5   Q.    Now, Ms. Kissick, did you know prior to that of any problems

6   on Ocala Funding?

7   A.    No.

8   Q.    Or on COLB related to Ocala Funding?

9   A.    No.

10  Q.    Did you try to reach out to the defendant to find out what

11  was happening?

12  A.    Yes.  We tried to get a conference call with him with Sumeet

13  Wadhera from Deutsche Bank and tried to do a conference call to

14  figure out hopefully it was just a horrible clerical error or

15  something.

16  Q.    And if you'd take a look at Government's Exhibit 22-32 and

17  22-33?

18          Do you have 22-32 in front --

19          THE COURT:  Is there an objection to either of those?

20          MS. KARINSHAK:  One moment, Judge.

21          No objection, Your Honor.

22          THE COURT:  All right, they're both in.

23          (Government's Exhibit Nos. 22-32 and 22-33 were received

24  in evidence.)

25  BY MR. STOKES:

1  Q.   Ms. Kissick, take a look at 22-32.

2  A.   Um-hum.

3  Q.   And is that -- do you see, is this another PIN?

4  A.   Yes.

5  Q.   And did you forward this to Special Agent Scott Turner?

6  A.   I did.

7  Q.   On August 5, 2009, at approximately 3:00 p.m., did you PIN

8  Lee Farkas, Desiree Brown, and Donna Skuhrovec?

9  A.   Yes.

10  Q.   Okay.  And so earlier I asked you just for clarification

11  whether you'd had any communications with Desiree Brown after, I

12  believe, August 3.  Does this appear to be a communication with

13  her after this point?

14  A.   Well, I e-mailed -- we PIN'd her, but we never heard from

15  her.

16  Q.   I understand.  So in other words, you reached out to her?

17  A.   Yeah.

18  Q.   Okay.  So what does that, what does that PIN say?

19  A.   "I need one of you to call me immediately regarding COLB and

20  Ocala Funding.  Now.  My cell is 407-399-6162."

21  Q.   Was this around the time that you learned of the

22  double-pledging?

23  A.   Yes.

24  Q.   Why were you reaching out to them?

25  A.   To find out what the heck was going on.

1   Q.   Would you take a look at 22-33?  Is this another PIN?

2   A.   Yes.

3   Q.   Another PIN that you forwarded to Scott Turner?

4   A.   Yes.

5   Q.   And is this a PIN you sent to Desiree Brown on August 6, in

6   the morning?

7   A.   Yes.

8   Q.   And what do you say in this PIN?

9   A.   "I do not know what's going on, but you need to come in and

10  help us all figure it out.  There's a major disconnect between

11  Ocala Funding and COLB.  You have got to help solve the issue."

12  Q.   At that point in time, did you know what the issue was?

13  Other than that there was apparent double-pledging, did you know

14  how it happened?

15  A.   No.

16  Q.   Did you ever get a call back from Desiree Brown?

17  A.   No.

18  Q.   Did you ever get a call back or a communication from the

19  defendant about this double-pledging?

20  A.   No.  We tried to have a conference call with him, but we

21  never -- it never happened.

22  Q.   Did he ever respond to your PIN?

23  A.   I don't remember.

24  Q.   Now, Ms. Kissick, after this, did you hire an attorney?

25  A.   Not until I got home.

1  Q.    Once you got back to Orlando after this time period sometime
2  in early August, did you hire an attorney?
3  A.    Yes.
4  Q.    And at that time, did you agree to meet with the prosecutors?
5  A.    Yes.
6  Q.    And in your meetings with -- and agents?
7  A.    Yes.
8  Q.    And did you meet with the government numerous times over the
9  next year and a half?
10 A.    Yes.
11 Q.    Reviewed documents?
12 A.    Yes.
13 Q.    Explained various transactions and the business relationship
14 between Colonial Bank and TBW?
15 A.    Yes.
16 Q.    And did you discuss your role in this scheme?
17 A.    Yes.
18 Q.    And, Ms. Kissick, were you fully truthful at all times?
19 A.    Not at all times, no.
20 Q.    At the beginning, were you -- did you continue to minimize
21 your role in the scheme?
22 A.    Yes.
23 Q.    And why were you doing that?
24 A.    I was scared, and I was trying to protect myself.
25 Q.    Ms. Kissick, did you ultimately plead guilty?

Kissick - Direct                                                      907

1   A.    Yes.

2   Q.    When did you plead guilty?

3   A.    In March.

4   Q.    And when is your sentencing?

5   A.    June 17.

6   Q.    And how much time are you facing a potential sentence?

7   A.    Up to 30 years.

8   Q.    And, Ms. Kissick, what was your salary at Colonial Bank?

9   A.    It ended up being 260,000 or 268.

10  Q.    That was in the end?

11  A.    Um-hum.

12  Q.    And did you receive a bonus?

13  A.    Sometimes.

14  Q.    And how much in bonus would you receive?

15  A.    90,000, 100,000 sometimes, zero.

16  Q.    It depended on the year?

17  A.    Yeah.

18  Q.    It depended on the business?

19  A.    Um-hum.

20  Q.    And did you -- and you were the head of the division

21  receiving that amount of money?

22  A.    Yes.

23  Q.    Now, Ms. Kissick, did you receive any payments from

24  Mr. Farkas for doing Plan B?

25  A.    No.

1  Q.    Did he pay you any kickbacks?

2  A.    No.

3  Q.    Did he fly you any -- take you on any vacations?

4  A.    No.

5  Q.    Did he fly you on his jet?

6  A.    I went on his jet with him on a couple trips, business trips.

7  Q.    Did he ever let you use your jet -- his jet for personal

8  purposes?

9  A.    No.

10  Q.    Did he give you any free mortgages?

11  A.    No.

12  Q.    Did you receive anything of particular value from him in

13  connection with Plan B?

14  A.    No.

15          MR. STOKES:  The Court's indulgence?

16          THE COURT:  Yes, sir.

17          MR. STOKES:  No further questions at this time, Your

18  Honor.

19          THE COURT:  All right.  Cross-examination?

20          MS. KARINSHAK:  Your Honor, the podium was moved when I

21  came back from lunch and I would ask that it be moved back so I

22  can have access to my documents.

23          THE COURT:  It can't be moved very much because of the

24  wires.

25          Mr. Wood?

Kissick - Cross                                                      909

1              Don't you do it.

2              THE COURT SECURITY OFFICER:  Which way do you want it?

3              MS. KARINSHAK:  Just right back where it was.

4              MR. STOKES:  Your Honor, we may need to approach.

5    Mr. Wood has explained to us why he had moved the podium before.

6              THE COURT:  It's been fixed now.  There's no problem.

7              MR. STOKES:  Okay.

8              MR. KARINSHAK:  Actually, Your Honor, we didn't move it

9    at all.  I was going to put it up a little bit more.  Maybe

10   halfway.

11             THE COURT:  The jurors have to be able to see the

12   witness, all right?

13             MS. KARINSHAK:  Okay.

14             THE COURT:  You'll have to work it out.

15                        CROSS-EXAMINATION

16   BY MS. KARINSHAK:

17   Q.   Good afternoon, Ms. Kissick.  How are you today?

18   A.   Fine.

19   Q.   And my name is Zahra Karinshak.  I represent Mr. Farkas.  And

20   we haven't met before today, have we?

21   A.   No.

22   Q.   And I'm sorry, could you please speak up?

23   A.   No.

24   Q.   And we haven't talked on the phone?

25   A.   No.

1  Q.   And I don't believe we've ever even seen each other, correct?

2  A.   Correct.

3  Q.   Now, Ms. Kissick, we're going to go through some documents,

4  and I wanted to provide you a highlighter, because we're going to

5  try to highlight it on the screen, but we might also need you to

6  highlight some of those documents.  I'd like to show you what's

7  been marked as Defendant's Exhibit 551.

8            MR. STOKES:  No objection, Your Honor.

9            THE COURT:  All right, it's in.

10           (Defendant's Exhibit No. 551 was received in evidence.)

11           THE COURT:  I assume you're moving it in?

12           MS. KARINSHAK:  Yes, Your Honor, I am.

13 Q.   Now, if you could please look at Defendant's Exhibit 551,

14 Ms. Kissick, could you please tell us who is this message from?

15 A.   Milton Vescovacci.

16 Q.   And who is Mr. Vescovacci?

17 A.   He's Colonial's counsel.

18 Q.   So he's Colonial Bank's lawyer?

19 A.   Yes.

20 Q.   And did you deal with him quite frequently in your dealings

21 there at Colonial Bank?

22 A.   Yes, I did.

23 Q.   And who is this message to?

24 A.   To me, to Rodney Lewis, and to Tamara Stidham, who was

25 in-house counsel for Colonial.

1   Q.    So Ms. Stidham, Ms. Stidham is in-house counsel?

2   A.    Yes.

3   Q.    And who is Mr. Lewis?

4   A.    He was the account manager for Taylor Bean for us at

5   Colonial.

6   Q.    Okay.  Is he above or below you in your order?

7   A.    Below.

8   Q.    Sorry?

9   A.    Below me.  He reported me.

10  Q.    He reported to you?

11  A.    Yes.

12  Q.    Okay.  Now, looking at this e-mail, the date is August 7,

13  2009, correct?

14  A.    Correct.

15  Q.    And it's showing that -- and I'm looking at the

16  e-mail, "Attached is a draft notice of default for the overline

17  facility," and then it goes into what the collateral for the

18  overline facility is, correct?

19  A.    Yes.

20  Q.    Could you please read what the collateral for the overline

21  facility is?

22  A.    "The collateral includes among other things, mortgage loans

23  notes, REO property, accounts, servicing contracts, servicing

24  receivables, takeout commitment, hedging instruments, TBW shares,

25  a life insurance policy, and a second lien on the Natixis MSRs and

1   a cross-second security on the servicing facility collateral, and

2   proceeds of the foregoing."

3   Q.   So this is all collateral for one facility, that being the

4   overline facility, correct?

5   A.   Yes.

6   Q.   And this is an entire menu of the collateral from your lawyer

7   to you with respect to this facility, correct?

8   A.   Yes.

9   Q.   And you had looked at the documents with respect to the

10  overline facility, and you knew that you had all kinds of

11  collateral with respect to that facility, correct?

12  A.   Correct.

13  Q.   And all the collateral you just read for the jury is valid

14  collateral for that overline facility, correct?

15  A.   I'm sorry, what?

16  Q.   All of that collateral that you just read for the jury,

17  that's all valid collateral for the overline facility, correct?

18  A.   Yes.

19  Q.   And you had mentioned mortgage loan notes as one of those

20  things, but there are several others listed as well, such as REO

21  property, accounts, servicing contracts, correct?

22  A.   Yes.

23  Q.   So if I were to evaluate my collateral just based on the

24  mortgage notes, then I wouldn't be accurately assessing the

25  collateral for the entire facility, would I?

Kissick - Cross                                                                913

1   A.    For the overline?  No.

2   Q.    So I wouldn't be doing it right if I just relied on the

3   notes, correct?

4   A.    Right.

5   Q.    Now, you mentioned a life insurance policy.  Whose life

6   insurance policy is collateral for this facility?

7   A.    Lee Farkas's.

8   Q.    Mr. Farkas's?

9   A.    Yes.

10  Q.    And do you recall the value of that life insurance policy?

11  A.    The portion we had was $2 million.

12  Q.    So a $2 million life insurance policy?

13  A.    Um-hum.

14          THE COURT:  Please say "yes" or "no."

15          THE WITNESS:  Yes.  I'm sorry.

16  BY MS. KARINSHAK:

17  Q.    So if Mr. Farkas were to die, your bank would get $2 million?

18  A.    Yes.

19  Q.    And you mentioned a second lien on the Natixis MSRs, correct?

20  A.    Right.

21  Q.    And the MSR is the mortgage servicing right, I believe,

22  correct?

23  A.    Yes.

24  Q.    And it's true and it's totally allowed that two entities can

25  have interest in MSRs, correct?

1   A.   Right.  We had a second lien behind Natixis.

2   Q.   Right.  But it's okay to do that.  You can have someone with

3   a first lien and someone with a second lien and maybe even someone

4   with a third lien, correct?

5   A.   Yes.

6   Q.   All right.  Now, isn't it true that to understand each of

7   these facilities that we've all been talking about, you really

8   need to understand the governing documents as to those facilities?

9   A.   Yes.

10  Q.   And weren't you involved in drafting, working on these

11  documents that govern each of these facilities?

12  A.   Yes.

13  Q.   Okay.  So let's take a look at a couple of those.

14           Could you please pass Defense Exhibit 1 to Ms. Kissick?

15           Do you have Defense Exhibit 1, Ms. Kissick?

16  A.   Yes.

17           MR. STOKES:  No objection, Your Honor.

18           THE COURT:  All right, then it's in.

19           (Defendant's Exhibit No. 1 was received in evidence.)

20  BY MS. KARINSHAK:

21  Q.   Okay.  Now, Ms. Kissick this is the mortgage loan

22  participation sale agreement for the AOT agency securities,

23  correct?

24  A.   Yes, it is.

25  Q.   And I'm sorry, I cannot hear you.

1  A.   Yes, it is.

2  Q.   And -- so this document, this big, thick document --

3          MR. STOKES:  Your Honor, if I may, this document appears

4  to be marked up.  It doesn't appear to be clean copy.

5          THE COURT:  All right, let me see.

6          MS. KARINSHAK:  Let me double-check.

7          THE COURT:  It certainly is marked up.  Is there a clean

8  copy?

9          MS. KARINSHAK:  Your Honor, one of my folks just went to

10 look.

11         THE COURT:  All right.  Well, temporarily we'll let this

12 in, but I expect a clean copy to replace it.

13         MS. KARINSHAK:  Yes, Your Honor.  We will, we will get

14 that.

15 Q.   All right.  Defense Exhibit 1 is the AOT program - agency

16 securities document, correct?

17 A.   Correct.

18 Q.   And the purchaser listed here is Colonial Bank?

19 A.   Yes.

20 Q.   And Taylor, Bean & Whitaker Mortgage Corporation is listed as

21 the seller?

22 A.   Yes.

23 Q.   And it's dated April 30, 2007, correct?

24 A.   Correct.

25 Q.   And that would be the effective date of this version of the

Kissick - Cross                                                          916

1   document?

2   A.    Yes.

3   Q.    And isn't it true you would have prior versions?  This would

4   be one of the versions that you would have been using as of April

5   30, 2007, correct?

6   A.    Yes.

7   Q.    Okay.  And flipping to the third page of that document, the

8   Recitals, and going down to the third recital, it says

9   here, "Whereas, seller acknowledges that it will use its

10  commercially reasonable efforts to cause each mortgage pool

11  purchased hereunder as evidenced by a participation certificate to

12  be converted into an agency security relating to such mortgage

13  pool, such agency security to be backed by and to relate to the

14  mortgage loans.  In furtherance thereof, seller agrees to use its

15  commercially reasonable efforts to cause the related agency

16  security to be issued and delivered on or before the settlement

17  date under the terms and conditions provided herein."

18          Correct?

19  A.    Yes.

20  Q.    And so that means that Taylor, Bean & Whitaker is supposed to

21  use commercially reasonable efforts to meet requirements of this

22  agreement, correct?

23  A.    Correct.

24  Q.    And use commercially reasonable efforts to -- with respect to

25  the mortgage pools, correct?

Kissick - Cross                                                    917

1  A.    Correct.

2  Q.    Now, moving to the next page, page No. 2, I'd like to focus

3  on the definition of "collateral," and it says that the definition

4  of collateral is actually found in section 7(d) of this agreement,

5  correct?

6  A.    Yes.

7  Q.    And so let's move to section 7(d) for the definition of

8  "collateral."  That's on page 16.

9           THE COURT:  7(d) as in David.

10          MS. KARINSHAK:  Yes, ma'am, 7(d) as in David.

11          THE WITNESS:  What page was that on?

12 BY MS. KARINSHAK:

13 Q.    On page 16.

14 A.    Okay.

15 Q.    Down at the bottom, section (d).  And this is the definition

16 of "collateral," correct, with respect to this -- with respect to

17 this facility?

18          MR. STOKES:  Judge, this is -- they've got a marked-up

19 document of this.

20          MR. KUGLAR:  Their Government's Exhibit 22-2A is the

21 same document.

22          MS. KARINSHAK:  If you could please substitute that out,

23 please?  It's Government's Exhibit 22-2A.  It's the same document.

24          THE COURT:  22-2A.

25          MS. KARINSHAK:  Yes, ma'am.

1          THE COURT:  All right, that's the one that's going to go
2    into evidence instead of this one.
3          MS. KARINSHAK:  Yes, Your Honor.  If we could replace
4    that for Defendant's Exhibit No. 1, that would be great.
5          (Government's Exhibit No. 22-2A was received in
6    evidence; Defendant's Exhibit No. 1 was withdrawn.)
7          THE COURT:  I'm just going to mark out Defense 1.  The
8    record will show it going in as Government 22-2A.
9          THE WITNESS:  We don't have that one.
10         THE COURT SECURITY OFFICER:  The document only says 22.
11   No 2A.
12         THE WITNESS:  It's not the same one.
13         MS. KARINSHAK:  22-2A.  If not, we have one right here.
14         This is 22-2A.
15   Q.   Okay.  So looking at 22-2A, we're looking at the definition
16   of "collateral," which is section 7(d) on page 16.  Ms. Kissick,
17   do you have that?
18   A.   7(b)?
19   Q.   7(d) as in dog.
20   A.   Yes, here it is.
21   Q.   Now, could you please read for us the definition of
22   "collateral"?
23   A.   "In order to secure the prompt payment in full of each
24   repurchase price as and when due hereunder, and the prompt payment
25   and performance by the seller of each of its other obligations

Kissick - Cross                                                      919

1   under this agreement, the seller hereby pledges, assigns and

2   delivers to purchaser, and grants to purchaser a security interest

3   in, all of the seller's right, title and interest in (i) each

4   mortgage loan, including, without limitation, the indebtedness,

5   promissory note or notes, collateral security, the end investor

6   commitment and all other documents and instruments evidencing,

7   securing or otherwise related to each such mortgage loan, together

8   with all of the rights, privileges and remedies applicable

9   thereto, its right to service such mortgage loans hereunder

10  (including, without limitation, pursuant to Section 8), (iii) all

11  proceeds thereof, and (iv) all payment streams received in

12  connection with any of the foregoing (collectively, the

13  collateral)."

14  Q.   So basically, the four little subparts, (i), (ii) and (iii)

15  and (iv), list the collateral with respect to this facility,

16  correct.

17  A.   Correct.

18  Q.   And so again, if I'm just looking at the mortgage loans with

19  respect to the AOT program agency securities, then I'm not looking

20  at all the collateral, correct?  If I just focus on the mortgage

21  loan, which is (i), and I don't include (ii), (iii) and (iv), then

22  I'm not including everything in the collateral, correct?

23  A.   Well, it's a part of the mortgage loan, because the mortgage

24  loan has the servicing rights attached to it.

25  Q.   So if I just take the loan itself, just the mortgage loan

1    part, am I including everything, like the value, the number on the

2    loan?  Like, if I have a $100,000 loan, if I just include my

3    $100,000 loan and I don't take into account servicing rights and

4    the other things listed here in this document, then I haven't

5    considered everything as part of my collateral, have I?

6    A.    Correct.

7    Q.    Okay.  And if we could move to page 5, there's another

8    definition I'd like you to read for the jury, and that's the

9    definition of a "qualified substitute mortgage."

10   A.    "Qualified substitute mortgage loan:  Shall mean a mortgage

11   loan (i) that, when aggregated with other qualified substitute

12   mortgage loans being substituted on such transfer date, has an

13   outstanding principal loan balance, after application of all

14   payments of principal due and received during or prior to the

15   month of substitution, equal to the outstanding principal loan

16   balance of the mortgage loan being substituted on the related

17   transfer date and (ii) that complies, as of the related transfer

18   date, with each of the representations and warranties made by

19   seller concerning the mortgage loan contained in this agreement."

20   Q.    And so that's the definition of a qualified substitute

21   mortgage loan with respect to this document, correct?

22   A.    Correct.

23   Q.    And that definition mentioned some seller promises, so

24   looking at page 20 of this document, subsection (b) talks about

25   what the seller is hereby representing and warranting, correct?

1   A.    Yes.

2   Q.    And flipping over to 21, (viii), which is an 8, what is one

3   of the promises that the seller is making to you, and that being

4   Taylor, Bean & Whitaker, under this document?

5   A.    The part starting "As to both the mortgage pool"?

6   Q.    No, the part starting "None of the mortgage loans."

7   A.    What page?

8   Q.    You're on page 21.  It's about, oh, a little lower than --

9   A.    Oh, okay, (viii).  "None of the mortgage loans are

10  counterfeit, fraudulent, forged, fictitious, or nonexistent or

11  have been pledged or assigned to any third party."

12  Q.    Okay.  So that's one of the promises that the seller is

13  making, correct?

14  A.    Correct.

15  Q.    That they're not going to have counterfeit, fraudulent,

16  forged, fictitious, or nonexistent nor any that have been pledged

17  or assigned to any third party, which would be third-party loans,

18  correct?

19  A.    Correct.

20  Q.    All right.  Now, moving to the next page, page 22, it appears

21  that there's something that happens if the seller uses these

22  counterfeit, fraudulent, forged, fictitious, or nonexistent

23  documents -- mortgage loans, correct, looking at (d) on page 22?

24  A.    Do you want me to read it?

25  Q.    Yes, please.

1    A.    Okay.

2    Q.    Just the, let's see, the first sentence.

3    A.    "In the event any of seller's representations or warranties

4    set forth in Sections 9(a), (b) and (c) are breached or determined

5    by either party not to be accurate (each a breach), if such breach

6    can be cured by action of seller, seller may attempt to cure such

7    breach, including, but not limited to, by replacing the mortgage

8    loans which are subject to and adversely affected by such breach

9    (the deficient mortgage loans) with one or more qualified

10   substitute mortgage loans to the extent permitted under the

11   applicable agency guide."

12   Q.    So in common English then, if there's a loan that's messed up

13   for the reasons we just read, then this document clearly allows

14   for qualified substitute mortgage loans, correct?

15   A.    Correct.

16   Q.    And you already gave us the definition for that, right?

17   A.    Yes.

18   Q.    So this document contemplated that there might be problems

19   with loans and what to do with those, correct?

20   A.    Correct.

21   Q.    And this document would have been written, I assume, with

22   counsel based on the wording that we've been going through,

23   correct?

24   A.    Correct.

25   Q.    And you were involved in helping draft this document,

1    correct?

2    A.    I reviewed it, yes.

3    Q.    With Mr. -- which lawyer would have helped with this

4    document, if you recall?

5    A.    Milton Vescovacci.  Milton Vescovacci.

6    Q.    And what law firm was he with again?

7    A.    He was with Akerman Senterfitt.

8    Q.    So where is that law firm located?

9    A.    He was in Miami.

10   Q.    Miami.

11   A.    Um-hum.

12   Q.    And does he have folks working with him as well that are

13   helping with these documents?

14   A.    Yes.

15   Q.    And so is there a -- would it be fair to say there's a team

16   of lawyers putting together this document for you?

17   A.    I don't know.

18   Q.    You only interacted with Mr. Vescovacci?

19   A.    Yes.

20   Q.    Okay.  But at least Mr. Vescovacci is helping you with

21   drafting these documents and helping you to understand these

22   documents, correct?

23   A.    Yes.

24   Q.    Now, let's look at the bottom of page 22, and starting that

25   last sentence, "It is understood," could you read that, please?

1   A.    "It is understood and agreed that the obligations of seller

2   set forth in this section 9 to cure (by replacement or otherwise)

3   or repurchase a deficient mortgage loan or an early payment

4   default loan and to indemnify purchaser as provided in this

5   section 9 constitute the sole remedies of purchaser respecting a

6   breach of the representations and warranties made by seller

7   hereunder."

8   Q.    So basically, this is saying that -- the part you read about

9   curing the breach is supposed to be the sole remedy of the

10  purchaser, which would be Colonial Bank, regarding a breach of any

11  of these representations or promises that the seller, that being

12  Taylor, Bean & Whitaker, would have made, correct?

13  A.    Right.

14  Q.    And then let's move to page 27, please, section 19(a).  Have

15  you got that section?

16  A.    Yes.

17  Q.    Okay.  Could you please read, it says, "Seller hereby

18  acknowledges that," and I just want you to read (a).  I don't want

19  you to go into the others.

20  A.    "Seller has been advised by counsel in the negotiation,

21  execution and delivery of this agreement, the custodial agreement,

22  the clearing agreement and every document to be executed by seller

23  pursuant to this agreement."

24  Q.    And so this is basically saying that Taylor, Bean & Whitaker,

25  the seller, has been advised by counsel in the negotiation,

Kissick - Cross                                                      925

1   execution, and delivery of this agreement, the custodial

2   agreement, the clearing agreement, and every document to be

3   executed by the seller pursuant to this agreement, correct?

4   A.    Yes.

5   Q.    Well, basically, the lawyers have advised the seller as well

6   as you, the purchaser, for this AOT program agency securities

7   agreement?

8   A.    Our attorney did not advise Taylor, Bean & Whitaker.

9   Q.    Well, it's in here that the seller acknowledges that,

10  correct?

11  A.    Advised by his own counsel, not our counsel.

12  Q.    Okay.  But your counsel would have been in these meetings,

13  correct?

14  A.    With their counsel as well.

15  Q.    Yes.  Wouldn't they have all been together talking about

16  these documents?

17  A.    If we had an attorney and they had an attorney, they would

18  both have attorneys there.

19  Q.    Okay.  And you just said Taylor, Bean & Whitaker had an

20  attorney, correct?

21  A.    Yes.

22  Q.    And who was that?

23  A.    I don't remember.

24  Q.    Would it be Jeff Cavender?

25  A.    Oh, yeah, possibly.

Kissick - Cross                                                      926

1   Q.   Do you remember Jeff Cavender?

2   A.   Yes.

3   Q.   Okay.  So we've got Taylor, Bean & Whitaker, Jeff Cavender,

4   and we've got Mr. Vescovacci from your law firm?

5   A.   Yes.

6   Q.   And we've got an acknowledgement here by the seller that he's

7   been advised by counsel -- or actually, the TBW has been advised

8   by counsel in the negotiation, execution, and delivery of this

9   document, correct?

10  A.   Correct.

11  Q.   Now I'd like to move to Defense Exhibit 2.  And do you have

12  that, ma'am?

13  A.   Yes.

14  Q.   And what is -- I'm sorry.

15          MR. STOKES:  No objection, Your Honor.

16          THE COURT:  All right, that's in.

17          (Defendant's Exhibit No. 2 was received in evidence.)

18  BY MS. KARINSHAK:

19  Q.   What is Defense Exhibit 2?

20  A.   It's the AOT program for home loan trades.

21  Q.   And is it also for whole loan trades and private issue

22  securities?

23  A.   Yes.

24  Q.   Okay.  And so we have a separate agreement here.  This is a

25  different AOT program, correct?  This is a different facility?

1   A.    Correct.

2   Q.    And it's for whole loan trades and private issue securities,

3   correct?

4   A.    Yes.

5   Q.    And again the same purchaser, Colonial Bank?

6   A.    Yes.

7   Q.    And again the same seller, Taylor, Bean & Whitaker?

8   A.    Yes.

9   Q.    Again the same date, April 30, 2007, correct?

10   A.    Yes.

11   Q.    All right.  And again looking to the recitals, which is the

12   first full page after the table of contents, did you find that?

13   A.    Yes.

14   Q.    Okay.  Again, that recital in the third paragraph, is that

15   the same recital that was in the first document that you've

16   already read to the jury?

17   A.    Yes, it is.

18   Q.    Okay.  So we won't read that again, but it's the same,

19   correct?

20   A.    Yes.

21   Q.    Okay.  Then moving to page 5, we have the same definition of

22   "qualified substitute mortgage loan," correct?

23   A.    Yes.

24   Q.    And that's the same one you already read to the jury,

25   correct?

Kissick - Cross                                                      928

1   A.    Yes, it is.

2   Q.    All right, let's move over to page 18.

3         Have you found that?

4   A.    Yes.

5   Q.    Page 18, (d), towards the middle of the page?

6   A.    Do you want me to read it?

7   Q.    Yes.  Yes, please.

8   A.    "In order to secure the prompt payment in full of each

9   repurchase price as and when due hereunder, and the prompt payment

10  and performance by the seller of each of its other obligations

11  under this agreement, the seller hereby pledges, assigns and

12  delivers to purchaser, and grants to purchaser a security interest

13  in, all of the seller's right, title and interest in each mortgage

14  loan, including, without limitation, the indebtedness, promissory

15  note or notes, collateral security, the end investor commitment

16  and all other documents and instruments evidencing, securing or

17  otherwise related to each such mortgage loan, together with all of

18  the rights, privileges and remedies applicable thereto, its right

19  to service such mortgage loans hereunder (including, without

20  limitation, pursuant to section 8), all proceeds thereof, and all

21  payment streams received in connection with any of the foregoing."

22  Q.    So again, this is collectively the collateral, correct?

23  A.    Yes.

24  Q.    So again, section (d) on page 18 tells you the collateral

25  with respect to the second facility, that being AOT whole loan

1   trades and private issue securities, correct?

2   A.   Correct.

3   Q.   And again, the collateral here has more than just the

4   mortgage loan itself, correct?

5   A.   Correct.

6   Q.   It's got the right to service the loan?

7   A.   Yes.

8   Q.   The proceeds thereof?

9   A.   Yes.

10  Q.   And all payment streams received in connection with any of

11  the foregoing?

12  A.   Yes.

13  Q.   And what kind of payment stream would, would be associated

14  with a mortgage loan?

15  A.   The servicing rights.

16  Q.   So that's the servicing rights, okay.

17           And also, I think you had mentioned that you had

18  additional collateral.  We mentioned Mr. Farkas's life insurance

19  policy of $2 million.  Did you also have collateral that was his

20  TBW stock?

21  A.   Yes.

22  Q.   And was that with respect to both of these agreements?

23  A.   No.  It was only on the overline.

24  Q.   That was only on the overline.

25           And how much stock did you have?  What was the value of

1  Mr. Farkas's stock in TBW?

2  A.   I don't know.  It was 79 percent, I think, of the company,

3  but I don't know.

4  Q.   Okay.  So 79 percent of the shares of Taylor, Bean &

5  Whitaker.  Whatever value Taylor, Bean & Whitaker had, you had 79

6  percent of that as collateral, correct?

7  A.   Correct.

8  Q.   Now, again we move to page 23, and I think we have the same

9  promise about, looking up there, the same promise about none of

10 the mortgage loans or counterfeit, fraudulent, forged, fictitious,

11 or nonexistent or have been pledged or assigned to any third

12 party, correct?

13 A.   Right.

14 Q.   And then moving to the bottom again, we have that same

15 subsection (d) talking about if there's a breach, correct?

16 A.   Yes.

17 Q.   And again, if there's a breach, there is a specific

18 allocation to have qualified substitute mortgages loan --

19 qualified substitute mortgage loans to be used, correct?

20 A.   Correct.

21 Q.   And again, this document contemplated what would happen if

22 there were problematic mortgage loans, correct?

23 A.   Correct.

24 Q.   And this document was also drafted by lawyers, correct?

25 A.   Yes.

1  Q.    And you were involved in that, correct?

2  A.    Correct.

3  Q.    And I believe you mentioned Mr. Vescovacci, was he involved

4  in this document as well?

5  A.    Yes.

6  Q.    And what about Mr. Cavender on behalf of Taylor, Bean &

7  Whitaker?

8  A.    I'm sure he reviewed it.

9  Q.    Okay.  And then were there any other lawyers involved when

10 you were drafting these documents?

11 A.    I don't think so.

12 Q.    Okay.  And if you could please speak up?

13 A.    I don't think so.  Sorry.

14 Q.    Now, again looking at the same page, there's language in,

15 let's see, the first -- the second paragraph, it's a smaller

16 paragraph, we've got the -- we're still on page 24.  "In addition

17 to such repurchase obligations"?

18 A.    Do you want me to read that?

19 Q.    I'm just talking about the last sentence of that paragraph.

20 A.    "It is understood and agreed that the obligations of seller

21 set forth in this section 9 to cure (by replacement or otherwise)

22 or repurchase a deficient mortgage loan or an early payment

23 default loan and to identify purchaser as provided in this section

24 9 constitute the sole remedies of purchaser respecting a breach of

25 the representations and warranties made by seller hereunder."

Kissick - Cross                                                          932

1    Q.   Okay.  So this document also has the same language about the

2    sole remedies under this document -- under this facility and its

3    controlling documents, correct?

4    A.   Yes.

5    Q.   So the AOT program with respect to whole loan trades and

6    private issue securities, that governing document, essentially

7    operates the same as the, the agreement with respect to the AOT

8    program agency securities, correct?

9    A.   Correct.

10   Q.   And again on page 29, there's the same acknowledgement by

11   seller with respect to being advised by counsel, correct?

12   A.   Correct.

13   Q.   Okay.  I'd now like to move to Defense Exhibit No. 3.

14           THE COURT:  Any objection?

15           MR. STOKES:  Your Honor, let me point out this isn't a

16   signed agreement, so if I could just talk with counsel for a

17   moment to find out what this is?

18           THE COURT:  Go ahead.  Go ahead.

19           (Discussion between counsel off the record.)

20           MR. STOKES:  No objection, Your Honor.

21           THE COURT:  All right, so it's in.

22           (Defendant's Exhibit No. 3 was received in evidence.)

23   BY MS. KARINSHAK:

24   Q.   Okay.  Ms. Kissick, what document is Defense Exhibit No. 3?

25   A.   The second amendment to the fourth amended and restated

Kissick - Cross                                                      933

1  security agreement.

2  Q.   And the date of this agreement is January 29, 2009, correct?

3  A.   Correct.

4  Q.   And it's between Taylor, Bean & Whitaker, which is called the

5  debtor -- correct?

6  A.   Correct.

7  Q.   And it's with Colonial Bank, the secured party, correct?

8  A.   Yes.

9  Q.   And these are documents for the overline facility, correct?

10 A.   I'm assuming so, yes.

11 Q.   Well, I don't want you to assume, ma'am.  Can you --

12 A.   Well, I've just seen it for the first time in a long time

13 so --

14 Q.   Okay.  Can you please just look at that?

15 A.   It is.

16 Q.   I'm sorry?

17 A.   It is, I believe, the -- it is the overline facility.

18 Q.   And just the title of this, the Second Amendment to the

19 Fourth Amended and Restated Security Agreement, that's the name,

20 right?

21 A.   Yes.

22 Q.   And that sounds like this agreement goes through lots of

23 amendments and lots of restatements and more amendments, correct?

24 A.   Yes.

25 Q.   And I assume that that means lawyers are involved every time

1  you change this document, correct?

2  A.    Yes.

3  Q.    And you've got to re-sign another one?

4  A.    Yes.

5  Q.    And then re-sign another one?

6  A.    Yes.

7  Q.    Okay.  And when this one being the second amendment to the

8  fourth amended, there's probably been lots of versions, correct?

9  A.    Yes.

10 Q.    And lawyers would have been involved in all of those

11 versions, correct?

12 A.    Yes.

13 Q.    And would you have been involved in putting together these

14 documents?

15 A.    Initially I was, but not after the first year or two.

16 Q.    Okay.  You weren't involved after the first year or two?

17 A.    Well, I was not the account manager.

18 Q.    Okay.  You weren't the account manager.  What were you?

19 A.    The department head.  So I didn't read it until later.

20 Q.    But at some point as the head honcho --

21 A.    I just made sure that what was approved got in here.

22 Q.    I'm sorry?

23 A.    I made sure that what was approved was put in the document.

24 Q.    Okay.  So you're double-checking that the lawyers did what

25 you wanted them to do, correct?

1   A.    Correct.

2   Q.    And even though some of these document are not signed, these

3   appear to be the documents that you were operating under given the

4   dates that are put forth in these documents?

5   A.    Yes.

6   Q.    And you would have kept these documents in your files there

7   at Colonial Bank, right?

8   A.    Yes.

9   Q.    Because you'd want to know what the operating agreement says

10  for all of these different facilities, correct?

11  A.    Yes.

12  Q.    And, in fact, given that you worked with all of these

13  facilities so much as a banker, you would want to have these there

14  so you can get in there and figure out what is allowed with

15  respect to each facility, correct?

16  A.    Correct.

17  Q.    All right, let's move to Defense Exhibit No. 5.

18          MR. STOKES:  No objection, Your Honor.

19          THE COURT:  All right, it's in.

20          (Defendant's Exhibit No. 5 was received in evidence.)

21  BY MS. KARINSHAK:

22  Q.    And again, we're just going to highlight some sections of

23  this document, Ms. Kissick.  Do you have that in front of you?

24  A.    Yes.

25  Q.    So what document is Defense Exhibit No. 5?

1   A.    Amended and restated loan participation sale agreement, but

2   it's between Taylor Bean and Seaside National Bank, with Colonial

3   just acting as collateral agent.

4   Q.    Okay.  But you're on there, correct?

5   A.    Right.

6   Q.    You're in this document?

7   A.    Correct.

8   Q.    Okay.  So you're a party to this document then, correct?

9   A.    Correct.

10  Q.    Okay.  And this is the COLB wet and dry mortgage loans

11  program?

12  A.    Yes.

13  Q.    And this is amended and restated loan participation sale

14  agreement, correct?

15  A.    Yes.

16  Q.    So it's been amended and restated at least one time; would

17  that be a fair assumption?

18  A.    Yes.

19  Q.    Okay.  And again, this document would be revised as many

20  times as necessary given the evolving relationships in this

21  contract?

22  A.    Actually, no.  These do not -- because it was two sale

23  concerns, they didn't get revised very often unless there was an

24  accounting issue.

25  Q.    Okay.  So this document doesn't get -- excuse me, Defense

Kissick - Cross                                                937

1    Exhibit 5 doesn't get revised as much as the other defense
2    Exhibits 1, 2, and 3 that we've already gone through?
3    A.   No.  AOT and COLB do not get revised often at all unless
4    there's an accounting issue, but the overline and any other loan
5    facility could get revised.
6    Q.   The overline and any other loan facility could get revised?
7    A.   Right.
8    Q.   And what is any other loan facility?
9    A.   The warehouse line that we had.
10   Q.   Anything else?
11   A.   Working capital line.
12   Q.   Anything else?
13   A.   I don't think so.
14   Q.   And are those all facilities that you have with respect to
15   this relationship with Taylor, Bean & Whitaker?
16   A.   Yes.
17   Q.   I'm sorry?
18   A.   Yes.
19   Q.   So those all are, are part of the working facilities that
20   you -- and agreements you have with Taylor, Bean & Whitaker?
21   A.   Yes.
22   Q.   And what is the date on Defense Exhibit No. 5?
23   A.   December 10, 2008.
24   Q.   And again, is this a document that would have been drafted by
25   lawyers, and would you have consulted with those lawyers in

1  drafting this document?

2  A.   Well, this was actually for another bank to provide the funds

3  for them.

4  Q.   Um-hum.

5  A.   So we just acted on our role as agent.  The other bank had to

6  be the one talking to the law firm.

7  Q.   So as agent, you don't get any lawyers involved in this

8  document?

9  A.   It was just handling the administration of the collateral,

10  and because of the sale, because of the true sale conditions,

11  there's, there's no deviation, so we did what we did.

12  Q.   But don't you have a lawyer look at it?

13  A.   Well, he -- our lawyer drafted it.

14  Q.   That's what I was trying to get to.

15  A.   Okay.

16  Q.   Thank you.  So your lawyer drafted it?

17  A.   Yes.

18  Q.   And who's your lawyer drafting this document?

19  A.   Milton Vescovacci.

20  Q.   Okay.  And would you have been involved at all -- when

21  Mr. Vescovacci is drafting this document, would you have been

22  involved at all in talking to him about what requirements need to

23  be met in this document?

24  A.   Well, he's the one that drafted the document.  I mean, he

25  followed the true sale guidelines so --

Kissick - Cross                                                            939

1   Q.    Did you discuss the true sale guidelines with him?

2   A.    He would know actually better than me.

3   Q.    But did you talk to him at all?

4   A.    I'm sure I did.

5   Q.    Okay.  Because again, as the head of the division, you want

6   to make sure these documents are correct, right?

7   A.    Yes.

8   Q.    Okay.  And you want to make sure to guard the facilities and

9   guard the interests of Colonial Bank at all times, correct?

10  A.    Correct.

11  Q.    Because that's part of your duties as the director of the

12  division?

13  A.    Correct.

14        MS. KARINSHAK:  Okay.  Could you hand up Defendant's

15  Exhibit 251, please, sir?  And I'm sorry, if you could hand up

16  251A, B, C, and D.  So we've got 251 and then 251A, B, C, and D.

17        THE COURT:  Any objections?

18        MR. STOKES:  Judge, I promise I won't take long to

19  review this much, but I just don't even know what this is.

20        No objection, Your Honor.

21        THE COURT:  All right, they're all in.

22  BY MS. KARINSHAK:

23  Q.    Now, I've shown you Defense Exhibit 251 for the purpose of

24  having the entire document, but what we're really going to focus

25  on, Ms. Kissick, is a smaller part of this big document.

1    A.    Okay.

2    Q.    Okay.  I want you to specifically look at 251D, which is the

3    procedure manual.

4              THE COURT:  Just so there's some context for this,

5    Ms. Kissick, what is 251?

6              THE WITNESS:  It looks like a summary of my whole

7    department.

8              THE COURT:  Have you ever seen it before?

9              THE WITNESS:  No.  I mean, at work I did, but not --

10             THE COURT:  But the document itself, have you seen the

11   document before?

12             THE WITNESS:  No.

13             THE COURT:  Look at the, look at the second or third

14   page of 251.  The bottom of the corner has a Bates stamp number

15   ending in 245.  Have you ever seen that document?

16             THE WITNESS:  I'm sorry, look at which one?

17             THE COURT:  Why don't you look at what appears to be the

18   title.

19             THE WITNESS:  "Colonial Bank Mortgage Warehouse Lending

20   Division Table of Contents."

21             THE COURT:  No, next page.

22             THE WITNESS:  "State of Alabama Audit."

23             THE COURT:  Have you seen that before?

24             THE WITNESS:  No.  I think it was put together by

25   Montgomery.

1          MR. STOKES:  Your Honor, this was described to us as a

2   policy manual by defense counsel.  This does appear to be

3   something completely different.  It is an audit of the bank.  We

4   do object to the admission of this, unless this witness, it's

5   relevant to this.

6          THE COURT:  I don't see how 251 is relevant if this

7   witness has never seen it.

8          MS. KARINSHAK:  Your Honor, I was just trying to give

9   the context from which the document came from.  I don't need all

10  of the 251, so if you'd like to take that out, that would be fine.

11  I wanted to have the policy manual that was within this audit.

12         THE COURT:  I understand, all right.  251 is out.

13         All right, so we're looking at 251D, as in David?

14         MS. KARINSHAK:  Yes, ma'am.  I'd like 251D, B, and A,

15  which are all part of this procedures manual.

16         THE COURT:  Which one are you starting with?  Which

17  subsection are you starting with?

18         MS. KARINSHAK:  Your Honor, I'm starting with the

19  procedures manual at 251D, which was at tab 13.

20  Q.   Do you have that, Ms. Kissick?

21  A.   Yes.

22  Q.   Now --

23         MR. STOKES:  Again, Your Honor, we're going to -- until

24  a foundation is laid, we do object.  We just don't know if the

25  witness has ever seen this or what this is.

1          THE COURT:  All right.  There has to be a foundation

2    laid.

3          Ms. Kissick, do you recognize this document?

4          THE WITNESS:  Yes.  I haven't seen them in several

5    years, but yes, I have seen them.

6          THE COURT:  All right.  When you say "them," what are

7    you looking at right now?

8          THE WITNESS:  There's a couple things.  There's new

9    business guidelines, and then there's a generic manual that we had

10   that we would prepare for each client, but it would be modified

11   depending on the client.

12   BY MS. KARINSHAK:

13   Q.   Looking back at the table of contents to 251, doesn't it say

14   at tab 13 that this is the mortgage warehouse lending procedures

15   manual, and this, 251D starts at tab 13?

16         THE WITNESS:  I gave away 251.

17         251 was prepared by folks in Montgomery for an exam, and

18   I don't really know what they sent in it, because I never saw it.

19   So they got this from my staff, and this is, like, our generic

20   manual.

21   Q.   I understand.  But you have a procedure manual for your

22   division, correct?

23   A.   Correct.

24   Q.   And that's what I'm trying to get to.

25   A.   Okay.

1   Q.   You have a procedure manual for running your division,

2   correct?

3   A.   Well, we have a lot.  This is the one that we gave our

4   clients.

5   Q.   I understand.

6           THE COURT:  Wait, wait.  I want this to be clear.

7   You're looking at just D right now?

8           THE WITNESS:  Yes.

9           THE COURT:  All right.  And you're saying that D is what

10  you give to clients?

11          THE WITNESS:  Yes.

12          THE COURT:  And the entire D.  There are a whole bunch

13  of documents.

14          THE WITNESS:  No, we do not give them -- the

15  underwriting guidelines were our underwriting guidelines, and that

16  did not go to clients.  The part that says "Prepared For Colonial

17  Bank Clients" is just the generic, and then we would customize it

18  and bind it and, you know, send it to clients.

19          THE COURT:  What concerns me is I don't know what we're

20  talking about, because my D, what I'm looking at has a whole bunch

21  of different things in it, and from Mr. Stokes' body language, I

22  think his is the same.

23          MR. STOKES:  We have no idea what this is.

24          THE COURT:  All right.  Let's look at Bates numbers.

25  There are tiny little numbers.

Kissick - Cross                                                          944

1        In a case with a lot of documents, ladies and gentlemen,

2   in order for the lawyers to keep track of many pages, they have a

3   stamping system, now I think it's done by computer.  It's called

4   Bates, B-a-t-e-s, and then there are a whole bunch of numbers, and

5   in the bottom right-hand corner, there's a whole bunch of little

6   numbers, and what I'm looking at right now, looking at Exhibit D,

7   is it starts, I'm going to go with the last four numbers of the

8   Bates stamp, 8430.

9        Is that what you have, Mr. Stokes, so we're looking at

10  the same thing?

11       MR. STOKES:  Yes, Your Honor, we do have that --

12       THE COURT:  And that's what you've got.

13       MR. STOKES:  -- as the second page of the document, the

14  first substantive page.

15       MS. KARINSHAK:  Yes, Your Honor.  Your Honor, I want to

16  double-check it with my other copy.  Mine does not have Bates, but

17  I have one right here.

18       THE COURT:  Well, the first page has a 13 on it.

19       MS. KARINSHAK:  Yes, ma'am.  That's why I cited back to

20  the table of contents for 13.

21       THE COURT:  All right.  Then it goes, I mean, the format

22  appears to be pretty much the same up through -37, 8437, and then

23  starting on 8438, there's something that says "Prepared for

24  Colonial Bank Clients, July 25, 2008."

25       Now, is that what you're saying, that those papers are

Kissick - Cross                                                      945

1    the ones that are given to clients?

2              THE WITNESS:  This was given to clients.

3              These were not given to clients, the guidelines.

4              THE COURT:  Don't do "this" and "that."  The guidelines

5    are, okay, are the first set of numbers I talked about.

6              THE WITNESS:  Correct.

7              THE COURT:  All right.  And then is all the rest of that

8    exhibit -- just so we're clear as to what we're talking about

9    here, is all the rest of that exhibit given to clients?  The

10   client package appears to begin at 8438.

11             THE WITNESS:  No the part ending -- starting with 8460

12   is not.  Let me see what else.

13             THE COURT:  And 8460 has the title "Underwriting

14   Process."  So you're saying that would not go to a client.

15             THE WITNESS:  Correct.  I think this middle section did,

16   though, starting with 8438 --

17             THE COURT:  All right.

18             THE WITNESS:  -- and ending with 8459.

19             THE COURT:  There appear to be three different groupings

20   within this exhibit.  Now, which of the three groupings are you

21   focusing this testimony --

22             MS. KARINSHAK:  Your Honor, I'm trying to focus on the

23   fact that this was within the bigger procedural manual that was

24   used by the Mortgage Warehouse Lending Division, but there are

25   parts of this -- it's basically a procedural manual by which this

1  division has been run, and some of these documents may have been

2  given to clients of that division.  It's just part of that bigger

3  document.

4         THE COURT:  Is the bigger document you're talking about

5  what you're calling tab 13?

6         MS. KARINSHAK:  Yes, ma'am.

7         THE COURT:  All right.  Ms. Kissick, then as I think I

8  understand, the question is is it your understanding that this

9  entire package, with the underwriting business and the information

10 for clients, was that plus these guidelines usually kept together

11 as one --

12        THE WITNESS:  Absolutely not.  These were never given to

13 clients, the guidelines.

14        THE COURT:  But for employees, for example, if you were

15 training a new person in your division, would this packet be given

16 to them?

17        THE WITNESS:  No.  The guidelines were for underwriting,

18 and the, and the procedural manual was mostly for operations.

19        THE COURT:  All right.  The proper exhibit, in my view,

20 ought to be then just the procedures.

21        MS. KARINSHAK:  Your Honor, that's fine.

22        THE COURT:  Is that all right?  All right, so we're

23 going to remove from this exhibit -- I assume then the government

24 has no objection?

25        MR. STOKES:  We don't, Your Honor, no.

Kissick - Cross                                                      947

1              THE COURT:  All right.  So this exhibit would stop at

2      8437, all right?  So 8430 to 8437, those seven sheets, that's the

3      guidelines you're talking about.

4              MS. KARINSHAK:  We're taking those out, right, Your

5      Honor?

6              THE COURT:  Well, that's going to be your Exhibit 251D,

7      and the rest of it is not proper to be part of that exhibit.

8              (Defendant's Exhibit No. 251D was received in evidence.)

9              THE COURT:  All right, then ask your questions about

10     that.

11             MS. KARINSHAK:  All right.  Your Honor --

12             THE COURT:  After all that, are there questions about

13     the exhibit?

14             MS. KARINSHAK:  Yes, Your Honor.

15             THE COURT:  All right.

16             MS. KARINSHAK:  I'm understanding that you are not

17     including 8438 to 8459?

18             THE COURT:  Not at this point.

19             MS. KARINSHAK:  Okay.

20             THE COURT:  If you lay a foundation, that's different,

21     but, I mean --

22     BY MS. KARINSHAK:

23     Q.   All right, I'd like to show you 8438, the Bates labels again,

24     to 8459?

25     A.   Okay.  I have them.

1  Q.   Do you recognize that document?

2  A.   Yes.

3  Q.   And I believe you said this was something you gave to, it

4  even says "Prepared for Colonial Bank Clients," correct?

5  A.   Correct.

6  Q.   And it's dated July 25, 2008?

7  A.   Correct.

8  Q.   And do you recognize this document?

9  A.   Yes.  This was the, the generic version of our procedures

10 manual.

11 Q.   Generic version of what?

12 A.   Procedures manual.

13 Q.   Okay.  So you have a procedures manual as a Mortgage

14 Warehouse Lending Division, and you also have a section that you

15 hand out to clients, this section here.

16 A.   Yes, yes.

17 Q.   Okay.  Now, looking to page 8439, we have the general

18 operating overview, correct?

19 A.   Yes.

20 Q.   And could you please read the last bullet on that page for

21 the jury?

22 A.   "This procedures manual provides a general description of the

23 operating procedures for a mortgage warehouse lending customer of

24 Colonial Bank.  This procedures manual is subject to change at any

25 time, at the sole and absolute discretion of Colonial Bank,

1    without prior notice to the mortgage company.  Colonial Bank will,

2    promptly after making any such change(s) to this procedural

3    manual, provide to the mortgage company a copy of any such

4    change(s).  Furthermore, Colonial Bank reserves the right to waive

5    or modify any of the requirements set forth herein, on a

6    case-by-case basis."

7    Q.   And so I want to focus on that last sentence:  "Furthermore,

8    Colonial Bank reserves the right to waive or modify any of the

9    requirements set forth herein, on a case-by-case basis."  That

10   sentence, who is the person who can waive or modify the

11   requirements?

12   A.   The operations managers or myself.

13   Q.   Okay.  And who were the operations managers?

14   A.   Joyce Shultz and -- well, actually, Joyce Shultz and Michelle

15   Carroll.

16   Q.   Okay.  And so could Ms. Kelly waive these, these

17   requirements?

18   A.   No.

19   Q.   So you or Joyce Shultz or -- the other lady's name was?

20   A.   Michelle Carroll.

21   Q.   Okay.  So you-all are the three that can waive or modify

22   requirement that are set forth in this document, and you do it on

23   a case-by-case basis, correct?

24   A.   Yes.

25   Q.   And you give this out to clients so clients know what to

1   expect when they're dealing with your division, correct?

2   A.   Correct.

3   Q.   And that would apply to your day-to-day work operations with

4   companies like Taylor, Bean & Whitaker, correct?

5   A.   Correct.

6   Q.   And again, if you wanted to make some exceptions to the rules

7   you've put in here, you can do it on a case-by-case basis, because

8   you're the head of the division?

9   A.   Correct.

10              MS. KARINSHAK:  And is this in evidence, Your Honor?

11              THE COURT:  Not the way it's been done, no.  Is this all

12   you're using from tab 13?

13              MS. KARINSHAK:  This is from tab 13, yes, ma'am.

14              THE COURT:  This is all that you are using from tab 13?

15              MS. KARINSHAK:  Yes, ma'am.

16              THE COURT:  All right.  This then is 251D, all right?

17   Not the rest of it.  Let's not burden the jury with any more

18   documents --

19              MS. KARINSHAK:  Yes, ma'am.  I'd like to get it focused

20   to the key documents.

21              MR. STOKES:  Exhibit 251D?

22              THE COURT:  Just -- yeah.  And the underwriting process

23   is not part of this exhibit at this point.

24              MS. KARINSHAK:  Your Honor, my understanding is it's

25   8438 through 8459.  That's what I have connected as 251D.

1              THE COURT:  That is -- D as in David?

2              MS. KARINSHAK:  D as in David, yes, ma'am.

3              THE COURT:  That's it.

4              MS. KARINSHAK:  Thank you, Judge.

5              THE COURT:  Now, you had also mentioned A, B, and C.

6    Are you still pushing -- putting those forward or not?

7              MS. KARINSHAK:  I'm going to come back to those.

8              THE COURT:  All right.  They're not in at this point

9    then.

10   BY MS. KARINSHAK:

11   Q.   Now, we just talked about the procedure manual that went out

12   to customers and talked about that you could do, you could do

13   exceptions on a case-by-case basis, and in this case in your

14   relationship with Taylor, Bean & Whitaker, you did waive or modify

15   requirements during the course of your relationship, correct?

16   A.   Correct.

17   Q.   And in fact, you could go -- you had the ability to go around

18   these documents by getting approval not only from yourself, but

19   you could take it to your higher ups, correct?

20   A.   Correct.

21   Q.   So would it be fair to say that if someone didn't review that

22   policy manual with respect to how you dealt with customers, they

23   may not understand what you as the head of the division had

24   authority to do?

25   A.   Please repeat that.  I don't understand what you're asking

Kissick - Cross                                                          952

1   me.

2   Q.   What I'm trying to say is that if someone didn't read that

3   manual and understand how you established your relationship to

4   your clients, they may not understand your authorities or how your

5   relationships worked with your customers, correct?

6   A.   Well, this was actually given to operational people for

7   operational to send in loans and our wire cutoff times and

8   everything else.  So, I mean, those were the things we waived,

9   like a wire cutoff time.

10  Q.   Okay.  But if I didn't read that document, as a person coming

11  in who doesn't know anything about your division, if I don't read

12  that document and go through this, I wouldn't necessarily

13  understand what your authorities were or how your company worked

14  with respect to those relationships, correct?

15  A.   Correct.

16  Q.   All right.  Now, let's look at this, Defendant's Exhibit 212,

17  please.

18          MR. STOKES:  No objection, Your Honor.

19          THE COURT:  All right.

20          (Defendant's Exhibit No. 212 was received in evidence.)

21  BY MS. KARINSHAK:

22  Q.   Now, Ms. Kissick, do you recognize this document?  It's an

23  e-mail --

24  A.   It's an e-mail.  I don't recognize it, but, I mean, it's our

25  e-mails.

1   Q.   It is your e-mails?

2   A.   Um-hum.

3   Q.   And your name is actually on the e-mail that's in the middle

4   of the page there.  Do you see the one dated April 25, 2006, at

5   11:05 a.m.?

6   A.   Yes.

7   Q.   And what is the subject?

8   A.   "Send me the COLB plus request on the big loan" --

9          THE COURT:  Whoa, whoa, whoa.  Slow down, please.

10         THE WITNESS:  "Send me the COLB plus request on the big

11  loan, and I will do that one today."

12  BY MS. KARINSHAK:

13  Q.   I'm sorry, ma'am, I was asking about the subject of the

14  e-mail.

15  A.   Oh.  "Aged warehouse loans."

16  Q.   Okay.  So "WH" stands for warehouse?

17  A.   Correct.

18  Q.   You just read for us, "Send me the COLB plus request on the

19  big loan, and I will do that one today," correct?

20  A.   Correct.

21  Q.   And move up the next e-mail in that chain.  Would you please

22  tell us who that's from and to?

23  A.   From Desiree to Teresa.

24  Q.   And just for the record, could you use their whole names?

25  A.   From Desiree Brown to Teresa Carrier.

1   Q.   And the date?

2   A.   April 25.

3   Q.   And the subject again?

4   A.   "Re:  Aged warehouse loans."

5   Q.   And this response was what?

6   A.   I thought over 120 days weren't eligible for COLB plus."

7   Q.   I'm sorry, ma'am, now, you're a little bit too close.  It's

8   kind of --

9   A.   Sorry.  "I thought over 120 days weren't eligible for COLB

10  plus."

11  Q.   Okay.  And just to make sure we have the record straight, the

12  e-mail that was sent to you was from -- I'm sorry, the e-mail you

13  read previously was from Teresa Carrier to Desiree Brown, copy

14  you, April 25, 2006, where we said, "Send me the COLB plus request

15  on the big loan, and I will do that one today," and then Ms. Brown

16  writes back, "I thought over 120 days weren't eligible for COLB

17  plus?"

18        And then what is the response above that?

19  A.   "We can do it upon approval."

20  Q.   And it was from whom?

21  A.   Teresa to Desiree.

22  Q.   And, I'm sorry, use their full names.

23  A.   Teresa Carrier to Desiree Brown.

24  Q.   Now, is this e-mail referring to the fact that you can change

25  some of the rules with respect to these facilities with approval?

Kissick - Cross                                                        955

1   A.    This would have to be done above me.

2   Q.    Okay.  But you can get it done even with approval above you?

3   A.    Yes.

4   Q.    Sorry?

5   A.    Yes.

6   Q.    And who would be the approving authority on this request for

7   the COLB plus?

8   A.    Well, I don't know.  I think it might have been Kamal at that

9   time.

10  Q.    Kamal who?

11  A.    I think Kamal was my boss then.

12  Q.    I'm sorry?

13  A.    Kamal Hosein.

14  Q.    Kamal Hosein?  And who is he?

15  A.    He was the treasurer.

16  Q.    And he was your boss?

17  A.    Yes.

18  Q.    And was he your boss the whole time you were at the Mortgage

19  Warehouse Lending Division?

20  A.    No.

21  Q.    Who was your first boss?

22  A.    Art Barksdale.

23  Q.    Okay.  And how long were you working with Art Barksdale?

24  From what date to what date?

25  A.    I don't remember when it ended.  August of '98 until I don't

Kissick - Cross                                                        956

1   remember when I switched.

2   Q.   How long do you think you worked with Mr. Hosein?

3   A.   A couple years, three maybe.

4   Q.   A couple years from the date of the shutdown or --

5   A.   I don't know.  Maybe three years.

6   Q.   Three years before August 2009?

7   A.   I don't really -- I don't know.  I'd have to go back and, and

8   look.  I don't know.

9   Q.   Okay.  But you think you worked with him for about three

10  years?

11  A.   Yes, I guess.  I don't, I don't remember to be honest with

12  you.  I really don't.

13  Q.   But at some point, he was your direct supervisor, correct?

14          MR. STOKES:  Your Honor, I think --

15          THE WITNESS:  Yes.

16          MR. STOKES:  -- she's answered this question five times

17  now.

18          THE COURT:  This has been established.  Let's move on.

19  BY MS. KARINSHAK:

20  Q.   Now, let's go to the next document, which is Defendant's

21  Exhibit 203.

22          THE COURT:  Is there an objection, Mr. Stokes?

23          MR. STOKES:  There's not, Your Honor.

24          THE COURT:  There is not.

25          MR. STOKES:  Yes.

1              THE COURT:  All right, it's in.

2              (Defendant's Exhibit No. 203 was received in evidence.)

3    BY MS. KARINSHAK:

4    Q.   Now, looking at Defendant's Exhibit 203, again, this is an

5    e-mail chain, and I wanted to focus on looking kind of above the

6    middle of the page, Ms. Kissick.  Who is this e-mail from?

7    A.   From Milton Vescovacci to me.

8    Q.   Okay.  And what is the date?

9    A.   August 5.

10   Q.   Of what -- of what year?

11   A.   '09.

12   Q.   2009?

13   A.   Yes.

14   Q.   All right.  And what is the subject?

15   A.   "Worst case."

16   Q.   And could you please read the contents of the e-mail for the

17   jury, please?

18   A.   "Please confirm if the list below of all facilities that

19   Colonial Bank has with TBW is correct.  The facilities that I am

20   aware of are as follows:  Wet and dry COLB with Colonial;

21   construction COLB with Colonial; overline facility with

22   Colonial" --

23   Q.   I mean, could you read the numbers and go a little bit

24   slower?

25   A.   Okay.  "No. 1, wet and dry COLB with Colonial; No. 2,

1   construction COLB with Colonial; No. 3, overline facility with

2   Colonial; No. 4, AOT (agency securities) facility with Colonial;

3   No. 5, AOT (private securities and whole loans) facility with

4   Colonial; co-purchaser -- No. 6, co-purchaser COLB with Seaside

5   and Colonial; No. 7, co-purchaser AOT with USAmeribank and

6   Colonial; and No. 8, co-purchaser AOT with Cole Taylor Bank and

7   Colonial."

8   Q.   Okay.  So those are eight different facilities that are

9   listed in this e-mail?

10  A.   Correct.

11  Q.   And Mr. Vescovacci again is your lawyer, correct?

12  A.   Correct.

13  Q.   And this is the attorney you had talked about who's been

14  consulting with you related to agreements for each of these

15  facilities, correct?

16  A.   Correct.

17  Q.   So we have eight different facilities in the relationship

18  between Colonial Bank and Taylor, Bean & Whitaker, correct?

19  A.   Correct.

20  Q.   And each of these would have their own agreements and

21  operating rules, correct?

22  A.   Well, actually the COLB are all exactly the same, and the AOT

23  are the same.  The only one that's different is the overline

24  because of the true sale.

25  Q.   Okay.  But those separate groups have operating agreements,

1  correct?

2  A.   They all have different operating agreements, but they all

3  are the same language.

4  Q.   Well, the same language, we reviewed the governing agreements

5  here earlier, correct?

6  A.   Correct.

7  Q.   And not all of them were the same, but there were two that

8  were the same, right, the AOT --

9  A.   Well, the AOTs are all the same, and the COLBs are the same.

10  Q.   Exactly.  So the AOTs are the same, the COLBs are the same,

11  and then you have the overline, correct?

12  A.   Correct.

13  Q.   Okay.  So there's three big sets of rules, correct?

14  A.   Correct.

15  Q.   And to understand the facilities and how those facilities

16  worked, you would have to understand those governing documents,

17  correct?

18  A.   Yes.

19         MS. KARINSHAK:  Okay.  And, Your Honor, I'd like to do a

20  demonstrative at this time.

21         THE COURT:  Have you shown it to the government?

22         MS. KARINSHAK:  Yes, Your Honor.

23         THE COURT:  Any objection, Mr. Stokes?

24         MR. STOKES:  I don't know if I have a copy of this or

25  not, Your Honor.

Kissick - Cross                                                    960

1              MS. KARINSHAK:  Here's another one.

2              MR. STOKES:  No, no objection.  I'm not sure what it is

3    exactly, but --

4              THE COURT:  All right.

5              MR. STOKES:  Your Honor, if I may, we may object as we

6    go on.  This is a representation of something that actually

7    doesn't exists, but we're not sure what it is, but we're happy to

8    proceed and then --

9              THE COURT:  It looks like it's a bunch of buckets.

10             MS. KARINSHAK:  Yes, ma'am.

11             THE COURT:  All right, go ahead.

12   BY MS. KARINSHAK:

13   Q.   Now, Ms. Kissick, looking at these, these buckets represent

14   the different agreements that are -- the different facilities that

15   you have with Taylor, Bean & Whitaker, correct?

16   A.   Correct.

17   Q.   And the mortgage loans will proceed from one bucket to the

18   other, mortgage notes would go from one bucket to another bucket,

19   depending on how -- the rules of each bucket, correct, the aging

20   of the loans and they can only be in certain buckets at certain

21   times, correct?

22   A.   Yes, correct.

23   Q.   Okay.  And so according to the rules of the different

24   buckets, a mortgage loan may or may not be able to be in that

25   bucket and may get moved to another bucket, correct?

Kissick - Cross                                                              961

1   A.    Yes.

2   Q.    And so in your relationship with Taylor, Bean & Whitaker,

3   with the volume of notes that are coming through, there's

4   potentially a lot of moving of mortgage notes between all these

5   buckets, correct?

6              MR. STOKES:  Your Honor, I'm just going to object

7   because they're showing graphics on this.  One, we don't know what

8   the graphics are, and witness hasn't even agreed that this is, in

9   fact, what happened, and they're showing the mortgage loans moving

10  between buckets and shuffling.

11             MS. KARINSHAK:  Your Honor --

12             THE COURT:  It's also a, creating an invisible record

13  for any further purposes for this record.  I don't think it's very

14  helpful.  This is a simplistic enough concept that can be done

15  with words, so let's take this off the screen, and go ahead.

16  BY MS. KARINSHAK:

17  Q.    Ms. Kissick, you talked about the loans would be moving

18  between different buckets, different facilities based on the rules

19  for those facilities, correct?

20  A.    Yes.

21  Q.    And each of those facilities has their own set of rules that

22  you're following while these loans are moving between all those

23  different facilities, correct?

24  A.    Well, actually, they're only supposed to go -- they aren't

25  supposed to move all around.  They're supposed to go to COLB and

Kissick - Cross                                                          962

1   get funded or go to AOT and get funded, and we ended up putting

2   them on overline when they didn't meet the requirements of anybody

3   else.

4   Q.    I'm sorry, when they didn't --

5   A.    When they aged out, sorry.  Now I'm talking too loud.

6   Q.    But you'd have to keep track of each of those as what can

7   stay on COLB for too long before it goes to AOT before it goes to

8   overline, correct?

9   A.    We do keep track of it on our paperwork, yes.

10          THE COURT:  Well, an individual mortgage, if I had a

11  mortgage, individual one, that could be on the COLB, correct?

12          THE WITNESS:  Correct.

13          THE COURT:  All right.  It wouldn't be on the AOT unless

14  it were part of a pool?

15          THE WITNESS:  Correct.

16          THE COURT:  And you don't get the mortgage that's in a

17  pool.  You get the pool papers.

18          THE WITNESS:  We get the papers, and the mortgages go

19  down to Document Custody.

20          THE COURT:  Right.

21          THE WITNESS:  But just the paperwork moves.

22  BY MS. KARINSHAK:

23  Q.    Now, would it be fair to -- let me establish your -- when did

24  your relationship begin with Taylor, Bean & Whitaker?  I believe

25  you said 1998?

Kissick - Cross                                                          963

1    A.    Right.   I started banking him at SunTrust in 1998.

2    Q.    And then when did he come -- did he come over -- Taylor, Bean

3    & Whitaker came over to Colonial in about September of 1999?

4    A.    Yes.

5    Q.    Would that be right?

6          And -- so from 1999 through August of 2009, would it be

7    fair to say that Taylor, Bean & Whitaker had grown exponentially

8    over that time?

9    A.    Yes.

10   Q.    And it had a very high volume?

11   A.    Yes.

12   Q.    And isn't it true that a lot of the tracking of those

13   mortgage loans with respect to that volume is done electronically?

14   A.    Yes.

15   Q.    So that people aren't even touching the documents, the loans?

16   They're coming in electronically and being sorted; is that right?

17   A.    No, we always would touch the loans.

18   Q.    Because that's the collateral that's in the safe, correct?

19   A.    Well, that's the collateral that comes in first that perfects

20   our interest, and then when the security is created, then it goes

21   to the vault downstairs in custody.

22   Q.    So that's actually touched, but other documents are not

23   necessarily?

24   A.    Correct.

25   Q.    And some of those loans, the information gets sorted by

Kissick - Cross                                                    964

1    specific data such as something's Fannie Mae eligible, and you can

2    run a query to figure out which documents are Fannie Mae eligible,

3    correct?

4    A.    Correct.

5    Q.    And so there's a lot of recordkeeping going on to keep track

6    of the, what can be in each of the facilities and, indeed, what is

7    in each of the facilities?

8    A.    Right.

9    Q.    Now, isn't it true that, that data integrity was an issue for

10   Colonial Bank with respect to these tracking of loans and the data

11   with respect to those loans?

12   A.    On Colonial's part?

13   Q.    Yes.

14   A.    No.

15   Q.    Okay.  Well, what about on Taylor, Bean & Whitaker's part?

16   A.    Definitely.

17   Q.    Okay.  When you say "definitely," what do you mean by that?

18   A.    Their systems didn't seem to talk to one another.

19   Q.    Their systems over at Taylor, Bean & Whitaker?

20   A.    Yes.

21   Q.    Didn't talk amongst themselves?

22   A.    Yes.

23   Q.    And Colonial Bank didn't ever have any data problems, you're

24   saying --

25   A.    On our, on our collateral monitoring system, no.  We were --

1  it was fine.  And we actually were sometimes the point of record

2  that Taylor Bean used.

3  Q.   You mean point of record, they'd reach out to you and say,

4  hey, we need to check our data versus yours?

5  A.   Yes.

6  Q.   And how often did that happen?

7  A.   All the time.

8  Q.   Okay.  So would it be fair to say there was a big data

9  integrity issue over at Taylor, Bean & Whitaker?

10 A.   Yes.  That was an ongoing issue.

11 Q.   And did you also in the course of your relationship with

12 Taylor, Bean & Whitaker and Mr. Farkas specifically make

13 recommendations to him about the fact that they're growing so much

14 that they needed more help?

15 A.   Yes.

16 Q.   And did you also say, "You know, you might need to add more

17 depth to your bench"?

18 A.   Yes.

19 Q.   And what do you mean when you say, "I'd like you to add more

20 depth to your bench"?

21 A.   He couldn't be the only person working at the company.

22 Q.   So you're saying he can't be the only one.  What do you mean

23 when you recommend to him to get depth to the bench?

24 A.   To add more experienced people.  He's growing quickly, and he

25 couldn't be the only one there working.

1   Q.   And in response to your suggestion that there be more depth

2   to the bench, wasn't a CFO brought on board, Mr. DeArmas?

3   A.   I think he'd already been there.  He was just hired after --

4   he was just made CFO when Ray Crocker left.

5   Q.   Ray Crocker left?

6   A.   Yeah.  I tried to get him to hire over people.

7   Q.   Who did you try -- you tried to get who to hire over people?

8   A.   I given him names like, I'm sorry, Frank Plenskofski.  I

9   can't even begin to spell it for you.  Sorry.

10  Q.   Who is Frank Plenskofski?

11  A.   Everybody called him Franky P.  He's very well known in the

12  industry.

13          I was trying to get somebody -- he was growing fast.  I

14  was trying to get a CFO, you know.

15  Q.   Okay.  So you wanted a different CFO then?

16  A.   Yes.

17  Q.   You didn't like Mr. DeArmas?

18  A.   No, it wasn't that.  He was becoming a big company.  He

19  needed people with more strengths, more skill sets.

20  Q.   So you didn't think Mr. DeArmas was strong enough to stay on

21  the team; is that correct?

22  A.   I could never really understand what he was telling me half

23  the time, so I guess that would be a fair assessment.

24  Q.   You couldn't understand what he was telling you?

25  A.   Correct.

1  Q.   What does that mean?

2  A.   I don't know what he was -- I didn't know what he was talking

3  about when he was answering questions for us.

4  Q.   So you would send a query to Mr. DeArmas, and he'd send

5  something back that you just didn't understand?

6  A.   It was -- yes, it was mumbo -- it was -- it didn't make

7  sense.  It was just like I was talking with a very learned person,

8  and it didn't make any sense, but I didn't know what he was

9  talking about half the time so --

10 Q.   Mr. DeArmas, wasn't he a certified public accountant?

11 A.   Yes.  And I'm not, and that can be part of it.  I don't know.

12 But I did not know what he was talking about half the time, so --

13 Q.   But he was the chief financial officer for Taylor, Bean &

14 Whitaker?

15 A.   Yes.

16 Q.   And did you also make a recommendation that I believe

17 Mr. Farkas followed, and that would be the CEO, Mr. Paul Allen?

18 A.   Actually, he hired Paul because he had just been cut off by

19 Fannie Mae, and Freddie Mac loved Paul Allen, and I remember him

20 telling me, "Don't blow it with Paul," because they needed him to

21 keep Freddie happy.  So I didn't, I didn't even know who Paul

22 Allen was.  They introduced me to Paul Allen.

23 Q.   Had you heard of Paul Allen?

24 A.   No.

25 Q.   Okay.  But I misunderstood something you said here.  You said

1   "they told me."  Who is "they"?

2   A.    Lee.

3   Q.    Okay.  So Lee told you he's hiring Mr. Paul Allen because he

4   wants to maintain a relationship with the --

5   A.    No.  He had been cut off by Fannie Mae.  Freddie Mac loved

6   Paul Allen, and they wanted -- Taylor Bean needed Paul Allen there

7   to kind of grease the wheels with Freddie Mac, because that was

8   their only lifeblood.

9   Q.    And Mr. Paul Allen had a great relationship then with Freddie

10  Mac, correct?

11  A.    That's what I was told, yes.

12  Q.    And so to keep good relationships up, Taylor, Bean &

13  Whitaker, Mr. Farkas hired and brought on Mr. Paul Allen to be the

14  CEO, correct?

15  A.    Correct.

16  Q.    And Mr. Paul Allen, do you know anything about his education

17  as far as does he have a degree?

18  A.    I'm assuming he does, yes.  I don't know.  I don't remember

19  that much.  He's very learned; I do know that.

20  Q.    Does he have a degree from the London School of Economics?

21  A.    I don't know.

22  Q.    Now, Ms. Kissick, would you agree that in the business you're

23  in of this, that it's a fast-moving business and mistakes can be

24  made, and you can even have sloppy work?

25  A.    Yes.

Kissick - Cross                                                              969

1   Q.    Even among your own employees?

2   A.    Yes.

3               MS. KARINSHAK:  Please show her Defense Exhibit 207.

4               MR. STOKES:  No objection.

5               THE COURT:  All right, it's in.

6               (Defendant's Exhibit No. 207 was received in evidence.)

7   BY MS. KARINSHAK:

8   Q.  Ms. Kissick, does Defense Exhibit 207, does that show what

9   appears to be some notes you -- or tell me what that is actually,

10  Defense 207.

11  A.    Well, I'm curious as to how you got this, because this was

12  kind of my narrative that I made for a department talk that I was

13  giving when we had a bunch of temporaries and they were not

14  understanding the right, the privilege they had of having a nice

15  job, and they were being a little spoiled, so I kind of gave them

16  a talk.

17  Q.    Well, if you notice, it's got a DOJ Bates label there, so it

18  would have come from the DOJ, correct?

19  A.    I guess so, yes.

20  Q.    Sorry?

21  A.    I guess so.

22  Q.    Okay.  Now, I want you to look at this memorandum of the talk

23  you're giving to your employees about -- first you say on the

24  first page, sub-point 1, what do you say?

25  A.    I'm sorry, what was that?

1  Q.   On that first, you have a 1 with a parentheses.  Could you

2  please tell us -- actually, start at the very beginning.  "I have

3  called you all to this meeting."  Please tell us what that is.

4  Read that first sentence.

5  A.   "I have called you all to this meeting because I need to go

6  over a few things with you.  I have struggled with what to say and

7  how to say it for the past several days.  I thought, I can give

8  each of you a flow chart and an org. chart and go over what we do

9  and how we do it so everyone will know exactly what their role is

10 and how what you do or don't do affects the big picture."

11          Keep going?

12 Q.   Yes.

13 A.   "I could be all sweetness and light, 'cause you know what a

14 softy I am, and we may do that when we're done, but in the end, I

15 have decided to say a couple of things very bluntly to you, and if

16 you are rolling your eyes as if this will not pertain to you,

17 well, then it probably does pertain to you, so you'd better listen

18 up."

19 Q.   What do you say at subparagraph 1?

20 A.   "Working at Colonial Bank in mortgage warehouse lending is a

21 privilege, not a right.  You don't realize how great you have it.

22 Do you know that Colonial pays for the parking of all its

23 employees (which includes our I-placement employees)?  That's $80

24 per month per employee every month of the year.  Most downtown

25 employers" --

1   Q.   Stop.  Go to the third paragraph, "I hear all sorts," and
2   read that part, please.
3   A.   "I hear all sorts of grumbling via the grapevine:  Oh, my
4   supervisor is so mean.  She makes us e-mail her when we leave.
5   Oh, my supervisor never pays attention to us, or my supervisor
6   micromanages us.  Oh, it's so unfair.  I-placement employees
7   didn't get bonuses, wah, wah, wah.  Well, here's the deal.  If you
8   don't like working here, leave."
9   Q.   And an i-placement employee is what?
10  A.   Temps.
11  Q.   Okay.
12  A.   Temp to perm.
13  Q.   And so I-placement --
14          MR. STOKES:  Your Honor, I'm just going to object.  I'm
15  not sure of the relevance of this document.
16          THE COURT:  I was wondering the same --
17          MS. KARINSHAK:  Your Honor, I'm getting to the.
18          THE COURT:  Get to it then.
19  BY MS. KARINSHAK:
20  Q.   Let's get to "sloppy work" in that letter, please.
21  A.   Where is this?
22  Q.   It's on page 3 of this.  Do you see the section "Sloppy
23  Work"?
24  A.   "Sloppy Work," yes.  "Did you know that the overdraft report
25  goes to Credit Admin every day in Montgomery and is shown to our

1   auditors?  Did you know that over 60 percent of MWL overdrafts are

2   due to analyst errors?  How'd you like it if you got your

3   MasterCard bill and there were mistakes on it monthly and that

4   every six out of ten charges on it were due to some clerk not

5   doing his/her job?  These mistakes take more work to unwind than

6   just a simple credit ticket.  Account Analysis has to also be

7   notified, because there is a prime plus 2 percent charge for

8   overdrafts.  Additionally, it looks bad within the rest of the

9   bank.  Credit in Montgomery reviews them, and it makes our credit

10  officers wonder if the customer has a problem.  We don't always

11  tell them" --

12          THE COURT:  Slow down, please.

13          THE WITNESS:  I'm sorry.  "We don't always tell them

14  it's Operations' fault, because then it will look like we don't

15  hire competent employees.  People think their little typos or

16  transpositions don't matter, but they do."

17  BY MS. KARINSHAK:

18  Q.    And then the last paragraph please?  Actually, let's just go

19  to the last sentence -- well, there's a sentence that starts,

20  "How'd you like to sign your life away on a mortgage?"  Read that

21  to end, please.

22  A.    "How'd you like to sign your life away on a mortgage and then

23  possibly have to go in and re-sign all of the docs because your

24  mortgage company's bank lost the note?  First, I'd think I was

25  being scammed; and secondly, it doesn't look good to our customer.

1  Banks are supposed to be sound and secure and not a black hole

2  pit, like some teenager's bedroom."

3  Q.   Now, you wouldn't have been writing this -- you gave, you

4  gave a speech as to this, correct?  This is what you told the

5  employees?

6  A.   Right.

7  Q.   Okay.  You wouldn't have been writing all of this and saying

8  all of this -- I mean, you took the trouble to write it down to

9  make sure you said everything you needed to say, correct?

10 A.   Um-hum.

11 Q.   You wouldn't have been writing this had your group not been

12 shipping notes to the wrong investor as well as losing notes,

13 correct?

14 A.   Well, that didn't really apply to Taylor Bean, because we

15 didn't have to ship notes to an investor.  We took them downstairs

16 to custody.  This happened to a couple of customers in particular,

17 and it really rattled me, because it was good customers, and it

18 was temporaries that were doing it, and that's why I decided

19 enough was enough.

20 Q.   Now, can you say without hesitation that there was no error

21 with shipping notes to the wrong investor or losing notes with

22 respect to Taylor, Bean & Whitaker?

23          THE COURT SECURITY OFFICER:  The Court's indulgence?

24          THE WITNESS:  Sorry, I don't know what I'm doing.

25 Breathing, I guess.  There you go.

1           THE COURT:   Technology.   A piece of sponge.

2           THE WITNESS:   Now you won't hear me breathe anymore.

3    Yeah.

4           Hello?   Much better.

5    BY MS. KARINSHAK:

6    Q.    Now, do you remember my question?   Can you say under oath

7    that here and without hesitation, that there was never an instance

8    where you shipped notes to the wrong investor and/or lost notes

9    with respect to Taylor, Bean & Whitaker?

10   A.    I cannot say that without hesitation, because I'm sure we did

11   every once in a while, but by and large, our group was very good.

12   Q.    Well, by and large, you're trying to do your job, correct?

13   A.    Yes.

14   Q.    And you're, and you're the head, and you're the head of the

15   division, and you're trying to do a good job for your, for your

16   company but also for your clients, correct?

17   A.    Yes.

18   Q.    And are you aware that part of this prosecution is about the

19   finding that some of Taylor, Bean & Whitaker notes, there's just

20   not enough notes, correct?

21   A.    Correct.

22   Q.    And have you tried to help the government figure out which

23   notes with respect to Taylor, Bean & Whitaker may or may not have

24   been lost?

25   A.    They were not lost.

Kissick - Cross                                                      975

1   Q.   As part of your cooperation, though, have you gone down and
2   reviewed all those records to be absolutely certain that you can
3   say that without hesitation and here under oath before the jury?
4   A.   I have not helped them, but I can honestly under oath tell
5   you that they were not lost.  They were never given to us.
6   Q.   Well, what about you said there might have been a wrong
7   investor?  Isn't that a possibility?
8   A.   No.
9   Q.   Did you go down and double-check with the government as part
10  of your cooperation to see if any of the notes went to the wrong
11  investor?
12  A.   No.  I wasn't -- first of all, after I left, I wasn't allowed
13  to go back, but secondly, your point is misleading, because we
14  didn't get the notes to begin with.  They weren't sent to the
15  wrong investor.  We never got them.
16  Q.   I understand that's your testimony, ma'am, but I'm just
17  trying to clarify.
18  A.   Okay.
19  Q.   You haven't been down there with the government to
20  double-check each and every one of those things, have you?
21  A.   No, I have not.
22  Q.   You haven't been able to re-access the bank, right?
23  A.   No, I have not.
24  Q.   You were gone, and you've been gone, correct?
25  A.   Yes, I have.

Kissick - Cross                                                          976

1   Q.   And, in fact, you admitted here in this document and when you

2   met with your employees that your operation looked like some

3   teenager's bedroom, correct?

4   A.   It was probably in 2006, but, you know, I don't think we were

5   talking about Taylor Bean, but yes, I did say that.

6   Q.   So at some point in your operation, it would be fair to say

7   it looked like a teenager's bedroom.  Otherwise, you wouldn't have

8   gone through this, correct?

9   A.   I was making a point because normally I joke around and have

10  fun, and for me to say this mean was pretty shocking to my staff,

11  and so, you know, it was for effect, but we do have a very -- we

12  had a very good operational staff.

13  Q.   I understand, ma'am, but when you answer the questions, would

14  you please say "yes" or "no" first?  And then you can --

15  A.   Okay.  Would you please repeat your question?

16        THE COURT:  I think this whole line of questioning is a

17  little off.

18        MS. KARINSHAK:  Okay.

19        THE COURT:  Let's move on.

20  BY MS. KARINSHAK:

21  Q.   All right.  Ms. Kissick, you have a master's degree, correct?

22  A.   Yes.

23  Q.   And what is that in?

24  A.   Management and marketing.

25  Q.   Okay.  And do you have an undergraduate degree?

Kissick - Cross                                                      977

1   A.    Yes.

2   Q.    And what is that in?

3   A.    English.

4   Q.    And I meant to ask you, I apologize, where was your master's

5   degree from?

6   A.    Miami University.

7   Q.    And is that in Ohio?

8   A.    Yes.

9   Q.    Okay.  And your undergraduate degree is from where?

10          THE COURT:  Now, what's the relevance of that?

11          MS. KARINSHAK:  Your Honor, I'm just trying to build it.

12          THE COURT:  Well, let's just move this along.

13          MS. KARINSHAK:  All right.

14  Q.    Now, how many years in banking -- how many years of banking

15  experience do you have?

16  A.    I started a training program in '86, in the fall of '86, and

17  I started lending, doing banks to -- loans to small banks in '87.

18  Q.    And your first 11 years in the banking industry were with

19  SunTrust, correct?

20  A.    Correct.

21  Q.    Then you had 11 years with Colonial Bank, correct?

22  A.    Correct.

23  Q.    So that's a total of 22 years in banking, correct?

24  A.    Correct.

25          MS. KARINSHAK:  Could you please show her Defendant

Kissick - Cross                                                     978

1   Exhibits 185 through 188?

2           THE COURT:  Are they not in our notebook?

3           MS. KARINSHAK:  I just was handed these, Your Honor.

4           THE COURT:  All right.  Well, by my count, I think we've

5   been at it two hours.  I went past the normal break time.  My

6   jurors are letting me know that.

7           MS. KARINSHAK:  Oh, I'm sorry.

8           THE COURT:  So let's take a break this afternoon until

9   10 after.

10          (Recess from 3:55 p.m., until 4:10 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kissick - Cross                                                      979

1          NOTE:  The case continues in the presence of the

2    defendant and the jury as follows:

3    JURY IN

4          THE COURT:  Mr. Stokes, or Mr. Connolly, I understand

5    you want to release a witness?

6          MR. ROGOW:  We do, Your Honor.  Mr. Barofsky had been

7    subpoenaed.  He has a trip that he wants to go on.  We are going

8    to release him with a stipulation from the Government that the

9    subpoenas that he signed to Colonial, the SIG TARP report to

10   Congress, and Mr. Barofsky's resignation letter to President Obama

11   memoranda all are authentic, and the copies we have we will then

12   be able to introduce without having Mr. Barofsky here.

13         THE COURT:  All right.  The Government is comfortable

14   with that stipulation?

15         MR. CONNOLLY:  Yes.  We aren't challenging the

16   authenticity.  We may have objection as to relevance, but we won't

17   challenge the authenticity of those documents.

18         THE COURT:  All right.  Then the subpoena is now

19   quashed, it's over, and Mr. Barofsky may go on with his life.

20         MR. ROGOW:  Thank you, Your Honor.

21         MR. CONNOLLY:  Thank you, Your Honor.

22         THE COURT:  All right, let's continue, please.

23   BY MS. KARINSHAK: (Continuing)

24   Q.   Now, I believe Ms. Kissick, you have Defendant's Exhibits

25   185, 186, and 187 and 188?

Kissick - Cross                                                          980

1   A.   Yes.

2           MS. KARINSHAK:  And we moved those in.  Are those in

3   evidence.

4           MR. STOKES:  No objection, Your Honor.

5           THE COURT:  All right, they are in.

6       (Defendant's Exh. Nos. 185, 186, 187 and 188 were received in

7   evidence)

8   BY MS. KARINSHAK: (Continuing)

9   Q.   Okay.  And 185, 186, Ms. Kissick, 185 shows that that is your

10  office and it has your title on the door there, correct?

11  A.   Correct.

12  Q.   And moving to 186, is that an accurate picture of your

13  office?

14  A.   Yes.

15  Q.   187 as well?

16  A.   Yes.

17  Q.   And it shows some of your memorabilia as well as some of your

18  pictures in your office?

19  A.   Yes.

20  Q.   188?

21  A.   Yes.

22  Q.   Now, could you please show the witness Defendant's Exhibits

23  251B and C.

24          MR. STOKES:  I am sorry, Your Honor, again no objection.

25          THE COURT:  All right, they are in.

Kissick - Cross                                                              981

1        (Defendant's Exh. Nos. 251B and 251C were received in

2   evidence)

3   BY MS. KARINSHAK: (Continuing)

4   Q.   Ms. Kissick, does Defendant's Exhibit 251B, is that your

5   organizational chart for the Mortgage Warehouse Lending Division?

6   A.   Yes.

7   Q.   And it shows you as the senior vice-president and the

8   director of the division, correct?

9   A.   Yes.

10        THE COURT:  I will tell you, if the jury can read that,

11   their eyes are a whole lot better than mine.  That's a terrible

12   exhibit.

13   Q.   Your Honor, unfortunately, we don't have a better one, I

14   apologize.

15        And moving to 251C, that's a little bit better, but it

16   doesn't show all the people, is that correct?

17   A.   This is for a different area within our department.

18   Q.   Okay.  Which area is that for?

19   A.   Document custody.

20   Q.   Okay.  And the first one, 251B, shows pretty much everyone in

21   your organization and how they report to you, correct?

22   A.   It doesn't show doc custody.  It just shows, I don't think,

23   it just shows the funding side and the pay-down side and the

24   lenders.

25   Q.   Okay.  So, between 251B and C, it shows all the people over

Kissick - Cross                                                    982

1  which you had control and authority, correct?

2  A.    Yes.

3  Q.    And so, we would need both pages to actually show the

4  fullness of your responsibilities at the Mortgage Warehouse

5  Lending Division, correct?

6  A.    Correct.

7  Q.    And approximately how many employees is that that you

8  supervised?

9  A.    I don't know if the temps are on here, but we had about 118

10 people.

11 Q.    And I believe you said you had at least 100 customers,

12 correct?

13 A.    Yes.

14 Q.    And what was the amount in assets that you had in 2008?

15 A.    2008?  Probably 5 billion.  About 5 billion.

16 Q.    And talking about your division, I believe you had testified

17 that you met Mr. Farkas when you were employed at SunTrust,

18 correct?

19 A.    Correct.

20 Q.    And your relationship with Mr. Farkas, it was only a

21 professional relationship, correct?

22 A.    I liked him.

23 Q.    So--

24 A.    Except for, you know, a couple times in 2002.  No, kidding.

25 We had--  He was always very nice.

Kissick - Cross                                                  983

1  Q.   But you weren't intimate with Mr. Farkas, correct?

2  A.   No, no, no, no.

3  Q.   And you testified you didn't get any kickbacks from Mr.

4  Farkas?

5  A.   Okay, please, moment here.

6  Q.   I'm sorry?

7  A.   Nothing.  No, nothing.

8  Q.   No kickbacks, correct?

9  A.   Nothing.

10 Q.   And no gifts?

11 A.   No.  Well, he gave me a birthday gift occasionally.  I had

12 surgery, sent flowers.

13 Q.   Okay.  And that was because of your professional

14 relationship?

15 A.   Yes.

16 Q.   And your working relationship, correct?

17 A.   Right.

18 Q.   And you had been working with Mr. Farkas since about

19 September 1999?

20 A.   At Colonial, but before that I was at SunTrust.

21 Q.   And how long had you worked with him at SunTrust?

22 A.   Actually just a few months before I left.

23 Q.   And would it be fair to say you brought him over as a

24 customer when you went to Colonial Bank?

25 A.   It was about a year later, a little about over a year later.

Kissick - Cross                                                          984

1    Q.   And would it be fair to say you brought TBW over as a

2    customer because that would be good for you as the head of the

3    Mortgage Warehouse Lending Division, correct?

4    A.   Well, it would be good for my department, correct.

5    Q.   Would it be fair to say to TBW had been profitable every year

6    since it's since inception you had been dealing with them?

7    A.   Yes.

8    Q.   And TBW was in fact your largest customer, correct?

9    A.   They definitely grew into being our largest customer.

10   Q.   Now, would it be fair to say that when you are working with a

11   warehouse line, the more you have, the more you lend, the more

12   money you make as you turn it?

13   A.   Yes.

14   Q.   And what does that mean, as you turn it?  What does that

15   mean?

16   A.   Collateral goes through the line, you close, and then you are

17   able to close new loans.

18   Q.   So, it's based on a lot of volume, correct?

19   A.   Correct.

20   Q.   So, the more you move, the more you make?

21   A.   Correct.

22   Q.   And didn't you also previously say in sworn testimony that

23   you can't view the line like a finite building loan that you have

24   to pay back.  It's a good thing to raise the debt ceiling to allow

25   TBW to grow, which also helps pay back your investment?

Kissick - Cross                                                    985

1   A.   I'm sure I did say that.  I don't remember saying that, but

2   that sounds correct.

3   Q.   That is something that would be true, correct?

4   A.   Yes.

5   Q.   And isn't it true that you received audited financial

6   statements from TBW annually?

7   A.   Yes.

8   Q.   Did you also receive monthly unaudited financial statements

9   from TBW?

10  A.   Yes.

11  Q.   Now, we have been talking about PINs quite a bit.  And could

12  you put up Government's Exhibit 1-13, please.  Or actually show

13  that to the witness.

14          MR. STOKES:  No objection, Your Honor.

15          THE COURT:  Then it's in.

16      (Government's Exh. No. 1-13 was received in evidence)

17          MS. KARINSHAK:  It is Government's Exhibit, I'm sorry,

18  Government's Exhibit 1-13.

19  BY MS. KARINSHAK: (Continuing)

20  Q.   And in Government's Exhibit 1-13, that's written on your

21  Colonial Bank e-mail, isn't it?

22  A.   Yes.

23  Q.   And it's not written from a PIN, correct?

24  A.   Correct.

25  Q.   And the bank has e-mail or actually has software to search

Kissick - Cross                                                    986

1  key e-mails for terms, isn't that right?

2  A.    I assume so, yes.   I didn't know at the time.

3  Q.    Okay.  So, when you are talking about going to prison, you're

4  kidding, correct?  It's on your company e-mail?

5  A.    I was joking, but there was some truth to it.

6  Q.    And when did you actually get a BlackBerry?

7  A.    2004, '05 maybe.

8  Q.    So, prior to that would you have e-mailed business, if you

9  were working on business from your home, would you have used your

10 home computer?

11 A.    I would have used the Colonial line if the VPN worked, but a

12 lot of times it didn't work, so that's when I used hotmail.

13 Q.    That's when you used your hotmail account?

14 A.    Yes.

15 Q.    So, for example, if you are e-mailing from hotmail, it's not

16 that you are necessarily hiding anything, it's that you're

17 e-mailing from home rather than being able to access--

18 A.    The VPN, I couldn't get on.

19 Q.    Isn't it true that the banking industry that you are in is

20 highly regulated?

21 A.    Yes.

22 Q.    I believe we talked about, but your bank was regulated by

23 whom?

24 A.    At the end it was regulated by the State of Alabama and the

25 FDIC.

1  Q.   And in the course of your relationship with Taylor Bean &

2  Whitaker, you had mentioned these Mortgage Warehouse Loan

3  Committee meetings where you discussed your relationships with

4  different borrowers, correct?

5  A.   Correct.

6  Q.   And sometimes there would be business brought before those

7  meetings as to what you wanted to do with particular customers,

8  correct?

9  A.   Correct.

10  Q.   And who would typically attend these meetings?

11  A.   The Warehouse Committee meetings were Kamal, Kamal Hosein,

12  Mary Lou Bathen, myself, Caryn Cope, Amy Nunnelley.  I can't

13  remember.

14  Q.   Okay.  But those are all higher-ups in the organization,

15  correct?

16  A.   Kamal is, yes, and Caryn Cope is.

17  Q.   What about Mary Lou Bathen?

18  A.   She was in Montgomery, I think she was my equal level.

19  Q.   Could you please give Ms. Kissick Defendant's Exhibit 202.

20         THE COURT:  Any objection?

21         MR. STOKES:  Judge, I am not sure what the relevance of

22  this is.  This appears to be related to some unrelated company.

23         MS. KARINSHAK:  Actually, if you look to the fourth

24  page, Taylor Bean & Whitaker is listed.

25         MR. STOKES:  No objection, Your Honor.

1        THE COURT:  All right, it's in.

2      (Defendant's Exh. No. 202 was received in evidence)

3  BY MS. KARINSHAK:  (Continuing)

4  Q.   Now, we were just talking about the Mortgage Warehouse Loan

5  Committee meetings, Ms. Kissick.  And isn't it true that

6  Defendant's Exhibit 202 is just an example of one of those type of

7  meetings that was held December 3, 2007?

8  A.   Yes, correct.

9  Q.   And then turn to the fourth page, that would be where it says

10 ratifications and it listed the borrower, Taylor Bean & Whitaker

11 Mortgage Corporation, correct?

12 A.   Correct.

13 Q.   And this is a ratification that has Rodney Lewis as the

14 officer, correct?

15 A.   Correct.

16 Q.   And it's a renewal and modification of your relationship with

17 Taylor Bean & Whitaker at that time, correct?

18 A.   Yes.

19 Q.   And it talks about renewing and decreasing different lines,

20 and it talks about the number and type of sublimits, correct?

21 A.   Yes.

22 Q.   And it also talks about the rates and fees that are being

23 paid with respect to conforming, wet, nonconforming, repurchase

24 and aged loans, correct?

25 A.   Correct.

1  Q.    And so, what is a LIBOR rate?

2  A.    It's an index, the London Interbank Offered Rate.  I wouldn't

3  know what it is right now, but it was what we priced off of.

4  Q.    You used that is the standard from which you set your

5  interest rates, correct?

6  A.    Correct.

7  Q.    And so, Taylor Bean & Whitaker would be paying the fees that

8  are listed here to your bank related to these different lines, the

9  conforming, wet, nonconforming, repurchase and aged loans, I

10  should say?

11  A.    Correct.

12  Q.    So, for example, for an aged loan, it would be 30-day LIBOR

13  plus 270 basis points?

14  A.    Yes.

15  Q.    And this is, you are bringing this business before the

16  committee for them to vote on this, correct?

17  A.    The officer was, Rodney, yes.

18  Q.    And so, this is being approved with respect to Taylor Bean &

19  Whitaker?

20  A.    Correct.

21  Q.    And it also on that next page, turning to the next page,

22  there is a conversation or listing of the collateral, correct?

23  A.    Correct.

24  Q.    And here it lists that there is a possessory ownership

25  interest in a residential first or second lien mortgage loan with

1  a backup security interest in the event the courts reclassify the

2  transaction as a debt arrangement and a further security interest

3  in any ancillary mortgage collateral, correct?

4  A.    Right.

5  Q.    And then there is listed under number II a possessory

6  interest and gives more details on that.  It also lists

7  cross-collateralization with TBW's permanent servicing portfolio

8  and other receivables from prior servicing sale holdbacks and

9  residentials from securitizations, correct?

10 A.    Residuals, yes, from securitizations.

11 Q.    And what is important about the cross-collateralization?

12 A.    I did that to cover any other facilities.

13 Q.    I'm sorry?

14 A.    I did that to protect the bank in case anything else happened

15 on any other facilities.

16 Q.    Okay.  And then under subsection III there is more collateral

17 listed here as well, correct?

18 A.    Correct.

19 Q.    And then additionally, listed additionally Colonial Bank has

20 100 percent of the common stock of the owner Lee B. Farkas, and I

21 believe it was 79.2 percent at that time, correct?

22 A.    Yes.

23 Q.    And then you also have a guarantor which says unlimited, Lee

24 B. Farkas, correct?

25 A.    Yes.

Kissick - Cross                                                        991

1   Q.    And what does that mean, an unlimited guarantor?

2   A.    We had our, the owners of the companies guarantee the lines

3   of credit.

4   Q.    The owners of the companies guaranteed the lines of credit?

5   A.    Yes.

6   Q.    With their word, correct?

7   A.    Right.

8   Q.    Now, in addition, with respect to your relationship with

9   Taylor Bean & Whitaker, did you also have occasion to present

10  credit packages for approval?

11  A.    Did I?

12  Q.    You or someone on your behalf?

13  A.    Yes.

14  Q.    At Colonial Bank?  All right, could you please hand

15  Defendant's Exhibit 204, please.

16            THE COURT:  Any objection?

17            MR. STOKES:  The Court's indulgence.

18            No objection, Your Honor.

19            THE COURT:  All right, it's in.

20        (Defendant's Exh. No. 204 was received in evidence)

21  BY MS. KARINSHAK: (Continuing)

22  Q.    Ms. Kissick, this would just be one of many credit packages

23  that would have gone for approval, but this one is dated

24  January 28, 2009, correct?

25  A.    Correct.

1  Q.   And this is a credit package that shows an extension and

2  modification for Taylor Bean & Whitaker, correct?

3  A.   Yes.

4  Q.   And looking at page 2, it talks about the different

5  facilities, correct?

6  A.   Correct.

7  Q.   Overline, working capital line, retention of MSR, and

8  servicing advances, correct?

9  A.   Correct.

10 Q.   And down here on that same page it lists the collateral

11 again, we have two different types of collateral listed for these

12 lines, correct?

13 A.   Yes.

14 Q.   First being the possessory interest that we have already

15 talked about.  And then for number II, the collateral assignment

16 of borrower's accounts and claims receivable, and all rights to

17 payments and reimbursements under its servicing agreements,

18 contracts and trust indentures related to the pledged receivables.

19 Pledge of the borrower's portfolio of residential mortgage

20 servicing rights purchased/retained under the facility and

21 assignment of all the borrower's rights to service loans,

22 including the right to receive prepayment penalties, if any, on

23 the servicing rights purchased, correct?

24 A.   Correct.

25 Q.   What does that mean?

1  A.   Can you repeat that?  I am sorry.

2  Q.   The number II part that I just read to you.  What does that

3  mean for us?  What kind of collateral?

4  A.   Just repeat it, what you just said again.  I'm sorry.

5  Q.   Number II, I am looking at--

6  A.   Collateral assignment of the borrower's accounts and claims

7  receivables?

8  Q.   Yes.

9  A.   We have an assignment of every account and receivable that

10  they have for anything dealing with the servicing.

11  Q.   For anything to do with servicing?

12  A.   Anything pertaining to the servicing under the working

13  capital line.

14  Q.   Okay.  And that's--  And then the number I part is the

15  collateral for the overline, correct, the subpart I?

16  A.   Correct.

17  Q.   Which is the possessory interest in the residential first or

18  second lien mortgage loan?

19  A.   Correct.

20  Q.   So, the collateral ties up to the facilities at the top of

21  the page such that the I goes to the overline and II goes to the

22  working capital line, is that right?

23  A.   Yes.

24  Q.   And then again it lists the common stock of the owner Lee B.

25  Farkas as well as a first lien position in the stock of Ocala

1  Servicing, correct?

2  A.   Correct.

3  Q.   And then it says, all the facilities are cross-defaulted and

4  cross-collateralized, that's right?

5  A.   Yes.

6  Q.   And why is it important that something be cross-defaulted?

7  A.   Because if you have a default on one, it triggers a default

8  on all of them.

9  Q.   And that means you could, if one defaults, then you as a bank

10 can trigger it for all of them and get paid as to all of the

11 facilities, correct?

12 A.   You could call them in default, correct.

13 Q.   Call them all in default and get paid immediately, correct?

14 A.   Correct.

15 Q.   And then cross-collateralization, why is that important to

16 you?

17 A.   Because we had the collateral for all the facilities being

18 available for all the facilities.

19 Q.   So, the collateral for AOT would be available for the

20 collateral for COLB, correct?

21 A.   Well, for these they are.  I'd have to read the documents

22 again.

23 Q.   Okay.  But the point being that some of the collateral can be

24 used for each and every line, it's not just for one line, it can

25 be used for all the lines, correct?

1    A.    I had set it for the overline to be cross-collateralized to

2    protect us in case of any problems on any facility, including AOT

3    and COLB.

4    Q.    All right.  Ms. Kissick, the bottom line is would it be fair

5    to say that Colonial Bank for all practical purposes owned Taylor

6    Bean & Whitaker?

7    A.    I don't really think that's a fair question to ask.  I don't

8    know.

9    Q.    Well, you have got the collateralization--

10            THE COURT:  Well, if the witness doesn't know, she

11   doesn't know.

12   Q.    And then again moving to page 3, you have got the personal

13   guarantee of Mr. Farkas as well, correct?

14   A.    Yes.

15   Q.    Then on page 6, or actually on page 5, let's look at that for

16   a moment.  We have got reporting requirements for the borrower as

17   well as the guarantor, and then we have the conditions.  And that

18   again lists the key man life insurance on Mr. Farkas remaining

19   assigned to the buyers/lenders.  Which is you, Colonial Bank,

20   correct.

21   A.    Correct.

22   Q.    And those go over to the next page, there are several

23   conditions listed, 21 in all, correct?

24   A.    Yes.

25   Q.    And again, talks about pledging of the stock of TBW to

Kissick - Cross                                                          996

1    Colonial Bank until all obligations are paid in full and in fact
2    Mr. Farkas' stock is currently being held in escrow by the law
3    firm Akerman Senterfitt, correct?
4    A.    Yes.
5    Q.    And that would be Mr. Vescovacci's firm, correct?
6    A.    Yes.
7    Q.    And moving down to number 17, number 17 shows the easy
8    payment plan, correct?
9    A.    No.   This was nothing to do with that.   This was the
10   servicing working capital facility, and that was a payment that
11   one of the banks imposed in the servicing facility, I think it was
12   Sovereign Bank.
13   Q.    And then on page 7 is the officer analysis which talks about
14   the reasons for the current request, correct?
15   A.    Yes.
16   Q.    And then in the third paragraph, it talks about that TBW has
17   made significant pay-downs to the syndicated credit relationship
18   over the first 90-day extension.   And then it gives more reasons
19   about this request and that TBW is moving forward with the
20   ventures that will potentially lead to significant retirement of
21   the outstandings under the working capital facility, correct?
22   A.    Yes.
23   Q.    And the outstandings, what is that?
24   A.    The amount that was outstanding.
25   Q.    The amount that is due to Colonial Bank?

1   A.    Yes.

2   Q.    So, this is showing that TBW is making progress towards

3   paying that off, right?

4   A.    Right, but this is not--  The only part that is showing here

5   is the Colonial Bank portion.  There was a lot of other portion

6   with other syndicate banks.  This was just our portion.

7   Q.    Okay.  Well, we are focusing on the Colonial Bank portion,

8   correct?  And then it talks about--  Well, actually strike that.

9             And then again on page 8 it talks about the borrower

10  description and competitive analysis, and this gives information

11  about TBW being a leading independent mortgage banking company

12  that's ranked seventh largest, it's the seventh largest

13  residential wholesaler based on volume, sixth largest issuer to

14  Freddie Mac, sixth largest issuer to Ginnie Mae MBS, top 20

15  servicer nationwide, 11ths largest servicer of Freddie Mac loans,

16  and the ninth largest servicer of Ginnie Mae loans, correct?

17  A.    Yes.

18  Q.    And then it talks about in that final paragraph that TBW has

19  achieved the status by originating and purchasing loans through

20  community bank and wholesale broker channels utilizing

21  sophisticated technology and emphasizing a high level of customer

22  service, correct?

23  A.    Yes.

24  Q.    And who puts together this credit package?

25  A.    This was done by Rodney Lewis.

1  Q.   So, he is involved with your relationship with Taylor Bean &

2  Whitaker, correct?

3  A.   Yes.

4  Q.   Then moving to page 13.  This again is talking about the MSR

5  portfolio at the top of the page.  And it is showing the portfolio

6  characteristics held as collateral by the bank group, it has a

7  chart there, correct?

8  A.   Yes.

9  Q.   And so, again that is showing the collateral, correct?

10 A.   Correct.

11 Q.   And then moving further down under the second chart it says,

12 as a condition to the loan agreement, TBW is required to deliver

13 to the bank group an independent third-party valuation on the

14 market of the PSR, the market value of the MSR portfolio, correct?

15 A.   Yes.

16 Q.   And then it talks about how they are getting this value for

17 the MSR portfolio, correct?

18 A.   Yes.

19 Q.   And MSR stands for mortgage servicing rights?

20 A.   Yes.

21 Q.   And then at the bottom chart, the value that it is showing

22 here, that is the value of the MSR portfolio for the past four

23 fiscal years and the current interim, correct?

24 A.   That is correct.

25 Q.   And what is the value in fiscal year 2006?

1   A.    254,825,000.

2   Q.    I am sorry, could you speak up, please.

3   A.    254,825,000.

4   Q.    Then when you move over to 2008, what is the value?

5   A.    The fiscal year value is 443,532.

6   Q.    And that's in millions again?

7   A.    Yes.

8   Q.    And then you see a seven-month interim for November 30, 2008,

9   correct?

10  A.    Yes.

11  Q.    And what is that value?

12  A.    513,088,000.

13  Q.    And then you see an eight-month interim ending in December of

14  2008, correct?

15  A.    Correct.  It is 480,061,000.

16  Q.    And again, this is the value of the mortgage servicing rights

17  portfolio, correct?

18  A.    Yes.

19  Q.    And that's part of the collateral that Colonial Bank holds

20  with respect to your facilities with Taylor Bean & Whitaker,

21  correct?

22  A.    Yes, it is.  We have a second on a portion of it.

23  Q.    I'm sorry?

24  A.    We have a first on a portion of it and we have a second on a

25  portion of it.

1   Q.    You had a first lien, you had a first on part of it and then

2   you had a second lien on part of it?

3   A.    We had a second lien actually on all of it.

4   Q.    And then looking at page 20, we have got a personal financial

5   statement analysis for Mr. Farkas.  And again, this would be

6   collateral backing up your relationship with respect to these

7   facilities, correct?

8   A.    Correct.

9   Q.    And it lists his net worth on this chart, and it also

10  mentions how much he has in liquid assets and total liabilities,

11  correct?

12  A.    Yes.

13  Q.    And also gives a FICO score.  And this is important to you

14  because of his personal guarantee, correct?

15  A.    Yes.

16  Q.    And it says there on the bottom paragraph, it's very unusual

17  to get any type of personal guarantee on a credit of this size and

18  nature.  Although Farkas provides little, if any, financial

19  strength as a guarantor, this provides more of a moral and ethical

20  guarantee against fraud or misrepresentation by the company

21  because all of his net worth is tied up in TBW, correct?

22  A.    Yes.

23  Q.    So, all of his net worth is tied up in TBW, and all of the

24  value in TBW or at least 79.2 percent is promised as collateral to

25  your bank, is that right?

Kissick - Cross                                                    1001

1   A.   Correct.

2   Q.   And then again on this page it mentions that there will be

3   third party audits by MDI who is going to perform independent

4   audits of TBW's operations during October 2008 and that MDI has

5   performed several reviews of TBW for Colonial Bank in prior years?

6            That's correct, that MDI did that for you, correct.

7   A.   Yes.

8   Q.   And these independent audits, these were people who came from

9   the outside, correct?

10  A.   Right.

11  Q.   And they came and reviewed TBW's operations and reported to

12  you?

13  A.   Right.

14  Q.   And they would identify things that needed to be improved,

15  but isn't that true that TBW always got a clean bill of health

16  from MDI?

17  A.   Yes.

18  Q.   And then it says in conclusion, based on the extensive

19  relationship with TBW, the continued profitability and the short

20  term nature of the request, the proposed extension and

21  modifications are recommended, correct?

22  A.   Correct.

23  Q.   Now, we talked about the volume of the kind of business that

24  TBW and you were in as far as being a Mortgage Warehouse Lending

25  Division.  And isn't that true that because of the type of

Kissick - Cross                                                    1002

1  business that TBW was in, they would be expected to have some

2  amount of overdraft each month?

3  A.   No.

4  Q.   No?  Isn't it true that Colonial Bank would set a ceiling of

5  the amount that could be overdrafted?

6  A.   Please repeat that.

7  Q.   Isn't it true that your bank would set a ceiling of the

8  amount that could be overdrafted by TBW?

9  A.   That was for if they were over their line, not for

10  operational overdrafts.

11  Q.   Now, isn't an overdraft similar to a bank giving someone like

12  a home equity line of credit?  Would that be a fair analogy?

13  A.   No, because a home equity line of credit would have a piece

14  of collateral.  It's an unsecured, it's like a credit card,

15  unsecured line of credit.

16  Q.   Okay.  That would what you are saying, it would be more like

17  a credit card?

18  A.   Yes.

19  Q.   And to the extent there would have been any ceiling of what

20  you could go over on your limit, who would be approving that for

21  Mr. Farkas and TBW?

22  A.   Are you talking about the Plan B information or just

23  anything--  There was an approval for an $11 million overdraft

24  that we had in this package that we had senior loan committee

25  approve.

Kissick - Cross                                                          1003

1  Q.   Well, let me give you Defendant's Exhibit 213.

2           THE COURT:  Mr. Stokes, any objection?

3           MR. STOKES:  I am reviewing it.  I don't believe so, but

4  it appears--

5  A.   I know it wasn't written on September 10.  It was printed out

6  on September 10 though because we were gone from the bank then.

7           THE COURT:  Don't put it on the screen yet.

8           MR. STOKES:  Your Honor--

9           THE COURT:  We don't have a copy of it.  I want to see a

10 copy of it before it goes up.

11          Mr. Stokes, does your's have writing on it?

12          MR. STOKES:  It is not that it has writing.  It just has

13 a date of September 10, 2009.  So, it appears to have an incorrect

14 date.  There are two copies of the document in our exhibit.  We

15 can pass up a copy to the Court if you would like.

16          THE COURT:  All right.

17          MR. STOKES:  It doesn't have an exhibit number on it.

18          We don't have an objection to it, Your Honor.

19          THE COURT:  Is the one you are looking at, Ms. Kissick,

20 does it have writing on it?

21          THE WITNESS:  Well, let's see.  No, mine do not.

22          THE COURT:  Oh, all right.  213 is in.

23      (Defendant's Exh. No. 213 was received in evidence)

24 BY MS. KARINSHAK: (Continuing)

25 Q.   Now, Ms. Kissick, you noted that the date was September 10,

Kissick - Cross                                                    1004

1   2009.  That would be an incorrect date, correct?

2   A.   Definitely.

3   Q.   And the correct date would be based on the context of this

4   document in 2006, correct?

5   A.   Yes.

6   Q.   But the purpose of this document is to show that there is an

7   approved overdraft for Taylor Bean & Whitaker, correct?

8   A.   Correct.

9   Q.   And this memo outlines the request to approve the rolling

10  overdraft for up to three business days at a time but for no more

11  than three times a month, correct?

12  A.   Correct.

13  Q.   And this is an example of approving an overdraft for Taylor

14  Bean & Whitaker that is done by the senior loan committee,

15  correct?

16  A.   That is correct.

17  Q.   And isn't it true that you had authority to approve

18  overdrafts yourself as the head of the Mortgage Warehouse Lending

19  Division in the amount of $500,000, correct?

20  A.   Yes.

21  Q.   And then otherwise it would go to this loan committee for

22  approval?

23  A.   Yes.

24  Q.   And then I note at the bottom of this first page the

25  paragraph there that says, since Colonial Bank's syndicated

1   working capital line is fully funded and the current bank group

2   cannot support any additional increases, TBW is funding all of its

3   new servicing rights under the aforementioned 150 million credit

4   agreement with CDC IXIS, correct?

5   A.    Yes.

6   Q.    And the working capital line is fully funded.  And basically

7   what is this telling us in that part of this document?

8   A.    What this said was that they were overdrawn and we wanted

9   them to go about getting it corrected the proper way.  So, I had

10  Rodney prepare an overdraft memo and get it approved because they

11  were going to have working capital availability at their other

12  lender, and we were just waiting for it to be completed.

13  Q.    And again you talk about TBW is currently overdrawn at

14  Colonial Bank by three million.  So, it would be fair to say that

15  the fact that they are overdrawn at this point is not a secret,

16  correct?

17  A.    Well, this one is not, correct.

18  Q.    Okay.  On the second page that's actually as part of this

19  document, correct?

20  A.    Correct.

21  Q.    And on the bottom paragraph, the approval of this proposed

22  overdraft will enable Colonial Bank to aid TBW in their working

23  capital needs while the legal documentation for the $35 million

24  take-out of Colonial Bank's outstandings is facilitated, correct?

25  A.    Correct.

Kissick - Cross                                                          1006

1    Q.    And it says that TBW's financial strength and strong

2    collateral is the reason we want to have this overdraft

3    recommended, correct?

4    A.    Correct.

5    Q.    Now, moving to Defendant's Exhibit 215.  You also received

6    compliance reports, correct, to Taylor Bean & Whitaker?

7              THE COURT:  Is there any objection to 215?

8              MR. STOKES:  No objection, Your Honor.

9              THE COURT:  All right, it's in.

10         (Defendant's Exh. No. 215 was received in evidence)

11   BY MS. KARINSHAK: (Continuing)

12   Q.    Ms. Kissick, looking at the bottom of that e-mail, you are

13   talking about I saw the compliance report.

14             So, it would be fair to say you got compliance reports

15   with respect to Taylor Bean & Whitaker?

16   A.    Yes.

17   Q.    And you saw the compliance report and you saw that there was

18   some aged loans over 120 days, and you brought that to the

19   attention of Mr. Farkas, correct?

20   A.    Yes.

21   Q.    And then he tells you, we got deals cooking, we're selling

22   all sorts of stuff and making progress, 300 million is a lot, but

23   not really in relation to our production.  It is less than 1

24   percent of our annual production, correct?

25   A.    Yes.

1  Q.   So, and then in fact Mr. Farkas again at the top of that

2  e-mail, says, you know, if you think about it, we're doing 36

3  billion, with a B, per year in production.  And so, 300 million is

4  less than 1 percent of that, and that's just not bad at all,

5  correct?

6  A.   Well, he sent that to Desiree, I didn't get that, but--

7  Q.   But that is shown on this document?

8  A.   Yes, but the thing was is that all of his aged loans stayed

9  at Colonial and he wasn't doing 36 billion with us.  And so, as

10 time went by, more loans stayed on the aged bucket and got more

11 attention.

12        I mean, he was doing a lot of production, there is no

13 doubt about that, it's just that the aged loans happened to stay

14 with Colonial.

15 Q.   And I believe it was your testimony that Mr. Farkas

16 throughout this whole time was trying to work to pay Colonial

17 Bank, correct?

18 A.   He did definitely was, yes.

19 Q.   On and on he was working on that the whole time, correct?

20 A.   Yes.

21 Q.   And you both were working together?

22 A.   Yes, we were.

23 Q.   In this long-term relationship, correct?

24 A.   Yes, we were.

25 Q.   And this relationship, it would be fair to say it was based

Kissick - Cross                                                    1008

1   on trust, that over time you had developed a strong trust with Mr.

2   Farkas, would that be fair to say?

3   A.   Yes.

4   Q.   And during the course of that relationship or that trust, you

5   made certain choices about whether to approve and to do certain

6   things with respect to that relationship?

7   A.   Please go on further.

8   Q.   I guess what I am trying to say is, you heard the saying life

9   is about choices?

10  A.   Yeah.

11  Q.   Well, in this relationship with Mr. Farkas you testified that

12  you made certain decisions, correct?

13  A.   Yes.

14  Q.   And you made those decisions as being a banker and someone

15  who is knowledgeable in the banking industry, correct?

16  A.   Yes, I suppose so.

17  Q.   And you did that knowing what you were doing because you are

18  a banker and you know what you are doing with respect to banking?

19  A.   No, not all the time.

20  Q.   But when you don't know, you consult with others, correct?

21  A.   It depends upon the situation.  I don't know really what

22  you're trying to get at, but--

23  Q.   Well, in these banking documents we see over and over that

24  you are consulting with lawyers, correct?

25  A.   Yes.

Kissick - Cross                                                          1009

1    Q.    You are consulting with auditors, correct?

2    A.    Yes.

3    Q.    You are consulting with third parties who are coming in to

4    evaluate the relationship with Taylor Bean & Whitaker, correct?

5    A.    Yes.

6    Q.    And there is lots of different people who are giving you

7    advice with respect to your relationship with your, your

8    relationship with Taylor Bean & Whitaker, correct?

9    A.    Correct.

10   Q.    And as to all those facilities you had established with

11   Taylor Bean & Whitaker, you got consultation from experts, for

12   lack of a better word, from lawyers and the people putting those

13   documents together, correct?

14   A.    Yes.

15   Q.    So, to the extent you didn't know what to do, you went to

16   those people for advice, correct?

17   A.    Yes.

18   Q.    Okay.  Now let's go to Defendant's Exhibit 205.

19         MR. STOKES:  No objection, Your Honor.

20         THE COURT:  All right, it's in.

21     (Defendant's Exh. No. 205 was received in evidence)

22   BY MS. KARINSHAK: (Continuing)

23   Q.    Now, is Defendant's Exhibit 205 an audit confirmation dated

24   July 11, 2008, which you would have signed?

25   A.    Yes.

Kissick - Cross                                                    1010

1  Q.   Is that your signature on the second page?

2  A.   Yes.

3  Q.   Now, you understood that this document was going to outside

4  auditors Deloitte & Touche, correct?

5  A.   Yes.

6  Q.   And that it would be important for this to be correct?

7  A.   I did understand that, but they were incorrect on AOT.

8        THE COURT:   Ms. Kissick, I know it has been a long day,

9  but you are going to have to stay closer to that microphone.

10        THE WITNESS:   I am sorry, what?

11 BY MS. KARINSHAK: (Continuing)

12 Q.   Could you repeat your answer.

13 A.   I said, yes, I understood that.  And it was correct except

14 for AOT.

15 Q.   But you signed it as being true and accurate?

16 A.   Yes.

17 Q.   And you knew it was essential to Taylor Bean & Whitaker

18 having good and accurate financial statements, correct?

19 A.   Yes.

20 Q.   And you still signed this, you just said that there is

21 something incorrect on there, but you still signed it?

22 A.   Well, they were aware of it as well.

23 Q.   I'm sorry, you signed it?

24 A.   I did sign it, yes.

25 Q.   And isn't it true that you showed all the lines were

Kissick - Cross                                                      1011

1   adequately collateralized, the warehouse line, the overline,
2   working capital, on this document?
3   A.    Yes.
4   Q.    And it also shows that your group was paid $216 million in
5   interest in the previous 12 months alone, correct, in that
6   category of cash paid for interest?
7   A.    That's what it looks like, yes.
8   Q.    Is that what the document says?
9   A.    Yes.
10  Q.    And Taylor Bean & Whitaker was Colonial Bank's most
11  profitable relationship, correct?
12  A.    Yes.
13  Q.    And here it shows you are getting 216, almost $217 million in
14  interest, correct?
15  A.    Correct.
16  Q.    And then it also shows that there is some unpaid interest
17  which will be due, which is 13 million and some change, correct?
18  A.    Yes.
19  Q.    This also shows that these lines are collateralized and
20  making money, in fact some of them are overcollateralized and have
21  more than enough money, correct?
22  A.    Yes.
23  Q.    All right, moving to Defendant's Exhibit 560.
24             THE COURT:  Any objection?
25             MR. STOKES:  No objection, Your Honor.

Kissick - Cross                                                          1012

1           THE COURT:  All right, it's in.

2       (Defendant's Exh. No. 560 was received in evidence)

3  BY MS. KARINSHAK: (Continuing)

4  Q.   Ms. Kissick, this is another audit confirmation dated June 5,

5  2009, correct?

6  A.   Correct.

7  Q.   Now, again, it's showing the different facilities and the

8  interest rates that are being paid by Taylor Bean & Whitaker,

9  correct?

10 A.   Excuse me, I only have one page.

11          THE COURT:  That's all we have as well.

12          Do you have two pages?

13          MR. STOKES:  I have two, Your Honor.

14 BY MS. KARINSHAK: (Continuing)

15 Q.   Let's just work on the first page.

16 A.   That's not the one I have though.

17 Q.   Sorry?

18 A.   I don't have the first page.

19 Q.   Oh, you don't have the first page.  560, is there a defense--

20 You don't have a defense 560?

21 A.   No, I only have one page.

22          THE COURT:  You only have the last page?

23          THE WITNESS:  Yes.

24          MS. KARINSHAK:  Okay.  We will come back to that, Your

25 Honor.

Kissick - Cross                                                    1013

1           THE COURT:  Well, no, here, here.

2           Go ahead, ask your question.

3   BY MS. KARINSHAK:  (Continuing)

4   Q.    Moving to 561, please.

5           THE COURT:  I'm sorry, are you using 560 or not?  She

6   has got the first page.

7           MS. KARINSHAK:  Oh, I am sorry, I thought we didn't have

8   the first page.

9           THE COURT:  We gave her ours.

10          MS. KARINSHAK:  Okay.  Let's go back then.

11  BY MS. KARINSHAK:  (Continuing)

12  Q.    Ms. Kissick, you have both pages?

13  A.    Yes.

14  Q.    All right.  Going to the first page of Defendant's

15  Exhibit 560.  That is again showing the audit confirmation for

16  June 5, 2009, correct?

17  A.    Yes.

18  Q.    And again, here I want to focus on what are your interest

19  rates on the different lines.  For example, what is the interest

20  rate Taylor Bean & Whitaker is paying on COLB?

21          It is 4.5 to 5.65 percent, correct?

22  A.    Yes.

23  Q.    And on the AOT, the interest rate being paid by Taylor Bean &

24  Whitaker is 5.23 to 5.5 percent, correct?

25  A.    Correct.

Kissick - Cross                                                    1014

1   Q.   And the interest on the overline is actually the highest

2   interest, which is 6.5 percent, correct?

3   A.   Correct.

4   Q.   And what is the interest rate on the loans that are being

5   swept?

6   A.   What?

7   Q.   When you were talking about sweeping before, the loans that

8   are being swept, are you getting an interest rate paid on those

9   loans?

10  A.   We weren't sweeping loans then.

11  Q.   Prior when you were sweeping loans, not during this time

12  period, but when you testified that prior you had been sweeping

13  loans, what was the interest rate that Taylor Bean & Whitaker was

14  paying to you on those loans?

15  A.   Six years before?  Whatever the prevailing rate was.

16  Q.   Do you have an estimation of what the prevailing rate would

17  have been?

18  A.   No, I don't know.  And I never saw this because I was on

19  medical leave.  So, I never saw this at the bank.

20  Q.   Well, isn't it true that Taylor Bean & Whitaker paid between

21  20 and $30 million per month in interest during the years of 2007,

22  2008 and 2009?

23  A.   Yes.

24  Q.   And that would be on that easy payment plan they were paying

25  you, correct?

1  A.    No.  That was on all the facilities they had with us.

2  Q.    Okay.  And then were they also making payments under the easy

3  payment plan?

4  A.    Of like 50,000 to $100,000 a day.

5  Q.    50 to 100,000 per day on the easy payment plan?

6  A.    Correct.

7  Q.    And that's in addition to the interest they are already

8  paying, correct?

9  A.    Correct.

10  Q.    And so, in this relationship you are making lots of money

11  with respect to the interest that is being paid, correct?

12  A.    But that easy payment plan wasn't interest.  That was

13  principal that they never had, I mean that we never had.

14  Q.    But as to the facilities and these loans that we were just

15  looking at, you are getting paid 20 to $30 million a month of

16  interest during 2007, '8, '9, right?

17  A.    Right, but they also had a lot of loans outstanding, so it

18  wasn't like it was out of market.

19  Q.    No, I am not saying it was out of market, I am just saying

20  you got paid interest on--

21  A.    We did get paid interest.

22  Q.    Okay.  And it was 20 to $30 million a month, right?

23  A.    Yes, it was.

24  Q.    Moving to Defendant's Exhibit 561.

25          Now, Defendant's Exhibit--

Kissick - Cross                                                    1016

1              THE COURT:  Is there an objection to this one?

2              MS. KARINSHAK:  Sorry.

3              MR. STOKES:  Judge, no objection if the witness can

4    identify it.

5              THE COURT:  All right, let's see if there is a

6    foundation for this.

7    BY MS. KARINSHAK: (Continuing)

8    Q.   Ms. Kissick, do you recognize Defendant's Exhibit 561?

9    A.   I did not--  I was in the hospital.  So, I mean, I know what

10   this is, this is a standard balance confirmation.

11             MR. STOKES:  We don't have an objection.

12             THE COURT:  All right, it's in.

13        (Defendant's Exh. No. 561 was received in evidence)

14   BY MS. KARINSHAK: (Continuing)

15   Q.   Okay, looking at the standard balance confirmation, isn't

16   this showing the account name, account number, interest rate and

17   balance with respect to these different bank accounts that Taylor

18   Bean held at your bank?

19   A.   Yes.  It looks like they are all escrow accounts.

20   Q.   And it is showing the balances on the far right with respect

21   to all of those accounts, correct?

22   A.   Correct.

23   Q.   So, there is a Ginnie Mae principal and interest account, a

24   Ginnie Mae taxes and interest account, and then they are all

25   listed there on the left-hand side, correct?

Kissick - Cross                                                    1017

1   A.    Correct.

2   Q.    And in the exceptions or comments, there is a statement that

3   all the balances are correct?

4   A.    That is true.

5   Q.    All right.  Defendant's Exhibit 552.

6            MR. STOKES:  No objection, Your Honor.

7            THE COURT:  All right, it's in.

8        (Defendant's Exh. No. 552 was received in evidence)

9   BY MS. KARINSHAK: (Continuing)

10  Q.    Ms. Kissick, at the bottom of this e-mail chain it appears to

11  be from you to Rodney Lewis on June 20, 2009.  Do you see that?

12  A.    Yes.

13  Q.    And basically you are talking to Mr. Lewis in PINs, correct?

14  A.    Yes.

15  Q.    And Mr. Lewis isn't part of this conspiracy that you have

16  alleged that you are in, is he?

17  A.    No.

18  Q.    But you are communicating with him in a PIN?

19  A.    Yes.

20  Q.    All right.  And then up to the top of, I am going to skip the

21  middle of that e-mail, but at the top, read that for us, please.

22  A.    It can't wait until Tuesday.  It may not have enough time for

23  Deloitte to finish the audit.  I have a doctor's appointment on 9

24  at Monday, but if it's then, Mary Lou will be on it with you.

25  Jeff Cavender said that from what he heard it is ridiculous.  And

1   he specifically mentioned wet funds.  I asked Jeff to have the

2   independent counsel e-mail the questions to David Byrne.  All

3   parties believe this will be promptly resolved.  I think Deloitte

4   was freaking outing about nothing.  But I was worried that if you

5   didn't appear cooperative, they may think something was up, which

6   is not the case at all.  I can see if David will be on the call

7   too.  I think we were trying to downplay it like it was just a

8   formality and not some horrible thing.

9   Q.   And so, this is relating to when Deloitte & Touche at the

10  very end found what they considered to be an irregularity?

11  A.   Well, it was supposed to be COLB wet funds, is what we were

12  told.  And we didn't think there was anything wrong with COLB wet

13  funds.

14  Q.   I am sorry, who told you COLB wet funds?

15  A.   Lee did originally.

16  Q.   Okay.  But basically Deloitte is there auditing.  And you

17  talk about Jeff Cavender who is the lawyer for Taylor Bean &

18  Whitaker, correct?

19  A.   Yes, Jeff Cavender contacted David Byrne.  And David Byrne

20  contacted me.  And they wanted to talk to Rodney specifically

21  because of a comment that Rodney made to somebody at Taylor Bean.

22  Q.   A comment that he made to somebody at Taylor Bean & Whitaker

23  is what started this?

24  A.   That's what I was told, yes.

25  Q.   Okay.

Kissick - Cross                                                    1019

1   A.    Started them wanting to talk to him.

2   Q.    Okay.  And who is David Byrne?

3   A.    He was Colonial Bank's general counsel, in-house.

4   Q.    So, this is basically again lawyers who are being involved in

5   reviewing what's going on with Deloitte & Touche and the audit,

6   correct?

7   A.    Yes.

8   Q.    And Mr. Cavender, who is the general counsel, states that

9   it's ridiculous and he specifically mentioned wet funds, correct?

10  A.    Yes.

11  Q.    And you say, this is you talking, that they are freaking out

12  about nothing, correct?

13  A.    Well, we thought COLB was fine and in perfect shape.

14  Q.    But you are saying they are freaking out about nothing,

15  that's your statement, correct?

16  A.    Yes.

17  Q.    And so, you didn't think anything was wrong, correct?

18  A.    Not about COLB, no.

19  Q.    And then let's go to Defendant's Exhibit 210.

20        MR. STOKES:  No objection, Your Honor.

21        THE COURT:  All right, it's in.

22     (Defendant's Exh. No. 210 was received in evidence)

23  BY MS. KARINSHAK: (Continuing)

24  Q.    Now, this e-mail, looking at the top of the e-mail is talking

25  about the fact that the bank hired Ernst & Young in May to do a

1   complete forensic review of all FF accounts and transactions.

2           What is an FF account?

3   A.   I don't know.  I forget.  Fed funds.  I don't know.

4   Q.   Just so we are clear for the record, I am looking at the

5   e-mail from you to Lee B. Farkas on July 22, 2009.

6           Do you see that?

7   A.   Yes, and I just forgot what the term is.  So, sorry.

8   Q.   And could you read, we just said here that it says FYI,

9   because of SIG TARP.  What does that mean?

10  A.   Because of the subpoena that we got.

11  Q.   Okay.  You got a subpoena from SIG TARP?

12  A.   Yes.

13  Q.   And which you probably shouldn't know.

14  A.   But he already did too.

15  Q.   I am sorry?

16  A.   He knew as well because they got one too.

17  Q.   Okay.  So, you are telling him that you got subpoenaed by SIG

18  TARP, you are giving him a heads-up then, correct?

19  A.    No, no, no.  I was actually telling him that we hired E&Y.

20  He knew we had SIG TARP, he had SIG TARP, it was mutually

21  discussed between Kamal, Sumeet, everybody else.  This is about

22  what he should know is that we hired E&Y previously.

23  Q.   So, you are telling him even though he shouldn't know that

24  you hired Ernst & Young?

25  A.    I am saying he probably shouldn't know, yeah.

Kissick - Cross                                                          1021

1   Q.    Okay.  But you all chose to hire the, the bank hire, that

2   would be Colonial Bank?

3   A.    Right.

4   Q.    Hired Ernst & Young in May to do a complete review of the FF

5   accounts and transactions.  You for two years and everybody else

6   for one year.  Found nothing.  Correct?

7   A.    Right.

8   Q.    And then you opine that I think the OCC whispered in

9   Deloitte's ear to try and screw us all.

10  A.    That was the gossip that was going around the bank, yes.

11  Q.    Okay.  Because Ernst & Young didn't find anything, correct?

12  A.    No.

13  Q.    And then you get a response back, maybe?  At the top, the top

14  e-mail?

15  A.    Yeah.

16  Q.    Is that--  Who is that a response from?

17  A.    Lee.

18  Q.    Defense Exhibit 206, please.  I would like to turn to some of

19  the facilities we have been talking about and their individual

20  financial status just for context of where we're going.

21          MR. STOKES:  No objection, Your Honor.

22          THE COURT:  All right, it's in.

23      (Defendant's Exh. No. 206 was received in evidence.

24  BY MS. KARINSHAK: (Continuing)

25  Q.    Do you have Defendant's Exhibit 206, Ms. Kissick?

Kissick - Cross                                                    1022

1   A.    Yes.

2   Q.    I would like you to look at this e-mail chain from the bottom

3   half where it appears to be from you to Brent Hicks, Kamal Hosein,

4   and you have copied Chris Best, David Rogers and Sarah Moore?

5   A.    It is actually from Brent to us.

6   Q.    That's at the bottom.  I was actually skipping above that.

7   But you are correct.

8   A.    Okay.

9   Q.    I wanted to highlight the response that you gave to Mr. Hicks

10  and Mr. Hosein, do you see that one?

11  A.    Yes.

12  Q.    Friday, April 10, 2009 at 5:49 p.m.

13  A.    Yes.

14  Q.    And what is this regarding?

15  A.    The overline.

16  Q.    And it says, regarding TBW transactions after the capital

17  injection, correct?

18  A.    Yes.

19  Q.    What do you say to Brent there?

20  A.    Brent, we also have the overline, which is very much

21  overcollateralized.  Is that what you were referencing.

22  Q.    Doesn't this e-mail show the overline was over

23  overcollateralized in April of 2009?

24  A.    Well, it's been collateralized since 2002.

25  Q.    But in this instance you are talking about it is very much

1  collateralized, correct?

2  A.    In relation to what is outstanding actually on the overline,

3  yes.

4  Q.    So, it is overcollateralized, and that would mean that it

5  would be able to be used for another facility, correct, because

6  you have got extra collateralization there?

7  A.    Yes.

8  Q.    And that's important because of the cross-collateralization

9  you just told the jury about.  When you have extra collateral on

10 one line, it could be valid collateral to be used on another

11 facility, correct?

12 A.    Yes.

13 Q.    And that's why you have cross-collateralization in your

14 governing documents so that you can use this collateral as

15 necessary, correct?

16 A.    Well, yes, that's why it was set up that way, but it was set

17 up that way because we were put in a situation--  Nobody else had

18 an overline in the whole bank, only Taylor Bean.  And I started it

19 2002 to protect the bank because of the situation that occurred.

20          And so, it was overcollateralized.  And no matter what,

21 it still wasn't in the right bucket or whatever.

22          So, we did have, we did have extra collateral and we did

23 have all of this, but it wasn't on AOT.  It was all in the

24 overline.

25 Q.    But you have cross-collateralization such that it can be used

Kissick - Cross                                                    1024

 1  for the other buckets, correct?

 2  A.    Yes.

 3  Q.    So, it could be used for the other facilities, correct?

 4  A.    Yes.

 5  Q.    Okay.  And that's why you set it up that way,

 6  cross-collateralization to protect the bank and all the different

 7  facilities that you are operating, correct?

 8  A.    Yes.

 9  Q.    Okay, let's go to Defendant's 211, please.

10          THE COURT:  Any objection?

11          MR. STOKES:  No objection, Your Honor.

12          THE COURT:  Okay, it's in.

13      (Defendant's Exh. No. 211 was received in evidence.

14  BY MS. KARINSHAK: (Continuing)

15  Q.    All right.  Would you please read the start of that e-mail

16  chain on Defendant's Exhibit 211.

17  A.    I called Teresa and reminded her that we do not track loan

18  level on AOT and COLB, and if that's what your official records

19  show as 3/31, so be it.  It changes all of the time.  However for

20  6/30 there are significant assets that you've repurchased with

21  cash from Freddie and Ginnie, which instead of being slotted,

22  listed on overline at zero, need to be slotted to AOT.

23  Q.    I am sorry, who is this e-mail from?

24  A.    It was from me to Lee.

25  Q.    And what is the date?

Kissick - Cross                                                          1025

1   A.    July 26.

2   Q.    Of 2009, correct?

3   A.    Yes.

4   Q.    And here you are telling Mr. Farkas that you called Teresa.

5   Who is Teresa?

6   A.    She is operations supervisor over at Taylor Bean's

7   relationship.

8   Q.    Okay.  And what is her name?

9   A.    Teresa Kelly.

10  Q.    And you called her and reminded her, we do not track loan

11  level on AOT and COLB, correct?

12  A.    Well, we don't track loan level on AOT.  So, I don't know why

13  I put the COLB in.

14  Q.    But you listed COLB in this e-mail?

15  A.    Yes, and I don't know why.

16  Q.    Okay.  And if that's what your official records show as 3/31,

17  so be it.

18         What are you referring to as the official records?

19  A.    Whatever he was saying was their total of loans.  And I think

20  I was more focussed on getting the loans that were on the overline

21  into the right trades in AOT.

22  Q.    And you said it changes all the time.  What do you mean by

23  that, it changes all the time?

24  A.    Well, they are COLB loans.  I mean, they are new loans, new

25  production.  And the dollar, the loan data changes all the time.

1  Q.   The loan what?

2  A.   The loans change all the time.

3  Q.   Because they are moving through the different facilities,

4  correct?

5  A.   Yeah, they get paid off.

6  Q.   I am sorry?

7  A.   The COLB loans get paid off.

8  Q.   Okay.  So, as they get paid off, then it makes room for

9  another loan?

10  A.   Right.

11  Q.   To come to that bucket?

12  A.   Right.

13  Q.   Okay.  However, for 6/30 there are significant assets that

14  you've repurchased with cash from Freddie and Ginnie which,

15  instead of being listed on overline at zero.

16        What does that mean, being listed on overline at zero.

17  A.   We are always put the loans on overline for reporting

18  purposes.  So, we would hope that they would see them and put them

19  in trades and get them out and sell them.

20        But because we were having our FDIC exam, I wanted them

21  to be, I wanted the hole to be fixed on AOT.  And I wanted them to

22  be done the right way.

23  Q.   You said they are listed at zero.  Do they have no value?

24  A.   No, no, we had no money against them on the overline.  They

25  just were listed.

Kissick - Cross                                                            1027

1   Q.   So, those are valid loans that are listed on the overline

2   that need to go over to AOT, is that what you're saying?

3   A.   I wanted them to move over to AOT.  But they weren't in

4   trades or anything.  That was just to fill the hole.

5   Q.   But what you are saying is they are on the overline at zero,

6   but we can move them over to AOT?

7   A.   That's what I wanted to do, yes.

8   Q.   And you say here you have repurchased them with cash from

9   Freddie and Ginnie.  And so now they have a value and they could

10  be moved into a different bucket, correct?

11  A.   Correct.

12  Q.   So even though it says zero, that doesn't mean it doesn't

13  have a value?

14  A.   Correct.

15  Q.   Now, let's move to Defendant's Exhibit 209.

16          MR. STOKES:  No objection, Your Honor.

17          THE COURT:  All right, it's in.

18      (Defendant's Exh. No. 209 was received in evidence)

19  BY MS. KARINSHAK: (Continuing)

20  Q.   And we will just leave that in the record talking about

21  Defendant's Exhibit 20--  One moment please, Judge.

22          Okay, we are going to--  Now, looking at Defendant's

23  Exhibit 209, this is the day of the raid, correct, August 3, 2009,

24  that's the day of the FBI raid?

25  A.   Yes.

Kissick - Cross                                                      1028

1   Q.    And for years you had been moving collateral between these
2   different facilities that we have talked about, correct?
3   A.    I didn't hear you.  I am sorry.
4   Q.    Would it fair to say that for years you had been moving
5   collateral between these different facilities, the different
6   buckets, correct?
7   A.    No, we didn't move it unless we had direction from Taylor
8   Bean from going from COLB to AOT.
9   Q.    But within the operating documents and agreements that you
10  are operating under, you were moving collateral between the
11  different facilities, correct?
12  A.    As far as from COLB to AOT?
13  Q.    I'm talking about looking at all the facilities as a whole.
14  A.    If they were, if we were requested to, we would, but we
15  wouldn't just move them to move them.  If they aged out, we would
16  move them into the right bucket, but we didn't just move them to
17  move them.
18  Q.    And looking at this e-mail, wouldn't it fair to say that some
19  of the loans were being moved and the collateral was being moved
20  because Mr. Hosein wanted facilities to look a certain way,
21  correct?  You had talked about that in your testimony.
22  A.    Of this particular one?
23  Q.    I'm just talking about in general.
24  A.    In general we were trying to get our balances down and all
25  the trades to look good for the FDIC, yes.

Kissick - Cross                                                    1029

1  Q.   And.  Mr. Hosein, your boss, had wanted these facilities to

2  look a certain way, correct?

3  A.   Yes.

4  Q.   And you did this for Mr. Hosein because you believed

5  everything was fully collateralized and cross-collateralized and

6  had all those protections we have talked about already, correct?

7  A.   Well, this was--  I knew about the hole in AOT and I didn't

8  want the hole to be discovered.  And so that was my, that was the

9  real thing I was trying to look for, which I said earlier.

10  Q.   Could you clarify that, please.

11  A.   This e-mail or this PIN was trying to get the loans to get

12  everything fixed.  Because the loans on the overline were on the

13  overline and they weren't on AOT, and I didn't want the hole to be

14  discovered on AOT.

15  Q.   But you had, Mr. Hosein knew or had complained about private

16  label versus agency labels, correct?

17  A.   Yes.

18  Q.   And you had labeled them a certain way to make him happy,

19  isn't that right?

20  A.   We labeled them as a result of his, I don't know what word to

21  say--  No, not under his direction, no, that was not done.  It was

22  to have him calm down, but it was not at his direction.

23  Q.   To have him calm down because you had mislabeled them on the

24  lines, correct?

25  A.   He did not know that we had mislabeled them.

Kissick - Cross                                                    1030

1   Q.    But you had mislabeled them on the lines, correct?

2   A.    I personally did not, no, but I knew about them, yes.

3   Q.    But you ordered them to be labeled a certain way, private

4   label versus agency, correct?

5   A.    No.  We received that information from Taylor Bean.

6   Q.    You received information as to how to label them?

7   A.    Yes.  I have no idea how to label a pool of loans.

8   Q.    You have no idea how to label individual loans?

9   A.    No.  I haven't reviewed collateral in like 25 years.  I

10  wouldn't even know.

11  Q.    Is that what you--  You are saying that Mr. Hosein didn't

12  know about the labels, you did that yourself to make the lines

13  look better, correct?

14  A.    No.  I said earlier that we were talking about it.  And it

15  was Lee and Desiree and Teresa and I.  And Lee said, let me think

16  about it for a little bit.  And he came back with this idea and we

17  accepted it because we didn't know what else to do because Kamal's

18  request was impossible.  Nobody was buying private label loans.

19  There was no way they could be sold.

20           And so, a portion of those loans we changed to agency to

21  just stop the harassment factor because there was no way they

22  could be sold, period.

23  Q.    Harassment factor from whom?

24  A.    OCC to Kamal.  Kamal to us.

25  Q.    So, you were doing that to satisfy your boss Kamal then,

1   correct?

2   A.   Well, no, he didn't say change them to agency.

3   Q.   I am not saying that he told you that.  I'm saying you want

4   to appear competent and you are putting those labels on there a

5   certain way to satisfy him that the line is as it should be,

6   correct?

7   A.   No.  We were deceiving him.

8   Q.   But you are doing that to make it all look better, correct?

9   A.   Yes.

10  Q.   And you are the banker in charge of those lines, correct?

11  A.   Yes.

12  Q.   And you are the head of the Mortgage Warehouse Lending

13  Division responsible for how those are allocated and slotted,

14  correct?

15  A.   No, I don't slot them or allocate them.  I am the one that

16  receives the information.  I have no idea.

17  Q.   You have no idea as to what?

18  A.   I manage the department.  I don't know how to do a mortgage

19  loan if my life depended on it.

20  Q.   But you are responsible for the folks who do that, you are

21  the boss?

22  A.   Our customers are the ones who slot the loans and move them

23  over.  Not my department.  My department reviews the collateral,

24  that's it.  We are not mortgage people.

25  Q.   But what I am trying to say is in those agencies and

Kissick - Cross                                                1032

1    facilities when Kamal Hosein, your boss, is looking at them, you

2    want them to look a certain way to make him happy, right?

3    A.   He never looked at the loans either.  He looked at the

4    reports.  And we wanted them to show agency to just get the

5    harassment factor down.

6         And we could not get rid of the loans, there was no way.

7    So we, we went ahead and agreed to accept them that way even

8    though we knew they were not right.

9    Q.   Well, isn't it true when you first met with the FBI, you told

10   them that you had made the decision about that labeling?

11   A.   I don't think so.

12   Q.   Would your memorandum of interview help you refresh your

13   recollection as to that statement?

14   A.   Sure.

15   Q.   Would you pass Defendant's Exhibit 235, please.  If you could

16   please look on the second page of that document.

17        Actually, I am sorry, it would be the third page.

18        THE COURT:  There is nothing in there.

19        MR. STOKES:  The Court's indulgence.

20        THE WITNESS:  I have nothing in my exhibit.

21        THE COURT:  Well, it's almost 5:30, and this is when

22   things start to fall apart, when we lose exhibits.  So, I think at

23   this point I am going to let the jury go home.  You have had a

24   long week, ladies and gentlemen.

25        Now, you have tomorrow off, so you can go to work.

Kissick - Cross                                                    1033

1   Those of you who may be government employees, I think you still
2   have jobs for tomorrow.  Again, I haven't heard what has happened.
3   But as I said, don't worry, the courthouse will be open Monday,
4   and we will start at 9:30 on Monday.
5           I appreciate again quite seriously how much attention
6   you have been paying to the case and your promptness, so I
7   appreciate that.
8           Again, please avoid any media coverage, any discussions
9   about the case.  Do not talk to each other.  Don't e-mail each
10  other about the case.  Just go home and have a good restful
11  weekend.  Leave your notes, your notebooks here, we will have them
12  back to you first thing Monday morning.
13          And I think I will keep the counsel here for a couple of
14  minutes, but you all are free to go.  Have a good weekend, ladies
15  and gentlemen.
16          NOTE:  At this point the jury leaves the courtroom;
17  whereupon the case continues as follows:
18  JURY OUT
19          Ms. Kissick, you need to be back here at 9:30 Monday
20  morning.  You can go now.
21          NOTE:  The witness stood down.
22          THE COURT:  Actually, Ms. Kissick, just for the record,
23  you are not to discuss your testimony with anyone or read anything
24  about the case.  All right.
25          THE WITNESS:  Or let anyone read anything to me.

1          MR. STOKES:  Judge, before Ms. Kissick leaves, can I

2   just--  We do need to speak to Ms. Kissick before she leaves

3   because I believe she has a flight scheduled tonight.  And as I

4   understand it, the government regulations, I don't think that we

5   can, the Government will fly her back.  So, I think we need her to

6   stay for the weekend.

7          THE COURT:  On those logistical things--

8          MR. STOKES:  I apologize, so I think we may need to talk

9   to her to work out those logistics, that's what I was told just

10  recently.  So, she is obviously learning this for the first time.

11  So, the Government will need to deal with her for that nature.

12         THE COURT:  You might want to wait out in the hall and

13  they will talk to you for a moment or two out there.

14         NOTE:  The witness leaves the courtroom.

15         THE COURT:  Are there going to be any other logistical

16  problems, Mr. Stokes, that you are aware of if there is a

17  shutdown?

18         MR. STOKES:  I am sorry, I didn't hear you.

19         THE COURT:  Are there going to be any other logistical

20  problems that you can envision because of the shutdown with your

21  other witnesses?

22         MR. STOKES:  Your Honor, I don't believe so.  I have

23  been told that for the Fraud Section at least that the trial team

24  will be essential.  And so, I will verify and let the Court know

25  tomorrow if there is going to be any problems with the shutdown,

1  but we believe we are not going to have a problem with the Fraud

2  Section.  And we are handling a significant amount of the travel

3  arrangements.  I can't speak for the U.S. Attorney's Office

4  though.

5          THE COURT:  All right.  We have a docket tomorrow

6  morning.  So, you can't leave your papers as they are on the

7  tables.

8          I can give you space in the corner and working with Mr.

9  Wood, we can give you space in the witness rooms.  We can lock

10 those, can't we, Mr. Wood?  Can we lock the witness rooms?

11         THE MARSHAL:  Yes.

12         THE COURT:  So, you don't have to cart everything back

13 to your offices.  You may need a few minutes this evening to clean

14 things up.  All right.  And that means you may need a little extra

15 time Monday morning to get everything back in place.  All right.

16         MR. STOKES:  Yes.

17         THE COURT:  Anything else before we recess?

18         MR. STOKES:  Your Honor, I would just, I think just from

19 a timing standpoint, I think we are, you know--  We've really made

20 a lot of headway here.  I think Ms. Karinshak is nearly finished

21 here.  And so, assuming that Ms. Kissick ends early on Monday, I

22 think we are going to move through a number of witnesses very

23 quickly next week.

24         THE COURT:  I would expect that.

25         MR. STOKES:  Yes.

1          THE COURT:  I was considering giving you a cutoff.

2    Because the cross has been so long and it is unpredictable, I am

3    not quite going to do that.  You did move it along today.  The

4    direct case went quite well, so we will not yet give you a

5    deadline.

6          MR. STOKES:  I would even point out, Your Honor, that I

7    believe the cross has been about one-and-a-half times the direct

8    at this point.  So, we are, the Government is moving this along as

9    quickly as we can.

10         THE COURT:  I am keeping track of that.  There is a

11   great benefit to brevity.

12         I think, Mr. Cummings, you got the award for the

13   shortest cross, and it was probably the most effective too.

14         In any case, we are going to definitely hold court on

15   Friday next week.  I think I mentioned that earlier, but I am not

16   yet sure what time we are going to start because I am going

17   rearrange some docket things Friday morning, but definitely plan

18   on that.  And make sure your witnesses are scheduled for that.

19         MR. STOKES:  Yes.  And, Your Honor, we may, we will

20   speak to the defense, but we may be filing a motion.  They

21   provided expert notice, we want the talk to the defense first

22   about that, but there are a number of issues in there.

23         So, would it make the most sense to put that on the

24   docket for next Friday.

25         THE COURT:  No, no, we will take it up early morning

Kissick - Cross                                                    1037

1   hours some day next week.  I don't want to delay things any more

2   than we absolutely have to.  All right.

3           MR. STOKES:  And, Your Honor, we also had requested and

4   the Court had ordered the defense to turn over summary charts by

5   Tuesday.  We have not received anything.  I don't know if--

6           THE COURT:  Then I assume there are none.

7           MR. STOKES:  I assume that's right.

8           MR. KUGLAR:  You got everything.

9           MR. STOKES:  So, we got--  The expert notice is what we

10  received then.

11          MR. KUGLAR:  Yes.

12          THE COURT:  You got the expert notice.  I thought you

13  were complaining about the summary charts.

14          MR. STOKES:  Yes, I was asking about the summary charts.

15  We did not receive any summary charts.

16          MR. KUGLAR:  All the charts referenced therein were

17  attached--

18          THE COURT:  All right, you all sort that out.  If there

19  was a ministerial error, no problem.  If in fact they don't yet

20  exist, there is a problem.

21          All right.  And if it is a real emergency, we could do

22  it tomorrow morning on the criminal docket.  So, otherwise some

23  morning next week before trial.

24          MR. STOKES:  Yes, Your Honor.

25          THE COURT:  We will recess court for the day.

1          NOTE:   The April 7. 2011 portion of the case is

2    concluded.

3          ----------------------------------------------

4

5

6

7

8                    CERTIFICATE OF COURT REPORTERS

9

10

11

12

13          We certify that the foregoing is a true and

14     accurate transcription of our stenographic notes.

15

16

17

18

19          /s/
            _____
            Norman B. Linnell, RMR, FCRR

20

21          /s/
            _____
            Anneliese J. Thomson, RDR, CRR

22

23

24

25