1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA    .      Criminal No. 1:10cr200
                            .
    vs.                     .      Alexandria, Virginia
                            .      April 18, 2011
LEE BENTLEY FARKAS,         .      9:00 a.m.
                            .
            Defendant.      .      EXCERPT OF A.M. SESSION
                            .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            CHARLES F. CONNOLLY, AUSA
                               PAUL J. NATHANSON, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                                 and
                               PATRICK F. STOKES, ESQ.
                               ROBERT ZINK, ESQ.
                               United States Department of Justice
                               Criminal Division, Fraud Section
                               1400 New York Avenue, N.W.
                               Washington, D.C. 20005


FOR THE DEFENDANT:             WILLIAM B. CUMMINGS, ESQ.
                               William B. Cummings, P.C.
                               P.O. Box 1177
                               Alexandria, VA 22313


(APPEARANCES CONT'D. ON FOLLOWING PAGE)


(Pages 1 - 110)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1  APPEARANCES:  (Cont'd.)

2  FOR THE DEFENDANT:              BRUCE S. ROGOW, ESQ.
                                   Bruce S. Rogow, PA
3                                  500 East Broward Boulevard
                                   Suite 1930
4                                  Fort Lauderdale, FL 33394
                                     and
5                                  CRAIG KUGLAR, ESQ.
                                   Law Office of Craig Kuglar, LLC
6                                  1130 Piedmont Avenue, Suite 913
                                   Atlanta, GA 30309
7                                    and
                                   ZAHRA S. KARINSHAK, ESQ.
8                                  Krevolin & Horst
                                   1201 West Peachtree Street
9                                  One Atlantic Center, Suite 3250
                                   Atlanta, GA 30309
10

11  ALSO PRESENT:                  JENNIFER GINDIN
                                   SA SCOTT TURNER
12                                 JUDSON VAUGHN

13
    OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
14                                 U.S. District Court, Fifth Floor
                                   401 Courthouse Square
15                                 Alexandria, VA 22314
                                   (703)299-8595
16

17

18

19

20

21

22

23

24

25

3

<u>I N D E X</u>

Closing Argument by Mr. Connolly:            Page 4

Closing Argument by Mr. Rogow:               Page 41

Rebuttal Argument by Mr. Stokes:             Page 93

4

P R O C E E D I N G S

    *         *         *         *         *

                    (Defendant and Jury present.)

        THE COURT:  Once again, good morning, ladies and

gentlemen, and again, thank you for being prompt.  We're going to

start, as I had told you on Friday, with the closing arguments,

and the government will make the first closing argument.  You-all

have enough paper left in your notebooks?  Yes?

                    (Jurors nodding heads.)

        THE COURT:  And again, I did not see much media coverage

about the case.  Did any of you bump into anything over the

weekend that might be an issue?

                    (Jurors shaking heads.)

        THE COURT:  No?

        Very good, we'll begin.  Mr. Connolly, I understand

you're making the first opening statement.

        MR. CONNOLLY:  Yes, Your Honor.

                    CLOSING ARGUMENT

                    BY MR. CONNOLLY:

        "I don't remember what Plan B was."  Those were the

incredible words that the defendant, Lee Farkas, said under oath

in this very courtroom on Friday afternoon:  "I don't remember

what Plan B was."

        After displaying an encyclopedic knowledge on the

evolution of Taylor, Bean & Whitaker from the very first lines of

1    credit to the first office addresses, when it came to answering

2    questions about what Plan B was, the defendant said he didn't

3    know.

4            Ladies and gentlemen, he lied.  He lied because Plan B

5    was a crime, and it was a key part of a conspiracy.  It was a

6    crime not only of staggering proportions but staggering boldness.

7    It involved selling hundreds of millions of dollars in fake assets

8    to a bank in return for real money.

9            Desiree Brown put it best when she testified:  "It was

10   stealing.  You can't give Colonial Bank nothing, take money from

11   them, and not know you are stealing."

12           And Plan B was not an isolated transaction.  It began on

13   December 11, 2003, and continued until TBW ceased operations in

14   August of 2009.  It involved hundreds, if not thousands, of dummy

15   loans or loans that had already been sold to someone else.  It

16   involved hundreds of fake pools of loans and hundreds of fake

17   Mesirow trade letters.

18           In fact, every witness involved with Plan B remembered

19   exactly what Plan B was.  Those witnesses will never forget what

20   Plan B was.

21           But when the defendant was asked about what this

22   company-saving $500 million plan was, the defendant said, "I don't

23   remember."  Ladies and gentlemen, the defendant was not telling

24   the truth, and he didn't tell the truth, because he is guilty.

25           Over the last two weeks, the testimony of nearly two

1   dozen witnesses, the hundreds of exhibits, including e-mails and

2   documents, the PINs, the recorded calls, in short, the evidence

3   presented in this case has brought you inside a wide-ranging

4   conspiracy of staggering proportions.  It is a conspiracy that

5   spread across two companies:  Taylor, Bean & Whitaker and Colonial

6   Bank, a conspiracy that affected banks, individuals, and

7   government agents throughout the country, a conspiracy that

8   involved billions of dollars.  That's right, billions of dollars.

9        You have heard from the key participants in this

10  conspiracy, six witnesses who have pled guilty:  Ray Bowman, the

11  former president of TBW; Teresa Kelly, an operations supervisor in

12  the Mortgage Warehouse Lending Division of Colonial Bank; Cathie

13  Kissick, the head of the Mortgage Warehouse Lending Division; Paul

14  Allen, the former CEO of Taylor, Bean & Whitaker; Desiree Brown,

15  the former treasurer; and Sean Ragland, the former senior

16  financial analyst.

17       All have told you the same thing:  The defendant, Lee

18  Farkas, was a member of a conspiracy.  In fact, they told you that

19  he was the leader of this conspiracy, and they were right.  The

20  evidence proves that they were right.  Your common sense confirms

21  that they were right.

22       Now, when you're sworn in as jurors, you do not leave

23  your common sense at the door.  To the contrary, Judge Brinkema

24  will instruct you that when evaluating the evidence presented in

25  this case, you are permitted to use your common sense, and your

1    common sense tells you that the person who benefited most from

2    this conspiracy was the defendant.  He was the one with the 30 to

3    40 cars, the jet and the seaplane, the restaurants, the bars, the

4    many houses.  He was the one with the fake Lee loans, the $30

5    million due from accounts, and the $300,000 monthly bonuses.

6           Common sense tells you that the reason the defendant

7    screamed or threatened anyone who talked to Colonial Bank without

8    his permission was because he was afraid, afraid that his massive

9    fraud would be discovered.  Common sense tells you that the reason

10   the defendant denied during cross-examination remembering what

11   recycling was is because recycling was the way in which he and his

12   coconspirators covered up the massive hole at Colonial Bank.  It

13   was a way in which the hole was allowed to grow and so the

14   auditors and higher-ups wouldn't find out about it.

15          In response to this overwhelming evidence, the defendant

16   would have you believe that he did nothing wrong, that the

17   billions in missing money was simply the result of a series of

18   growing pains and mistakes.  It simply is not credible.

19          In fact, in order to believe the defendant's testimony,

20   you have to disbelieve the testimony of almost a dozen witnesses,

21   including Teresa Kelly, Cathie Kissick, Ray Bowman, Mike

22   Wawrzyniak, Desiree Brown, Paul Allen, Sean Ragland, John Bruno,

23   and Avi Pemper.

24          Now, I want to take a few minutes and walk through just

25   some of the testimony of each of these witnesses that you would

1  have to discredit in order to believe the defendant's testimony.

2  And, ladies and gentlemen, as I work through my closing, I will be

3  referring to some government exhibits.  Feel free to take notes,

4  because you'll get a list of all the admitted exhibits, but you

5  won't get a transcript of this closing or a list of the specific

6  exhibits I mention.

7        Let's start with Teresa Kelly.  Teresa Kelly had no

8  problem remembering exactly what Plan B was.  She was the former

9  operations supervisor at the Mortgage Warehouse Lending Division.

10  You heard Teresa Kelly say that she did Plan B with the defendant,

11  with Cathie Kissick, and with Desiree Brown.  In fact, both

12  Ms. Kissick and Ms. Brown corroborate that testimony.

13        All said they did Plan B with the defendant.  All

14  testified that Plan B was fake or worthless collateral for real

15  money.  All said that Plan B started on COLB, then moved to AOT

16  when it became too difficult to track.  All said the defendant

17  knew each and every step of the way.

18        Teresa Kelly also testified that upon request from the

19  defendant, she would inform the defendant of the size of the Plan

20  B hole.  Her testimony is supported by Government's Exhibit 1-134.

21        Teresa Kelly testified in detail about the defendant's

22  efforts to drive a list of loans -- remember the thumb drive? --

23  from Ocala to Orlando in a last-ditch effort to provide data for

24  the hole on the AOT facility.  In fact, you heard a recorded

25  conversation about that effort.

1          Ask yourself this:  Why is the owner of one of the

2   largest mortgage origination companies in the country, a company

3   with thousands of employees, having repeated direct and personal

4   conversations with a lower-level operations supervisor at another

5   company?  Why is he volunteering to personally drive 80 to 90

6   miles to bring a thumb drive of data to Teresa Kelly?

7          Ms. Kelly testified that she thought it was an effort to

8   fill the hole at AOT but that, in fact, it turned out to be data

9   to use to lie to auditors.  Whose recollection of this strikes you

10  as more credible, Teresa Kelly, who's getting a hand-delivered

11  thumb drive of data from the owner of Taylor, Bean & Whitaker, or

12  the defendant, who claimed on the stand last Friday that he

13  personally drove from Ocala to Orlando just because he suddenly

14  had an urge to get out of the office and wanted to have a steak

15  dinner 90 miles away?

16         Cathie Kissick.  Cathie Kissick also had no problem

17  remembering exactly what Plan B was.  She was the head of the

18  Mortgage Warehouse Lending Division and one of the defendant's key

19  coconspirators.  She had specific discussions with the defendant

20  about the fact that Plan B on COLB used double-sold loans and that

21  Plan B on AOT used already sold pools.  Recall Government Exhibit

22  1-163.  This was an e-mail discussing Plan B versus real loans.

23  This e-mail makes clear that Plan B is fake.  The defendant gets

24  this e-mail.

25         Ms. Kissick testified that she and the defendant

1  discussed hiding Plan B through recycling.  She also said they

2  purposely used PINs, those peer-to-peer communications on a

3  BlackBerry, to have discussions about Plan B without those

4  discussions being preserved.

5        Now, the defendant says that PINs were used for jokes

6  and other private conversations, but once again, it's not

7  credible.  Teresa Kelly, Desiree Brown, Cathie Kissick all said

8  the defendant discussed using PINs to hide Plan B.  They wanted to

9  hide those discussions because they knew it was wrong.

10       Now, Ms. Kissick is certainly a key coconspirator, and

11 in fact, the defense even suggested she might be the real leader.

12 For purposes of finding the defendant guilty of conspiracy, it

13 doesn't matter who the leader was.  It doesn't matter if the

14 defendant was the leader, a middleman, or a low-level guy who

15 helped carry out the crime, like Sean Ragland, but the idea that

16 Cathie Kissick was leading the whole conspiracy doesn't hold up.

17       Witness after witness testified to the fact that Cathie

18 Kissick was distraught about the position she was in.  You saw

19 repeated e-mails evidencing her stress and her angst.  Recall

20 Desiree Brown's testimony about the defendant taking advantage of

21 Colonial and Cathie Kissick.  Ms. Brown described the defendant's

22 treatment of Ms. Kissick as "quite bullying."

23       Recall Ray Bowman.  He said Cathie Kissick called him

24 every day, multiple times a day.  In fact, the defendant himself

25 told Ray Bowman his philosophy regarding Colonial Bank, a

philosophy he carried out for six years.  He said it this way:
"If I owe you a hundred dollars, I have a problem.  If I owe you a
million dollars, you have a problem."

Michael Wawrzyniak.  Do you recall Mike Wawrzyniak?  He
was the young data guy, an important position but not a senior
executive.  Mike Wawrzyniak had no problem remembering exactly
what Plan B was.

Defendant said he didn't recall what he told Mike
Wawrzyniak about Plan B, but Mike Wawrzyniak had a very specific
recollection of being called into the defendant's office to work
on a project that the defendant described as Plan B.  The
defendant told Wawrzyniak to pool loan data for loans not at
Colonial Bank and send that information to Colonial.  He also told
Mike Wawrzyniak to keep it quiet.

Even Mike Wawrzyniak, a young data guy, quickly figured
out that Plan B involved sending loans that someone else already
financed or owned to Colonial so that Colonial could pretend to
have those as collateral.

Now, when you're evaluating whose testimony to believe,
whether to believe Mike Wawrzyniak's or the defendant's, use your
common sense.  Wawrzyniak was a low-level IT guy who gets called
to the chairman and owner of the company's office for a special
project that he's told to keep quiet, and shortly after that
meeting, the defendant starts sending e-mails directly to Mike
Wawrzyniak instructing him to carry out Plan B, not by hint but

1   specifically by using the term "Plan B."

2          Your common sense tells you that Mike Wawrzyniak would

3   remember that conversation clearly.  The e-mails corroborate your

4   common sense, and Wawrzyniak's testimony corroborates Teresa

5   Kelly, Cathie Kissick, and Desiree Brown.

6          Ray Bowman, the government's second witness, he was

7   president of Taylor, Bean & Whitaker.  Ray Bowman had no problem

8   remembering exactly what Plan B was.  Bowman testified that it was

9   the defendant himself who told Bowman what Plan B was and that

10  Plan B involved dummy loans.  Bowman told the defendant he thought

11  Plan B was unethical and illegal.  By the way, Ray Bowman was

12  right:  It was unethical; it was illegal.

13         Defendant claims he doesn't remember this, but look at

14  Government Exhibit 1-100, and when the defendant was shown an

15  e-mail in which Bowman expresses in writing his opposition to Plan

16  B, the defendant says, "Well, that's just because Ray didn't think

17  we owed them the money," but you heard the testimony of Ray

18  Bowman.  He said he did his own research and found out that

19  Taylor, Bean & Whitaker had to come up with almost $1,200 per

20  loan.  That is money they couldn't finance.  Ray Bowman quickly

21  determined it wasn't Colonial's fault.

22         As with Teresa Kelly, Cathie Kissick, and Desiree Brown

23  and Mike Wawrzyniak, the defendant told Ray Bowman not to discuss

24  Plan B with anyone.  Now, recall the reason the defendant offered

25  for telling everyone to keep it quiet.  He testified it was

1   because if Cathie Kissick or Teresa Kelly sent an e-mail to a

2   large group at Taylor, Bean & Whitaker, everyone receiving it

3   would drop what they were doing and instantly jump to help

4   Colonial Bank.

5         It doesn't make sense, and it doesn't explain why he

6   told Wawrzyniak, Bowman, and Brown, all TBW employees, to keep it

7   quiet.  Your common sense tells you why he did it.  Plan B was

8   wrong, the defendant knew it was wrong, and he didn't want people

9   finding out about it.

10        Bowman was also the first to testify about TBW's efforts

11  to inflate the values of its MSRs, sometimes by billions of

12  dollars.  Defendant denied knowing anything about this, but

13  Bowman's testimony is corroborated by Desiree Brown and Paul

14  Allen, both who specifically testified that they discussed with

15  the defendant the falsification of the mortgage servicing rights.

16        Mr. Bowman's testimony is also important when evaluating

17  the defense's claim that the defendant thought there was always

18  enough assets.  Now, the defendant himself didn't say too much

19  about this during his testimony, but the defense cross-examined

20  many witnesses about this.

21        Remember Ray Bowman's testimony about the $4 million --

22  excuse me, $4 billion speculative trading he engaged in to try to

23  pay back Plan B?  $4 billion was bet-the-company-type money.

24  Bowman said the defendant was fully aware and approved of the

25  speculative trading.

1           If the assets were truly there, your common sense tells

2     you that defendant would not have allowed Bowman to bet the

3     company, a company the defendant viewed as his company.  He simply

4     would have returned the assets to Colonial Bank, or he would have

5     told Ray, "No, I'm not going to risk my company that I've built

6     from the ground up."

7           Finally, Ray Bowman testified that after the FBI raid,

8     he suggested that -- to the defendant that they both go to the FBI

9     and tell the FBI what he did.  The defendant's response was

10    not, "Sure.  They're confused.  There's nothing wrong.  Let's end

11    this now."  His response was, "I'm not willing to do that."

12          Desiree Brown.  Desiree Brown had no problem remembering

13    exactly what Plan B was.  Desiree Brown was one of the defendant's

14    closest confidantes.  He promoted her from a receptionist making

15    $8 an hour to the treasurer making over $500,000 a year.  He gave

16    her a free mortgage loan for almost $700,000.  He did so because

17    she was a key player in his fraud scheme, because she would follow

18    his directions, because she wouldn't push back when she was asked

19    to carry out the illegal scheme.

20          Desiree Brown testified the defendant made specific

21    requests of her to do Plan B.  She testified that without Plan B,

22    TBW would go out of business.  Similar to Ms. Kissick and

23    Ms. Kelly, she testified that the defendant knew exactly what

24    recycling was and that it was used to hide the Plan B hole.

25          Desiree Brown also testified about Ocala Funding.  Now,

1  she said that there may have been some confusion at first about

2  what Ocala Funding money could be used for but that she quickly,

3  quickly learned it could not be used for non-Ocala Funding

4  purposes.  She said the defendant knew this as well and that they

5  discussed it.  She testified that the defendant knew about the

6  hole, Government Exhibit 17-17, in which she tells the defendant

7  the hole is about $231 million.

8          Ms. Brown said it was the defendant, not Paul Allen, who

9  had to approve the use of Ocala Funding money.  The defendant may

10  have sent Margaret Potter to Paul Allen with an Ocala Funding

11  question, but when it came to the billions of dollars in Ocala

12  Funding, it was the defendant who decided how the money was used,

13  and you've seen unchallenged evidence that the money was used

14  inappropriately.

15          Desiree also testified about Project Squirrel, efforts

16  to squirrel away money for the capital raise, that $300 million

17  that would allow the defendant to buy Colonial.

18          Finally, she discussed the specific conversation with

19  the defendant in which she expressed concern about being a

20  scapegoat and going to jail.  Defendant told her at the time, "I

21  will take the blame."

22          On Friday afternoon, the defendant said he didn't recall

23  any such conversation, but I'm sure that if he did, he would have

24  said it was just part of his peculiar sense of humor.

25          Paul Allen.  Paul Allen was the former CEO of TBW.  Paul

1    Allen knew nothing about Plan B, and the defendant confirmed this.

2    If Plan B was a legitimate means of getting additional money from

3    Colonial Bank, don't you think the defendant would have told his

4    CEO about it?

5         Allen testified to the fact that he was cut off from

6    Treasury almost as soon as he started, and although the defendant

7    corroborated this as well, the reason he gave does not hold up.

8    Common sense tells you that the CEO should have access to all

9    departments and certainly the Treasury Department.

10        The reason the defendant did not tell his CEO about Plan

11   B is because he didn't want Plan B discovered.  In fact, that is

12   why the defendant sent Allen the "I am going to kill you" e-mail

13   after learning that Allen had a conversation with Colonial Bank.

14   There is simply no logical explanation for that e-mail other than

15   the fact that the defendant wanted to cover up his ongoing fraud

16   scheme with Colonial Bank.  Remember, Allen testified he wasn't

17   prevented from talking to anyone else.

18        Defendant said in his testimony that he left Ocala

19   Funding to Paul Allen, but Allen testified to keeping the

20   defendant informed of the hole in Ocala Funding.  The e-mails in

21   this case confirm Paul Allen's testimony.  Look at Government

22   Exhibit 17-181.  Similar to other witnesses' testimonies about

23   their use of PINs, Allen said the defendant told him to use

24   personal e-mail addresses to keep exchanges regarding Ocala

25   Funding off the TBW servers.

1          Sean Ragland.  Recall Sean Ragland.  He was a senior

2   financial analyst at Taylor Bean.  Defendant testified he never

3   said anything more than hello to Sean Ragland.

4          Sean Ragland had a different recollection.  He testified

5   about a very specific conversation he had with the defendant in

6   June 2008 about a new paydown method.  Mr. Ragland described in

7   detail that conversation.  He explained how defendant said to

8   Desiree Brown and him, "We're doing things wrong in Ocala

9   Funding," and they didn't understand how it worked.  He explained

10  how the defendant told him not to make any paydowns of loans until

11  there was enough cash and loans in the facility to cover existing

12  liabilities.

13         Witness after witness explained that was not how Ocala

14  Funding was supposed to work.  When loans were sold from Ocala

15  Funding to Freddie Mac and Freddie Mac sent the money back, that

16  money had to be used to pay down the loans off of Ocala Funding.

17  What the defendant was directing Sean Ragland to do, to not pay

18  down, to slow the paydowns, is what led to the double and triple

19  pledging.

20         Similar to Mike Wawrzyniak's testimony, when evaluating

21  whether to believe the defendant or Sean Ragland's recollection,

22  consider that Sean Ragland during his entire tenure at Taylor,

23  Bean & Whitaker had one substantive conversation with the

24  defendant.  It was with the owner and chairman of the company, and

25  in that conversation, chairman and owner told Ragland not to pay

1   off loans that were supposed to be paid off.  Sean Ragland is

2   going to remember that conversation.  The defendant doesn't want

3   to remember that conversation.

4          John Bruno.  John Bruno was Taylor, Bean & Whitaker's

5   lawyer for the capital raise.  He testified about the importance

6   of getting investors by the March 31, 2009 deadline, about the

7   fear that if they didn't raise the $300 million by then, Colonial

8   would go under and Taylor Bean would soon follow.

9          Bruno testified that during those last few weeks of

10  March 2009, he spoke every single day with the defendant and that

11  it was the defendant who was leading the capital raise efforts on

12  Taylor Bean's behalf.  Bruno also testified that the investor list

13  on March 31 was supposed to be a final list, that as of that date,

14  the 10 percent escrow deposits were supposed to have been made

15  from each investor into Platinum Bank.

16         Now, recall the defendant's testimony on

17  cross-examination, when Mr. Stokes asked him about the final

18  investor list.  The defendant got agitated, and he said, "Everyone

19  understood that list was just an interim list, everyone except

20  you, Mr. Stokes."

21         Once again, the defendant's testimony is at odds with

22  everyone else.  John Bruno said it was fully understood that the

23  list was final.  He said the defendant never mentioned it was an

24  interim list or that the investors were just placeholders.  Bruno

25  said he never advised that the list could be interim or that the

1   investors could be just placeholders.

2        And Government Exhibit 15-1, this is the press release
3   that went out to the world that said "a definitive agreement."
4   you don't need Judge Brinkema to tell you what "definitive
5   agreement" means.  You already know.

6        Again, go back to your common sense.  If the names could
7   just be interim, why make them up?  Why not use Company A and
8   Company B?  If the names are just placeholders, why deposit a real
9   $5 million on Manny Friedman and South Towne Capital's behalf
10  without their knowledge?  Why not tell your lawyer about it, and
11  why not call Colonial Bank five minutes after this press release
12  comes out about a definitive agreement and said, "Hold on, you've
13  got it all wrong"?

14       The reason is obvious.  The investors were supposed to
15  be final.  Everyone, including the defendant, knew it, which is
16  why he and his coconspirators falsified the information about
17  Manny Friedman and South Towne and falsified the information about
18  them making deposits.

19       Avi Pemper.  Mr. Pemper was an investment banker for BNP
20  Paribas.  Defendant conceded on cross-examination that Avi had
21  become a personal friend after working together for six years on
22  Ocala Funding.

23       Mr. Pemper testified there was no doubt that Ocala
24  Funding was supposed to be a bankruptcy remote facility.  In fact,
25  until August 7 of 2009, Avi Pemper believed that all of BNP's $500

1  million in collateral was at Ocala Funding.  And Avi testified

2  that when he learned on Friday morning, August 8 -- August 7, that

3  almost all of BNP's supposed loans had already been sold to

4  someone else, he was simply incredulous.

5       Avi Pemper's testimony is corroborated by Deutsche

6  Bank's Brendon Girardi.  Mr. Girardi went to Ocala Funding on

7  August 2009 thinking Deutsche Bank's $1.25 billion in assets was

8  there.  He also was shocked to learn it was almost all gone.

9       Now importantly, Mr. Pemper had two key conversations

10  with the defendant.  The first was a dinner conversation at

11  Bonefish on Thursday, August 6, 2009.  That's the conversation in

12  which the defendant said to his friend, Avi, that the defendant

13  and Cathie Kissick were going to jail.  On cross-examination, the

14  defendant said he didn't recall ever talking to anyone about going

15  to jail, but Avi Pemper was the third witness to testify about a

16  specific conversation with the defendant related to going to jail.

17       Recall Ray Bowman talked about his conversation with the

18  defendant the day after the FBI search, and Desiree Brown

19  testified about her conversation with the defendant in which they

20  discussed going to jail and her worry about being a scapegoat

21  because of the fraud scheme.  The defendant doesn't want to

22  remember those conversations, because they confirm that he knew

23  what was going on was wrong and he knew it was a crime.

24       The fact that three separate people, some of whom never

25  had any contact with each other, had similar conversations with

1    the defendant corroborates their testimony.

2            The second conversation that Mr. Pemper had was the next

3    day, Friday, August 7.  After discovering that there was virtually

4    no collateral backing BNP's $500 million in commercial paper, he

5    confronted the defendant and asked him if it was possible that the

6    loans had already been sold.

7            The defendant didn't say, "What are you talking about?

8    I don't know anything about it."  He didn't say, "It's not a

9    problem, because we don't need to have the assets there.  The

10   documents allow the assets to be somewhere else."

11           Rather, the defendant said, "It happened, and it just

12   kept happening."  The defendant was right.  He knew exactly what

13   had happened at Ocala Funding.  He was the one who had ordered the

14   slow paydowns of the loans, and once that happened, it just kept

15   happening, and it led to double and triple pledging, and it led to

16   a $1.5 billion hole.

17           Now, ladies and gentlemen, there's one additional key

18   witness:  the defendant himself.  That's right.  In order to

19   believe his testimony you heard here on Friday, you have to

20   discredit what Lee Farkas said and what he wrote during the time

21   of the conspiracy.

22           During our case-in-chief, we introduced over a hundred

23   e-mails that the defendant sent or received during the time of the

24   conspiracy, over 100.  He was not shown a single one of those

25   e-mails on direct examination.

1          Ask yourself why.  The reason is clear.  It's because

2    the defendant has no answer for those e-mails.  The answer is

3    because those e-mails clearly show the defendant knew what was

4    going on and was actively participating in the fraud scheme.  That

5    is why the defendant had so much difficulty during

6    cross-examination.  In fact, before professing ignorance about

7    what Plan B was, he initially offered a convoluted explanation

8    about re-advancing loans that had been partially paid down.  That

9    was until he was shown an e-mail in which he himself referred to

10   Plan B as something else.

11          The e-mails he sent during the life of this conspiracy,

12   the statements he made at the time prove beyond any doubt that the

13   defendant knew about the fraud scheme and he knew it was wrong.

14   And those e-mails, those statements stand in direct contravention

15   to his testimony on the stand last Friday.  Therefore, in order to

16   believe the defendant's testimony in this case, you have to

17   disbelieve what he said and what he wrote at the time.

18          I'd like to turn to the indictment.  Defendant is

19   charged with 14 separate counts:  one count of conspiracy, six

20   counts of bank fraud, four counts of wire fraud, and three counts

21   of security fraud.  I'm going to take a few minutes and walk

22   through the elements for these counts and highlight some key

23   issues.

24          I want to make a comment first about the government's

25   exhibits.  We generally tried to number them so that they relate

1  to the count, so you will have a list of all the exhibits when

2  you're back during your deliberations, and if you're looking for

3  something that relates to, say, Count 5, start at the part of the

4  exhibit list that begins 5-.  We tried to put the documents that

5  are key to the counts in that way.

6          Count 1 is the conspiracy count.  It charges that from

7  in or about early 2002 through in or about August 2009, the

8  defendant did knowingly and intentionally combine, conspire,

9  confederate, and agree with others to commit bank fraud, wire

10  fraud, and securities fraud.

11          This count relates to the defendant's agreement and

12  understanding with Cathie Kissick, Teresa Kelly, Ray Bowman,

13  Desiree Brown, Paul Allen, Sean Ragland, and others to get money

14  for nothing from Colonial Bank, to take money from Ocala Funding,

15  and to try to get money from the government's TARP program.  It

16  includes sweeping.  It includes Plan B on COLB.  It includes

17  Plan B on AOT, recycling, Ocala Funding, Project Squirrel, and the

18  capital raise.

19          Now, what makes conspiracies so dangerous is that they

20  are an agreement among different people to commit criminal acts,

21  often time criminal acts that would be incredibly difficult to

22  commit alone.  This case is a perfect example.  There is simply no

23  way this conspiracy or fraud could have happened with just one

24  person.

25          And because there are many people involved and because

1   conspirators tend not to reduce their illegal agreements to

2   writing, it can be very difficult to discover and to investigate

3   these crimes.  As a result, it's often necessary for the

4   government to explain this criminal behavior to you by having

5   members of the conspiracy explain it to you themselves.  That's

6   what you've heard in this case.

7           Now, there are two elements the government must prove in

8   order to prove the defendant guilty of conspiracy.  First, we must

9   prove that an agreement or understanding to commit bank fraud,

10  wire fraud, and securities fraud was reached or entered into by

11  two or more persons.  We must prove that at some time during the,

12  during the existence or life of that conspiracy, agreement, or

13  understanding, the defendant knew the purpose of the agreement,

14  and with that knowledge, he deliberately joined the conspiracy

15  with the intent to further its unlawful purpose.

16          The first element is not subject to any dispute.  You've

17  heard from six different people who've testified that they engaged

18  in conspiracy to commit bank fraud, wire fraud, securities fraud.

19  Bowman, Kissick, Kelly, Brown, Allen, Ragland all admitted that

20  they worked with others in a scheme to defraud.  Thus, the key

21  element for you to consider is the second element:  Did the

22  defendant knowingly and deliberately join the conspiracy with the

23  intent to further it?  The evidence proves he did.

24          Now, to be clear, the government is only required to

25  show that he knowingly joined the conspiracy.  We're not required

1  to prove specifically what role he had, but, in fact, the evidence

2  proves that not only did he join it, but he led it.  Every single

3  conspirator who testified testified to direct conversations with

4  the defendant about efforts to further the scheme.

5         Ray Bowman told you it was the defendant who described

6  Plan B as dummy loans.  It was the defendant who instituted Plan B

7  over Ray's objections.

8         Teresa Kelly told you it was the defendant's idea to

9  recycle private pools into agency securities to hide the fact that

10  they were sitting on AOT for years.

11         Cathie Kissick testified about the repeated

12  conversations with the defendant that Plan B loans on COLB were

13  double-sold loans and that Plan B on AOT were double-sold pools.

14  Desiree Brown testified that it was the defendant who told her to

15  squirrel away money for the capital raise and that he knew the

16  money ultimately came from Ocala Funding.

17         Paul Allen testified that in the fall of 2008, the

18  defendant specifically told Allen the defendant had moved the hole

19  from Ocala Funding to Colonial Bank.  Remember, Allen confirmed

20  that the defendant himself used the word "hole."

21         Sean Ragland testified that it was the defendant who

22  directed him to slow paydowns in an effort to further hide the

23  hole.

24         In addition, you saw e-mail after e-mail in which the

25  defendant himself took affirmative steps to further the scheme.

1   Government Exhibit 1-158, the defendant directing Ray Bowman to

2   tell Mike Wawrzyniak 3.5 million of Plan B.  Government Exhibit

3   1-157, the defendant telling Mike Wawrzyniak directly to recycle

4   Plan B loans.  Government Exhibit 1-134, the defendant inquiring

5   of Teresa Kelly how much Plan B there is at Colonial, and at that

6   time in February 2004, there was over 220 million.

7           Government Exhibit 17-177, the defendant acknowledging

8   to Paul Allen the drain in Ocala Funding, and Government Exhibit

9   17-17, the defendant being kept informed by Desiree Brown about

10  the hole in Ocala.

11          The evidence shows the defendant knew the purpose of

12  this illegal agreement.  He used the words "dummy loans."  He came

13  up with the idea to recycle fake assets.  He told Paul Allen he

14  moved the hole.  He told Desiree when to take money out of Ocala

15  Funding, and he never told his lawyer or anyone else that he

16  thought the capital raise investors were mere placeholders.

17          Now, there are three goals of the conspiracy as charged

18  in the indictment:  bank fraud, wire fraud, securities fraud.  You

19  don't have to find all three to find the defendant guilty.  You

20  have to be unanimous as to which one you find, but you only need

21  to find one.  Nevertheless, the evidence proves beyond any doubt

22  the defendant guilty of all three.

23          Bank fraud, this is Plan B.  This is recycling.  Every

24  time one of the coconspirators sent fake data, whether Plan B

25  dummy loan data to COLB or Plan B pool data to AOT, and Colonial

1  Bank gave money to Taylor, Bean & Whitaker, it was bank fraud.

2  Every time they refreshed Plan B to make it look like new loans

3  were in, it was bank fraud.  Every time they recycled AOT pools

4  and did a round-trip transaction to cover up the hole, it was bank

5  fraud, every time.

6          Now, to prove the conspiracy, the government doesn't

7  have to show that the defendant participated in each act himself.

8  In fact, it's enough that he simply understood the purpose of the

9  conspiracy and intentionally joined it.  Judge Brinkema will

10 explain that if the acts or conduct of another is deliberately

11 ordered or directed by the defendant or authorized or consented by

12 the defendant, then the law holds the defendant responsible for

13 such acts or conduct just as if he personally did it himself.

14         What that means is that when the defendant sends e-mail

15 after e-mail to Mike Wawrzyniak telling him to do $10 million of

16 Plan B with the understanding that that false data is going to be

17 sent to Colonial, it's the same as if defendant himself sent the

18 information to Colonial.

19         We introduced at least five e-mails directly from the

20 defendant to Mike Wawrzyniak telling him to do more Plan B.

21 Government Exhibit 1-111 on December 11, 2003; Government Exhibit

22 1-41, just a few weeks later, on December 22; Government Exhibit

23 1-141, on April 7, 2004; Government Exhibit 1-152 on May 26, 2004;

24 Government Exhibit 1-157, June 28, 2004.  Repeated e-mails over a

25 six-month period.

1          The second goal of the conspiracy was wire fraud.  Every

2     time any coconspirator used an interstate wire to advance Plan B,

3     every time an interstate wire was used to take money to or from

4     Taylor, Bean & Whitaker, it was in furtherance of this massive

5     conspiracy, it was wire fraud.  And there's a stipulation setting

6     forth a number of these interstate wires and showing that they ran

7     through this district.  That's Government Exhibit 21-2.

8          The third goal of the conspiracy was securities fraud.

9     Every time Colonial BancGroup filed a form 10-K or a form

10    10-K -- Q with the SEC -- and remember, those are filed right down

11    the road here in Alexandria, Virginia -- it was securities fraud.

12    Think about it.  Plan B starts in December 2003 at about 120

13    million.  Sarah Moore, our very first witness, told you the

14    materiality was only about 20 million.  This is already six times

15    more.

16         That means that the three 10-Qs filed in 2004 are all

17    false, and all are securities fraud.  That means that the 10-K

18    filed for year 2004 was also false.  It was also securities fraud.

19    In fact, from 2004 to 2009, Colonial BancGroup would have filed at

20    least 16 false and misleading 10-Qs and five false and misleading

21    10-Ks.  Each was an object crime in the conspiracy.  Each was

22    securities fraud.

23         Now, that's the conspiracy count.  With respect to the

24    bank and wire fraud counts, which are Counts 2 through 11, the

25    elements are very similar.  Judge Brinkema will describe them in

1    detail, but basically the government must prove that the defendant

2    knowingly executed a scheme to defraud, the defendant had intent

3    to fraud, and the jurisdictional element.

4           Now, most of the jurisdictional elements have been

5    stipulated to.  For bank fraud, Counts 2 through 7, it's only that

6    Colonial Bank was FDIC insured.  Government Exhibit 21-3B is the

7    stipulation.

8           For wire fraud, it's Counts 8 through 11, it's that the

9    wires were interstate and that they traveled through the Eastern

10   District of Virginia.  Government Exhibit 21-2 is that

11   stipulation.

12          The bank fraud and wire fraud charges in Counts 2

13   through 7 and 10 and 11 break down into two categories:  advances

14   and recycles.  Put another way, advances are getting money for

15   nothing, asking for money out of Colonial Bank in return for fake

16   assets.  Counts 2 and 3 charge advances.  Recycles are covering up

17   the money for nothing and subsequent hole.  Counts 4 through 7 and

18   10 and 11 are the recycles.

19          For Counts 2 through 7, 10 and 11, the government

20   established beyond any doubt that they were fake transactions, and

21   frankly, defense really hasn't countered this.  I'd like to walk

22   through Count 7 as an example.  All these counts are very similar,

23   and there are summary charges for each, but let's walk through

24   Count 7 for a moment.

25          Count 7 charges bank fraud for a false AOT transaction

1    on July 6, 2009.  Look at Government Exhibit 7-19.  It's the

2    summary chart for Count 7.  The slides in that exhibit take you

3    step by step through the transaction, but I want to focus on just

4    three of them.

5              First is page 3.  This is the chart that shows the the

6    pools sold to AOT on July 6, 2009, have already been sold to

7    another investor, here Bank of America.  TBW is re-using the

8    unique pool numbers for a fake trade.  It also shows that there

9    were literally no loans behind the re-used pool numbers sent to

10   Colonial Bank.  In short, this shows a Plan B AOT transaction.

11             Next I want you to look at Government Exhibit 7-2.  This

12   is one of the attachments to that exhibit.  This is the fake

13   Mesirow trade letter for this transaction.  For each of the

14   counts, 2 through 7, 10 and 11, there are fake Mesirow trade

15   letters.  They're in evidence.

16             Why are these important?  These are important because

17   these are the letters that supposedly told Colonial Bank, hey,

18   we've already got someone who's agreed to buy these pools in 30 to

19   45 days.  These letters were required by the AOT facility.

20             Now, it's likely stating the obvious, but a real

21   transaction is not going to have fake trade letters.  The fact

22   that the defendant and his accomplices had to falsify the letters

23   proves again that it's not a real transaction, and it proves that

24   they knew it.

25             Let's go back to the summary exhibit, 7-19.  I want you

1  next to look at page 6.  This shows the money being wired from AOT

2  to Ocala Funding in exchange for the fake pools.

3          Ladies and gentlemen, I want to be clear about one

4  point:  The bank fraud is complete at this point in time.  The

5  second that money leaves Colonial Bank, regardless of what happens

6  down the road, the crime is complete, and Lee Farkas and his

7  accomplices have committed bank fraud.

8          Look finally at the last page of the summary chart.

9  This shows the complete transaction, and it shows the money going

10  back to Colonial Bank.  You've heard repeated testimony as to why

11  that is.  It's because it was designed as a round-trip transaction

12  to cover up the fact that there was a huge hole at AOT.  It was

13  trying to hide from auditors and bank management that there were

14  Plan B pools on AOT.

15          Now, the defense put on an expert who testified to a

16  point that candidly anyone with a calculator could have made.  She

17  simply confirmed what the government had already showed you in our

18  summary charts:  that more money went back to Colonial Bank on

19  that same day than left in that day.  Now, the defendant expert

20  acknowledged that she wasn't commenting on the validity of the

21  underlying transactions, and she acknowledged that selling fake

22  loan data would be a problem and that round-trip transactions

23  were, in fact, red flags that auditors often looked at, but you

24  heard testimony from witnesses as to why the money wasn't exactly

25  the same, because the defendant and his accomplices wanted to make

1  sure that it wasn't too obvious that it was a round trip.

2  Otherwise, the auditors or management might catch it.

3          It is completely irrelevant whether the money goes back

4  to the bank or not.  You simply don't need to find an ultimate

5  loss to the bank for the bank or wire fraud.  Think about it.  If

6  you rob a bank, it is a crime whether you pay the bank back three

7  hours later, two weeks later, or even whether you promise to pay

8  the bank back at the time you steal the money.

9          It's no different here.  Once fake pools with fake

10  Mesirow letters are sent to the bank and real money is sent back

11  out, the crime is complete.  As Desiree Brown said, it's stealing.

12  In terms of the indictment, it's bank fraud and wire fraud.

13          There is a summary chart and Mesirow trade letter for

14  each of the Counts 2 through 7, 10, and 11, and those exhibit

15  numbers are in the list that you'll get.

16          Now, Counts 8 and 9 also charge wire fraud.  Both of

17  these relate to the $300 million capital raise.  With these the

18  government must show the defendant's knowing participation in the

19  scheme to defraud, his intent to defraud, a material false

20  statement or pretense, and the jurisdictional element of the wire

21  traveling interstate and into EDVA.  The scheme to defraud in

22  these two counts is the scheme to help Colonial Bank getting $550

23  million in TARP money by falsely stating that Taylor, Bean &

24  Whitaker had raised $300 million.

25          Count 8 relates to the wiring of the $25 million from

1   Ocala Funding through Richmond, Virginia, to Platinum Bank for

2   purposes of fulfilling that 10 percent escrow deposit on behalf of

3   the investors.  Government Exhibit 21-2 is a stipulation that the

4   actual wire and where it traveled.

5           Government Exhibit 18-46, this is an e-mail from Paul

6   Allen to Lee Farkas.  It attaches the spreadsheet showing that the

7   $25 million wire came from Ocala Funding.  You heard testimony

8   that that wire was used as a 10 percent down deposit for Manny

9   Friedman and for South Towne Capital.

10          You heard that neither was an investor.  You also heard

11  from John Bruno, the lawyer, and Paul Allen that Ocala Funding

12  money couldn't even be used for Taylor, Bean & Whitaker's deposit,

13  but it was.

14          Desiree Brown's testimony shows you that the defendant

15  caused the wire in Count 8.  It was the defendant who told Desiree

16  Brown to squirrel away money, and the defendant knew that money

17  came out of Ocala Funding, because Desiree Brown was carrying out

18  his direction.

19          Court 9, this relates to Government Exhibit 9-1, the

20  false verification of funds letter.  This is the one saying

21  Platinum had received 30 million in escrow as a 10 percent

22  deposit.  The wire was the e-mailing of this letter from Will

23  Leaming to Gale Simons-Poole -- she testified in this case -- at

24  the FDIC.

25          The defendant was the one who directed Paul Allen to

1    call Will Leaming and say we need a shorter verification of funds

2    letter, as opposed to the spreadsheet that showed for money EJF

3    and South Towne came from Ocala Funding.

4            And Ms. Simons-Poole said this information was material,

5    that it was very important to her and the FDIC.  Government

6    Exhibit 21-4 is the stipulation that that e-mail to

7    Ms. Simons-Poole went through EDVA.

8            The last three substantive counts are Counts 14 through

9    16.  They are the securities fraud counts.  Again, there are three

10   elements, and Judge Brinkema will instruct you on the specific

11   elements, but it's basically that the defendant executed a scheme

12   to defraud, he did so with the intent to defraud, and the

13   jurisdictional element.  The jurisdictional element is met because

14   Colonial BancGroup was registered with the SEC under Section 12,

15   and it made -- its false filings affected Colonial stock, and it

16   filed those in EDVA.

17           Count 14 relates to the form 10-K that BancGroup filed

18   on March 2, 2009.  This represent BancGroup's assets of December

19   31, 2008.  Summary chart 14-15 shows the size of the hole at the

20   time was nearly $900 million.  That was not shown in the 10-K.

21   Therefore, the 10-K contained materially false information

22   regarding Colonial Bank's assets.

23           Government Exhibit 14-1 is the full 10-K, and 14-2 is

24   the excerpt that Sarah Moore highlighted the key areas.  The key

25   area here is the securities purchased under agreement to resale.

1  This was the AOT assets.  This was false.

2          Ladies and gentlemen, your common sense tells you that

3  investors in Colonial Bank would want to know about the nearly

4  $900 million hole, and as you know, the investor you heard from,

5  David Gaynor, he would have wanted to know about that hole.

6          Count 15, this is Colonial Bank's 8-K that it filed with

7  the SEC to announce the definitive agreement on the capital raise.

8  You saw the press release earlier.  Look back to the information

9  for Counts 8 and 9 to talk about the falsity of that press

10  release.  The press release is false.  You heard direct testimony

11  it was false.  The documentary evidence shows it was false,

12  because it was based on the defendant's lies about the investors

13  in the capital raise and the lies about where the escrow deposits

14  came from.

15          Finally is Count 16.  This is Colonial BancGroup's 10-Q.

16  It was filed on May 8 of 2009, and it represented the assets as of

17  March 31, 2009.  Look at summary chart 16-9 to see the hole at

18  that, March 31, 2009.  It's over $750 million.  That's not shown

19  in the 10-Q.  The 10-Q is false.

20          Government Exhibit 16-8 is the full 10-Q, and 16-8A is

21  an excerpt that was highlighted by Sarah Moore.  Again, the

22  investors in Colonial Bank would want to know about the $750

23  million hole.  David Gaynor would want to know about the hole.

24          Those are the 14 counts.  The evidence has shown the

25  defendant is guilty of every one of them.

1          In their opening statement, defense tried to make this

2   case about whether or not there was an actual hole.  As an initial

3   matter, it is simply irrelevant whether there was a hole.  It

4   doesn't matter because the crime is complete when defendant

5   directed dummy loans to be sent to Colonial Bank and when Colonial

6   Bank advanced money on those dummy loans.  It doesn't matter

7   because the crime is complete when fake pools of loans with fake

8   Mesirow letters are sent to AOT and Colonial sends real money back

9   to Taylor, Bean & Whitaker.  It doesn't matter because the crime

10  is complete when Colonial Bank files 10-Qs and 10-Ks with the SEC

11  that include materially false information about their assets.

12         When Judge Brinkema instructs you on the law, I want you

13  to listen very carefully to something you're not going to hear.

14  She will not tell you that you have to make any finding of loss to

15  the bank or make any finding about a hole.  It is simply not an

16  element of the crimes charged, but even though it doesn't matter

17  whether or not there was a hole, the overwhelming evidence is that

18  there was a hole, a huge hole, one of staggering proportions.

19         Before you were seated as jurors in this case, it is

20  likely that if someone told you about a $1 million fraud scheme,

21  you would think that was a huge amount of money.  Take a moment to

22  contemplate the numbers that have been testified to in this case.

23  The overdraft started at around $10 million and grew from there.

24  When Plan B was implemented on December 11, 2003, it was $120

25  million.  That grew to be $250 million before it was moved to AOT.

1   Then it grew upwards of 900 million.

2         But even that isn't the largest part of this incredible

3   fraud conspiracy.  Ocala Funding, which was a $1.75 billion

4   facility, ended with a hole of approximately $1.5 billion.  Neil

5   Luria, the chief restructuring officer for Taylor, Bean &

6   Whitaker's bankruptcy, testified due to the double and triple

7   pledging, the combined hole is nearly $3 billion.

8         Ray Peroutka, the government's summary witness,

9   confirmed that his analysis of Taylor, Bean & Whitaker and

10  Colonial Bank's own records show the hole of 1.5 billion on Ocala

11  Funding, 550 million on AOT, and double-pledged loans of nearly

12  $900 million.  And while these are staggering numbers, they're all

13  too real.

14        Deutsche Bank and BNP have lost a combined 1.5 billion.

15  Colonial Bank has lost nearly 1.8 billion.

16        During the defense's opening, they also said the

17  defendant was an inventor.  They were right.  He invented fake

18  assets.  The overwhelming evidence has proved there was a

19  conspiracy, and the defendant was a key part of it.

20        Now, you may be asking yourself why did he do it?  He

21  did it out of greed.  He did it because Taylor, Bean & Whitaker

22  was his company.  He owned it, he built it up, and he used it as

23  his personal piggy bank.  If TBW failed, defendant's jets, his

24  cars, his multiple houses, his many businesses, all would come

25  crashing down.  Without Taylor, Bean & Whitaker, Lee Farkas

1    couldn't live the lifestyle he wanted.

2              The uncontroverted evidence proves the defendant stole

3    almost $30 million from TBW for use for his own personal benefit.

4    The evidence shows he never intended to pay it back, at least not

5    with his own money.  How do you know?  Recall the due from

6    shareholder account.  This is a due from account that was

7    basically a record of the money the defendant pulled out of TBW

8    for his own use, but it wasn't a gift.  He was supposed to pay it

9    back.

10             Maureen Emig testified about this, about the problems

11   that arose when the defendant's due from accounts at TBW got so

12   big, around $30 million, that they were affecting the warehouse

13   lines that were the very lifeblood of TBW.  This due from had to

14   be paid down, but the defendant didn't sell properties or cars or

15   restaurants and pay it back himself.

16             Let's look at Government Exhibit 20-30.  I know it's a

17   bit confusing, but what it shows is that working with his

18   coconspirators, the defendant did a Plan B advance on AOT.  He

19   took out $15 million for fake loans, and then he had the $15

20   million applied to the due from accounts.  That money was treated

21   as if it came from the defendant himself.

22             Even the defendant's own witness, Margaret Potter's

23   testimony, proves the defendant never intended to pay it back.

24   She testified the defendant told her to take $20,000 each month

25   from his $200,000-plus bonuses and send it over to pay the due

1   from accounts.  $20,000 a month is a lot of money unless you've

2   just taken $15 million from a bank.  It would take you over 30

3   years to pay off that $15 million at $20,000 a month.

4        But the 15 million was not the only money the defendant

5   pulled out.  Recall Special Agent Scott Turner's testimony

6   regarding the Lee loans.  Government Exhibit 19-124, this shows

7   that nearly $6 million in Lee loans, these were loans for which

8   the defendant received real money for fake notes.  And defendant's

9   excuse during his testimony was that the fake notes didn't matter;

10  they were just placeholders.

11       If they didn't matter, why did he create the notes on

12  other people's houses or properties or on properties that didn't

13  exist?  If they didn't matter, why not put the notes on his own

14  house, not of farms?  If they didn't matter, why do them at all?

15       The fact is they did matter.  They mattered because

16  Colonial Bank wouldn't give money to Taylor, Bean & Whitaker

17  without the notes, and despite what he told you, the defendant

18  knew Colonial was really going to finance those loans.

19       In 2008, well after the Plan B scheme was in full force,

20  well after hundreds of millions of dollars was given to Taylor,

21  Bean & Whitaker from Colonial Bank in return for worthless assets,

22  the defendant said to Ray Bowman in New York City, "I could rob a

23  bank with a pencil."

24       Ladies and gentlemen, we have proven beyond any

25  reasonable doubt that that is exactly what Lee Farkas did.  He

1  robbed Colonial Bank with a pencil.

2          And do you recall Ray Bowman's response to that

3  statement?  He said, "I thought I was probably that pencil."  He

4  was right, but he was not alone.

5          It takes more than one pencil to steal over a billion

6  dollars.  It takes a conspiracy.  It takes coconspirators.  And

7  you've met many of them:  Desiree Brown, Cathie Kissick, Paul

8  Allen, Sean Ragland, Teresa Kelly.  They were all the pencils.

9  They were the tools that the defendant used to commit his fraud

10 scheme.

11         The facts in this case are overwhelming.  Lee Farkas

12 orchestrated one of the longest and largest bank fraud schemes in

13 the country.  He used Taylor, Bean & Whitaker, Colonial Bank, and

14 Ocala Funding as his personal piggy bank.  He lived the high life:

15 a jet, a seaplane, houses up and down the East Coast.  He had a

16 house in Key West in which he paid someone to wash it by hand with

17 a sponge.  It is simply stunning.

18         After you retire to the jury room, after you conduct

19 your deliberations, after you recall the testimony, and after you

20 evaluate the defendant's truth on the stand, we are confident that

21 you will find the defendant guilty of conspiracy and each of the

22 individual counts of bank fraud, wire fraud, and securities fraud.

23 We are confident that you will find him guilty not because we ask

24 you to do so but because that is what the evidence has proven

25 beyond any reasonable doubt.

1        Ladies and gentlemen, you will have the final word in

2   this case.  Make your final word a verdict of guilty on all

3   counts.  Thank you.

4        THE COURT:  All right.  Now, ladies and gentlemen,

5   because I want you to be fully attentive as we do these various

6   last segments of the trial, I'm going to give you a short break

7   now before the defense closing, and then after the defense

8   closing, we'll have the rebuttal from the government.  Then I will

9   give you your second longer break, because the instructions that I

10  need to give you on the law are complicated, and I want to make

11  sure you're completely alert for those.

12       We're not going to break for lunch until all that has

13  been done, so the second break I give you will be a bit longer,

14  all right?  But right now I'd ask you to just take ten minutes,

15  and as I said, you'll get a longer break after we finish the

16  arguments.

17       We'll stand in recess for ten minutes.

18       (Recess from 10:28 a.m., until 10:38 a.m.)

19                 (Defendant and Jury present.)

20       THE COURT:  All right, Mr. Rogow?

21                 CLOSING ARGUMENT

22                 BY MR. ROGOW:

23       May it please the Court, members of the jury.

24       When you were sworn in a little over two weeks ago,

25  Judge Brinkema gave you some preliminary instructions, and I think

1  they're important, and I think they're worth going over.  One

2  thing that you heard from Mr. Connolly's argument is his very

3  forceful presentation of what he thought the evidence was, but you

4  are the judges of the facts, and that's what Judge Brinkema told

5  you two weeks ago.

6          In fact, she said that she wished she had a robe for

7  each of you so she could clothe you with that robe so that you

8  would feel the role that you're playing, which, of course, is an

9  important and a critical role.

10          And she is going to give you instructions that will form

11  the framework for your analysis, and what was missing from the

12  argument that you heard earlier this morning is any reference to

13  the instructions that will form the framework for your analysis.

14  They are the guide for your work, and they do not come from

15  somewhere out in space.  They come actually from the Constitution.

16          The role that you're playing today as judges is a role

17  that has been created by the Constitution, and it is a role that

18  is of the utmost importance, and probably at no other time in your

19  life will you ever have a civic duty like this duty.  There are

20  important matters in your life, and I think the judge will

21  instruct you that this is a very important matter, but on the

22  civic duty side, it is the most important matter that you can have

23  to undertake as a citizen of this country.

24          And you will hear in those instructions over and over

25  again the term "reasonable doubt," and you heard it mentioned a

1    little by Mr. Connolly, but when the judge reads her instructions

2    to you, you will hear it repeatedly, because it is the key to what

3    your role is as a juror, and the reasonable doubt instruction that

4    you will get is the product of the Constitution being a restraint

5    on governmental power, and that is an important concept, and you

6    must start with that concept.

7            When the Constitution talks about the right to be free

8    from illegal searches and seizures, when the Constitution talks

9    about the right to a jury trial, when the Constitution talks about

10   the right to a lawyer, to counsel, and the right to cross-examine

11   and the right to present witnesses, all of those things encompass

12   one single thought:  that the Constitution is a restraint on

13   governmental power, and your role as jurors is to analyze the

14   facts of this case cognizant of that restraint on governmental

15   power.

16           And you will hear "reasonable doubt" spoken of over and

17   over, and what does that mean?  It means a reason to doubt.  And

18   what does "doubt" mean?  If you have a doubt, you hesitate.  If

19   you're driving your car and you see a big pool of water and you're

20   afraid --

21           MR. STOKES:  Objection, Your Honor.  Fourth Circuit law.

22           THE COURT:  No, I think this is all right.  Overruled.

23           MR. ROGOW:  If you're driving your car and you see a big

24   pool of water and you don't know how deep it is and you don't know

25   whether or not it will affect the engine of your car and you have

1    a doubt, and what do you do?  You hesitate.  And so hesitation is

2    an important concept in considering reasonable doubt.  And in this

3    case, you're going to hear other instructions that I think

4    encompass this notion of doubt and hesitation, especially because

5    of the unique testimony in this case.

6            You're going to hear that you've got to use your

7    experience, your common sense, and you're going to hear more in

8    the instructions.  Use the common knowledge of the natural

9    tendencies and inclinations of human beings.  That is a very

10   important comment in this case and a very important instruction,

11   because what is this case built on?  It is built upon the

12   testimony of six alleged coconspirators.

13           It's an extraordinary case when you have six people come

14   into court and say that they conspired with someone and they're

15   guilty of offenses.  And you've heard the names over and over

16   again this morning, and you've heard them during the testimony:

17   Kissick, Kelly, Allen, Bowman, Brown, Ragland.  All of them have

18   pled guilty to conspiracy, to a conspiracy with Lee Farkas.  And

19   this, I think, is a starting point for your analysis and

20   consideration of the facts.

21           Why would these people come in and plead guilty?  The

22   government, of course, says they come in and plead guilty because

23   they are guilty, but what is your common knowledge in terms of how

24   people react?

25           Really, if you look at this case, what you see is a

1   notion of the government saying that Lee Farkas was their master,

2   that Lee Farkas controlled them, that they did what they did

3   because that's what Lee Farkas wanted them to do.

4          I heard those people as you did, and it's your

5   recollection of their testimony, and it's your recollection of

6   their credibility, but think about this in terms of whether or not

7   you have a doubt about what they've said about your hesitation.

8   These were people who did not look like these were people engaged

9   in a long-term criminal enterprise.  These were not drug dealers.

10  These were people who were working hard, they believed in their

11  companies, they worked hard for their companies, Kissick did.

12  Kelly, Teresa Kelly said she thought that Cathie Kissick had the

13  best interests of -- and was loyal to Colonial Bank.

14         So if they were working all of this time to create some

15  common criminal enterprise, it's an extraordinary kind of thought

16  given their background and the kind of work they were doing, but

17  that's the government's theory, that Lee Farkas was their master.

18         But there is another theory here, that their master was

19  the government, and that, I think, is an important thing to look

20  at in this case.  Each of them have pled guilty.  Why did each of

21  them plead guilty?  They pled guilty because they were faced with

22  enormous threatened sentences by the government, and this is where

23  your common knowledge, this is where your common knowledge of the

24  natural tendencies and inclinations of human beings comes into

25  play.

1          What did they say?  They said they did these things

2  because they didn't want to get fired.  Well, they were making 40,

3  50,000.  Desiree Brown, I think, made 500,000.  Paul Allen made

4  400,000, and Paul Allen's 400,000 was no more than he was making

5  before he joined TBW.

6          So on one side of the ledger, you hear them saying they

7  did this even though they now say they knew it was wrong, because

8  they didn't want to lose their jobs, and on the other side of the

9  ledger, the second master, now what you're hearing is they are

10 confessing to having done something wrong.  Why?  Because they do

11 not want to go to jail for a long time.

12         And if you think about your common knowledge, if you

13 think about the choice between doing something that you think is

14 not right and losing your job but doing it anyway and on the other

15 hand testifying in court that they did something wrong, even all

16 of the objective external evidence is they didn't really believe

17 they were doing something wrong, then why did they come to the

18 court and tell you they're guilty and they pled guilty?  Because

19 the threat from the government that they could go to jail for

20 thirty years, for life under the sentencing guidelines, for five

21 years, ten years, was too much.

22         What does your common knowledge tell you?  Would people

23 make a decision to come in and cooperate and say things that will

24 help them if it's going to save them from a long term in jail?

25 The answer obviously is yes.  And you will hear the instructions

1  saying use your common knowledge of the natural tendencies and

2  inclinations of human beings.

3          So as you go back over the testimony and think about

4  it -- because there's no question that the government's case is

5  built on these six people.  Yes, there are going to be documents

6  and e-mails and the summary charts and all of that else, but

7  without doubt, there is no question that without these people

8  having pled guilty, there would have been no case for the

9  government.

10          And you're going to hear more instructions that are

11  important in this framework for analysis for you.  You're going to

12  hear an instruction saying alleged accomplices pleading guilty

13  does not prove the defendant's guilt.  You're going to hear an

14  instruction that says if the accomplice testimony, if the

15  accomplice testimony has been affected by self-interest or by the

16  agreement that he or she has with the government, you have to

17  consider that, too, and that's why I'm telling you about this

18  framework for analysis.

19          You just can't take all this and say, well, the

20  government said here's what happened, and here are a couple of

21  e-mails and things like that.  You've got to analyze this from the

22  get-go with this framework from the instructions that the Court is

23  going to give you, the framework that is the restraint on

24  governmental power.

25          You can imagine how scary it is to have all of these

1    agencies, FBI people, threats of long jail sentences.  Would that

2    affect your decision in terms of how you're going to present

3    yourself?  Common knowledge tells you that it would, and another

4    instruction you're going to hear is that it's up to you to

5    determine whether the informers, because these people are

6    classified now as informers, whether or not their testimony has

7    been affected by self-interest or again by his or her agreements

8    with the government.

9           You heard us, as I, Mr. Cummings, Ms. Karinshak

10   cross-examined people, we always asked them about their agreements

11   with the government, and all of them said yes, they were hoping

12   that by pleading guilty, it would reduce their sentences.  I think

13   Mr. Allen said it was something that he wanted to do because he

14   wanted to get home as soon as he could to his wife and family, and

15   that makes sense, and that is what common knowledge tells us, but

16   common knowledge, I think, also tells us that one would not be

17   involved in a continuing criminal enterprise for six or seven

18   years and think that they did nothing illegal, although I'll talk

19   about Mr., Mr. Bowman saying he did send an e-mail saying I think

20   something may be unethical or illegal, but does it make any sense

21   that these nice people would for all of these years, for no gain

22   to themselves really, do something that the government has now

23   said is criminal?  Does that make any sense?

24          It doesn't make sense looking at these people.  What

25   makes sense is these people have now come into court to say they

1  did something criminal because they do not want to go to jail for

2  a long time, because the power of the government has brought them

3  to the state where they ran that risk.  And as I go through some

4  of the people, you will see that they didn't plead guilty so

5  quickly.  In fact, Paul Allen pled guilty, and it's in the

6  testimony and you heard his testimony, he pled guilty on April 1,

7  2004 (sic), three days before this trial started.

8          Why did he wait so long?  And I'll take you through his

9  answer, because I asked him that question, and you'll go back and

10 you'll see that Sean Ragland, who reported to Paul Allen, he pled

11 guilty on March 30.  These people didn't jump on board and say,

12 "I'm guilty."  In fact, as I take you through the testimony,

13 you'll find that many of them said, "We didn't do anything wrong,"

14 including Cathie Kissick in her e-mail to Teresa Kelly.

15         So this is a framework for analysis.  Use particular

16 care -- and you're going to hear this, too, from Judge Brinkema --

17 use particular care when considering the acts and declarations of

18 coconspirators.

19         And if you think about all of these instructions that

20 you're going to get, they are communicating to you the importance

21 of the decision that you're making and the restraint that you have

22 to use in terms of assessing all of the testimony and the evidence

23 that you've heard.

24         And in terms of evidence that you've heard, another

25 instruction that you will hear is a question is not evidence.

1    That instruction will be given to you.  Why is that important in

2    this case?  So much of the testimony of these six witnesses when

3    you heard was like the testimony of automatons.  The question

4    would be asked by the government and you'd hear yes, no, yes, no.

5            That is a different kind of testimony.  That's not them

6    telling the story.  That is them telling the story that they have

7    worked out with the government over -- and you heard this, too --

8    30 hours, 50 hours, multiple meetings with the government agents.

9    And when I say government agents, not just the FBI.  SIGTARP,

10   FDIC, HUD, a whole army of government agents was questioning these

11   people and trying to bring these people into the fold of the

12   government:  Plead guilty and testify.

13           And, of course, the benefit from testifying, yes, all of

14   them said, well, it's up to the judge finally, but all of them

15   admitted that what they wanted was the help and support of the

16   government, for the government to file a motion saying that the

17   sentences should be reduced because of their cooperation, and none

18   of them said, well, I'm hoping for a year or two years or anything

19   like that.  It was all, if you think about it, all nicely

20   programmed, all nicely said the same way:  "Well, the final

21   decision is up to the judge, and yes, I'm hoping for the best."

22           You know, I don't know if you believe that, that they

23   don't have in their mind something that they think they want, but

24   you have no doubt and you can have no doubt that what they believe

25   is, is that by being here and testifying that they were

1    coconspirators with Lee Farkas, that they are going to get a

2    benefit from it.

3            And I think that there is a strange kind of situation

4    here, because I think you should ask and probably will ask among

5    yourselves how can it be, what would happen if these six people

6    who pled guilty are going to go to jail and if we find Mr. Farkas

7    to be not guilty because the government hasn't proven it beyond a

8    reasonable doubt because we cannot say without hesitation that

9    Mr. Farkas is guilty?  How can it be that these six people now

10   have pled guilty and they will go to jail perhaps and he will not?

11           What's that the product of?  It's a product of

12   Mr. Farkas calling upon what the Constitution guaranteed him and

13   having the courage to be able to come to this court and testify --

14   and I'll talk about his testimony in a while -- but to come to

15   this court and insist that the government carry its burden of

16   proof.  He believed -- and you heard his testimony, and I started

17   with it, why didn't he flee?  Because he didn't think he did

18   anything wrong.

19           And I'll take you through some of the reasons why, but

20   the point I'm making is I know this is a question that is a fair

21   question to ask, how can they be guilty and he not be guilty, and

22   the answer is because he has forced the government to carry its

23   burden of proof, which they have not carried.

24           And the fact that they provided this testimony through

25   this kind of rote testimony, yes-no, to the government's

1  questions, and then the Court is instructing you that a question

2  is not evidence is something critical that you must weigh during

3  your analysis.

4        Now, let me start with Ray Bowman in terms of why you

5  believe or shouldn't believe any of these people.  Bowman is

6  another one of the late pleaders.  He pled on March 14 of 2011,

7  and he said, quite honestly, "I'm hoping I would not have to go to

8  jail."

9        And I asked him whether or not he was hoping the

10  government would help, and he said, "Absolutely."  And, of course,

11  that's sensible, and we understand why, but that ties into what

12  I'm telling you:  That's what human nature is.  Let me get out of

13  this jam.  For this jam, I'm willing to say things that will help

14  me out.

15        But working for TBW, did he show any real concern about

16  doing anything wrong?  No, because he really didn't think he was

17  doing anything wrong.

18        How do we know that?  Who did he bring in?  I thought

19  this was extraordinary.  He brought in his best friends, Rob Young

20  and Clay Lehman.  He brought in his brother to work for TBW, his

21  father-in-law, who was the head of security for TBW.  He brought

22  all of these people in.

23        Is that the kind of acts you think you would do if you

24  believed that you were involved in some kind of criminal

25  enterprise?  It goes against common sense.  You're not going to

1  bring your family, your friends into a business that you think is

2  founded upon some kind of criminal enterprise.

3        And indeed, Bowman, when he first was interviewed by

4  the, by the FBI or one of the agencies, said that he didn't think

5  they did anything wrong.  His statement to the FBI was "no fraud,"

6  and you're going to hear an instruction, too, about prior

7  inconsistent statements.

8        So when Bowman is first confronted, he says there's no

9  fraud, but when it comes to this court, he says there's fraud?  It

10 makes sense, doesn't it?  Of course.  Saying there's fraud when he

11 testifies here is something to help him out in really the most

12 important thing in his life:  trying to stay out of jail as best

13 he can.

14        So here is Bowman.  He didn't even remember when he

15 became president of TBW, if you will recall.  He said, "I'm just

16 not good with dates."  An important kind of matter, knowing when

17 you became the president of a company?  Of course.  Bringing in

18 your best friends if you think you're running a criminal

19 enterprise?  That makes no sense.

20        So what do we do with Bowman?  Bowman said what he said.

21 We cross-examined him.  You make the decision about it, but the

22 framework for analysis is what's important here.  Does it make

23 sense that Bowman would think he was really in a criminal

24 enterprise when he's bringing in all of his friends and family?

25        And he was not the only one, by the way, who made

1   previously inconsistent statements, and I think if I recall right,

2   Bowman was charged with making a false statement to the FBI, so

3   not only did he say at the beginning there was no fraud, but the

4   government got him to, to have to plead guilty to saying that was

5   false.

6          Why did they do that?  Well, that's going to make the

7   whole package.  If you left Bowman standing there alone saying, "I

8   told them there was no fraud," that doesn't sit right with where

9   the government needs him to be in terms of proving the case.

10         And he wasn't the only one, by the way, who said there

11  was nothing wrong, and I think this is an important issue, too.

12  If you take a look -- and I'm not putting anything on the screen.

13  I'm going to give you the numbers of some exhibits, you can go

14  back and look at the exhibits later on, but I don't want to

15  distract you with things on the screen.  I want to talk to you

16  about what I think the evidence shows and why I think the evidence

17  cannot lead you to find beyond a reasonable doubt without

18  hesitation that Lee Farkas was part of a conspiracy.

19         I told you about Bowman saying he thought that there was

20  no fraud.  Allen also told the FBI that he thought there was no

21  fraud, but take a look when you go back at Defense Exhibit 2-27,

22  and that is a text between Cathie Kissick and Teresa Kelly.

23         Now, remember, August 7, 2009, is after there has been

24  the raid, after materials have been served, after Cathie Kissick

25  spent five hours in a police car or in a federal car of some sort

1  with agents.  She was on her way, you recall, to Ohio.  They

2  grabbed her.  They put her in the car.  She spent five hours with

3  them, and imagine the kind of strain and fright and scare that

4  causes, but on August 7, a few days later, she sends a text to

5  Teresa Kelly saying, "We didn't -- there was collateral there.  We

6  have to prove them wrong," meaning the government officials.

7       So here she is right on the eve of this raid, on the eve

8  of five hours of being held in that car, and she's saying, "We

9  didn't do anything wrong."  She didn't know that at that point

10 Teresa Kelly was figuring out maybe I ought to cooperate with the

11 government.

12      And again, you know, this is not a, a thing that you

13 have to be a genius to understand.  When you're surrounded by

14 agents, when this pressure is on you, when you see what the future

15 might be if you don't get onto the stand with people who are going

16 to help you ultimately, then you're not very smart or observant,

17 and they are smart and observant.  They observed what could happen

18 to them, and that's why they decided this is the better choice for

19 us.

20      Quitting TBW or quitting Colonial?  No, that wasn't

21 something they wanted to do.  Why?  Because really in their heart

22 of hearts, they didn't think they were doing anything wrong.

23      The key to it all is Kissick always knew there was

24 collateral, and I'll take you through the collateral.  I mean, how

25 does Kissick view this?  She views it as one should:  that there

1    was plenty of money there, plenty of collateral there.

2            And so yes, were there overdrafts?  Were there

3    shortfalls?  Yes, there were all of those things, but she knew

4    there was collateral, and I'll take you through that in a minute.

5            So you have Kissick.  She is really, I think, one of the

6    most important witnesses, obviously, in this case, and what did

7    she say?  She said in that e-mail -- in that text, rather, to

8    Kelly, "We have collateral."

9            And you will see if you take a look at our exhibit,

10   Defense Exhibit 2004 (sic), everything was cross-collateralized.

11   Default on one part of the TBW accounts would result in a default

12   on everything.  They owned TBW lock, stock, and barrel.

13           And Defense 204 is a defense exhibit that shows what all

14   of these kinds of collateral were, and Defense Exhibit 551 lays

15   them out:  mortgage loans; REO, real estate-owned accounts;

16   servicing accounts, take-outs; hedging accounts; TBW shares; life

17   insurance; second liens on other MSRs.  There was a lot of

18   collateral there.

19           Did she believe there was a lot of collateral?  Yes.

20   Would she have kept doing this if she didn't think there was a lot

21   of collateral?  No.  In fact, when you think about her

22   relationship with TBW, she believed in TBW, and she believed in

23   Lee Farkas.

24           How do we know that?  She was going to go to Platinum

25   Bank with Lee Farkas if Lee Farkas went to Platinum Bank.  Would

1  you go -- if Lee Farkas were leaving and taking the business to

2  Platinum Bank and she thought she was doing something illegal and

3  unconscionable, would she continue on and want to go?  No.

4          And when she sends an e-mail -- and I'll give you that

5  defense exhibit, I think it is Defense Exhibit 2008 (sic); it is,

6  Defense Exhibit 2008 -- an e-mail to Kamal Hosein saying, "We've

7  been doing this for 20 years.  This is why we charge them so

8  much."

9          And indeed -- and I think you have to put this in

10  context.  You know, a trial is not about the whole world of life

11  that is involved in a company or a person's life.  It takes a few

12  moments and it magnifies them, magnifies them to the extent that

13  it fills up the room, which is what the government is doing in

14  this case.

15          And everyone has it in their own experience.  You have a

16  fight with someone, a disagreement with someone, and nothing else

17  enters into your mind.  It fills up the whole relationship.

18          But a trial, of course, distorts the complete sense of

19  time and place and compresses it all into several exhibits, over a

20  hundred e-mails Mr. Connolly said.

21          How many e-mails were there in the TBW-Colonial e-mail

22  servers?  Thousands, tens of thousands probably, but you pluck out

23  a few and you say, aha, that proves beyond a reasonable doubt that

24  there's guilt.  It's not realistic, but trials are that way, and

25  we have to deal with what we have.

1          But the point I'm making is when she sends -- when

2     Kissick sends an e-mail to Kamal Hosein, who is right under Sarah

3     Moore, and says, "This is the way we've always done it; 20 years

4     we've been doing it; that's why we charge them so much," what she

5     is saying is, is that no problem here.   They have collateral.

6          And how much money did they make?   A billion and a half

7     dollars, I think the testimony was, in terms of interest.   Was TBW

8     a great client for and a great customer for Colonial Bank?   The

9     answer is yes.

10          And let me talk a little bit about Colonial Bank,

11     because I think it's very interesting and it ties into the, the

12     fraud counts with regard to the capital raise and the March 31

13     press release.   You know, Sarah Moore testified.   This is right at

14     the beginning of the case, and I think it, it is something worth

15     going back and reflecting on.

16          Remember, they needed to raise money.   They needed to

17     raise $300 million, and when you go back and look at the letter,

18     the TARP letter -- and I'll give you that specific exhibit number

19     in a moment -- when you go back and look at that TARP letter from

20     the FDIC, it says, it says "expressly," it's expressly conditioned

21     upon raising $300 million.   I mean, it could not be clearer:   an

22     express condition.

23          And you heard that Sarah Moore said they all conferred,

24     Bobby Lowder and Jack Miller, their long-time lawyer and all these

25     other outside lawyers, and they issued a press release that said

1   they're getting TARP money subject to certain conditions.  It's an

2   outright lie.  A patent, flagrant lie.  All you had to do was look

3   at that letter from the FDIC.  There was no way you could

4   misinterpret that.

5          And yet they hired lawyers and had lawyers and other

6   people and public relations people, I think Sarah Moore said she

7   went and looked at other press releases that other banks had.  You

8   know, this is -- it's amusing and it's sad that a bank, Colonial

9   Bank, a New York Stock Exchange-listed bank, could not take a

10  sentence out of an FDIC letter and make an honest statement about

11  it, and they didn't make an honest statement about it, and she

12  hemmed and hawed, but there's no question, remember, this is the

13  situation in which a couple of days later, the *American Banker*, a

14  newspaper dealing with bank matters which she likened to the

15  *National Enquirer*, of course, but the *American Banker* is the one

16  that revealed the fact that their statement was false, that it

17  took them almost another month to come out with a new press

18  release.

19         And, you know, this, too, ties into all of this picture

20  of the higher-ups at Colonial Bank -- Cathie Kissick was the only

21  one making money for Colonial Bank.  Sarah Moore agreed that

22  Colonial Bank was troubled, and, of course, that's what TARP is

23  all about, for troubled banks, and Sarah Moore agreed that they'd

24  lost money in Florida on commercial loans, they'd lost money in

25  Nevada on commercial loans.  They were not losing money on Cathie

1   Kissick's Mortgage Warehouse Lending Division.  That's the only

2   one that was making money for them.

3          And so when Mr. Gaynor testified later on -- and this,

4   too, I think, reflects how far the government was reaching.  Why

5   bring Mr. Gaynor in?  For him to cry on the stand that his family

6   had owned Jefferson Bank in Miami Beach and his mother and he and

7   his brother and sister had 900,000 shares, and they're trying to

8   blame the failure of Colonial BancGroup on Lee Farkas?

9          Let me tell you, Mr. Gaynor with his -- when he said he

10  lost $18 million, Sarah Moore testified that when they sent out

11  that press release, the stock went -- that false press release,

12  the stock went from $2 to $3.04 a share.  So on that day, March 31

13  or April 1, the stock was worth $2 a share.  Mr. Gaynor had ridden

14  that stock all the way down to $2 a share.

15         He didn't have $18 million in.  He had $1,800,000 in at

16  the most, and it went up a little bit, a dollar a share, because

17  of Colonial's lie, and then he held onto it, and he rode it down

18  to nothing.

19         I'm sorry that Mr. Gaynor lost money.  I'm sorry that he

20  felt like his father's legacy was lost, but that was not

21  Mr. Farkas's fault, but what it does show is how far the

22  government would reach to try to convince you that Mr. Farkas is

23  evil and responsible for all of that.  Colonial Bank was

24  responsible for its problems, not Mr. Farkas.  In fact,

25  Mr. Farkas's billion and a half dollars was responsible for

1  Colonial Bank being a bank that had some merit.

2          And, you know, how did it all fall apart?  And I'm

3  jumping way ahead, but you need to get to the end to understand

4  why the government's theory that all this money was lost, it was

5  brought to a close because the government seized everything.  The

6  government came in and on short notice closed everything down.

7          Do you remember what, what Cathie Kissick said?  "We

8  were trying to fix it, always trying to fix it."  Everybody was

9  trying to fix it.  Kissick was trying to fix it.  Kelly was trying

10  to fix it.  Bowman was trying to fix it.

11          So here you have Cathie Kissick, who I guess you'd say

12  is the star witness against, against Mr. Farkas, but think about

13  Cathie Kissick and all those years, with Kelly saying she was

14  loyal to the bank, with Cathie Kissick telling Kamal Hosein, "This

15  is the way we do it.  We're trying to make this work, and they're

16  paying us good money on the loans."

17          And, you know, Colonial Bank had PriceWaterhouseCoopers

18  as their auditor.  TBW had Deloitte & Touche as their auditors.

19  These companies were not operating on the fly in the dark

20  somewhere.  These companies were operating with top lawyers, with

21  top auditors who were there to look at the documents.

22          Would not Colonial Bank, knowing that this is their best

23  division, would not they say to someone, "Let's go take a close

24  look at this"?  No, they would recognize that this was an

25  important division, and they did take a close look.

1          Now, the government will tell you, well, they couldn't

2    find it because it was hidden, and let me tell you, this stuff

3    wasn't hidden.  And, you know, I'll talk about the Mesirow trades

4    and the trade letters, which obviously were no go because Colonial

5    Bank couldn't engage in trades, but boy, you look at that stuff,

6    anybody who'd look at it would know it had no meaning.  It had no

7    purpose.  It was not done intentionally to defraud anybody or to

8    lie to anybody.

9          And Teresa Kelly, because Kissick and Kelly have to go

10   together, they are a team in this kind of thing, and when does she

11   plead?  She's a late pleader, too.  She doesn't jump on the

12   bandwagon and say, "I confess, I confess.  Let me be part of the

13   government's team."  No, not until March 14, 2009 (sic).

14         And I think it's very, very extraordinary in terms of

15   how you have to assess all of their testimony.  When did these

16   people decide to plead is the first question.  The answer is

17   always going to be almost on the eve of trial.  And the second

18   question is why did they decide to plead?  And the answer is

19   clear:  because they wanted to try to spare themselves of the risk

20   of going to trial and being convicted or risk that Mr. Farkas was

21   willing to take because he didn't think he did anything wrong and

22   because he's had the courage to hold the government to its burdens

23   of proof.

24         And so did, did Kelly ever say that, that Farkas said to

25   her he did not want the bank officials to know?  No, that was

1  never said.  She made the decisions about how to record the things

2  that were sent over to her.  She never studied the agreements, and

3  indeed, no one ever studied the agreements.  None of those

4  witnesses ever studied the agreements.  Without fail, you can go

5  look -- remember their testimony.  You can look at the agreements.

6  They're long, they're involved, they're subtle, there are a lot of

7  legalisms in it, but they are important.  All of these agreements

8  are what really drives the relationships between the parties.

9          This is not just a matter of a few e-mails back and

10  forth.  This is the agreements.  If you have a credit card or you

11  have a debit card, you have an agreement with the bank, 20-25

12  pages.  I doubt that any of us have ever read the agreements we

13  have with banks, but let me tell you, if you have an overdraft

14  charge for $35 and you want then to dispute that with the bank, go

15  take a look at your agreement and see whether or not it says you

16  have to file an arbitration action to do it.  The agreements are

17  what controls, but none of them ever looked at the agreements.

18          She didn't know Cathie Kissick's authority.  She said

19  she was only counting, counting the notes as collateral.  That's

20  what Kelly is saying, but she didn't know what the agreements

21  called for in terms of what could be counted.

22          So here's somebody who's testifying, testifying that she

23  thinks that she did something wrong.  She didn't even know what

24  the agreement said.

25          What did she, what did she know?  She knew that Kissick

1   had authority.  She thought that Kissick was loyal to the bank.

2           And, and here's a couple of examples of where the

3   government's reaching, I think, is troubling and you have to

4   consider in terms of weighing all the testimony:  crap loans.

5   Yes, they found one and they cross-examined Mr., Mr. Farkas with

6   one e-mail where he said "crap."  That's not the way he speaks.

7           What did Kelly say?  Kelly said "crap" was lingo that

8   Cathie would use.  "Crap loans" is what Cathie Kissick would use.

9           And this is another example of the government trying to

10  reach in so far to try to grab ahold of Farkas and bring him in

11  that they find one e-mail out of tens and thousands where he uses

12  the word "crap."

13          And by the way, and this is important, a crap loan has

14  value.  A crap loan is not valueless.  There are, there are

15  markets for these loans.  And so in these kind of situations,

16  clearly you've got a use of a word that's used in a pejorative way

17  for one purpose:  to kind of influence you, to lead you to

18  conclude that Mr. Farkas is guilty.

19          And I've got a couple of other examples of that that I

20  think are troubling with regard to how far the government reaches

21  on that end, because what's this really about?  This case is

22  really about did Lee Farkas and these other people knowingly and

23  intentionally with intent to defraud do any of these things?  And

24  your measurement has to be under the analysis the judge is going

25  to give you is whether or not there's any reason to doubt that

1   they did, and one of the major reasons to doubt, which I keep

2   coming back to, is they were working together for years with a

3   common goal to try to fix things.

4          Did his business get ahead of what they could all

5   handle?  Yes.  Kind of like when they build these, these

6   developments in areas that are adjacent to municipalities or

7   cities and they build all the buildings, they build the

8   apartments, they build the shopping centers, and they don't have

9   the infrastructure that allows you to reach them.

10         So during that time until the infrastructure is built,

11  what happens?  Traffic is jammed.  There are clogs on the streets.

12  Everybody is frustrated.  That's the kind of thing that you see.

13         Well, who else do we see?  We have Michael Wawrzyniak,

14  and Mr. Wawrzyniak, he, too, interviewed by the FBI, told the FBI

15  not aware of any, of any uncollateralized trades between TBW and

16  Colonial.  He said that.  So here he is starting off saying

17  nothing wrong.  He talked to them.  He told them that many

18  employees have access to TBW's funding lists.  On December 22,

19  2009, he told the FBI that there were systems issues.

20         Yes, later on did he decide, well, he was going to be

21  helpful?  Yes.  Now, Wawrzyniak was not charged with a crime,

22  despite the fact that he had made a misstatement to the FBI at the

23  beginning.  No question about it.  But he was not charged with

24  anything.

25         Why is that?  How did he escape the reaches of the

1    government in this situation?  I can't, I can't venture a guess

2    other than they left him alone, maybe it looks better to have

3    somebody out there who made a misstatement to the FBI, to not

4    charge them in terms of building credibility of the other people.

5           Paul Allen.  Paul Allen the CEO.  And you heard this

6    morning that, well, he was a CEO.  Then why wouldn't he know

7    everything?  You heard what Mr., what Mr. Farkas said about Paul

8    Allen.  He had, he had certain strengths, but his strengths were

9    not in running the whole company and knowing everything, and he

10   was operating out of Virginia.

11          And, you know, this, too, I think, was important:  Do

12   you remember Mr. Farkas spoke of Paul Allen and he said he's very

13   smart?  You did not hear anything from Lee Farkas that sought to

14   demean or discredit any of these people with whom he was working.

15   He respected these people.  These people worked together.

16          The government points out to you things that they think

17   show that Lee Farkas was not telling the truth, but given the

18   standards and the, and the framework for analysis, if you have a

19   doubt about that, if you hesitate about that, then you've got to

20   find Lee Farkas not guilty, because that's what this is about.  If

21   you hesitate about any of his testimony, then you have a

22   reasonable doubt under the instructions that the Court is going to

23   tell you and under what common sense tells you a reason to doubt

24   is.  Something that causes you to say, whoa, I'm not sure I want

25   to go there, that's a reasonable doubt.

1          When did, when did Paul Allen plead guilty?  April 1, as
2   I mentioned before.  That is something that on the eve of trial,
3   he decides that he wants to plead guilty.

4          And I asked him this question:  "Between August 2009 and
5   March 2011, did you consider pleading guilty to any crime during
6   that time?"

7          And his answer was, "I am trying to remember."

8          That's not something that you would forget.  "I'm trying
9   to remember that"?

10         And what does that tell you?  That during all of that
11  time, he was not pleading guilty because he believed he was not
12  guilty, but on the eve of trial, the pressure was too great for
13  him.  And he said what he wanted out of this:  "the shortest
14  amount of time that I have to spend away from my wife and
15  children."

16         So what was Paul Allen's role?  He was in charge of
17  Ocala Funding.  His responsibility was Ocala Funding.  The
18  government can try to build whatever they want in terms of the
19  relationship and what kind of effect Lee had on him, and when Lee
20  said, "I could kill you for talking to Colonial," why?  You heard
21  what Mr. Farkas said.  He wanted the different parts of TBW to be
22  separate, to take care of their own business.  But even that, that
23  one little e-mail, "I would kill you," I think I asked Allen, "Did
24  you take that literally?"

25         No, he didn't take that literally.

1    The government keeps pulling into this case little

2    excerpts of things to try to make it sound like they are somehow

3    or other indications of guilt, and in the whole framework of a

4    life, of a life at a company, of the interaction of a company,

5    that's not enough to carry the day for them.

6    Desiree Brown.  Desiree Brown, I think, was probably the

7    witness that the government relied upon the most, and if you

8    remember -- and you have to trust your memory on this, not what I

9    tell you -- if you remember, she continually said, "Probably.

10   Probably."

11   The government asked whether or not something was Plan

12   B.  She said, "Probably."  Well, if you're talking about a reason

13   to doubt and somebody tells you, "Probably" -- and you'll

14   remember, I think it was, it was Bowman who kept saying, "I

15   believe, I believe" -- those phrases are important.

16   You know, in this situation, which I've described to you

17   as a magnification of moments, you've got to seize upon some of

18   these kind of things and, and decide whether or not they give you

19   confidence, and when somebody answers important questions like

20   this -- and she was well-programmed; she was a yes-no all the way

21   along -- when they start to answer questions like this and say,

22   "Probably," you've got to hesitate.  You've got to have a doubt.

23   If one, if one goes to a physician seeking some kind of,

24   of answer to an important condition and the physician says, "You

25   need to have a major operation," and you say, "Are you sure?" and

1   the physician says, "Probably," well, would you hesitate before

2   you'd say yes to that?  Of course you would.  So these phrases in

3   a trial like this are important phrases to consider.

4          And she did use the word "stealing."  You know, when I

5   asked her, I said, "Well, when you pay -- when you borrow money

6   from a bank and you pay interest on it, is that stealing?" and

7   yes, she said yes to that, too.  It's nonsensical.

8          Now, I know, of course, the government -- and they

9   talked about this -- the government wants to say, well, if you

10  take money and you're not going to be able to pay it back and

11  there's going to be a deficit, it is stealing, but it's not.  But

12  why did she use that word, "stealing"?  The same kind of reason

13  that we heard so many of these words:  Use the pejorative term.

14  Use "stealing."  Call it stealing because that has a more dramatic

15  effect.

16         And one of the things she said probably to was the

17  question about a Mickey Mouse loan.  You know, some things kind of

18  jump out at you, because they kind of come out of left field, and

19  so when the government asked -- "This Mickey Mouse loan, what was

20  it?  Was it a Plan B?" and she said, "Probably."

21         And Project Squirrel, I don't know how -- some of you

22  may or may not know the phrase.  Your parents may have said, "We

23  want to squirrel away money for a project; we want to do something

24  like that."  There's nothing malignant in using the term

25  "squirrel," and she decided to call it "Project Squirrel."  You

1    know, these terms, "Project Squirrel," "Plan B," kind of catch

2    phrases that the government uses, why?  Because they are a neat

3    little hook that the government thinks that they can hang this

4    case on and therefore encourage you to find Lee Farkas guilty.

5           What did, what did Farkas say about Plan B?  "I don't

6    remember what Plan B was," because what did they want to know?

7    Plan B was a lot of things.  It was an alternative.

8           Listen, is there any question that they were, that they

9    were running short, that there were overdrafts?  No.  Did Lee

10   Farkas have any control about the bank's overdraft treatment,

11   about the bank's sweeping?  None.  Those were strictly up to the

12   bank.

13          He could not say, "I want you to take money out of one

14   account and sweep it."  That was all Cathie Kissick's ability to

15   do.  So really, Cathie Kissick controlled TBW, had all of the kind

16   of security from TBW.

17          And when Desiree Brown was communicating with Teresa

18   Kelly or Cathie Kissick, this was all done not in a malignant way.

19   These were benign transactions.

20          Were mistakes made?  Were there some double-pledge loans

21   out there?  Sure there were.  But, you know, you've heard that

22   from the testimony, including the lady from the Bank of America,

23   Ms. Kogut I think her name was, who said yes, even in her

24   operation, mistakes are made.

25          So what, what do we do with Desiree Brown?  She is

1    another one who she pled February 24, another late pleader.  She,

2    too, wants to get on the right side of the government.  Makes

3    sense, everybody understands that, but that's what your common

4    knowledge tells you.

5            Does it make sense that she would stay with Lee Farkas

6    for all of this time if she thought she were committing crimes all

7    of this time?  She got a good salary in the end, but that's not

8    what it was at the beginning.  And so what is, what is the only

9    commonsense response to that?  She thought they were trying to fix

10   it.  She, she thought that by doing this, these transactions with

11   Teresa Kelly, who could send loans back and say, "Hey, these are

12   no good," that they would fix the problem, just as Cathie Kissick

13   always thought they would fix the problem.

14           And she said -- and this is a quote from her, too -- "I

15   thought there could be collateral in the MSRs" -- mortgage

16   servicing rights -- "and the real estate owned," but she never

17   read the documents, either.  As I said before, nobody ever read

18   the documents.

19           And Sean Ragland.  Sean Ragland, March 30 he pled,

20   another late pleader, three or four days before the trial.  Paul

21   Allen was his boss, and he, he was the one who said that there was

22   an inflated accounts receivable, the $536 million accounts

23   receivable, and he discussed it with Delton de Armas.

24           Well, you know, he said -- and I thought quite

25   honestly -- yes, Delton de Armas had his reasons, Delton de Armas

1  was experienced, but again, if anyone looks at this, if anyone

2  looks at TBW's financial statements, I think there are, like, $590

3  million on the accounts receivable line, 536 was on this specific

4  line.  Would an auditor have looked at that and said, "Whoa, let

5  me, let me double-check that"?  Well, this all passed the audit

6  requirements.  Deloitte signed off on this audit.  It was out

7  there.  There's no reason to think that there was anything wrong

8  with it.

9          So what do we have with, with the six coconspirators?

10  We have the six coconspirators compromised by at least half of

11  them telling the government at the beginning there was nothing

12  wrong.  We have the six coconspirators compromised by the fact

13  that they worked for all these years in this incredible -- with

14  this incredible notion that they were violating the law just to

15  save a relatively low-paying job?  It doesn't make any sense.

16          The only thing that makes any sense is the six

17  coconspirators pled guilty to save their skins because they didn't

18  have the courage that Mr. Farkas has had to come to court and have

19  the government try to prove their case.

20          And the government puts up a lot of evidence that they

21  think proves their case, but remember -- and this omission, I

22  think, is telling from the opening statement -- or the closing

23  argument that you heard from the government -- the government gave

24  you no framework for analysis.  The government said nothing about

25  how "reasonable doubt" is defined, how you treat accomplice

1    testimony, how you treat informer testimony.

2           And there are a lot of other witnesses, and I'm going to

3    go over them in a, in a kind of short way.  Avi Pemper and

4    Girardi, the BNP Paribas and the Deutsche Bank person, did they

5    lose a lot of money?  They said that they did.  Why?  Because once

6    the government took over TBW and Colonial, it was all gone.  And

7    so had it, had it played out, would we know if the ending of this

8    could be a happy story?  We'll never know, because the government

9    acted so precipitously in what, in what they did.

10          Mr. Luria did his after-the-fact accounting.

11   Mr. Peroutka did his accounting, and remember, Peroutka on those

12   summary charts the government showed you didn't even have it

13   right.  He had one account being a Colonial account, but it was

14   really a TBW account, and that was brought out in the examination.

15          And Ms. Fortune -- Mrs. Fortune, who testified that

16   Colonial profited, yes, it's true that anybody could take a look

17   at this and see that Colonial profited from all of these

18   transactions, and the government says, well, it was just a matter

19   of addition.  Anybody who knows how to add could do it.

20          The question you have to ask yourself is so why did the

21   government portray it as something malignant when the truth was,

22   was that in terms of Colonial, it was benign?  They actually did

23   benefit.

24          Now, all of these people who testified are people who

25   testified for the government.  They were cross-examined.  You

1   heard all of their testimony, and you have to decide whether or

2   not, because they are the keys to this, you have to decide whether

3   or not you hesitate before you buy their stories when you put it

4   in the context of what they were facing on the side of the

5   government and the kind of jail time the government was offering

6   them as compared to were they doing this for six or seven years

7   just because they wanted to keep their jobs.

8           They did it for six or seven years because they believed

9   in it, they believed that what they were doing was not criminal,

10  they had no agreement of what the agreement said, they didn't know

11  anything about what under the law could be substituted for

12  collateral, and so when you look at their testimony, it is skewed

13  towards what the government wants them to say, and I understand

14  why:  because they needed to save their skin.

15          That is the highest calling of any person in terms of a

16  person seeking to protect themselves:  I will do what's in my best

17  interest, and what was in their best interest is to testify that

18  yes, we conspired with Lee Farkas.

19          So if it was clear, so good, why did the government have

20  to overreach with, with so many things to try to bring you into

21  the fold of the government's case?  The dining room, for example,

22  and Desiree Brown saying they had pheasant and caviar, where is

23  that coming from?  That's the kind of thing to try to prejudice

24  you, a kind of a populist kind of thing that they were trying to

25  foist upon you in terms of believing that this is part of Lee

1   Farkas's greed.

2          Margaret Potter told you there was a reason for that,

3   there was a reason to have the executive dining room, and she told

4   you that people, regular employees could go there.

5          The flippant comments that Mr. Farkas made going to,

6   sharing a suite with Martha Stewart, why are we looking at that

7   kind of thing?  Only for the same kind of reason:  trying to build

8   its case on these kinds of things.

9          Did Mr. Farkas have a weird sense of humor?  You know

10  the John Welch loans, and I'll talk about those, too, I mean,

11  those bills which were due from 1900 to 1929, when I asked

12  Mr. Farkas about it, what did he say?  He said, "They're overdue."

13  Here's a man on trial basically for his freedom, and he responds

14  with a touch of humor, because those loans were nonsensical.

15         Why were there notes created?  Well, the government says

16  he should have done them without notes.  You know, he's running a

17  huge company, $200 million a day they were doing in the mortgage

18  loan business.  They had a million loans.  And you heard the

19  testimony that a million loans with the mortgage servicing rights

20  were worth $40, $35 or $40 a month.  That's $35 or $40 million a

21  month.  And you, and you multiple that by 12, and you see how much

22  money there was out there in terms of collateral and what could

23  have been used had there been a collapse of TBW, but the

24  government reaches into things like Martha Stewart.

25         He said, "I'm going to share a suite with Martha

1    Stewart," which he said, "How can that be?  I'm not going to spend
2    time in a women's jail."
3         And the fact that he mentioned jail a couple of times,
4    again, this is an example of a sense of humor, of joking, of a
5    lightness of being.  There is no lightness of being in the
6    government's approach to this case, but, you know, human beings
7    live a much larger life, and so to take a moment like this and
8    pass this off as indicative of some kind of criminal intent, I
9    think, is a misuse of in terms of our own common knowledge, a
10   misuse of how people act and relate to one another.
11        The PINs.  The PINs, PINs in this situation were
12   pre-texts, and the PIN, the one PIN that they confronted
13   Mr. Farkas with was a PIN to a friend of his about a piano bar,
14   and from that they're trying to say that again there was something
15   malignant about using PINs.
16        The kickbacks.  Again, the government reaches into, I
17   think, asking Teresa Kelly, "Did you get kickbacks?"  Calling them
18   kickbacks just to use that phrase is another example of reaching
19   so far in to try to make up something that doesn't really have any
20   factual basis.
21        What did she say?  "He sent me tickets to an Aerosmith
22   concert."  Cathie Kissick said that on occasion he would send her
23   flowers or something when she was in the hospital.  There were no
24   kickbacks.  There were no bribes here.  This is not a kickback or
25   bribe case.

1        What does that prove to you?  That proves to you that

2   these people were doing their business believing in their business

3   and believing that they were doing it according to what they could

4   do and that they weren't doing anything illegal.

5        It would have been a big sign post for you if you saw

6   that Lee Farkas was sending checks to some kind of foreign bank

7   account for Cathie Kissick or put together some other bank

8   account.  When you take a look and when you hear what the

9   testimony was in terms of the relationship, the only commonsense

10  conclusion is they were all working together, not in a criminal

11  conspiracy, working together to make money for Colonial Bank,

12  working together to have TBW succeed.  So all of these, all of

13  these kinds of little bits and pieces of evidence are important.

14        You know, the government points, as is its right, to all

15  of the evidence that they thinks supports their case, and I'm

16  pointing you to not just evidence, but to, to the knowledge that

17  comes out of hearing the testimony of why these people said what

18  they did and why the government's efforts to make these things

19  into something malignant, not benign, should be rejected by you,

20  because you cannot say without hesitation, you have a reason to

21  doubt that what they thought they were doing was illegal.

22        And the defense theory of the case, and you'll see that

23  in the instructions, and basically it's that Lee Farkas did not

24  conspire or agree to violate any law, or if laws were violated, he

25  did not intentionally or knowingly violate any laws.  And that's

1 really what this case is going to boil down to:  intentionally or

2 knowingly violate any laws.  And the instruction assumes that

3 there could be laws violated sometimes, but that doesn't mean that

4 somebody is guilty.

5       How much time do I have left, Your Honor?  I didn't take

6 my watch out at the beginning.

7       THE COURT:  You started at 10:40, so you have about 20

8 minutes.

9       MR. ROGOW:  I won't need that long, but --

10       THE COURT:  Fifteen minutes left.

11       MR. ROGOW:  So, so let me go through some of these,

12 these counts.  The, the bank fraud counts -- well, first of all on

13 conspiracy, I've told you what I think the evidence is on

14 conspiracy and why you have to have a reason to doubt that these

15 people agreed to conspire.  Did they enter into some criminal

16 conspiracy by agreement?  And I think that there's plenty of

17 reason to doubt that.

18       The counts.  Count 2, he caused Colonial to wire $76

19 million to LaSalle; Count 3, he caused Colonial to wire 60

20 million; Count 4, he caused Colonial to wire 154 million; 5, he

21 caused Colonial to wire 46 million; 6, he caused 59 million to be

22 wired; 7, he caused $31 million to be wired.

23       Now, what the government is going to say is, well, sure,

24 he didn't do it.  He didn't push the button to send that wire, but

25 as part of the conspiracy, he's responsible for it.

1          If there were a conspiracy, the government would be

2    right, but if there's not a conspiracy, the government isn't

3    right.   If the government hasn't proven beyond a reasonable doubt

4    that there was a conspiracy, then none of these counts can stand.

5          And the same thing with the wire fraud.   Count 8, he

6    caused a $25 million wire from LaSalle; Count 9, he caused an

7    e-mail from Platinum's CEO to FDIC; Count 10, he caused a $46

8    million wire from Colonial to LaSalle; Count 11, he caused a $46

9    million wire from Colonial to LaSalle.

10         Again, all of these things depend upon there having been

11   a conspiracy.   All of these things depend upon the government

12   having, having proven beyond a reasonable doubt that there was an

13   agreement between these parties -- and in this situation, it's the

14   TARP -- allegations he was defrauding TARP -- that they were

15   defrauding TARP -- and again, you come down to what I think this

16   case is about from the beginning:   Did these good people conspire

17   with one another?   Did they conspire with one another to break the

18   law?

19         And in the TARP thing, this is Manny Friedman, and this

20   is the March 31 press release.   You know, I think that the

21   testimony here was very interesting.   Paul Allen agreed that he

22   was the one that was dealing with Manny Friedman, and there is an

23   e-mail in which Paul Allen tells Lee on the eve of the March 31

24   deadline, or assumed deadline, that Manny Friedman was in.

25         We never heard from Manny Friedman.   What we, what we

1    did hear was that Paul Allen believed because he sent that e-mail

2    that Manny Friedman was in on the, on the TARP application $300

3    million amount.

4           Now, what does all of that take us to?  Well, in terms

5    of the TARP situation, there is a document, I'm going to give you

6    that document number, too, just before I finish, where it's clear

7    if you read the March 31 application -- or the stock purchase

8    agreement, it leaves open the possibility that there is going to

9    be more.  It talks about contingencies and reasonable, taking

10   reasonable commercial steps and things like that, and we know two

11   things.  We know it from Mr. Bruno.

12          You know, Mr. Bruno may have said he thought that was

13   the final list, but I don't know how he could say he thought that

14   was the final list when there was a final list.  The final list

15   was the May 22 stock purchase agreement which had the signatures

16   of every one of the stock purchasers, every one.

17          You take a look -- and I'll give you that number in a

18   minute -- you take a look at the May 22 stock purchase agreement,

19   and everybody signs on the dotted line, and Manny Friedman is not

20   there, because Manny Friedman was there at the beginning, because

21   Paul Allen told Lee Farkas that Manny Friedman was in.

22          And so how can John Bruno say this was it, the final

23   list, when John Bruno himself agreed that there was a list, the

24   final list?  And if you take a look at the March 31 stock purchase

25   agreement, the only signature you see from purchasers is Lee

1   Farkas for TBW.  So there was no misrepresentation.

2          And the next day, when it turned out that, that people

3   were concerned about that, it was being addressed, and it got

4   addressed.  Indeed, I think this was -- the stock purchase

5   agreement I'm talking about was the second amended stock purchase

6   agreement.  That was May 22.  The first amended one took place

7   April 30.  So there was more to it.

8          And, you know, like everything in this case, there's

9   always more to the story.  As Paul Harvey used to say when he told

10   the story, here's the story.  Then there's more to the story, the

11   rest of the story.  And so you have to look at this in terms of

12   the rest of the story.

13          And the other counts, 14, 15, and 16 dealing with

14   securities fraud, the 10-K, the 8-Q, I've told you already about

15   Colonial Bank.  Lee Farkas didn't cause those to be fraudulent

16   submissions to the Securities and Exchange Commission.  Colonial

17   Bank did those things.  Colonial Bank did those things.  They had

18   Kamal Hosein; they had Sarah Moore; they had their auditors; they

19   had Bobby Lowder, the president; all of those people looked at

20   those things.  If they had a question about the Mortgage Warehouse

21   Lending Division, did they make any inquiry into it?  No,

22   apparently not, although it was easy enough to do.

23          And by the way, in terms of the capital raise, and this,

24   I think, is another -- you know, I'm trying to give you a picture,

25   a larger picture, because the concern, I think, that one must have

1   as a juror and as a citizen is to magnify a certain little piece

2   and not see the whole picture.  The capital raise ties into this,

3   too.

4         In the capital raise, you heard testimony from Sarah

5   Moore that she and Bobby Lowder, the chairman of the bank, the

6   chairman, by the way, who told Mr. Gaynor, who lost all of his

7   money, that everything was great with Capital Bank, that Bobby

8   Lowder and Sarah Moore went to see Lee Farkas.  They were dealing

9   face to face with Lee Farkas.

10        Would Sarah Moore and Bobby Lowder be dealing face to

11  face with somebody that they thought was defrauding them, fleecing

12  them?  No.  They were seeing Capital Bank -- they were seeing

13  Colonial Bank being helped by Lee Farkas, and indeed, the real

14  theme through all of this if you look at it, as bizarre as this

15  mortgage warehouse lending business is, and it is bizarre, and it

16  is probably almost unintelligible, which in some ways is even

17  enough in and of itself to cause you to hesitate about it in terms

18  of understanding it, they were there talking to Lee Farkas about

19  helping them save Colonial Bank, and Lee Farkas was willing to try

20  to help save Colonial Bank, and that raises a very, very

21  interesting question:  Would Lee Farkas be trying to help save

22  Colonial Bank if he knew Colonial Bank were built on fraud, if he

23  knew Colonial Bank was a house of cards, if he knew Colonial Bank

24  was going to have billions of dollars in losses as a result of

25  him?  No.

1          Now, you may hear the government say in their rebuttal,

2    well, Lee Farkas was going to do this because he was going to be

3    able to perpetuate the fraud by being able to have this control of

4    Colonial Bank.  He bet the farm on Colonial Bank.  If he were

5    going to be part of that capital raise, would he bet the farm, all

6    the greed that the government is talking about?

7          And by the way, cars and planes and stuff like that,

8    that's -- they're looking for motive?  There is no -- that's not a

9    fair kind of thing to do.  Yes, he had some cars.  Yes, he had a

10   plane.  You heard about how important the plane was to his

11   business.  But my question is would he -- if he were greedy, if

12   that were his motive, would he put everything on the line for

13   Colonial Bank if he thought that Colonial Bank were then going to

14   be disintegrating because of fraud?

15         And let me tell you, if Lee Farkas and TBW had this

16   interest in Colonial Bank, there would be regulation and

17   regulators galore that would be looking at it.  It doesn't make

18   any sense.  It doesn't make any common sense.

19         So then you have the question of Lee's testimony.  It is

20   extraordinary, I think the government will concede it's

21   extraordinary for a defendant to testify, and what makes his

22   testimony credible?  Yes, there are some things that he hesitated

23   about.  There are some things that he didn't know.  There are some

24   things he was unclear about, but one thing about his testimony as

25   you heard it was I asked him questions, and he answered in

1    paragraphs.  He told a story.

2              Unlike the witnesses that the government put on, where

3    the government asked the questions, questions which the Court is

4    going to tell you are not evidence, and they just answered yes,

5    no, yes, no, Lee Farkas told you the story.

6              Did -- was he candid about the Mesirow trade

7    assignments?  Yes.  Was he candid about the Welch notes?  Was he

8    candid about the clubhouse notes?  Yes.  How did they come about?

9    They came about because he told someone, "Do a note," and then

10   they had this strange program that generated these notes with

11   addresses that made no sense, with dates for payment that made no

12   sense, with Mesirow trade agreements that were sent over that made

13   no sense.

14             One doesn't have to be an auditor, a rocket scientist, a

15   lawyer, an accountant, or anybody to look at the Mesirow trade

16   assignments and see that they don't have all the things filled in.

17   Mr. Donnelly testified these were no good.  Didn't need

18   Mr. Donnelly to say that.  Anybody could look at that to know they

19   were no good, but that's not the question.  The question is were

20   they sent over with the intent to deceive anybody?  Were they sent

21   over with the intent to perpetuate a fraud?

22             And by the way, if anybody looked at it, you'd know

23   right away if you're going to perpetuate a fraud, you want to do

24   something that is deceptive looking, that makes it look like it's

25   real.  The Lee loans, with the notes due December 31, 1929?  The

1   truth is it's a joke, but it's a sad joke.   It's a sad joke

2   because it gets used here to try to convince you that Lee was, was

3   guilty.

4           Did he have a due from shareholder account?  Yes.  Was

5   it large?  Yes.  Was money borrowed and paid back?  Yes.

6           And Maureen Emig, you know, testified that that next

7   day, that $15 million transfer that they showed you on the summary

8   chart, the next day, the money was paid to, to Colonial Bank.

9           So what does the fact that, that Lee Farkas bring to the

10  table?  It brings to the table your opportunity to take a measure

11  of him in a larger piece, not just how he's been described by the

12  people that the government's put on who were, who were seeking to

13  get their sentences reduced.  It gives you a chance to take a

14  measure of him.

15          It gives you a chance to ask yourself would a fellow be

16  involved in a capital raise for Colonial Bank and try to have

17  Colonial Bank as part of his group of companies or an interest in

18  it if he thought that Colonial Bank was rife with fraud?  No.

19          And, you know, another thing about, about this fraud

20  thing:  Remember, Cathie Kissick said that she would have gone

21  over to Platinum with Lee Farkas.  And again, would Cathie Kissick

22  have gone with Lee Farkas if she thought Cathie Kissick -- I mean,

23  if she thought Lee Farkas were some kind of a fraudster?  I don't

24  think so.

25          These were not bad people.  You know, sometimes they

1   have drug dealers, and they testify against somebody in their, in

2   their drug conspiracy.  That's not these people at all.  These

3   people were hard-working people, trying to do what they could do

4   best for each of their companies.

5           So the question is was there a good faith, an honestly

6   held belief or opinion that what they were doing was okay?  The

7   answer is, I think, yes if you look at it objectively.  The answer

8   is if you look at the documents that I'm going to suggest that you

9   take a look at, that yes, they had a good faith belief that what

10  they were doing was not something illegal.

11          The judge is going to tell you that there's a

12  presumption of innocence, and if there are two conclusions, one of

13  innocence and the other of guilt, the jury must, of course, adopt

14  the conclusion of innocence.

15          And this kind of reminds me of there's a wonderful old

16  story about years ago -- hundreds of years ago in Poland, there

17  was a rabbi, and what he did was try to resolve disputes among

18  people in his community, and one day he's resolving a dispute and

19  he hears one side, and he says to that one side, "You're right."

20          And then he hear the other side, and he says to the

21  other side, "You're right.

22          And then his wife, the rebbetzin, says, "Oh, Great

23  Rabbi, how can he be right and he be right?"

24          And the rabbi says, "You're right, too."

25          And so what you see is a situation where there are many

1   sides of a story and many people can be right, but this

2   instruction that the Court is going to give you, two conclusions,

3   one of innocence, the other of guilt, and "innocence" means proof

4   beyond a reasonable doubt, has not been met by the government,

5   something that causes you to hesitate.

6          If that is there, if you hesitate at all, then you've

7   got a doubt, and there's plenty of evidence in this case to give

8   you a reason to doubt, a reason to doubt the testimony and the way

9   the government has tried to weave that testimony and weave

10  documents and exhibits into making you or trying to convince you

11  that what was going on at TBW and Colonial was a complete criminal

12  enterprise and a product of fraud from start to finish.

13         Now, what exhibits do I think are important for you?

14  Defense Exhibit 227, which is the Kissick to Kelly August 7 e-mail

15  saying, "We have collateral."  Defense Exhibit 2008 (sic), the

16  Kissick e-mail to Kamal Hosein:  "We've been doing it for 20

17  years.  That's why we charge them so much."

18         Defense Exhibit 2, the AOT agreement, and pages 18 and

19  pages 24, those are long agreements which deal with collateral,

20  the kind of collateral, and the cure provisions.  Government's

21  Exhibit 18-26, that's a stock purchase agreement.  If you take a

22  look at page 21, you'll see that it talks about best efforts being

23  used by everyone, and you'll see that it's not signed by all of

24  the purchasers.

25         And Defense Exhibit 655, the May 22 stock purchase

1    agreement, which everyone signs, which makes it clear that that

2    was the final document, and all of this testimony about the March

3    31 being final, being definitive, all of that, it's just a play on

4    words that the government is suggesting to you, because if you

5    look at the real document, the final definitive document is May

6    22, Defense Exhibit 655.

7         Defense Exhibit 204, the credit memo, which lists all of

8    the collateral; and Government's Exhibit 18-16, the TARP letter

9    from the Department of the Treasury that talks about with the

10   express condition that $300 million be raised.

11        And I come back to that because to me, that's kind of

12   emblematic of this case.  This case started with a clear lie by

13   the highest-ranking people at Colonial, and what the government is

14   asking you now to -- suggesting to you now is that all these

15   people who were working in the trenches at Colonial were the ones

16   who were lying and cheating and stealing, and they weren't.  They

17   were trying to make a profit for Colonial, and they did to a

18   billion-and-a-half dollar number, and the people at TBW were

19   trying to catch up with a, with a business that had grown so

20   rapidly, so successfully under the direction of Lee Farkas that it

21   got ahead of itself, and the traffic arteries got clogged, and

22   there were problems, and so the two teams were working together.

23        Desiree Brown will tell you the two teams were working

24   together in a conspiratorial, criminal way, and what I'm

25   suggesting to you is based upon the evidence, you have to have a

1    reason to doubt that.  You have to have a reason to doubt it,

2    because common sense and the human condition tells you it doesn't

3    make any sense.

4           The amount of the hole is not an issue, and it's

5    interesting that Mr. Connolly said the amount of the hole is not

6    an issue, and then he proceeded to tell you a billion here, a

7    billion there, always billion with a "B."  If it didn't make any

8    difference, then why did you hear it?

9           You heard it because that's what a closing argument is

10   from the government, to try to persuade you to do something, but

11   my request of you -- and I'm not arguing to you -- my request of

12   you is you listen to the judge's instructions, you listen to the

13   framework for analysis, and you pay attention to what the

14   Constitution has taught us from the beginning, that your role here

15   is part of the restraint on governmental power, and you should

16   exercise that restraint and find Lee Farkas to be not guilty on

17   each of the counts.  Thank you.

18          THE COURT:  All right, counsel, approach the bench,

19   please.

20          (Bench conference on the record.)

21          THE COURT:  I was watching your body language during

22   part of the closing argument.  And, Mr. Rogow, I didn't want to

23   interrupt your flow, but unfortunately, I probably should have

24   granted the government's request on Friday to specifically tell

25   you not to try to define "reasonable doubt."

1          I'm going to have to caution the jury right now about

2     some of what you said in your closing argument, because it's a

3     misstatement of the law, and I can't let them have statements

4     rattling around in their heads.  At one point, you said that the

5     government had not given the jury a definition of "reasonable

6     doubt."  They can't.  Our circuit doesn't permit that.

7          I'm going to tell the jury, No. 1, that lawyers are not

8     allowed to define "reasonable doubt" and that reasonable doubt is

9     a doubt that is based upon reason, not hesitation.  I have to do

10    that, because it's not fair.  If you'd done it maybe once, I might

11    have let it slip by, but you hit and hit and hit.  And the reason

12    that the government has not defined it, that's not fair, because

13    they can't, and you can't, either.

14          MR. ROGOW:  I was just explaining that because if you

15    have doubt, in my examples, you have to hesitate.

16          THE COURT:  It has to be a reasonable doubt.

17          MR. ROGOW:  Yes, a reason to doubt, and I said that.  I

18    think it would be very prejudicial for you to tell them anything

19    other than a reasonable doubt is something that gives you based

20    upon the evidence a reason to doubt.

21          THE COURT:  No, can't do that.  Fourth Circuit.

22          MR. STOKES:  Judge, if I may?

23          THE COURT:  Yes, Mr. Stokes.

24          MR. STOKES:  Actually, I believe that Mr. Rogow's

25    description of "reasonable doubt" as a reason to doubt is also

1   very misleading and is not a correct statement of the law.  The

2   law is it has to be a reasonable doubt, not a reason to doubt.  A

3   reason to doubt suggests that any reason to doubt is a reasonable

4   doubt, which is clearly not correct.

5           THE COURT:  Well, all right.  I'm going to give them a

6   simple admonition at this point --

7           MR. STOKES:  I understand.

8           THE COURT:  -- but I just want to make sure, again, I

9   didn't want to interrupt you in the middle of your flow, but I

10  think you were over the line, and next time I'll make that line

11  stronger for the next case.

12          MR. STOKES:  If I may, Your Honor, I had intended, and

13  I'll make this very brief, but to comment on his descriptions of

14  what "reasonable doubt" were just to simply point out that it is

15  not a reason to doubt, but it is a reasonable doubt.

16          THE COURT:  All right.

17          MR. ROGOW:  I wish, I wish you had interrupted me to

18  spare me from, from having to suffer this instruction.

19          THE COURT:  Well, I won't, I won't comment on

20  "hesitation," but I am going to tell the jury that lawyers cannot

21  define it --

22          MR. ROGOW:  Fine.

23          THE COURT:  -- and that there's no error on the

24  government's part.

25          MR. ROGOW:  That's fine.

1        THE COURT:  And also -- I'll take care of it, all right?

2        MR. STOKES:  If I may just to be clear, Your Honor, if

3  the Court isn't going to talk about hesitation, may I comment that

4  again the defense has defined it as reason to doubt or reason to

5  hesitate?  The Court will instruct you.  So I want to mention

6  "hesitation" as well.

7        THE COURT:  If you say the word "hesitation" does not

8  appear in the Court's instruction, that's fair game.

9        MR. STOKES:  Fine.  Your Honor, just for clarification,

10  are we -- I may have misunderstood.  Are we taking a break now or

11  later?

12        THE COURT:  We'll take it after.

13        MR. STOKES:  After.

14        THE COURT:  You have 20 minutes.

15        MR. STOKES:  Yes.

16        THE COURT:  Okay.  That's what you've got.  We'll take

17  the break then.

18        MR. STOKES:  All right.

19        (End of bench conference.)

20        THE COURT:  Ladies and gentlemen, it is my job and once

21  we finish with the government's rebuttal and you have your longer

22  morning break, I'm going to give you the legal instructions, but I

23  wanted to clarify something for you now before the rebuttal

24  argument, and that is that under the law, counsel are not

25  permitted to define "reasonable doubt," and when defense counsel

1    indicated the government had not defined "reasonable doubt" for

2    you in their opening statement, that's because the government is

3    not permitted to do so.

4          In fact, the standard of proof beyond a reasonable doubt

5    means exactly what those words mean.  It's a doubt based upon

6    reason, and the Court cannot define because it doesn't need to

7    define what "reasonable doubt" means.  It means a doubt that is

8    based upon reason.

9          You'll hear that again at the end of the Court's

10   instructions, but I wanted to make sure you understood the

11   context.

12         All right, Mr. Stokes, are you ready?

13         MR. STOKES:  Yes, I am, Your Honor.

14                       REBUTTAL ARGUMENT

15                       BY MR. STOKES:

16         Ladies and gentlemen, there doesn't seem to be any

17   dispute that there's a conspiracy here.  I think the only question

18   is whether the conspiracy is one led by that man, Lee Farkas, the

19   defendant, or the government, as the defense claims.

20         Now, there's an old saw in our business for prosecutors

21   and defense lawyers that when the evidence is overwhelming against

22   the defendant, as we submit to you it is in this case, it is

23   absolutely overwhelming, that for the defense, if you've got

24   nothing else to do, you attack the government.

25         Here they're blaming the government for bringing in

1   witnesses and forcing them into pleas and to testifying

2   untruthfully.  We'll leave it to you to decide, you saw the

3   witnesses and you saw them on the stand, as to whether they

4   testified untruthfully and whether the defendant's eight-year

5   fraud scheme was simply a mistake.

6          Now, the defense has repeatedly defined "reasonable

7   doubt" in case, so I just want to direct you in the Court's

8   instructions which it's going to give you, not only read to you

9   but give you a copy, on pages 9 and 10 of those instructions will

10  be the Court's instruction on what "reasonable doubt" is, but I

11  just want to touch very briefly on what it's not, and what it's

12  not is what the defense defined it as.

13         Defense conveniently defined it in a way that was

14  favorable to the defense, and the defense defined it as if you

15  have any hesitation or if you have any reason to doubt, that

16  therefore, you must acquit.  That's not what reasonable doubt is.

17         Juries every day of the week find through evidence

18  presented in court, find defendants guilty despite this, this

19  admittedly high barrier for the government.  The question is

20  simply whether or not you have reasonable doubt as to the

21  evidence, not whether you have any hesitation or any doubt

22  whatsoever.

23         Now, let's talk about what the actual evidence is in

24  this case.  I have 20 minutes.  I'm not going to be able to

25  respond to every single point the defense made.  You might want to

1  shout up and shout "Hallelujah" at this point that it only lasts

2  20 minutes, but I do want to touch on some of the points.

3        As we told you at the very beginning, this is a very

4  simple case.  Taylor Bean was running out of money.  Taylor Bean

5  was experiencing severe cash shortages.  Taylor Bean couldn't make

6  ends meet at the end of the day, and so what did the defendant and

7  his coconspirators do?  The defendant and his coconspirators went

8  out and stole that money, stole it from Colonial Bank, stole it

9  from Deutsche Bank, stole it from BNP.

10        The numbers, as my colleague told you and as I told you

11  at the beginning, are simply staggering, so let's review them

12  quickly.  As of August 3, 2009, there's $500 million of fake

13  loans, pools of loans, of Plan B loans on the AOT facility.

14  There's another $900 million of double-sold loans, loans that have

15  already been sold to Ocala Funding or to Freddie Mac or to both,

16  sitting on Colonial Bank's COLB facility.  There's also another

17  one and a half billion dollars missing from Ocala Funding,

18  staggering numbers, numbers that defense suggests we've tried to

19  magnify small things.

20        Well, let's talk about magnifying small things.  TBW's

21  profits in 2007, as you will see from the exhibits that we

22  admitted, were approximately $26 million.  By August 2009, the

23  defendant and TBW were sitting on a hole at three different banks

24  of roughly $3 billion.  A company that has a net profit of $26

25  million is sitting on a hole of $3 billion.

1          And counsel and the defendant want you to believe that

2     we're magnifying this, just blowing things out of proportion,

3     making things up.  We submit to you that it is, it defies common

4     sense, the common knowledge that counsel repeatedly referred to,

5     it defies common knowledge and common sense that the defendant in

6     a company making $26 million in net profit a year could be sitting

7     on top of $3 billion of fake assets, covering up a $3 billion hole

8     without knowing it, without knowing that his, his CEO, his

9     president, his treasurer, that Cathie Kissick, Teresa Kelly, and

10    others are involved in a fraud scheme.

11         Now, there's a lot of issues, a lot of evidence in the

12    case, so I'm going to try to narrow down what's actually in

13    dispute in this case.  Defendant himself said when he took the

14    stand that you can't sell fake assets to a bank.  Common sense.

15    So there's really no question that TBW couldn't sell those fake

16    pools of loans and those fake loans to the COLB and AOT facility.

17         There's really no dispute, as the defendant agreed on

18    cross-examination, that you can't put fake assets on Colonial's

19    books that end up in the Colonial Bank and Colonial BancGroup's

20    financial statements filed with the public.  Common sense tells

21    you that.

22         What we also know is that the defendant, despite the

23    cross-examination of our witnesses, did not, in fact, rely on any

24    lawyers for Plan B.  During his testimony, he, in fact, said that

25    he didn't know what Plan B was, so clearly, he had not relied on

1   lawyers in order to conduct Plan B.

2           You also know that there's really no dispute that there

3   was, in fact, a $500 million hole on the AOT facility as of August

4   2009.  The defense has put on an expert, and the defendant himself

5   has testified, and nobody has disputed that number.  Nobody has

6   put in any evidence to the contrary.

7           The defendant -- there's really no dispute that there's

8   $900 million of a hole on the COLB facility as of August 2009.

9   Again, defendant's own expert took the stand, presented no

10  contrary evidence.

11          There's also no dispute that one and a half billion

12  dollars is missing from Ocala Funding.  The defendant's only

13  response to that was, "It was too complicated for me.  I didn't

14  know anything about Ocala Funding.  I left that to Paul Allen."

15          What the defendant would have you believe is that there

16  was an eight-year fraud scheme operating under his nose but he was

17  unaware of it.  He would have you believe that Plan B was

18  something that was legal, but he doesn't know what it is, despite

19  being in e-mail after e-mail, writing to Michael Wawrzyniak to go

20  do Plan B, to Teresa Kelly to do Plan B, to Cathie Kissick to

21  recycle talking about Plan B, with Desiree Brown directing her to

22  do Plan B, but the defendant at the time obviously knew what Plan

23  B was but here in court suffers from amnesia, doesn't know what

24  that means.

25          The defendant would also have you believe that there was

1   no fraud scheme, because these people who came in and testified,

2   his coconspirators, pled guilty because the government intimidated

3   them into doing that, and there actually was no conspiracy that

4   they're participating in.  They're simply benighted.  They simply

5   caved to pressure from the government.

6           Now, you've seen all of the plea agreements entered into

7   evidence, and you've heard their testimony, and you certainly will

8   make your own judgment as to whether they -- whether their words

9   that they themselves actually participated in a conspiracy,

10  whether their words that they actually committed fraud are

11  believable or not.

12          Also consider when you look at their plea agreements,

13  look at the last pages, and you'll see that their plea agreements

14  are signed not just by those individuals but by their attorneys as

15  well, and look at the statements that they sign over it, that the

16  attorneys sign over, and question just how believable defense

17  counsel's claim is that these -- and defendant's claim is that

18  these witnesses simply pled guilty because the government

19  intimidated them to.

20          It sounds good for a TV show, maybe a cop movie at

21  night, but really, how realistic is that?  You fortunately have

22  gotten the opportunity to see all these witnesses.  They were

23  brought into court, they were made to testify for hours on end,

24  and you'll be able to judge that for yourself.

25          Really, the, the only question here is whether the

1    defendant is telling the truth.  He took the stand.  He told you

2    what he believed.  So the only question is whether he's telling

3    the truth when he says he wasn't aware of a conspiracy and he

4    wasn't aware of Plan B or the massive hole and the stealing of

5    money from Ocala Funding, and that's it.

6              We submit to you that the defendant's testimony is

7    directly at odds with the evidence in the case.  What we proved to

8    you -- I'm not going to rehash all of the evidence.  You've heard

9    it for two weeks now, you certainly know this, but we've proved to

10   you that there was a fraud scheme.  We've shown you what Plan B

11   was.  We've brought in the witnesses who told you about it.  We've

12   showed you documents supporting it that corroborate those

13   witnesses' testimony, the documents and the e-mails that show that

14   Plan B did, in fact, exist, that there were fake pools of loans on

15   AOT, that there were fake loans on the COLB facility, that there

16   was money stolen from Ocala Funding.  Those documents that were

17   written at the time of the scheme corroborate those witnesses'

18   testimony here in court.

19             Desiree Brown said it to you very simply, we submit to

20   you very convincingly, was that Plan B was essentially simple.  It

21   was stealing.  You can't sell fake assets to a bank and not think

22   it's stealing.

23             Now, we submit to you that the evidence in the case not

24   only showed that the defendant knew of and participated in this

25   fraud scheme -- and to be clear, that's all we need to prove --

1   but that he knew and participated in this fraud scheme, but that

2   he also led it over eight years.

3          One of the key ways you know that is the defendant's

4   testimony on the stand when he stood up and he -- or when he

5   testified that he didn't know what Plan B was.  That was not

6   addressed in the defense closing, and that is because, we submit

7   to you, that it's simply implausible.

8          The defendant in e-mail after e-mail directed people on

9   what Plan B was.  He directed people to recycle.  On the stand, he

10  claims he has no idea what those terms mean.  He thought recycle

11  was reconciling, but you saw his exhibit, Defense Exhibit 209, in

12  which he wrote to Cathie Kissick on the day of the search warrant

13  that there's 50 agents crawling all over us -- or, sorry, I think

14  it was 30 agents crawling all over us, and that if, if those

15  agents get Teresa Kelly's laptop, they'll know about the recycled

16  stuff.

17         Why was he worried about that, and why was he

18  communicating that in a PIN?  Because Plan B was a crime, and

19  recycling it was designed to hide the Plan B.  Defendant was

20  writing it in a PIN, not realizing it would be sent to the

21  government -- or provided to the government, and he was writing

22  about his knowledge of Plan B at that time.  When he came into

23  court, he's conveniently forgotten all of that.  He's forgotten

24  what Plan B is.  He's forgotten what recycling is.

25         We submit to you that that alone is enough to know that

1  if you can't believe the defendant on that absolutely central

2  issue in this case, why should you believe him on anything?

3          You've heard from our coconspirators, who described Plan

4  B in detail.  Five different coconspirators told you in detail

5  what Plan B was:  Cathie Kissick, Desiree Brown, Teresa Kelly, Ray

6  Bowman, and Mike Wawrzyniak.  And to be clear, their testimony

7  wasn't entirely consistent.  They differed at times, because they

8  had different perspectives.  They had different jobs.

9          Mr. Bowman testified that he didn't know what the Plan B

10  data was, but he thought it was made-up data.  Mike Wawrzyniak,

11  who actually pooled the data, told you what it was.  They were

12  double-sold loans, loans that had already been sold to Freddie,

13  WAMU, other banks.  Teresa Kelly told you the same.

14          Desiree Brown told you that she didn't know what Plan B

15  was when she first started working with it but eventually learned

16  through working with the defendant and others.  Desiree Brown also

17  told you she wasn't aware of the overdraft and sweeping or you

18  didn't hear any testimony from her about the overdraft and

19  sweeping before.  So these witnesses all came at this from

20  different perspectives from their different jobs to describe what

21  happened.

22          Three of these witnesses also described to you how Ocala

23  Funding worked, and they described it in detail:  Paul Allen, Sean

24  Ragland, and Desiree Brown.  Importantly, Desiree Brown told you

25  that she didn't report to Paul Allen.  In fact, the defendant kept

1   her from talking to Paul Allen about treasury functions.  Instead,

2   when they needed to decide what to do with Ocala Funding money,

3   where would she go?  You saw the e-mails, and you heard her

4   testimony.  She would go to the defendant to steal the money.

5          Why?  Well, she's already been stealing money, as she

6   described it, with the defendant through Colonial Bank, through

7   Plan B.  Why would she go to the CEO, who's not part of Plan B?

8   Instead, she went directly to the defendant.

9          In those silos, defendant told you that he kept Desiree

10  Brown from Paul Allen and from Delton de Armas and others because

11  he wanted them to have their own areas of information and not to

12  cross-pollinate and learn from others.  The reason the defendant

13  kept Desiree Brown from Paul Allen and, and Delton de Armas and

14  others is obvious and simple, and we submit to you that the reason

15  is simply that he did not want Paul Allen knowing about Plan B.

16  He kept a tight hold upon information, and he was the conduit

17  through which everything passed.  The reason is he wanted to keep

18  the conspiracy under wraps.  He had to protect himself.

19          You've seen the e-mails.  You've seen the documents.

20  All of these things corroborate these witnesses.  All of these

21  things support their stories.

22          You've heard the recordings with Desiree Brown and

23  Teresa Kelly.  Those recordings, on those recordings, the

24  defendant says he's going to take the blame with Desiree Brown.

25  With Teresa Kelly, he tells her that he's giving her data.  She

1    needs to hang onto it so they can make Colonial's books look the

2    same as the data on his disk.  He's cooking the books.  That's why

3    he's giving her the data.

4         That information again doesn't show that these are

5    automatons on the stand, but instead corroborates their testimony

6    and shows that what was happening at the time of the conspiracy,

7    those e-mails, those transactional documents, match up with what

8    you heard in court and give you a basis for determining whether

9    they're telling you the truth.

10         If you have any doubts, though, about whether or not the

11   defendant knew that fake loans were being sold and fake pools of

12   loans were being sold to Colonial Bank through Plan B, consider

13   the defendant's own fake loans.  This is the man who took out fake

14   loans in John Welch's name, took out loans on John Welch's

15   properties, took out loans on properties that didn't exist, took

16   out loans on a clubhouse, claiming it was seven different condo

17   units, and then has the temerity to come into court and tell you

18   that that's somebody else's fault.  "That's not my fault.  I was

19   just taking out notes."

20         Isn't it convenient that those notes happened to be

21   mortgage notes, those notes happened to be mortgage notes on

22   properties that don't exist, that are properties in other people's

23   names, notes that are -- that have no value?  And isn't it

24   convenient that they're all the defendant's notes?  They're all

25   helping the defendant take money out of the company.

1          If you have any question about that, whether the

2   defendant was involved in Plan B and selling fake notes to

3   Colonial Bank, consider how he got $15 million out of Colonial

4   Bank to pay down his shareholder loan account, that due from

5   account.  He sold Colonial Bank a 15 -- a fake pool of loans for

6   $15 million, took that money, claimed it was his, as you saw in

7   the e-mails, and then -- and the testimony, and then reduced his

8   own shareholder loan account.

9          So the defendant owes his company $15 million.  He pays

10  that down.  How does he get the money to pay his own loan account?

11  He steals it from Colonial Bank.

12         Let me quickly walk through some of the reasons why the

13  defendant's version of these events is simply not believable.

14  First, the defendant, as you've heard from multiple people, sold,

15  sold fake assets for eight years to Colonial Bank.  The

16  defendant's company is the main beneficiary of this.  The bank --

17  I'm sorry, TBW obtained more than $3 billion through fake loan

18  sales and stolen money from Ocala Funding, and that went to

19  benefit not Cathie Kissick, not Teresa Kelly, not Desiree Brown,

20  Paul Allen, or Sean Ragland.  That, that benefited TBW and the

21  defendant personally.

22         So if you are wondering who is behind this fraud scheme,

23  you can simply look at all the toys the defendant had.  You can

24  look at all the, the jets, the boats, the houses, all of those

25  things, and look at that in comparison to what Desiree Brown, what

1  Teresa Kelly, Cathie Kissick, and others got out of this scheme.

2  There's no question that they, they've acknowledged their

3  participation in this scheme, but the defendant was the one who

4  benefited.  The defendant was the one who became magnificently

5  rich out of this scheme.

6          Now, there are a couple of arguments I just want to

7  quickly deal with that the defendant has raised in his --

8  throughout the trial and in closing that we submit to you are

9  simply red herrings, and I want to deal with them quickly, and

10 frankly, I submit to you that they don't really need much more

11 time than to deal with them quickly.

12         First, the defendant has repeatedly referenced the AOT

13 agreement as some sort of basis for why Plan B was permitted.  The

14 AOT agreement, as you may recall, was the agreement that said that

15 you cannot sell fake loans to Colonial Bank, but to the extent

16 that there are counterfeit or fraudulent loans, they can be

17 replaced down the road.

18         Common sense tells you that agreements don't approve the

19 sale of more than $500 million of fake loans to Colonial Bank.

20 That agreement is there simply to allow for, to the extent that a

21 borrower or a broker or somebody engages in some sort of fraud,

22 for that loan to be replaced down the road, not to permit the

23 chairman of the company, of one of the country's largest mortgage

24 companies in the country, to engage in an eight-year scheme of

25 selling fake loans.

1          They also tell you there's no -- in the opening, they

2    told you there was no hole in the books, and now in closing they

3    chide the government for continuing to talk about the hole.  Well,

4    that's because we submit to you it's been definitively proven that

5    there was a gigantic gaping hole at Colonial Bank and at Ocala

6    Funding, and so they've abandoned that argument.

7          You heard from Neil Luria, you heard from Ray Peroutka,

8    but to be clear, it truly doesn't matter if there's a hole there.

9    Selling fake assets to Colonial Bank is in and of itself a crime

10   whether or not there's any hole.

11         Take a look at Government -- I'm sorry, at the jury

12   instructions on page 38 of the jury instructions that the judge is

13   going to give you, and it's going to say that it doesn't matter

14   whether a fraud scheme is successful in order for you to find that

15   there was conspiracy, and the judge will also instruct you on page

16   52 that no one needs to even lose any money.  Obviously, here

17   people lost money, but we don't need to even prove that.

18         The defense also talks about the TARP funds, and we

19   think that this argument the defense makes is emblematic of a lot

20   of what you've heard from the defense in this case, and that is

21   that they argue that this, this agreement on March 31 was not a

22   final agreement.

23         As you've heard, the evidence is that there was a signed

24   agreement on March 31 that was submitted to the SEC, that was

25   filed publicly and was submitted to the FDIC, and later there were

1   amended agreements.  Now, the fact that there were amended

2   agreements does not change the fact that on March 31, there was a

3   signed agreement, signed by the defendant that said here are the

4   investors in Colonial Bank in this capital raise.

5          It was a definitive agreement by its very definition.

6   That it might change down the road has no bearing on whether or

7   not at that point in time the defendant thought or believed or was

8   representing to the FDIC and others that two investors in

9   particular were, in fact, investors:  EJF and South Towne.  The

10  fact that they weren't, that they didn't know they were investors,

11  and that the defendant put the money in for them and stole that

12  money from Ocala Funding, we think, is indicative of what this

13  fraud scheme is really about.

14          THE COURT:  Mr. Stokes, you've got one more minute.

15          MR. STOKES:  Thank you, Your Honor.

16          I just in this last minute want to touch briefly on one

17  last issue with the credibility of the government's witnesses.

18  You have their plea agreements.  You can see what's -- and you saw

19  them on the stand.  You can certainly consider what motives they

20  had to lie and what motives they had to tell the truth.

21          We submit to you that the plea agreement provides that

22  there's a structure and that provides that if they lie, they can

23  be punished for that for, for lying, and their plea agreements can

24  be yanked.  You can certainly consider that in your determination

25  as to whether they were telling you the truth.

1          You can also consider what they didn't say.  They didn't

2    take the stand and tell you elaborate details of conversations

3    with the defendant eight-nine -- seven-eight years ago.  They

4    didn't come and tell you about the defendant said to them, "Hey, I

5    am guilty, and I am going to jail," and let me tell you in

6    explicit and exquisite detail what he said.  If they'd come in and

7    said those sorts of things, you, of course, would say they're not

8    believable.

9          We submit to you that what they did say, the limited

10   information they provided, the limited conversations they

11   provided, that's the hallmark of, of authenticity.  That's because

12   people's memories fade.  They can't remember everything.  They're

13   talking about conversations and events six, seven, eight years

14   ago, and we submit to you that that is the, the mark that their

15   testimony was truthful.

16         The defendant has been -- sold a story to Cathie Kissick

17   and Teresa Kelly for eight years, told them a story that the

18   check's in the mail.  We're going to get there.  We're going to

19   fix this.  We're going to take care of this problem, this hole at

20   Colonial Bank.  Check's coming.  Just wait.  Just give us a little

21   bit more time.

22         In court today, the defendant is trying to sell you the

23   same story.  Defense counsel stood up here and told you it's the

24   government's fault.  If we hadn't shut down this fraud, that he

25   could have dug himself out if we'd only given him a little bit

1   longer.

2          That check's not in the mail.  That check's not coming.

3   That check was never sent, because the defendant didn't have the

4   money.  Instead, he stole the money from Colonial Bank and Ocala

5   Funding.

6          We ask you to go back and deliberate, consider the

7   evidence, and then return the only verdict that this evidence

8   supports, and that is, the defendant is guilty on all counts.

9          THE COURT:  All right, ladies and gentlemen, I'm

10  actually going to change our schedule, because it occurred to me

11  that if I give you a break now, then we still have lunch to deal

12  with, so I think it would be better for you to go to lunch now and

13  come back at 20 after, and then I will give you the instructions,

14  all right?

15         Please remember the case is not over yet, because you

16  can see the law is a bit complicated, and until you get the legal

17  structure which you have to use in deciding the facts of this

18  case, you don't have the whole picture.  So do not in any respect

19  begin your deliberations.  Again, avoid any contact with anyone

20  who might talk to you about the case, and we'll see you back here

21  at 20 after.  Thank you.

22         (Recess from 12:21 p.m., until 1:20 p.m.)

23

24

25

1              CERTIFICATE OF THE REPORTER

2      I certify that the foregoing is a correct excerpt of the

3  record of proceedings in the above-entitled matter.

4

5

6                              _____
                                        /s/
7                              Anneliese J. Thomson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25