IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:10CR200 |
| v. | ) | |
| | ) | Honorable Leonie M. Brinkema |
| LEE BENTLEY FARKAS, | ) | |
| | ) | Sentencing Date:  June 30, 2011 |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Denis J. McInerney, Chief, Fraud

Section of the Criminal Division of the United States Department of Justice, Patrick F. Stokes,

Deputy Chief, and Robert A. Zink, Trial Attorney, and Neil H. MacBride, United States Attorney

for the Eastern District of Virginia, Charles F. Connolly and Paul J. Nathanson, Assistant United

States Attorneys, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing

Commission, Guidelines Manual ("Guidelines" or "U.S.S.G.") § 6A1.2 (Nov. 2010), files this

Position of the United States With Respect to Sentencing of the defendant, Lee Bentley Farkas.

*Introduction*

From 2002 to August 2009 Farkas orchestrated a fraud of staggering proportions – one of

the largest bank fraud schemes in this country's history – through his company, Taylor, Bean &

Whitaker Mortgage Corp. ("TBW").  Farkas spearheaded the sale of more than $1.5 billion in

fake mortgage assets to Colonial Bank, ultimately leaving a deficit of more than $500 million in

its Assignment of Trade ("AOT") financing facility.  He directed the misappropriation of more

than $1.5 billion from Ocala Funding, a commercial-paper vehicle set up by TBW to finance

mortgage purchases and funded by Deutsche Bank ("DB") and BNP Paribas ("BNP").  He oversaw the triple-selling of mortgage loans, worth approximately $900 million, to Colonial Bank, Ocala Funding, and Freddie Mac.  He led an effort to fraudulently obtain another $553 million from the government's Troubled Asset Relief Program ("TARP").  His scheme contributed significantly to the failure of Colonial Bank, wiping out shareholder value in its public parent company, Colonial BancGroup.  And, throughout, Farkas profited handsomely.  As the principal owner of TBW, which would have collapsed in 2002 but for the fraud scheme, Farkas took home millions in salary.  He personally stole more than $40 million from TBW and Colonial Bank.  He acquired a jet, in part, through the sale of fake mortgages.  He diverted TBW money to assemble a large personal collection of expensive antique and collector cars.  He amassed a substantial portfolio of vacation homes, rental properties, restaurants, and small businesses, all financed by TBW.  And he drew attention to himself through charitable giving made possible only because of his fraud.

Farkas fueled his  lifestyle of ostentatious wealth by ripping off banks and attempting to steal from the government, all with little to no regard for the consequences to TBW's or Colonial Bank's employees, thousands of whom lost their jobs when TBW and Colonial Bank closed, or to the shareholders of Colonial BancGroup.  Between 2007 and August 2009, as the country faced one of the worst financial crises in recent history largely sparked by suspect mortgage-related transactions, Farkas ramped up his scheme to rip off banks through sales of fake mortgage assets and by double-and triple-selling mortgage loans.  And to this day, as evidenced by his deceitful testimony on the stand and his written submission to the probation officer, Farkas continues to deny any responsibility for the devastation brought on by the staggering fraud scheme that he initiated and led.

The nature, duration, and scope of Farkas's criminal acts warrant maximum punishment for maximum deterrence.  The Guidelines in this case advise a sentencing range of life, bound by the statutory maximum of 385 years.  In light of Farkas's stunning criminal scheme, giving full force to the advisory Guidelines range here would be fair and just.  Accordingly, the government respectfully submits that an appropriate sentence in this case would be a Guidelines sentence capped at the statutory maximum of 385 years.  Alternatively, the government respectfully recommends a period of years that would ensure that Farkas will remain in prison for life and forcefully promote general deterrence.

### Background[1]

Lee Farkas was the chairman and principal owner of TBW, a mortgage company based in Ocala, Florida.  Colonial Bank was one of the 25 largest depository banks in the country and was based in Montgomery, Alabama.  Colonial's Mortgage Warehouse Lending Division ("MWLD") provided financing to mortgage origination companies, including TBW.  From approximately 2002 through August 2009, Farkas and numerous co-conspirators defrauded three banks of more than $2.9 billion, misled shareholders of Colonial BancGroup, and attempted to fraudulently obtain approximately $553 million from the government's TARP program.

### I.    THE FIVE PHASES OF THE FRAUD SCHEME

At trial, the government proved Farkas led a five-part fraud scheme:

### A.    *Overdraft / sweeping scheme*

Beginning in 2002, Farkas and other co-conspirators engaged in a "sweeping" scheme to hide overdrafts in TBW bank accounts held at Colonial Bank.  TBW ran large overdrafts

---

[1] In light of this Court's familiarity with the facts of this case, the Government includes only a brief overview and recitation of the key facts.

in its Master Account to cover its operating expenses.  To cover up the overdrafts,

conspirators "swept" funds on a daily basis into this account from the Investor Funding

Account, a Colonial Bank-controlled account.[2]  The sweeping scheme, which grew to

approximately $140 million, continued until approximately December 2003.  In addition to

Farkas, other co-conspirators participating in the sweeping scheme included Ray Bowman,

the president of TBW, Cathie Kissick, head of the MWLD at Colonial Bank, and Teresa

Kelly, an MWLD operations supervisor.

### B.    *Plan B on COLB*

In December 2003, Farkas and Kissick implemented "Plan B," a new phase of the

scheme in which they caused the deficit covered up by the sweeping scheme to be moved to the

COLB facility.  While Plan B was initially supposed to be a one-time event, the conspirators

continued to engage in Plan B transactions for years.  Under Plan B, conspirators caused TBW to

engage in fake sales of mortgage assets to Colonial Bank.  TBW pretended to sell mortgage

loans to Colonial Bank, and the bank advanced TBW money for the loans.  In fact, the mortgage

loans either did not exist or had already been sold to other banks or investors.  By mid-2005,

Colonial Bank held approximately $250 million in Plan B loans on its books.  In addition to

Farkas and Kissick, Bowman and Kelly also participated in Plan B.

### C.    *Plan B on AOT*

Plan B on COLB grew to approximately $250 million and, because of the number of

loans involved, became difficult for the conspirators to administer.  In 2005, the conspirators

---

[2] At trial, Farkas argued that the sweeping scheme was not fraudulent because it involved the
movement of TBW funds from the Investor Funding Account to the Master Account.  Farkas's
claim is misleading.  The Investor Funding Account held deposits from investors that had
purchased loans held on a Colonial Bank facility such as COLB.  Typically, Colonial Bank
owned 99% of these COLB loans and TBW owned 1%.  Thus, the bulk of the money in the
Investor Funding Account was owed to Colonial Bank.

moved Plan B from COLB to Colonial's AOT facility.  The AOT facility was intended for the purchase of pools of loans that TBW was in the process of selling or securitizing.  Under this new version of Plan B, the conspirators engaged in fake sales of pools of loans to Colonial Bank, and in return TBW received over $1.3 billion from Colonial Bank from mid-2005 through mid-2008.  The Plan B pools of loans that TBW sold Colonial Bank consisted of nothing more than data for pools of loans that TBW had already sold to other investors.  As such, the Plan B data was worthless to Colonial Bank.  TBW paid down some of the Plan B balance on AOT over time and, by August 2009, Colonial Bank held approximately $500 million worth of worthless Plan B pools on the AOT facility.  Other co-conspirators involved with Plan B on AOT included Brown, Kissick, and Kelly.  Farkas and Brown also failed to disclose to Kissick and Kelly that approximately $700 million worth of loans they had sold to AOT were in fact double sold, paid in full, or charged off.  As a result of Plan B and the sale of worthless loans to Colonial Bank, Colonial BancGroup, the public holding company for the bank, significantly overstated the mortgage assets held by the MWLD in BancGroup's public financial filings, including its annual reports (Forms 10-K) and quarterly reports (Forms 10-Q).

### D.  *Ocala Funding ("OF")*

OF was a standalone subsidiary of TBW.  It was designed to provide low-cost funding to TBW for additional mortgage loan originations.  It was also set up to be bankruptcy remote.  OF issued commercial paper (corporate IOUs) to investors in return for cash.  OF would then use the cash to fund mortgage loans at TBW.  OF was required to have at all times more assets (cash + loans) than liabilities (the commercial paper + subordinated debt).  And, OF cash could only be used for OF purposes.  When TBW ceased operations in August 2009, there were two investors in OF:  DB and BNP, who owned a combined $1.75 billion in commercial paper.  Farkas and co-

conspirators caused nearly all of the assets in OF to be stripped out and used to pay other TBW expenses, including mandatory servicing advances to investors in mortgage-backed securities TBW had sold.  To cover up the missing assets, Farkas and other co-conspirators caused OF loans already sold to Freddie Mac to continue to appear as collateral at Colonial Bank and OF. As a result, Colonial Bank believed it owned $900 million in loans that had already been sold to Freddie Mac, and DB and BNP, as the investors in OF, believed they had approximately $1.67 billion in loan collateral backing their supposedly asset-backed commercial paper when in fact there was only collateral of roughly $160 million.  Paul Allen, TBW's CEO, and Sean Ragland, a TBW financial analyst, facilitated the conspiracy by causing false collateral reports to be sent to DB and BNP as well as the custodian for OF, LaSalle Bank (purchased by Bank of America in 2007), that inflated by hundreds of millions of dollars the actual value of the collateral backing the commercial paper.  Kissick and Kelly were not involved in the OF phase of the fraud scheme, and Colonial Bank was a victim of this fraud.

       **E**.   *Capital Raise*

In the fall of 2008, Colonial BancGroup, Colonial Bank's holding company, applied for more than $550 million of TARP funds.  Colonial BancGroup was approved for $553 million contingent upon its raising an additional $300 million in private capital.  In early 2009, TBW undertook to lead the capital raise.  TBW said it would invest $150 million itself and would find two private equity investors to invest $50 million each.  Colonial BancGroup undertook to raise the remaining $50 million from other companies with which it did business.  Ultimately, Colonial BancGroup announced on March 31, 2009, that it had met its contingency.  That was false; TBW had falsely represented the participation of the two $50 million private equity investors and misrepresented the source of TBW's 10% deposit.  Moreover, Colonial

BancGroup's TARP application, which incorporated the bank's financial statements, was materially false in that the fraud scheme caused the bank to significantly overstate the value of mortgage assets on its books.  Farkas and Allen were involved in falsely representing the participation of the two $50 million private equity investors.  And Farkas directed Brown in obtaining a $25 million deposit on behalf of TBW and the two equity investors by taking the money from OF.  While Kissick was not aware of Farkas's misrepresentations regarding the equity investors, she knew that Colonial BancGroup's TARP application relied upon false bank financial data.

## II.     FARKAS'S PERSONAL GAIN FROM THE SCHEME

Farkas pulled tens of millions of dollars out of TBW—in excess of his millions of dollars in salary and bonuses—in order to support his lifestyle.  He caused TBW to originate at least 24 fraudulent loans, totaling at least $7.3 million, which he used to fund the purchase of real estate for himself and others, to fund bars he operated in Ft. Lauderdale and Atlanta, and to pay, in part, for the purchase of a $28 million private jet.  Farkas took out these loans, identified at trial as "Lee loans," on properties he did not own or that did not exist and in the names of others—real people whose identity the defendant used as the borrowers on many of these loans, without their knowledge.  Farkas never made payments on these loans, never executed or recorded mortgages to accompany the loan promissory notes, and the loans were sold to Colonial Bank as part of mortgage pools in fraudulent Plan B transactions or otherwise funded by Colonial Bank.

Tens of millions of additional dollars Farkas pulled out of TBW for his personal use are reflected on TBW's general ledger in receivable accounts—Farkas's personal "due from shareholder" account and "due from" accounts associated with his personal entities, like 3201 Partnership and the businesses that owned his bars, restaurants, and health clubs.  When TBW

accountants could tell Farkas was moving money out the door for non-TBW purposes, they dutifully recorded the amounts in "due from" accounts.  When TBW collapsed, Farkas's due from shareholder account and the due from 3201 Partnership accounts had a total balance of nearly $20 million.  And as was proven at trial, this balance is understated by $15 million.  The only time Farkas ever meaningfully paid down his "due from" accounts was with a fraudulent $15 million Plan B advance in connection with the sale of a fake pool of mortgage loans to Colonial Bank, so he could pay down his due from shareholder account and bring an end to the attention it was receiving from TBW's other lenders.  As these numbers make clear, Farkas's extravagant lifestyle required enormous amounts of money, and his massive fraud kept TBW in business and able to meet the demands his lifestyle placed on it.

### Argument

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Guidelines are now advisory.  *United States v. Booker*, 543 U.S. 220, 261 (2005).  As such, "[i]n the wake of *Booker* . . . the discretion of the sentencing court is no longer bound by the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  The Supreme Court subsequently clarified that this means that the sentencing court "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007), *quoted in Nelson v. United States*, 129 S. Ct. 890, 892 (2009).  Nevertheless, "sentencing courts are not left with unguided and unbounded sentencing discretion."  *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006).   Instead, at sentencing a court "must first calculate the Guidelines range."  *Nelson,* 129 S. Ct. at 891; *see also Hughes*, 401 F.3d at 546 (holding that a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'") (*quoting Booker*, 542 U.S. at 264).  After appropriately calculating the Guidelines,

a sentencing court must then consider the Guidelines range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate for the individual defendant. *Nelson,* 129 S. Ct. at 891-92; *see also Hughes,* 401 F.3d at 546.

## I.    THE APPROPRIATE GUIDELINES RANGE

The Pre-Sentence Report ("PSR") calculates the defendant's adjusted offense level as 55, which is an astounding 12 levels higher than the highest offense level set forth in the Guidelines. The PSR calculation includes the following enhancements:

- Base offense level of 7;
- 30-level enhancement for loss of more than $400,000,000;
- 6-level enhancement for more than 250 victims;
- 4-level enhancement for substantially jeopardizing the safety and soundness of a financial institution;
- 2-level reduction because the combined enhancement for number of victims and safety and soundness of a financial institution is capped at 8;
- 2-level enhancement for use of sophisticated means;
- 4-level enhancement for role as an organizer and leader of a criminal activity that involved 5 or more participants;
- 2-level enhancement for abuse of trust; and
- 2-level enhancement for obstruction of justice.

The United States has no objections to the PSR and believes that the Probation Officer correctly calculated the defendant's offense level as a 55. Pursuant to U.S.S.G. Chapter 5, however, the PSR limits Farkas's offense level to a 43, with a recommended Guideline sentence of life imprisonment. U.S.S.G. Chapter 5, Part A, Comment. n. 2.

None of the 14 counts on which the defendant was convicted has a statutory maximum of life imprisonment. Section 5G1.2(d) of the Guidelines states that in such a situation "if the sentence imposed on the count carrying the highest statutory maximum is less than the total

punishment, the sentence imposed on one or more of the other counts, shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d).  Consequently, the Guidelines sentence for the defendant is calculated by running each of the 14 statutory maximum sentences of conviction consecutively, to the extent necessary to ensure Farkas spends the rest of his life in prison  Counts one through seven have 30-year statutory maximums, counts eight and nine have 20-year statutory maximums, counts 10 and 11 have 30-year statutory maximums, and counts 14 through 16 have 25-year statutory maximums.  Thus, the defendant faces a total statutory maximum sentence of 385 years.  The defendant appears to contest only the enhancements for number of victims, leadership role, abuse of trust, and obstruction of justice.  *See* Defendant's Objections to PSR.  Nevertheless, the United States sets forth the evidentiary support for each enhancement below.

### A.    *The PSR Correctly Applies a 30-Level Enhancement for Loss Greater than $400,000,000*

The PSR correctly applies a 30-level enhancement pursuant to § 2B1.1(b)(1)(P) because the loss in this case far exceeds $400 million, which is the highest level established by the Guidelines.  At trial, the government proved that Farkas's scheme caused actual losses exceeding $2.9 billion.  In addition, Farkas sought to steal another $553 million from the government's TARP program.  The government's calculation consisted of the following:

### 1.    Plan B Losses of More Than $500 Million

The government established the losses associated with Plan B on AOT in several ways. One, Teresa Kelly testified that she knew AOT had a $500 million "hole" as of August 2009. Trial Tr. vol. 3 (a.m.), 479:16-25, Apr. 6, 2011.  Two, the government's summary witness, Ray Peroutka, identified the historical hole in AOT from approximately January 2008 through August 2009 by comparing Colonial Bank records of the book value of collateral as recorded in the

bank's general ledger and in contemporaneous collateral reports generated by Teresa Kelly. As these reports showed, the deficit in collateral between what Colonial Bank paid TBW and what Colonial Bank actually held in collateral was approximately $500 million as of August 2009. Trial Tr. vol. 8 (a.m.), 2006-07, Apr. 14, 2011 ("Peroutka Tr."); Govt. Exh. 1-700. And, three, Peroutka testified about his review of collateral found at Colonial Bank that was either assigned to AOT or not assigned to any financing facility. By analyzing transaction histories for these loans in TBW's servicing database, FICS, Peroutka identified hundreds of millions of dollars worth of ineligible loans on AOT, including loans that had been double-sold, charged off, or paid in full. From this, Peroutka calculated the deficit in collateral on AOT, giving Farkas credit for thousands of loans not actually assigned to AOT, at approximately $550 million. Peroutka Tr.1999-2006; Govt. Exh. 1-700.

Farkas argued at trial and in a submission to the Probation Officer that excess collateral pledged to other facilities, such as the working capital line of credit and the Overline facility, more than made up for any collateral shortfall on AOT. This argument is not supported by the facts adduced at trial. For example, government witness Neil Luria testified that there was no available collateral to cover the hole at Colonial Bank. Moreover, the defendant's argument ignores the fact that any legitimately pledged collateral could not somehow erase the actual losses caused by his fraudulent transactions. Farkas's argument is akin to a bank robber claiming no harm from his bank heist because he maintained an account at the bank.

### 2.     Ocala Funding Fraud of Approximately $2.4 Billion

Putting aside defendant's arguments about collateral related to Plan B, the losses from the Ocala Funding part of the scheme, which are unrelated to the Plan B losses, are enormous. The government proved that Farkas and his co-conspirators misappropriated approximately $2.4

billion through the Ocala Funding phase of the fraud scheme.  As Peroutka testified, he identified in Colonial Bank and TBW records a collateral shortfall in the Ocala Funding facility of approximately $1.5 billion.  Peroutka Tr. 2016-19; Govt. Exh. 1-700.  This collateral shortfall was confirmed by the testimony of Avi Pemper, Brendon Girardi and Paul Allen that after TBW ceased operations there was little to no collateral backing the $1.7 billion of outstanding commercial paper.  Trial Tr. vol. 6 (a.m.), 1453:5-13 (Apr. 12, 2011) (Allen testifying that in August 2009, the shortage in Ocala Funding was approximately $1.5 billion); Trial Tr. vol. 7 (a.m.), 1804:14-19 (Apr. 12, 2011) (Pemper testifying that in August 2009 the value of the collateral backing BNP's commercial paper was almost nothing.)

Peroutka also identified loans that were pledged to both Colonial Bank and Ocala Funding at the same time they had been sold to Freddie Mac.  Through this double- and triple-pledging scheme, Farkas and his co-conspirators defrauded Colonial Bank of another $900 million.  Peroutka Tr. 2017-18; Govt. Exh. 1-700.

3.    Intended Loss from $553 Million TARP Approval

The government also proved that Farkas fraudulently attempted to obtain $553 million in TARP funds by causing Colonial BancGroup to submit an application based, in part, on the bank's inflated assets in the MWLD.  Farkas also led a group of investors seeking to raise $300 million for Colonial BancGroup to meet a contingency before the government would approve the bank's TARP application.  Unable to identify sufficient interest in the deal, Farkas falsely identified two private equity investors for $50 million each in a definitive agreement signed by him on behalf of other investors, and led an effort to use stolen funds from Ocala Funding to represent escrow deposits by these ostensible investors.  In fact, neither investor had agreed to participate in the capital raise.

**B.**      ***The PSR Correctly Applies a Six-Level Enhancement for More than 250 Victims***

The PSR correctly applies a six-level enhancement pursuant to § 2B1.1(b)(2)(C) because the offense involved more than 250 victims.  The Guidelines define a "victim" as "any person who sustained any part of the actual loss" and includes within that definition "individuals, corporations, companies and associations."  U.S.S.G. § 2B1.1, Comment. n. 1.  The conspiracy directly caused losses to three major financial institutions.  Deutsche Bank and BNP lost a combined $1.7 billion as a direct result of the Ocala Funding portion of the fraud scheme.  *See,* P.S.R., p. 38.  Colonial Bank itself was also a victim.  Evidence at trial established that Colonial Bank lost approximately $1.4 billion through the AOT fraud and the double and triple pledging that resulted from the Ocala Funding fraud.  The FDIC, which is acting as the receiver for Colonial Bank, sets the loss at approximately $2.4 billion.  *See also* PSR ¶ 56 (FDIC identifying actual loss of approximately $1.8 billion).

Beyond the major financial institutions that have been victimized, there are thousands of individuals who are also victims.  At the very least, the 9,291 holders of Colonial BancGroup common stock who owned stock on August 3, 2009 – the day federal agents executed search warrants on Colonial Bank and TBW, and the day the fraud investigation became public – are victims.[3]  By August 4, 2009, the day after the fraud investigation became public, the price of Colonial BancGroup's common stock fell precipitously to $0.49.  By December 17, 2010, Colonial BancGroup's common stock closed at $.007 and thereafter could no longer be publicly traded.  Critically, at no time from August 3, 2009 to December 2010 did Colonial BancGroup's common stock recover to its pre-August 3, 2009 trading price.  Therefore, all individuals who

---

3  The shareholder notice administrator retained by the Department of Justice to distribute victim notifications provided the government with the number of Colonial BancGroup common stock holders as of August 3, 2009.

held Colonial BancGroup common stock as of August 3, 2009 are victims because, once the

fraud was disclosed, the stockholders were unable to sell their stock for a price higher or equal to

the price at which they purchased the stock.

### C.   *The PSR Correctly Applies a Two-Level Enhancement for Substantially Jeopardizing the Safety and Soundness of a Financial Institution*[4]

The PSR correctly applies a two-level enhancement pursuant to § 2B1.1(b)(14)(B)(i)

because the fraud contributed to the failure of Colonial Bank, a financial institution under the

Guidelines and federal law.  The evidence presented at trial showed that as of August 2009,

Colonial Bank's AOT facility was under-collateralized by over $500 million. But this

approximately $500 million hole does not even account for the approximately $900 million of

double—and triple—pledged loans that Colonial Bank believed it owned on the COLB facility.

Given these staggering numbers, it is not surprising that Colonial Bank went into receivership

less than two-weeks after TBW ceased operations.  In fact, the defendant himself predicted this,

repeatedly telling his co-conspirators that if TBW failed, Colonial would soon follow.  *See e.g.*

Trial Tr. vol. 2 (p.m.), 381:7-8, Apr. 5, 2011 (Farkas telling Kelly, if the overdraft is not covered,

"it will be catastrophic to TBW and subsequently to Colonial Bank"); Trial Tr. vol. 2 (a.m.),

233:13-14, Apr. 5, 2011 (Farkas telling Bowman if they did not do Plan B it would "basically

shut our company down and Colonial . . ."); Trial Tr. vol. 4 (a.m.), 781:18-20, Apr. 7, 2011

(Farkas emailing Kissick,"If you make good on your threats, the meltdown will surely be

unpleasant."); Trial Tr. 4 (a.m.), 781:20, Apr. 7, 2011 (Farkas telling Kissick, if Colonial Bank

cut off funding, it "would be unpleasant for [TBW] and unpleasant for [Colonial]"); Trial Tr. 4

---

[4]  Although this enhancement normally calls for a four-level increase, only two levels are added
because of a reduction for overlapping enhancements pursuant to U.S.S.G. § 2B1.1(b)(14)(C).

(a.m.), 832:3, Apr. 7, 2011 (Farkas telling Kissick that if TBW shut down, "Colonial Bank would be the one that would be hurt, because if he blew up, we would blow up").

Nevertheless, the defendant asserts in his objections to the PSR that "there is no evidence that he was the cause of the Colonial Bank failure."  Rather than rely on the evidence at trial, the defendant cites to the FDIC Inspector General Report, issued in April 2010.  That report makes clear that, although the fraud was not the sole cause of Colonial Bank's failure, it was one of the three key factors contributing to the bank's demise.  *See* FDIC, Report of the Inspector General "Material Loss Review of Colonial Bank," at 3.  This is sufficient to trigger the enhancement. *See United States v. Young*, 413 F.3d 727, 732-33 (8th Cir. 2005) (denying a defendant's challenged to a four-level enhancement for substantially jeopardizing the safety and soundness of a financial institution and finding that "nothing in the language requires the offense be the sole cause of jeopardy to the bank's safety and soundness"); *see also United States v. Zech*, 553 F.3d 663, 666 (8th Cir. 2009) (finding that the financial institution's avoidance of insolvency did not preclude application of the enhancement).

Even if this Court were to find that the conspiracy's causal relationship to the failure of Colonial Bank was insufficient to trigger an enhancement under § 2B1.1(b)(14)(B)(i), the enhancement would properly apply under § 2B1.1(b)(14)(B)(ii)(II), which applies if "the offense substantially endangered the solvency or financial security of an organization that . . . had 1,000 or more employees."  There is no dispute that the fraud scheme resulted in the failure of TBW in August 2009 or that TBW had well over 2,000 employees shortly before it ceased operations. There is also no question that TBW is an "organization" under the Guidelines.  *See* U.S.S.G. § 8A1.1.  This fact alone is enough to trigger the four point enhancement under § 2B1.1(b)(14)(B)(ii)(II).

The defendant's conduct is also enough to trigger a two-level enhancement under § 2B1.1(b)(14)(A) because the defendant derived more than $1 million from Colonial Bank. As discussed above, TBW received over a billion dollars from Colonial Bank as a result of the sale of worthless assets. In addition, the defendant himself derived more than $1 million from Colonial Bank through the placement of the fraudulent "Lee loans" on the Colonial Bank facilities. Both of these are sufficient to trigger a two-point enhancement under § 2B1.1(b)(14)(A).[5]

**D.**   ***The PSR Correctly Applies a Two-Level Enhancement for Sophisticated Means***

The PSR correctly applies a two-level enhancement pursuant to § 2B1.1(b)(9)(C) because the fraud scheme involved sophisticated means. The defendant does not appear to object to this enhancement, but, even if he did, the enhancement is well-founded. The defendant led an incredibly complex, eight-year conspiracy that defrauded sophisticated financial institutions and numerous regulators. The conspiracy involved repeated transfers of tens of millions of dollars to hide a growing overdraft. It involved Plan B, in which the conspirators, at the defendant's direction, created fictitious spreadsheets that listed the alleged assets backing hundreds of millions of dollars in advances. In order to ensure that internal bank auditors, regulators, and external auditors did not discover the ongoing fraud, the conspirators would recycle or refresh their fictitious collateral every few months. They also engaged in complicated round trip transactions to hide the fact that the collateral on the AOT facility did not exist. In fact, the extent of the defendant's sophisticated means of covering up the scheme is evidenced by the defendant's persistent, yet erroneous, argument that the specific transactions charged in the indictment—and found to be proven beyond a reasonable doubt by the jury—actually resulted in

---

[5]  This would not result in any change to the offense level because the 2 point reduction under § 2B1.1(b)(14)(C) would not apply.

a net benefit to Colonial Bank.  Any of these facts alone would be enough to justify the

sophisticated means enhancement.  *See* U.S.S.G. § 2B1.1, cmt. n. 8(B) ("'Sophisticated means'

means especially complex or especially intricate offense conduct pertaining to the execution or

concealment of an offense."); *United States v. Milner*, 2008 WL 199703, *6 (E.D.N.C. 2008)

(setting forth cases in which sophisticated means enhancement applies because the conduct at

issue is more complex than the average case).

### E.        *The PSR Correctly Applies a Four-Level Enhancement for Leader or Organizer*

The PSR correctly applies a four-level enhancement pursuant to § 3B1.1(a) because the

defendant was the "organizer or leader of a criminal activity that involved five or more

participants or was otherwise extensive."  *See* PSR, ¶ 60.  Defendant challenges this

enhancement claiming that "it has not been proven that Farkas . . . was the organizer and leader"

of the conspiracy.  *See* Defendant's Objections to PSR, ¶ 60.  Defendant's objection ignores the

overwhelming evidence presented at trial that establishes well beyond a preponderance that the

defendant was in fact the leader of this extensive conspiracy.

There is no dispute that the conspiracy was extensive and that it involved more than five

participants.  In addition to the defendant, six conspirators pleaded guilty and cooperated with

the government.  All six of the cooperating co-conspirators testified that the defendant was the

person from whom they took direction, or learned of the fraud scheme.  *See e.g.* Trial Tr. vol. 2

(a.m.), 232:11-12, Apr. 5, 2011 (Bowman learning of Plan B from Farkas); Trial Tr. vol. 6

(p.m.), 1578:19-10, Apr. 12, 2011 (Brown testifying that Farkas is the decision maker on Plan

B); Trial Tr. vol. 3 (a.m.), 459:4-15, Apr. 6, 2011 (Kelly testifying that, with respect to

"recycling," Farkas would get involved "if the system needed to change"); Trial Tr. vol. 3 (a.m.),

471:15-19, Apr. 6, 2011 (Kelly testifying that when she spoke or emailed with Farkas, it was

with respect to Plan B transactions); Trial Tr. vol. 4 (a.m.), 813:1-10, Apr. 7, 2011 (Kissick

testifying that Farkas was her point of contact at TBW for Plan B, while Desiree Brown was the

TBW employee handling Plan B's day-to-day administration); Trial Tr. vol. 6 (a.m.), 1441:25,

Apr. 12, 2011 (Allen testifying that he learned from Farkas that Farkas had "moved" the Ocala

Funding hole to Colonial Bank).  In short, he was the clear leader of the conspiracy.

　　　The only issue, therefore, is whether the defendant was the leader/organizer (thus subject

to a four-level increase) or a manger/supervisor (thus subject to a three-level increase).  The

Guidelines list seven non-exclusive factors that a court may consider to determine the

defendant's role:  (1) exercise of decision making authority; (2) the nature of the defendant's

participation; (3) whether the defendant recruited accomplices; (4) whether the defendant

claimed a larger share of the proceeds; (5) the defendant's degree in planning or organizing the

offense; (6) the nature and scope of the crime; and (7) the defendant's degree of control over

others.  U.S.S.G. § 3B1.1, Comment. n. 4.  Each one of these factors supports the finding that the

defendant was the leader/organizer of the conspiracy.

　　　As mentioned above, all the co-conspirators described Farkas as the leader.  As the

chairman and owner of TBW, Farkas was the most senior executive involved in the fraud and he

clearly was the decision maker.  His participation was extensive; in fact he was involved in many

decisions related to the details of the fraud, such as what data to send to Colonial and which

private equity firms to claim were investors in the capital raise.  He recruited a number of

accomplices into the scheme, including Bowman, Brown, Allen, and Michael Wawryzniak, a

lower level IT employee at TBW.  As discussed throughout, the defendant was by far the biggest

beneficiary of the fraud.  And, the defendant was actively involved in all five aspects of the

conspiracy and exerted more control over the other co-conspirators than did any other member.

He purposefully excluded certain people from various aspects of the fraud, directed others only to report directly to him, and had direct conversations with a number of lower level employees in an effort to further the fraud scheme.  *See, e.g.,* Trial Tr. vol. 3 (p.m.) 670:17-23, Apr. 6, 2011 (Farkas telling Wawrzyniak what data to pull for Plan B); Trial Tr. vol. 6 (a.m.) 1362:8-12, Apr. 12, 2011 (Farkas precluding Allen from getting information from TBW's treasury department). The overwhelming evidence is that the defendant was the leader and organizer of this massive fraud scheme and a four-level increase is appropriate.

**F.      *The PSR Correctly Applies a Two-Level Enhancement for Abuse of Trust***

The PSR correctly applies a two-level enhancement pursuant to § 3B1.3 for abuse of a position of trust.  *See* PSR, ¶ 66.  The defendant does not appear to object to this enhancement, but does object to the inclusion of one fact supporting the enhancement.  Regardless of the nature of the defendant's objection, the evidence clearly supports the application of the enhancement. *See United States v. Dahlstrom*, 180 F.3d 677, 685 (5th Cir. 1999) (affirming an abuse of trust enhancement for the defendant who was the CEO and president of a private company and noting that "an abuse of position of trust is imposed if a defendant's job places the defendant in a superior position to commit a crime and the defendant takes advantage of that superior position to facilitate the crime."); *United States v. Ragland*, 72 F.3d 500, 503 (6th Cir. 1996) (defining position of trust as one "characterized by substantial discretionary judgment that is ordinarily given considerable deference."); *United States v. Morris*, 18 F.3d 562, 568 (8th Cir. 1994) (affirming district court's application of abuse of trust enhancement for an officer and director of a bank who used her position to commit the offense and to conceal her criminal conduct).

First, there is no dispute that as owner and chairman of TBW, the defendant occupied a position of private trust.  *See* U.S.S.G. § 3B1.3, Comment. n. 1 (defining a position of private

trust as "characterized by professional or managerial discretion" and noting that "persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are non-discretionary in nature").  There is likewise no real dispute that the defendant used his position as owner and chairman of TBW to "facilitate the commission [and] concealment of the offense."  The defendant used his position as owner of TBW to pressure Cathie Kissick to continue with the fraud scheme, even when she expressed frustration and resignation.  The testimony at trial established that whenever Kissick pushed back on engaging in additional fraudulent transactions, the defendant threatened to shut down TBW, which would have exposed the fraud and likely caused Colonial Bank—and Kissick—significant harm.  The defendant also used his position as owner and chairman to control the flow of information, which made detection of the fraud significantly more difficult.  For example, the defendant precluded Paul Allen, the TBW CEO, from talking with Colonial Bank directly.  *See* Trial Tr. vol. 6 (a.m.) 1369:7-9, Apr. 12, 2011 (Farkas telling Allen not to have conversations with Colonial Bank without Farkas's approval).  He also directed Wawryzniak not to discuss the Plan B project that the defendant assigned to him directly.

### G. *The PSR Correctly Applies a Two-Level Enhancement for Obstruction of Justice*

The PSR correctly applies a two-level enhancement pursuant to § 3C1.1 for obstruction of justice based on the defendant's pejurious trial testimony.  *See* PSR, ¶¶ 66-67.  The defendant objects to this enhancement on the grounds that "perjury was not alleged, nor proven at trial, and conviction of a crime for which defendant maintains his innocence is not evidence of perjury." *See* Defendant's Objections to PSR.  Defendant's objections are without merit.  The government need not charge perjury in order for the enhancement to apply.  Rather, the district court must find by a preponderance of the evidence that the defendant perjured himself by giving false

testimony concerning a material matter with the willful intent to provide false testimony.  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

The Court has already determined that the defendant gave false testimony.  In considering the government's request to have the defendant remanded post-verdict, the Court noted that it "agree[d] with what must have been part of the jury's finding that Mr. Farkas . . . was not honest when he testified from the stand."  Trial Tr. vol. 11, 22:14-19, Apr. 19, 2011.  In particular, the Court observed that Farkas's "testimony on the Plan B . . . was vivid, and it was very clear to the Court and, obviously, to the jury that that was not truthful."  Trial Tr. vol. 11, 22:20-22, Apr. 19, 2011.  Indeed, Plan B was a principal component of Farkas's fraud scheme and a central issue at trial.  Farkas took the stand and repeatedly testified that he did not remember what Plan B was, or attempted to explain it away in innocent terms.  *See* Trial Tr. vol. 9 (a.m.), 2292:3-5, Apr. 15, 2011; Trial Tr. vol. 9 (p.m.), 2306:7-12 & 2385:9-14, Apr. 15, 2011.  As the Court recognized, this testimony was patently false and flatly contradicted by the mountain of evidence adduced at trial.

## II.    THE 18 U.S.C. § 3553(A) FACTORS

After calculating the appropriate Guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'"  *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006) (quoting *Green*, 436 F.3d at 455).  Section 3553(a) directs the sentencing court to consider various factors, including the nature and circumstances of the offense and characteristics of the defendant.  In addition, § 3553(a) states that the court must consider other factors, including the need for the sentence "to reflect the seriousness of the

offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(A) & (B).

> **A.**   ***Nature and Circumstances of the Offense, Seriousness of the Offense, Respect for the Law, and Just Punishment for the Offense.***

As set forth above, and as made clear at trial, Farkas orchestrated an eight-year fraud of staggering proportions.  His fraud caused billions of dollars of losses to financial institutions, significantly led to the failures of TBW and Colonial Bank, caused thousands of employees to lose their jobs, and wiped out the investments of thousands of Colonial BancGroup shareholders.

As the Court has noted at each of the sentencings in this case thus far, Farkas's co-conspirators are generally decent people who made terrible decisions and failed to extricate themselves from a fraud scheme spiraling out of control.  Farkas can hardly be included in this category.  For years, he manipulated his co-conspirators and others to his personal advantage.  He celebrated having coerced Cathie Kissick to accede to his demands.  *See, e.g.*, Trial Tr. vol. 6 (p.m.), 1574:6-12, Apr. 12, 2011 (testimony of Desiree Brown).  At TBW, Farkas promoted to key positions individuals who were unqualified and whom he could control and then used them in furtherance of his fraud scheme.  Farkas purposefully limited the information flowing to certain co-conspirators and controlled their communications and interactions with others for his own benefit.

As Brown and Bowman testified, Farkas exploited Kissick's and Kelly's vulnerable positions to steal even more money from Colonial Bank.  At the same time that he used Kissick and Kelly to steal money through Plan B, he deceived them by parking nearly $700 million in worthless loans on AOT (including double-sold, paid-in-full, charged-off, and Lee loans) and double- and triple-pledging nearly $900 million worth of loans to the COLB facility, loans that

were already pledged to Ocala Funding and/or sold to Freddie Mac.  Farkas exemplifies the adage that there is "no honor among thieves."

While Farkas's co-conspirators are by no means victims of his crimes, it has become clear from their testimony at trial and their allocutions at sentencing that Farkas has ruined their lives.  Most have been sentenced to significant periods of incarceration; all will live with the heavy burden of felony convictions and the collateral consequences.  And, critically, no conspirator except Farkas personally profited from the fraud scheme.  While Farkas was pulling tens of millions of dollars out of TBW to support his ostentatious lifestyle, driving exotic cars, and flying in his private jet to vacation homes in Maine and Key West, his co-conspirators were living in fear.

Not only did Farkas mastermind this gargantuan fraud scheme and destroy many lives in the process, but he also continues to show an absolute lack of respect for the law.  In his statement submitted to the Probation Officer, Farkas does more than deny his crime; he suggests he was merely being "Pollyannaish" and "foolishly optimistic."  *See* PSR, ¶69.  He continues to deflect attention away from his sale of hundreds of millions of dollars of fake Plan B assets to Colonial Bank by suggesting he had sufficient collateral pledged to other facilities.  *See id.*  This collateral argument ignores, of course, the nearly $2.4 billion double- and triple-pledging scam he operated on Ocala Funding and Colonial Bank for the simple reason that, as defense arguments make clear, the maximum value of Farkas's supposed collateral was well under $1 billion.

In sentencing Farkas's co-conspirators, the Court took into account as mitigating factors their roles in the fraud scheme as compared to that of Farkas.  The government respectfully requests that in order to satisfy the just punishment requirement of 18 U.S.C. § 3553(a)(2)(A), a

substantial sentence of imprisonment for Farkas must reflect, in part, the unique situation he was in to recruit, control, exploit, and reward—or fail to reward—the co-conspirators in his fraud scheme.  A sentence at the statutory maximum would do just that.

**B.       *The Need to Afford Adequate Deterrence***

The Court must also consider the need for the sentence imposed to afford adequate deterrence.  18 U.S.C. § 3553(a)(2).  In this respect, the government respectfully submits that the statutory maximum sentence of 385 years is also justified.  The government concedes that a statutory maximum sentence is unnecessary for purposes of specific deterrence given that any substantial sentence of incarceration is likely to result in the defendant being imprisoned for life.  But, such a lengthy sentence is appropriate to establish the goal of general deterrence.  And general deterrence is perhaps even more important in complex, corporate fraud cases such as this one, which are often difficult to detect, investigate, and prosecute.  *See, e.g. United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'").

**1.       Specific Deterrence**

Unlike the other six defendants in this case, the sentence imposed on this defendant must serve specific deterrence.  The defendant has yet to acknowledge his illegal conduct.  He has yet to accept responsibility and there is nothing in the record to suggest that, if given the opportunity, this defendant would not once again engage in illegal conduct.  Indeed, even after federal agents raided TBW in August 2009, even after TBW had to shut down and thousands of employees lost their jobs, and even after the defendant knew that there was a federal criminal investigation, the defendant invested millions of dollars in other mortgage companies in an effort to get back into

the game.  *See* PSR, ¶ 92.  Therefore, a substantial sentence is needed for specific deterrence alone.

### 2. General Deterrence

Although the difference between a sentence at the statutory maximum and a term of years ensuring he spend his life in prison may be immaterial to Farkas, sentencing him to the maximum penalty allowed by law will send the most forceful and unequivocal message to senior corporate executives that engaging in fraud and deceit in order to pump up your company or line your own pockets is unacceptable and will have severe consequences.  Only a strong message of deterrence will provide the appropriate disincentives to the very people best-equipped with the means and ability to commit fraud.  That is why courts have recognized that deterrence alone can justify a lengthy sentence.  *See, e.g.*, *U.S. v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008); *United States v. Sagendorf*, 445 F.3d 515, 518 (1st Cir. 2006).

In this case, the defendant was the owner and chairman of a large private company that employed thousands of people.  He personally led an eight year long, multi-billion dollar fraud scheme.  And he personally took over $40 million from his company and from Colonial Bank to finance his extravagant lifestyle.  A very lengthy sentence, particularly one at the statutory maximum sentence of 385 years, will certainly draw the attention of corporate executives and will provide necessary and substantial general deterrence.

### C. *The Need to Avoid Unwarranted Sentencing Disparities*

Imposition of the statutory maximum sentence for Farkas would not create an unwarranted sentencing disparity with sentences already imposed in this case or with respect to sentences imposed in other similar cases across the county.

With regard to the sentences of his co-conspirators, Farkas is simply not similarly situated to any of them.  Each of the cooperating co-defendants pleaded guilty, accepted responsibility for his or her criminal conduct, cooperated with the government, and testified truthfully at trial, in stark contrast to Farkas.  While each of the cooperating co-defendants was involved in discrete parts of the fraud scheme, only Farkas was involved in, and had knowledge of, all aspects of the fraud.  As several witnesses testified, Farkas also limited co-conspirators' access to information, so he could best exploit them.  Further, the evidence at trial established that Farkas was the undisputed leader of the fraud scheme.  He was the overwhelming beneficiary of the scheme, as evidenced by his opulent lifestyle, and he designed the scheme, in large measure, to enrich himself and his company.  Perhaps most significantly, Farkas lied at trial and, with his submission to the Probation Officer, continues to mislead the Court as to his role in the fraud.  A substantial disparity in sentences between Farkas and his co-conspirators is, in light of these circumstances, both entirely warranted and necessary.

The government's sentencing recommendation for Farkas is also fully consistent with sentences imposed by courts across the country on similarly situated white collar defendants. The gravamen of Farkas's crimes is theft by fraud:  he lied to banks, he sold them fake assets, and he sent them bogus collateral records, all designed to help him steal money directly from them.  But he did not just harm financial institutions.  His actions also contributed to Colonial BancGroup shareholders being wiped out, and he attempted to swindle another $553 million from TARP.  These actions warrant comparison to a number of defendants, four of whom are listed below.  These defendants were convicted after trial for committing significant investment frauds and were sentenced to substantial periods of incarceration based on actual, out-of-pocket loss:

1. *Norman Schmidt*, No. 04-CR-103 (D. Colo. 2010) (Defendant convicted at trial for $43 million Ponzi scheme; sentenced to 310 years' imprisonment);

2. *Edward Okun*, No. 08-CR-132 (E.D. Va. 2009) (Defendant convicted at trial for $126 million investment scheme; sentenced to 100 years' imprisonment)[6];

3. *Richard Harkless*, No. 07-CR-18 (C.D. Cal. 2009) (Defendant convicted at trial for $39 million Ponzi scheme; sentenced to 100 years' imprisonment);

4. *Thomas Petters*, No. 08-CR-364 (D. Minn. 2010) (Defendant convicted at trial of $1.8 billion Ponzi scheme; sentenced to 50 years' imprisonment);

Even sentences for white collar defendants who accepted responsibility and pleaded guilty have been significant in cases where the defendant caused significant out-of-pocket loss – losses like those caused by Farkas in this case:

1. *Bernard Madoff*, No. 09-CR-213 (S.D.N.Y 2009) (Defendant pleaded guilty in $13 billion Ponzi scheme; sentenced to 150 years' imprisonment);

2. *Scott Rothstein*, No. 09-CR-60331 (S.D. Fla. 2010) (Defendant pleaded guilty to $430 million Ponzi scheme; sentenced to 50 years' imprisonment);

3. *Louis Pearlman*, No. 07-CR-97 (M.D. Fla. 2008) (Defendant pleaded guilty to $300 million Ponzi scheme; sentenced to 25 years' imprisonment);

4. *Marc Dreier*, No. 09-CR-85 (S.D.N.Y. 2009) (Defendant pleaded guilty to $400 million investment fraud scheme; sentenced to 20 years' imprisonment);

5. *Samuel Israel*, No. 05-CR-1039 (S.D.N.Y. 2005) (Defendant pleaded guilty to $400 million Ponzi scheme; sentenced to 20 years' imprisonment)

White collar cases involving accounting fraud have also yielded substantial sentences. *See, e.g., United States v. Ebbers*, 02-CR-1144 (S.D.N.Y. 2005) (Defendant convicted at trial for $11 billion accounting fraud; sentenced to 25 years' imprisonment). Here, Farkas deserves punishment for the accounting aspect of his crime—the losses suffered by Colonial BancGroup's

---

[6] The 100 year sentence imposed on Edward Okun is the most substantial sentence imposed on a white collar defendant, in this district, in recent history. Okun's sentenced was based, at least in part, on the $126 million in actual, out-of-pocket loss he caused. Here, the actual loss caused by Farkas is nearly $3 billion. This fact alone justifies a more significant period of imprisonment for Farkas.

shareholders.  But, unlike Ebbers, Farkas's crimes did not stop at cooking the books.  He spearheaded a scheme that directly stole billions from financial institutions by selling fake assets, diverting money from bank accounts, and covering up the fraudulent transactions with false documents.  He manufactured fake loans to line his own pockets, and he sold those to Colonial Bank.  And, of course, he attempted to steal another half billion dollars from the government through his TARP scheme.

In light of the nature of Farkas's crimes, his deception on the stand, and his continued lies about his role in the scheme, a sentence at the statutory maximum, or alternatively, one that ensures he spend the rest of his life in prison, when compared with similar sentences identified above, is warranted.

## III.   SENTENCING RECOMMENDATION

As set out above, the government respectfully requests that the Court impose a sentence that gives full force to the Guidelines.  Alternatively, the government respectfully requests that the Court impose a term of years that will ensure Farkas spend the remainder of his life in prison. If the Court chooses to impose a term of years less than 385 years, the government respectfully submits that, in light of the egregious nature of Farkas's crimes and the sentences identified above, a sentence of at least 50 years is appropriate.

### *Forfeiture*

The United States has filed motions seeking the defendant's forfeiture to the United States of all property constituting, or derived from, proceeds he obtained directly or indirectly as the result of his fraud scheme.  In particular, the government has requested a money judgment in the amount of $42,199,597.47, representing $7,330,500 in proceeds Farkas obtained through the issuance of fraudulent mortgage loans, $15 million Farkas obtained from a fraudulent Plan B

transaction and used to pay down his due from shareholder account, and $19,869,097.47 in proceeds Farkas pulled out of TBW and that was recorded in his due from shareholder account and in the receivable accounts associated with his general partnership, 3201 Partnership.  In its motions, the government has also identified real properties, automobiles, and other assets owned in whole or in part by the defendant.  The government respectfully requests entry of the $42.2 million forfeiture money judgment and forfeiture of the identified properties as substitute assets.[7]

### Restitution

The government is still in the process of identifying victims and their loss amounts.  The amount of potential restitution in this case is enormous, with the defendant potentially facing a restitution order of more than $2.9 billion.  While it is unlikely that the victims will recover the full amount from the defendant or his co-conspirators, the government needs additional time to identify victims and the amounts they are owed to ensure they are able to recover ratably from any restitution payments made by Farkas (or the other defendants).  Therefore, after consultation with defense counsel and pursuant to 18 U.S.C. § 3664(d)(5), the government respectfully moves the Court to defer the entry of a restitution order until after Farkas is sentenced and after a hearing is held on the issue sometime in July or August.  This will ensure that late-identified victims and changes to loss figures based on additional review are consistently reflected in each restitution order.

### Conclusion

In accordance with the foregoing and for the reasons stated herein, the United States respectfully requests that the Court impose a sentence at the statutory maximum of 385 years or,

---

[7] The government has continued to uncover assets owned in whole or in part by the defendant and anticipates moving for the forfeiture of additional substitute assets in the near future.

alternatively, a substantial term of years to ensure that Farkas remain in prison for the rest of his

life.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By:          _____/s/_____
Charles F. Connolly
Paul J. Nathanson
Assistant United States Attorneys
Eastern District of Virginia
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Ph:  703.299.3700
Fax:  703.299.3981
Charles.Connolly@usdoj.gov

Denis J. McInerney
United States Department of Justice
Chief, Criminal Division, Fraud Section

By:          _____/s/_____
Patrick F. Stokes
  Deputy Chief
Robert A. Zink
  Trial Attorney
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Ph:  202.305.4232
Fax:  202.514.7021
Patrick.stokes2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2011, I filed electronically the foregoing

Position of the United States with Respect to Sentencing using the CM/ECF system, which will

send a notification of such filing (NEF) to the following:

> William Bruce Cummings
> William B. Cummings P.C.
> P.O. Box 1177
> Alexandria, Virginia 22313
> Ph:  703-836-7997
> wbcpclaw@aol.com

I have also sent a copy of the filing to the following:

> Karen Moran
> Senior U.S. Probation Officer
> Karen_Moran@vaep.uscourts.gov

> _____/s/_____
> Charles F. Connolly
> Assistant United States Attorney
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> Phone:  (703) 299-3700
> Fax:  (703) 299-3981
> Email:  Charles.Connolly@usdoj.gov