IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>) |
| v. | ) 1:10cr200 (LMB) |
| LEE BENTLEY FARKAS, | )<br>)<br>) |
| Defendant. | )<br>)<br>) |

## MEMORANDUM OPINION

On June 30, 2011 the Court held a hearing on the government's Motion for Preliminary Order of Forfeiture and Forfeiture of Substitute Assets. At the close of the hearing, the motion was granted and an Order issued, requiring the defendant, Lee Bentley Farkas ("Farkas"), to "forfeit a money judgment in the amount of $38,541,209.69[1] as the value of the property constituting or derived from proceeds he obtained directly or indirectly as a result" of his fraudulent activities. Order at 2. The Court also found that because the proceeds of the offenses were not available for forfeiture, other property could be forfeited as a substitute for such

---

[1] The government initially sought forfeiture in the amount of $30,724,959.67 and later moved to increase that amount by $11,474,637.80. At the forfeiture hearing, the government deducted accrued interest and submitted a new request for $38,541,209.69, the amount ultimately ordered.

proceeds. Id. This Memorandum Opinion explains in more detail the reasons for granting the motion.

## I. Background

On April 19, 2011 following a jury trial, Farkas was found guilty on fourteen counts including, among other offenses, bank and wire fraud in violation of 18 U.S.C. §§ 1344 and 1343, respectively, and conspiracy to commit bank and wire fraud in violation of 18 U.S.C. § 1349. The fraudulent scheme revolved around defendant's tenure as chairman of Taylor, Bean, and Whitaker Mortgage Corp. (TBW) between 2002 and 2009, during which he and co-conspirators undertook a series of fraudulent measures to hide TBW's financial difficulties, ultimately resulting in over $3.5 billion in losses to various victims. See generally Position of the United States with Respect to Sentencing (summarizing the fraudulent schemes). The fraud evolved over several stages, beginning with conspirators at Colonial Bank agreeing to cover insufficient funds in TBW's account by sweeping Colonial Bank funds into the account overnight to disguise the fact that the TBW account was overdrawn. As the "hole" in TBW's assets with the Bank grew larger, more sophisticated schemes, including Plan B, were initiated. See Apr. 5, 2011 Tr. Vol. 2 383:22-419:19; Apr. 6, 2011 Tr. Vol. 3 426:3-501:7 (testimony of Teresa Kelly). As a further part of Farkas' scheme, he had TBW create a subsidiary,

2

Ocala Funding, which was used to sell mortgage backed securities. The securities sold through this entity lacked proper security, resulting in a shortfall of over $1.5 billion between the worth of the paper and the assets backing it. See Apr. 12, 2011 Tr. Vol. 6 1371:2-1430:22; 1441:20-1449:9; 1452:10-1457:5 (testimony of Paul Allen).

## II. Discussion

The government maintains that Farkas is subject to mandatory forfeiture due to his convictions for bank and wire fraud under 18 U.S.C. §§ 1344 and 1343 and conspiracy to commit these offenses, relying on two statutes as the basis for its forfeiture motion. The criminal forfeiture statute, 18 U.S.C. § 982(a)(2), provides for forfeiture of "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of" bank and wire fraud, and conspiracy to commit such crimes, affecting financial institutions. The procedures for forfeiting such property are governed by 21 U.S.C. § 853. See 18 U.S.C. § 982(b)(1).

A second forfeiture statute, 18 U.S.C. § 981(a)(1)(C), provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation [of 18 U.S.C. § 1344]." Section

981(a)(1)(C)'s provisions are applicable to this case pursuant to 28 U.S.C. § 2461(c).[2]

Four sources of forfeitable funds are at issue in this case[3]:

(1) $15 million paid to TBW for an amount due on defendant's shareholder account;

(2) $8,394,459.67 paid to or for the benefit of defendant from defendant's shareholder account;

(3) $7,330,500 in fraudulent loans originated through TBW ("Lee loans"); and

(4) $11,474,637.80 transferred from TBW to or for the benefit of defendant's general partnership, 3201 Partnership.

**A. The definition of "proceeds" and the nexus requirement**

The primary dispute between Farkas and the government centers on the nexus requirement of the forfeiture statutes, and the extent to which the government has established a

---

[2] 28 U.S.C. § 2461(c) provides:
If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case.
In this case, the government properly included a forfeiture notice in the indictment [Dkt. No. 1 ¶¶ 58-59].

[3] See United States' Mot. for Prelim. Order of Forfeiture & Forfeiture of Substitute Assets & Br. in Supp. Thereof at 5 ("Gov't's Mot.") and United States' Mot. to Am. the Proposed Prelim. Order of Forfeiture & Order Forfeiting Substitute Assets & Br. in Supp. Thereof at 1 ("Gov't's Mot. to Amend").

4

relationship between the funds sought to be forfeited and the offenses of conviction. The government bears the burden of showing by a preponderance of the evidence that there is a substantial connection between the offense and the property sought to be forfeited. United States v. Herder, 594 F.3d 352, 364 (4th Cir. 2010). The parties primarily disagree as to whether funds that were not directly a result of defendant's illegal activity, and were arguably obtained through legitimate TBW business activity during the period of the fraud, are nonetheless forfeitable. The government argues that such funds are tainted by illegality because TBW would not have remained in business in the absence of defendant's fraudulent scheme. The defendant advocates for a narrower construction of the applicable forfeiture statutes that would require a closer fit between the fraud itself and the property. In particular, he argues that the government must show that the money at issue was "tied to the fraud and not money generated by TBW's legitimate business operations." Opp'n to Mot. for Prelim. Order of Forfeiture and Forfeiture of Substitute Assets at 1 ("Def.'s Opp'n").

The defendant faces an uphill battle in arguing that the funds at issue in this case, obtained during the course of the fraud when TBW would have been insolvent but for the fraud, are not subject to forfeiture. First, § 982(a)(2) clearly states

5

that, to be forfeitable, proceeds need not be obtained as a direct result of the crime; indirectly-acquired funds are subject to forfeiture as well. Although neither § 982(a)(2) nor Fourth Circuit case law has defined "proceeds" in this context, the criminal forfeiture provision is to be "liberally construed to effectuate its remedial purposes." 21 U.S.C. § 853(o).

Similarly, section 981(a)(2)(A) defines "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." That statute clarifies that the definition of "proceeds" "is not limited to the net gain or profit realized from the offense." The language of both forfeiture statutes therefore supports the government's contention that TBW funds available to the defendant between 2002 and 2009 were obtained as an indirect result of the fraud, because TBW would not have been in existence without the benefit of the fraud.

Moreover, property is forfeitable if the defendant would not have received it but for his illegal activities. See United States v. Benyo, 384 F. Supp. 2d 909, 914 (E.D. Va. 2005) ("[T]he Government must show that defendants...would not have received the [allegedly forfeitable property] 'but for' the predicate illegal activity."); United States v. Ivanchukov, 405

6

F. Supp. 2d 708, 712-13 (E.D. Va. 2005) (adopting a "but for" nexus test for illegal proceeds under the criminal forfeiture statute and noting the test's use in several other circuits); United States v. Nicolo, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009) (holding that under § 981(a)(2)(A), "proceeds are property that a person would not have but for the criminal offense" (internal quotation marks, citation, and alteration omitted)).

As such, because Farkas' fraudulent activity enabled TBW to remain in the business of obtaining mortgage funding, securitizing mortgages, and selling mortgage-backed securities, "proceeds" must be interpreted sufficiently broadly to capture the defendant's gross receipts even if those receipts cannot be directly attributable to, for example, a particular fraudulent loan. See Nicolo, 597 F. Supp. 2d at 346 ("With respect to forfeiture of fraud proceeds under § 981,... a defendant may be ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits from the scheme."); see also United States v. McHan, 101 F.3d 1027, 1041 (4th Cir. 1996) (noting in the context of the forfeiture of drug proceeds that because in § 853(a)(1) Congress used the word "proceeds" instead of "profits," it meant the term to mean "gross proceeds"); United States v. Boulware, 384 F.3d 794 (9th Cir. 2004) (interpreting 18 U.S.C. § 982 and 21 U.S.C. § 853 as requiring

7

forfeiture of all proceeds without a set-off for amounts of the improperly-obtained loan repaid to the lender).

Defendant argues for a narrower view of "proceeds." He cites to a 1994 Northern District of Illinois case in which the court interpreted "proceeds" in § 981 to mean net revenues, or profits/gains, rather than gross revenues. See Def.'s Opp'n at 4 (extensively quoting United States v. 122,942 Shares of Common Stock of FirstRock Bancorp, Inc., 847 F. Supp. 105 (N.D. Ill. 1994)). However, the government correctly notes that FirstRock Bancorp was decided before the Civil Asset Forfeiture Reform Act (CAFRA), which added to § 981 the definition of "proceeds." As discussed above, CAFRA makes clear that for civil forfeiture purposes, "proceeds" are "not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). Furthermore, the analysis in FirstRock Bancorp is inconsistent with the approach of courts in this district and elsewhere, discussed above, which have found that property is forfeitable where the government establishes that the defendant would not have obtained the property but for his criminal conduct. E.g., Ivanchukov, 405 F. Supp. 2d at 712-13; Nicolo, 597 F. Supp. 2d at 346. The reasoning in those cases is sound and the "but for" test will be applied to the funds at issue in this case.

    1. <u>Forfeiture of direct proceeds: $15 million obtained from Colonial Bank and $7,330,500 in Lee loans</u>

The government seeks forfeiture of $15 million that defendant obtained from Colonial Bank and then applied to his due-from-shareholder account at TBW. To cover that $15 million, Farkas provided a pool of fake loans to Colonial Bank purportedly worth $15 million. In fact, there were no loans actually backing the pool. Farkas used the $15 million to pay down his due-from-shareholder account at TBW. See United States' Reply to Def.'s Opp'n to Mot. for Prelim. Order of Forfeiture and Forfeiture of Substitute Assets at 5 ("Gov't's Reply"); Apr. 11, 2011 Tr. Vol. 5 1304:22-1312:12 (testimony of Maureen Emig). The government also seeks forfeiture of $7,330,500 representing additional fraudulent loans ("Lee loans"). The monies represented on TBW's books as the "Lee loans" were supposed to be securitized by mortgages; however, these mortgages were either taken out in other people's names or were backed by properties that Farkas did not own or that did not actually exist. These fake mortgages were then sold to or funded by Colonial Bank. See Gov't's Reply at 6-7; Apr. 11, 2011 Tr. Vol. 5 1248-1276 (testimony of Special Agent Scott Turner). Farkas used some of the Lee loan funds to purchase a private jet. Apr. 11, 2011 Tr. Vol. 5 1272-1276. The government therefore correctly contends that the $15 million and the Lee loans "were part and parcel of the massive fraud scheme," as Farkas obtained these funds fraudulently by using

fake mortgages as security. Gov't's Reply at 1-2. As such, these funds are direct proceeds of defendant's fraud and subject to forfeiture.

Farkas argues that he actually repaid to Colonial Bank the $15 million he fraudulently obtained to pay down his due-from-shareholder balance at TBW and that the payment benefitted TBW, and not him. Farkas goes on to argue that, at most, he benefitted from the $15 million for only the few hours for which he borrowed it. Def.'s Opp'n at 5. This argument is not persuasive. Farkas obtained the $15 million as a direct result of a fraudulent AOT Plan B transaction and applied the funds to his personal due-from-shareholder account at TBW. It is irrelevant that the $15 million was only in his possession for a short period of time, because the funds were "within [his] sole possession, dominion and control," at some point. Ivanchukov, 405 F. Supp. 2d at 713-14. The government correctly argues that what TBW ultimately did with those funds is also not relevant to the forfeiture determination. First, "defendant is not entitled to a set-off for any portion of the loan that was repaid to the lender" under § 982(a)(2)(A). United States v. Apazidis, No. 10-cr-0707, 2011 WL 1844158, at *7 (E.D.N.Y. May 17, 2011). Moreover, title to the illegally-obtained funds vested in the government at the moment the fraud was committed, and the

government's interest is therefore not contingent on the defendant's ultimate disposition of those funds. 21 U.S.C. § 853(c).

With regard to the $7,330,500 in Lee loans, defendant states that it is "undisputed" that such loans "were simply a way to document money owed by Mr. Farkas to TBW," Def.'s Opp'n at 10, and argues that "the Government has not established how much or even if any of this money represented in these figures ever reached Farkas's hands." Id. at 11. The defendant's characterization of these loans is clearly disputed by the government, which argues that the Lee loans were "part and parcel of the defendant's fraudulent conduct." Gov't's Reply at 6. Indeed, as discussed above, the evidence at trial established that the security for these loans were on properties Farkas did not own or that did not even exist. The government therefore correctly contends that "the false borrowers, addresses, and payment terms on the notes associated with these loans, the lack of payments ever made by the defendant, and the lack of associated mortgages foreclose the defendant's argument that these loans 'were simply a way to document money owed by [him] to TBW' or that they reflected real obligations to pay by the defendant." Id. at 7. Rather, the loans were clearly fraudulent and the proceeds are therefore subject to forfeiture.

11

Accordingly, the $15 million in fraudulently obtained funds from Colonial Bank and the $7,330,500 in Lee loans are forfeitable as "proceeds the [defendant] obtained directly or indirectly" as a result of his fraud.

2. <u>Forfeiture of indirect proceeds: $8,394,459.67 in defendant's due-from-shareholder account and $11,474,637.80 balance in the due-from-3201 Partnership account</u>

The government also seeks to forfeit the funds in defendant's due-from-shareholder account and the due-from-3201 Partnership accounts. As discussed above, to be forfeitable under § 982(a)(2)(A), property must constitute or be derived from proceeds the defendant obtained directly *or indirectly* as a result of the offense. To forfeit property "indirectly derived from" fraudulent activity, the government must have evidence of a nexus to the fraud.

Farkas argues that the government has not proved that the $8,394,459.67 he borrowed from TBW is traceable to the fraudulent schemes being carried out by the conspirators, because TBW "generated substantial cash from its legitimate operations," resulting in the company's ability to make the loans to the defendant. Def.'s Opp'n at 7. He also argues that he was making efforts to pay down the debt, pointing to his monthly payments of $20,000. Id. at 8-9. Lastly, Farkas argues that the funds in the due-from-3201 Partnership accounts were

12

merely bookkeeping adjustments and/or were used for legitimate purposes, which did not result in the defendant personally acquiring any of the money.[4] Def.'s Resp. to (1) United States' Mot. to Am. the Proposed Prelim. Order of Forfeiture; and (2) United States' Reply to Def.'s Opp'n to Mot. for Prelim. Order of Forfeiture and Forfeiture of Substitute Assets at 2-4 ("Def.'s Resp.").

The 3201 Partnership is a general partnership of which defendant is a fifty-percent owner. See Decl. of Special Agent David A. Lehr at 3 [Dkt. No. 288-2]. Moreover, money funneled to defendant's partnership is still forfeitable even if not in his personal possession. See United States v. Vampire Nation, 451 F.3d 189, 202 (3d Cir. 2006) (finding entry of a forfeiture order appropriate when the defendant was no longer in possession of the forfeitable proceeds, because the alternative position "would permit defendants who unlawfully obtain proceeds to dissipate those proceeds and avoid liability for their ill-

---

[4] Defendant also asserts that the funds due from his partnership are not subject to forfeiture because they were borrowed before Plan B was initiated. See Def.'s Resp. at 2; June 30, 2011 Tr. 13:3-5. However, the pertinent date for forfeiture purposes is March of 2002, when the sweeping began. See Apr. 7, 2011 Tr. Vol. 4 762:22-763:7. The sweeping disguised TBW's cash flow problems and marked the beginning of the larger fraudulent scheme. Indeed, the government characterizes the sweeping as the "first phase of th[e] scheme." Apr. 4, 2011 Tr. Vol. 1 6:15-16. The ledgers reflecting the due-from-partnership accounts show initial dates after March of 2002. See Def.'s Resp. Exs. A-C.

gotten gains"); United States v. Capoccia, 402 F. App'x 639, 640 (2d Cir. 2010) ("[P]roperty need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators in order to be subject to forfeiture.").

Moreover, the funds defendant obtained from TBW through the due-from-shareholder and due-from-3201 Partnership accounts would not have been available to him but for his fraud, because TBW would not have remained in business in the absence of the bank and wire fraud scheme. The evidence produced at trial amply demonstrates that TBW was only able to continue its business activities due to the ongoing fraud. See Gov't's Reply at 7-8 (summarizing trial evidence). In this way, the funds the defendant extracted from TBW through these "due from" accounts were "indirectly derived from" the fraud schemes, insofar as he would not have had access to these funds if the direct proceeds from the fraud were not keeping TBW solvent. As the government succinctly states, "TBW's continued existence depended on the defendant's fraud, and the money he pulled out of the company to support his extravagant lifestyle was available to him only because of the fraud." Id. at 9.

Defendant places great significance on the argument that TBW generated revenue from legitimate business operations after the fraud commenced and until the company's demise. See June 30, 2011 Tr. 10:3-25, 11:1. However, whether the specific funds

14

resulted from legitimate or illegal activities at TBW is irrelevant because any funds held by TBW would have been unavailable to defendant but for his fraud. Similarly, any efforts defendant made to repay the loans (insubstantial as those efforts may be) do not affect the calculus, as, again, he obtained the property as a result of his fraud and the government's interest vested at the time of the offense.[5] The nexus requirement is satisfied by tracing defendant's fraud to the continued viability of TBW to defendant's access to the funds sought to be forfeited, demonstrating that he obtained such funds indirectly as a result of his crime.

### B. Forfeiture of substitute assets

Title 21 U.S.C. § 853(p) provides for the mandatory forfeiture of substitute assets if the property, "as a result of any act or omission of the defendant,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

---

[5] The government notes that, had defendant not obtained the fraudulent $15 million payment from Colonial Bank, it would have taken him 145 years to pay off the balance of his due-from-shareholder account with his monthly payments of $20,000. Gov't's Reply at 9.

15

(E) has been commingled with other property which cannot be divided without difficulty."

Through the affidavits it has submitted, the government has established that "the directly traceable proceeds either have been comingled with the Defendant's other assets and cannot be separated without difficulty, have been transferred to third parties, or cannot otherwise be located." Gov't's Mot. at 7; Decls. of Special Agent David A. Lehr [Dkt. Nos. 279-2 and 288-2].

### III. Conclusion

For the reasons stated above, pursuant to 18 U.S.C. §§ 981 and 982, defendant must forfeit to the government $38,541,209.69, which represents the proceeds of the offenses of conviction. Because the requirements of 21 U.S.C. § 853(p) have also been met, the government may forfeit other property as a substitute for the unavailable proceeds.

Entered this 26th day of October, 2011.

Alexandria, Virginia

/s/ 
Leonie M. Brinkema
United States District Judge