IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
        v.                         )          1:10cr00200 (LMB)
                                   )          1:13cv01191 (LMB)
LEE BENTLEY FARKAS,                )
                                   )
            Defendant.             )

MEMORANDUM OPINION

On September 19, 2013, Lee Bentley Farkas ("Farkas" or

"Movant") proceeding pro se timely filed a Motion Under 28 U.S.C.

§ 2255 to Vacate, Set Aside, or Correct Sentence by a Person in

Federal Custody ("Original Motion"). Farkas later retained

counsel, and on October 8, 2013, they filed an Amended Motion

Under 28 U.S.C. § 2255 to Vacate and Set Aside Sentence ("Amended

Motion"), which asserted the same grounds for relief as Farkas

had in his original motion.[1] The government has filed a response

accompanied by declarations submitted by Craig H. Kuglar and

William B. Cummings, two of Farkas's trial counsel. Farkas has

filed a reply. He did not submit any declarations or affidavits

in support of his motions or his reply.

For the reasons that follow, Farkas's motions will be

dismissed with prejudice and his request for discovery and an

evidentiary hearing will be denied as moot.

---

[1] Farkas's original and amended motions are referred to
collectively as his "motions."

I.  FACTUAL BACKGROUND

On June 15, 2010, Farkas was indicted for conspiracy under 18 U.S.C. § 1349 (Count 1); bank fraud under 18 U.S.C. §§ 1344 and 2 (counts 2 through 7); wire fraud under 18 U.S.C. §§ 1343 and 2 (counts 8 through 11); and securities fraud under 18 U.S.C. §§ 1348 and 2 (counts 14 through 16).[2]

On August 10, 2010, over Farkas's objection, Cummings was appointed under the Criminal Justice Act, 18 U.S.C. § 3006(A), to represent Farkas, who had not yet gained access to assets to retain counsel of his choice.  Farkas later obtained sufficient insurance proceeds to retain Cummings as local counsel, and he also retained Kuglar, Bruce Rogow, and Zahra Karinshak to represent him.

Initially, November 1, 2010, was set as the trial date. Later, Farkas moved to transfer his case to the United States District Court for the Middle District of Florida and also to continue the trial date three times.  Farkas's motion to transfer was denied, but his first two requests for a continuance were granted, and the trial began on April 4, 2011.  Following a nine-day jury trial, Farkas was found guilty on all counts.  He was sentenced on June 30, 2011, to 30 years of imprisonment, followed

---

[2] Counts 12 and 13 were dismissed on the government's motion on April 1, 2011.

by three years of supervised release, and extensive restitution and forefeiture obligations were imposed.

Farkas timely noted an appeal in which he challenged the decisions denying his motion to transfer and third motion to continue the trial date; appointing counsel under the Criminal Justice Act; limiting his cross-examination of a government witness, Neil Luria; declining to give a jury instruction defining "beyond a reasonable doubt"; instructing the jury that its "sole interest is to seek the truth from the evidence"; and adjudicating the government's motion for an order of forfeiture.

The United States Court of Appeals for the Fourth Circuit rejected each of the issues Farkas raised on appeal and affirmed the Court's judgment, United States v. Farkas, 474 F. App'x 349 (4th Cir. 2012), finding that there was sufficient evidence at trial to support the jury's decision.  The Fourth Circuit summarized the trial evidence as follows:

> Farkas and his co-conspirators engaged in a multi-stage
> fraud scheme between 2002 and 2009, while Farkas was
> chairman and principal owner of [Taylor, Bean, &
> Whitaker Mortgage Corp. ("TBW")], a mortgage lending
> company based in Ocala, Florida and with offices in
> seven states.  TBW originated and serviced residential
> mortgage loans and sold them, either individually,
> pooled, or as part of a mortgage-backed security, to
> third-party investors and commercial financial
> institutions in the secondary mortgage market.  To fund
> the loans it originated, TBW relied on advances from
> various warehouse banks and purchase facilities, which
> were to be repaid from the proceeds of TBW's sales to
> investors.  TBW received short-term, secured funding

3

from Colonial Bank, a subsidiary of Alabama-based
Colonial BancGroup, and in particular Colonial Bank's
Mortgage Warehouse Lending Division ("MWLD").

Between 2002 and 2003, Farkas and his co-conspirators
engaged in a scheme to disguise overdrafts of TBW's
master advance account held at Colonial Bank by
"sweeping" funds from TBW's investor funding account,
which was also held at Colonial Bank and represented
proceeds from sales of loans to investors in the
secondary market, into and out of the master advance
account. As a result of this sweeping scheme, Colonial
Bank's daily reports did not show the overdrafts.
Farkas's co-conspirators included Ray Bowman, president
of TBW, Cathie Kissick, head of the MWLD at Colonial
Bank, and Teresa Kelly, a MWLD operations supervisor.

As the deficit in TBW's assets with Colonial Bank grew
to well over $100 million, Farkas and his co-
conspirators initiated more sophisticated schemes,
including "Plan B." Under Plan B, they caused TBW to
sell sham mortgage loans and pools of loans to Colonial
Bank. These loans and pools of loans either did not
exist or had already been sold to investors;
accordingly, they were worthless or had significantly
impaired value. Colonial Bank held approximately $250
million in Plan B individual loans on its books by mid-
2005, and by August 2009, Colonial Bank held
approximately $500 million in Plan B pools of loans.
As a result, Colonial BancGroup significantly
overstated the value of its assets in its quarterly and
annual reports to the United States Securities and
Exchange Commission ["S.E.C."].

Relatedly, in furtherance of the scheme, Farkas created
Ocala Funding, a subsidiary of TBW that issued
commercial paper to investors in return for cash, which
in turn was used to fund mortgage loans at TBW. Farkas
and his co-conspirators overstated by hundreds of
millions of dollars the actual value of the collateral
backing the commercial paper and underreported Ocala
Funding's liabilities, ultimately resulting in a
shortfall of more than $1.5 billion. In the final
stage of the scheme, Farkas and his co-conspirators
attempted to fraudulently obtain $553 million for
Colonial BancGroup, Colonial Bank's holding company,

from the Troubled Asset Relief Program, a program that
Congress created to rescue distressed financial
institutions.

Id. at 351-52.

## II.  DISCUSSION

A motion under 28 U.S.C. § 2255 provides for a collateral

attack on a conviction or sentence that was imposed in violation

of the United States Constitution or laws, where the court lacked

jurisdiction to impose the sentence, where the sentence was in

excess of the maximum authorized, or where the sentence or

conviction is otherwise subject to collateral attack.  To

prevail, a movant bears the burden of proving his grounds for

collateral relief by a preponderance of the evidence.  Vanater v.

Boles, 377 F.2d 898, 900 (4th Cir. 1967).  Relief under Section

2255 is designed to correct for fundamental constitutional,

jurisdictional, or other errors, and is therefore reserved for

situations in which failing to grant relief would otherwise

"inherently result [] in a complete miscarriage of justice."

United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting

Hill v. United States, 368 U.S. 424, 428 (1962)).

A Section 2255 motion "may not do service for an appeal,"

and claims that were not appealed are deemed waived and,

therefore, procedurally defaulted unless the movant can show

cause and actual prejudice.  United States v. Frady, 456 U.S.

5

152, 165-67 (1982).  An exception to this standard applies when a defendant brings a claim of constitutionally ineffective assistance of appellate counsel, which can be raised in a collateral challenge.  See United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999).

Farkas's motions assert three basic grounds for relief: (A) ineffective assistance of trial counsel; (B) ineffective assistance of appellate counsel;[3] and (C) the government's violations of Brady v. Maryland, 373 U.S. 83 (1963).  Farkas requests permission to conduct discovery and seeks an evidentiary hearing.

A. **Ineffective Assistance of Trial Counsel**

To sustain his motions based on ineffective assistance of counsel, Farkas must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984), which requires a showing of both deficient performance by counsel and resulting prejudice to the movant.  Deficient performance occurs when "counsel's representation fell below an objective standard of

---

[3] Recognizing that the law in this Circuit requires ineffective assistance of counsel claims to be "reviewed individually, rather than collectively," Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998), Farkas nonetheless argues that "the accumulation of two or more errors can prejudice a defendant in the very same way as a single reversible error," and he raises the issue to preserve it "in the event the law in this Circuit joins the other courts, or if further review is necessitated."  Mem. at 23, 27-28.  As explained below, none of Farkas's individual claims has any merit.  Accordingly, it is not appropriate to consider their cumulative effect.  Fisher, 163 F.3d at 852-53.

reasonableness." Id. at 688. Such a determination "must be highly deferential" with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The reasonableness of a lawyer's trial performance must be "evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances," a standard that is, again, "highly deferential." Kimmelman v. Morrison, 477 U.S. 365, 381 (1986); see also Strickland, 466 U.S. at 689; United States v. Roane, 378 F.3d 382, 404-05 (4th Cir. 2004).

Even if counsel's performance were deficient, to prevail, a movant must also show prejudice; that is, he must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A showing that "the errors had some conceivable effect on the outcome of the proceeding" is not enough; a "reasonable probability" requires that the errors are "sufficient to undermine confidence in the outcome." Id. at 693-94. Essentially, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. Farkas bears the burden of proving both deficient performance and sufficient prejudice

for each of his ineffective assistance claims.  Fields v. Att'y Gen. of State of Md., 956 F.2d 1290, 1297-99 (4th Cir. 1992).

Farkas argues that trial counsel were ineffective because they failed to (1) move for a judgment of acquittal and object to the jury instruction on 18 U.S.C. § 2; (2) challenge the investigation and jurisdiction of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"); (3) research and investigate; (4) prepare for trial; (5) review documents in preparation for cross-examination; (6) object to summary evidence; (7) object to the jury instruction on the definition of a "security"; (8) move to dismiss Count I; (9) object during the government's summation; and (10) review documents produced by the government.  Mem. of Law in Supp. of Amend. Mot. Under 28 U.S.C. § 2255 ("Mem.") at 4-23; Reply Mem. of Law in Supp. of Amend. Mot. Under 28 U.S.C. § 2255 ("Reply").[4]

1. Failure to Move for a Judgment of Acquittal and Object to the Jury Instruction on 18 U.S.C. § 2

Counts 2 through 16 of the indictment charged Farkas with bank, wire, and securities fraud under 18 U.S.C. §§ 1344, 1343, 1348, and 2.  Title 18, Section 2 is entitled "Principals," and provides in full:

---

[4] Farkas's Reply addresses only arguments (1), (2), (6), (7), and (8), and he "rel[ies] on [his] opening brief for any issues . . . not addressed in [his] reply."  Reply at 20.

(a)  Whoever  commits  an  offense  against  the  United
States  or  aids,  abets,  counsels,  commands,  induces  or
procures its commission, is punishable as a principal.

(b)  Whoever willfully causes an act to be done which if
directly  performed  by  him  or  another  would  be  an
offense  against  the  United  States,  is  punishable  as  a
principal.

18 U.S.C. § 2.

At the close of the evidence, the government proposed

separate instructions on the elements for sections 2(a) and 2(b).

Dkt. No. 170 at 51-53.  At the charging conference, Farkas's

counsel argued that the second instruction, dealing with Section

2(b), should be omitted as redundant and the Court agreed.  Opp'n

at Ex. 2 (Charging Conference Transcript).  Ultimately, the jury

was instructed that

a person may violate the law even though he or she does
not personally do each and every act constituting the
offense  if  that  person  'aided  and  abetted'  the
commission of the offense.

\*     \*     \*

Before  a  defendant  may  be  held  responsible  for
aiding  and  abetting  others  in  the  commission  of  a
crime, it is necessary that the government prove beyond
a  reasonable  doubt  that  the  defendant  knowingly  and
deliberately  associated  himself  in  some  way  with  the
crime charged and participated in it with the intent to
commit the crime.
In order to be found guilty of aiding and abetting
the  commission  of  the  crimes  charged  in  Counts  Two
through Sixteen of the indictment, the government must
prove beyond a reasonable doubt that the defendant:
One,  knew  that  the  crime  charged  was  to  be
committed or was being committed,

9

Two knowingly did some act for the purpose of aiding, commanding or encouraging the commission of that crime, and

Three, acted with the intention of causing the crime charged to be committed.

Before the defendant may be found guilty as an aider or an abettor to the crime, the government must prove, beyond a reasonable doubt, that some person or persons committed each of the essential elements of the offenses charged in Counts Two through Eleven and Fourteen through Sixteen of the indictment.

Merely being present at the scene of the crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct for the jury to find that a defendant aided and abetted the commission of that crime.

The government must prove that the defendant knowingly and deliberately associated himself with the crime in some way as a participant—someone who wanted the crime to be committed—not as a mere spectator.

Dkt. No. 262-5 at 43 ("Aiding and Abetting – Explained"). The jury was also instructed as to the definition of "Willfully":

"The term 'willfully', as used in these instructions to describe the alleged state of mind of defendant, means that he knowingly performed an act or failed to act, deliberately and intentionally or 'on purpose' as contrasted with accidentally, carelessly, or unintentionally." Id. at 44.

Farkas argues that trial counsel were ineffective when they failed to move for a judgment of acquittal after the Court misinstructed the jurors under Section 2(a) rather than Section 2(b). Farkas contends that there was no evidence that he shared any criminal intent with the individuals who actually committed the acts charged in the indictment; that is, there was no

10

evidence that the individuals who filed forms with the S.E.C. had any criminal intent or were aware of the unlawful nature of their acts.  Mem. at 4-6; Reply at 4-11.

Farkas also argues that counsel should have objected to the Section 2(a) instruction as an impermissible variance from the charges in the indictment, which he argues was, like the government's case, "structured around Section 2(b)."  Mem. at 6-7.

In response, the government first points out that, contrary to his claim, Farkas's counsel did move for a judgment of acquittal after the government rested.  That motion was denied.  Opp'n, Ex. 1 (Trial Transcript) ("Ex. 1") at 2127.[5]  Second, the government argues that evidence presented at trial was more than sufficient to establish Farkas's role as a principal.  As a principal, the government argues, Farkas "need only have willfully caused" the bank, wire, and securities fraud charged in the indictment; accordingly, the intent of the individuals who physically sent wires or filed forms with the S.E.C. is irrelevant.  Third, given Farkas's counsel's request to have the Section 2(b) instruction struck and the Court's finding that the Section 2(a) instruction was broad enough to cover principal liability under Section 2(b), any post-verdict motion for a

---

[5] Transcript citations are to the numbers in the upper, right-hand corner of each page.

judgment of acquittal on this basis would have been meritless, and therefore Farkas has failed to demonstrate any prejudice, even assuming that counsel's decision to forego the motion was objectively unreasonable.  Opp'n at 8-12.

The government also correctly argues that the principal liability prescribed in Section 2(b) was incorporated in the instructions on each of the substantive counts for bank, wire, and securities fraud, when the Court summarized that Farkas was charged with knowingly and intentionally causing Colonial Bank to wire funds by means of materially false and fraudulent pretenses, representations, and promises (counts 2 through 7 (bank fraud)); causing certain wires and e-mails to be transmitted (counts 8 through 11 (wire fraud)); and knowingly and intentionally executing a scheme to defraud by causing materially false forms to be filed electronically by Colonial BancGroup with the S.E.C. (counts 14 through 16 (securities fraud)).  Just as the evidence presented at trial was sufficient to establish Farkas's principal liability, so the government argues that the instructions given as to Section 2(a) and the individual bank, wire, and securities fraud counts were similarly sufficient to inform the jury of the law governing Farkas's principal liability under Section 2(b). Id. at 10-11, Ex. 3 (Jury Instructions and Closing Arguments Transcript).

The distinction between sections 2(a) and 2(b) on which Farkas so heavily relies is irrelevant for three reasons.  First, the proposed instruction for "willfully causing" criminal acts that, had they been committed by Farkas, would have rendered him liable for wire, bank, and securities fraud under Section 2(b), was essentially included in the jury instruction as to liability under Section 2(a).  Together with the instructions as to the definition of "willfulness" and the explanation of the elements for the substantive counts, these instructions were more than sufficient to inform the jury that Farkas's conduct had to be both "knowing" and "deliberate" and, therefore, "willful."  Given the instructions the jury received, a separate instruction on Section 2(b) would have been redundant.

Second, Section 2(b) does nothing more than clarify the implicit meaning of Section 2(a), by removing "all doubt that one who puts in motion or assists in the illegal enterprise or causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense."  18 U.S.C. § 2 (Historical and Statutory Notes); see also United States v. Hourani, 1999 WL 16472, at *3-*4 (6th Cir. Jan. 8, 1999) (rejecting defendant's challenge to transferred intent under Section 2(b) because "the

historical and statutory notes clarify that the transferred
intent treated in § 2(b) is substantively implicit in § 2(a)" and
because "the Indictment does not specify either § 2(a) or §
2(b)").[6]  Given that the principal liability encompassed in
Section 2(b) is implicit in Section 2(a), Farkas's argument is
premised on a distinction without a difference and is therefore
meritless.

Finally, to the extent Farkas argues that Section 2(b) "only
comes into play where the defendant uses an innocent intermediary
to commit an offense," Reply at 7, in his case the key
intermediaries were not innocent, but were co-conspirators,
including Colonial Bank employees Kissick and Kelly, as well as
numerous officers and employees of Farkas's company, TBW.[7]

_____

[6] As in Hourani, the indictment charging Farkas did not
distinguish between sections 2(a) and 2(b).

[7] In his Reply, Farkas essentially rehashes the argument that he
cannot be held liable as a principal for securities fraud because
he never issued the securities at issue.  Farkas goes on to argue
that securities fraud under Section 1348 "was never intended to
be applied to the officer of a borrower, whose company allegedly
supplies false information to a bank that ultimately provides
that information to its parent company, which then includes the
information in a filing with the SEC."  From Farkas's point of
view, the "nexus" between his conduct and the criminal act at
issue – false filings with the S.E.C. – is "too tenuous to
support a criminal conviction."  This argument is the crux of
Farkas's "actual innocence" claim as to counts 14 through 16 of
the indictment, which is also a retread of his argument on
principal liability.  Farkas asserts, again, that he cannot be
liable for securities fraud under 18 U.S.C. § 1348 "because he is
not the issuer of securities," and that "he could only be charged

14

Accordingly, Farkas's trial counsel were not objectively unreasonable in their decision not to move for a judgment of acquittal on this basis after the jury returned its verdict. Moreover, given the instructions the jury received and their relationship to the facts of this case, Farkas has failed to carry his burden to show, by a preponderance of the evidence, that had counsel moved for an acquittal on this basis, there is a reasonable probability that the motion would have been granted and the outcome of the trial would have been different.

## 2. Failure to Challenge SIGTARP Investigation and Jurisdiction

Farkas next argues that trial counsel failed to challenge the power of SIGTARP to conduct investigations of conduct that pre-dated the existence of the Emergency Economic Stabilization Act of 2008, SIGTARP's authorizing statute. Farkas maintains that because SIGTARP did not have jurisdiction over criminal activity that occurred before its creation in October 2008, it was not authorized to reference pre-October 2008 conduct in the affidavit supporting the search warrants for the TBW offices and Colonial Bank, and that counsel should have moved to suppress on this ground. Mem. at 7-9; Reply at 15-18, Ex. B.

---

with conspiracy if at least one co-conspirator was the issuer of securities." Reply at 19-20. For all the reasons explained above, this argument is meritless.

There is no merit to this claim.  The search warrants were obtained on August 3, 2009, well after SIGTARP was authorized to conduct investigations.  Moreover, as the government points out, the indictment specifically alleged that Farkas and his co-conspirators fraudulently sought over $500 million in TARP funds and that "[r]egardless of when the conduct occurred, its impact on the accuracy and validity of Colonial Bank's TARP application brought it squarely within SIGTARP's jurisdiction."  Opp'n at 12-13.  The government goes on to argue that even if SIGTARP lacked jurisdiction to investigate conduct that pre-dated its creation, other federal law enforcement agencies, including the FBI, the Federal Deposit Insurance Corporation, and the Department of Housing and Urban Development also participated in the investigation, and the affidavits in support of both search warrants were signed by FBI Special Agent Scott Turner, who was jointly assigned to the FBI's Securities Fraud Squad and SIGTARP. Whatever argument may be made as to SIGTARP's jurisdiction, Farkas cannot challenge the FBI's authority to investigate fraudulent conduct occurring before 2008.  Id., Ex. 1 at 1280.

The government's arguments are well taken.  Farkas cites no case law, and none appears to exist, to support his contention that an agency investigating an offense cannot gather information that pre-dates the existence of the agency.  Here, there can be

16

no argument that SIGTARP's investigation into Colonial Bank's TARP application was within its jurisdiction and that other federal agencies were properly involved. For these reasons, Farkas's arguments that the warrants in question were executed in bad faith or SIGTARP acted ultra vires are wholly unavailing, defeating his assertion that his counsel's decision not to challenge SIGTARP's investigation or jurisdiction was unreasonable.

### 3. Failure to Research and Investigate

Farkas argues that trial counsel "failed to properly demand, locate or introduce into evidence the records documenting the substantial interest payments made by TBW to Colonial Bank, which would have drastically undermined the prosecution's theory that [he] intended to defraud Colonial and others." Similarly, Farkas faults trial counsel for failing to introduce the COLB and AOT agreements that his counsel argued permitted the transfers of funds that formed the basis of the government's case, agreements that "would have shown that [he] was not acting with any intent to defraud." Mem. at 9-11.

Farkas also argues that counsel should have introduced into evidence the contents of a thumb drive Farkas provided to Teresa Kelly, a Colonial Bank employee, which contained evidence of the collateral that supported the bank's debt, given the

17

prosecution's reference to it during closing arguments.  Lastly,
Farkas argues that trial counsel failed to investigate the credit
write-ups of Colonial Bank employee Cathie Kissick, which would
have shown that the bank's debt was supported by collateral.  Id.
at 11-12.

Farkas's contentions are contradicted by the record.
Evidence of the interest payments made to TBW and Colonial Bank
was located by counsel, reviewed, and introduced at trial, as
were the COLB and AOT agreements and evidence regarding loan
collateral.  See Opp'n, Ex. 6 (Declaration of Craig H. Kuglar,
Esq. in Response to Petitioner's 28 U.S.C. § 2255 Motion)
("Kuglar Decl.") at ¶¶ 8 ("I personally traveled to Miami and
collected several thousand pages of documents . . . include[ing]
the transaction documents for the AOT and COLB lines."), 11 ("The
Farkas Trial team located records substantiating interest
payments paid by TBW to Colonial Bank.  Colonial Bank's former
officer Cathie Kissick admitted in her testimony that Colonial
Bank received hundreds of millions of dollars of interest
payments from TBW over the course of the TBW/Colonial Bank
relationship."), 12 ("The Farkas Trial Team introduced the COLB
and AOT agreements [into] evidence and specifically questioned
witnesses about specific language in those agreements."), 14 ("My
staff and I, with the assistance of Farkas, reviewed and analyzed

18

Colonial Bank documents evidencing the collateral held by Colonial Bank."); see also Ex. 1 at 614, 914-39, 948-52, 1003-15, 1137-38, 1054, 1597, 2366.

According to defense counsel, additional evidence Farkas argues should have been introduced at trial, including evidence on the thumb drive (which was discussed at trial), would have been duplicative. See Kuglar Decl. at ¶¶ 11 ("The decision not to introduce documents was made after serious thought and discussion and based on the collective experience of the Farkas Trial Team with input from Farkas."), 14 ("The introduction of documents would have been duplicative of testimony elicited by [the] Farkas Trial Team of Colonial Bank's former officer, Cathie Kissick."); see also Ex. 1 at 569-74.  Far from prejudicing Farkas, counsel's decision not to introduce that evidence saved time and energy better directed to other aspects of his defense and did not add to the overwhelming weight of the evidence against him.

Moreover, all of the evidence regarding interest payments, collateral, and the agreements that provided the mechanism for Farkas's fraud were irrelevant to the ultimate issue because, as the jury found beyond a reasonable doubt, their existence was in no way exculpatory.  As the government correctly observes, "[w]hether or not interest payments were made, [Farkas] still

19

obtained hundreds of millions of dollars from Colonial Bank through fraudulent means." Opp'n at 16. Further, the introduction of evidence of collateral was immaterial to the outcome of the trial because the government's evidence established beyond a reasonable doubt that TBW sold loans and pools of loans to Colonial Bank that had already been sold to third parties. Accordingly, much of the so-called collateral Farkas relies on here was either bogus or unrelated to the debt at issue and therefore would not have impugned the overwhelming evidence that Farkas sold Colonial Bank loans TBW no longer owned.

For these reasons, Farkas's counsel's tactical decision not to introduce additional evidence, a decision to which the Court must afford considerable deference, was not unreasonable. Even assuming it was, Farkas has failed to demonstrate a reasonable probability that, had the additional evidence been introduced, the outcome of his trial would have been different. For all these reasons, this ineffective assistance claim fails.

4. Failure to Prepare for Trial

Farkas next argues that counsel were unprepared for his trial to move as quickly as it did, and therefore failed to call certain witnesses. Farkas goes on to argue that counsel also failed to adequately prepare his testimony, and that counsel's

20

preparation for closing arguments was insufficient because after
he gave counsel a detailed list of points to be used in counsel's
closing "counsel never even considered [them]."  Mem. at 13-15.

    Farkas provides no evidence, such as a declaration from a
witness, to support his claim that witnesses who were not called
would have testified as he says they would.  Farkas also offers
no evidence to contradict his counsel's statements that the
"critical" witnesses he identifies, among others, were in fact
approached and either refused to speak with counsel or "did speak
but indicated that their testimony would not be favorable to
Farkas."  Kuglar Decl. at ¶ 17; see also Opp'n, Ex. 7
(Declaration of William B. Cummings, Esquire in Response to
Petitioner's 28 U.S.C. § 2255 Motion) ("Cummings Decl.") at ¶ 37.

    Farkas's claim that counsel were ineffective in preparing
for his testimony is also unsupported by the evidence.  Trial
counsel have averred that they "assisted in preparing Farkas for
his testimony over a four-month period," in which they "spent no
less than 100 hours . . . preparing Farkas for his testimony."
Kuglar Decl. at ¶ 19.  Farkas even "retained the services of a
witness consulting firm . . . which spent countless hours
preparing Farkas for his trial testimony over a three-month
period."  Id.

As to Farkas's claim that counsel failed to prepare for closing argument, he does not identify which of the several points he provided to counsel were omitted or explain how the outcome of the trial would have been different had counsel followed all of his instructions.  Given the high degree of deference afforded counsel's trial tactics, particularly in regard to closing arguments, see Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (per curiam) ("Judicial review of a defense attorney's summation is . . . highly deferential."), Farkas has failed to make the requisite showing here.  Moreover, contrary to Farkas's claim, the evidence in this record shows that trial counsel diligently prepared for and competently presented closing arguments, attacking the credibility of the government's witnesses, arguing that sufficient collateral existed to support TBW's debts, and arguing that Colonial Bank received interest payments from TBW.  See Cummings Decl. at ¶ 39; Opp'n, Ex. 3 (Jury Instructions and Closing Arguments Transcript) at 64-100.

For all these reasons, Farkas's arguments that his counsel were ineffective in their trial preparations fail.

5. Failure to Review Documents in Preparation for Cross-
Examination

Farkas argues that trial counsel failed to review the personal notebooks of co-conspirator Paul Allen, TBW's Chief Executive Officer, before Allen's cross-examination, and that had

they done so, they could have used the notebooks to establish
that Farkas had nothing to do with Ocala Funding LLC.
Essentially re-raising an argument that has already been rejected
by the Fourth Circuit, Farkas also argues that trial counsel
should have objected when they were precluded from introducing
evidence of the pecuniary interest of another witness, Neil
Luria, TBW's chief restructuring officer. Farkas argues that
counsel also should have objected when the Court "curtailed"
attempts to mitigate the loss amount during Luria's cross-
examination. Had counsel been allowed to proceed, Farkas argues
that "the defense could have shown that sufficient collateral and
security had been furnished to Colonial to fully support its
financing of TBW's loans." Mem. at 16.

     Farkas's argument as to Allen's notebooks is baseless. Not
only did Farkas's counsel have the opportunity to review Allen's
notebooks before they cross-examined him, counsel also questioned
Allen about specific entries in the notebooks. See Kuglar Decl.
at ¶ 20 (stating that "the Paul Allen notebooks were hand
delivered to counsel in advance of Allen's testimony," that
counsel "reviewed the Paul Allen notebooks prior to Paul Allen's
testimony and provided Bruce Rogow, who was responsible for the
cross examination, with my thoughts on the use of the Paul Allen
notebooks at trial," and that "[t]he decision to use or not use

entries in the notebooks was a decision made by counsel after careful consideration"); see also Ex. 1 at 1431, 1510.  Farkas has also not identified what information from the notebooks trial counsel failed to use or how that information would have affected the outcome of the trial.

Farkas's challenge to the Court precluding counsel from introducing evidence of Luria's pecuniary interest during cross-examination, although now couched as an ineffective assistance claim, was raised before and rejected by the Fourth Circuit on direct appeal and, therefore, cannot be raised again here.  See Farkas, 474 F. App'x at 356-57; Jones v. United States, 178 F.3d 790, 796 (6th Cir. 1999) (finding it "well settled" that "a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law").  In examining this issue, the Fourth Circuit applied the less-deferential, intermediate "plain error" standard because Farkas raised "an alleged constitutional violation."  Farkas, 474 F. App'x at 356.  The Fourth Circuit also rejected the same characterization of Luria's cross-examination Farkas advances here, finding that the record "suggests [] that Farkas sought to show that Luria's salary and other administrative costs connected to the bankruptcy reduced the amount of TBW assets available to

24

pay its creditors"; that is, that "Farkas made no attempt to proffer that he sought to show bias . . . [but] suggested that the large disparity between TBW's assets and its liabilities to creditors in bankruptcy was prejudicial." Id. at 357.  The Fourth Circuit concluded by "declining on appeal to find error based on Farkas's post hoc recasting of the evidentiary basis for his cross-examination of Luria." Id.  For the same reasons, and assuming this argument is not barred on collateral review, Farkas's contention here is baseless.

As to Farkas's claim that counsel should have objected to the Court's "curtailment" of Luria's cross-examination on the subject of the loss amount, this argument ignores the fact that the loss amount is completely irrelevant to the issue of Farkas's fraud.  At trial, counsel for the defense submitted a great deal of evidence and testimony regarding interest payments and collateral, all in an attempt to "fill the hole" (to use Farkas's phrase); however, the evidence of the "hole" was overwhelming. For all these reasons, counsel's decision not to object on these and the other grounds discussed above was reasonable and, even if it were not, Farkas has failed to carry his burden to show that there is a reasonable probability that counsel's objections would have altered the outcome at trial or on appeal.

25

6. Failure to Object to Summary Evidence

Farkas argues that a forensic accountant called at the end

of the government's case, Raymond J. Peroutka, "opined as to

various critical issues, including the amount of the alleged

'hole' in TBW's assets on certain dates." To the extent that the

summary evidence was admissible under Federal Rule of Evidence

1006, Farkas argues that such evidence must be accurate and non-

argumentative, but that Peroutka fundamentally misunderstood the

evidence he purported to summarize when he testified that Ginnie

Mae "owned" loans that were in fact held by the MWLD. Farkas

claims that this inaccuracy contributed to the discrepancy (the

"hole") between the value of the AOT and the actual value of the

collateralization. Farkas also argues that the charts'

references to "sweeping" improperly "embraced the prosecution's

theory of the case" and that counsel should have requested a

limiting instruction as to this evidence or objected to the

evidence for this reason. Mem. at 17-18; Reply at 12-13, Ex. A.

Even assuming his counsel's decision not to object to the

summary evidence was unreasonable, Farkas fails to carry his

burden to demonstrate that there is a reasonable probability that

such an objection, or an additional limiting instruction, would

have altered the outcome of his trial. Assuming, again, for

purposes of argument that the summary evidence admitted at trial

overstated the size of the "hole" – the difference between the
actual and reported value of the loans at issue - as discussed
above, the size of the "hole" was irrelevant to the issue of
Farkas's fraud.  See Ex. 1 at 1899-1900 ("THE COURT: . . . [I]t's
completely irrelevant to this case as to whether there's a $50
million or a $5 billion hole. . . . It's a fraud case, and quite
frankly, you can have a fraud without a big loss.").
Accordingly, to the extent that Farkas objects to the accuracy of
the summary evidence as to the size of the "hole," that objection
is meritless and therefore cannot serve as the basis for any
finding of prejudice.  Farkas also offers no support for his
contention that "sweeping" is a prejudicial or otherwise
illegitimate term.  For these reasons, this ineffective
assistance of counsel argument fails.

### 7. Failure to Object to the Jury Instruction on the Definition of a "Security"

Farkas argues that trial counsel were ineffective for
failing to object to the jury instruction defining a "security"
as "any note."  Relying exclusively on persuasive precedent,
Farkas argues that whether a note is a security is a mixed
question of fact and law that should be decided by the jury, and
that by defining a "security" as "any note," the Court therefore
invaded the province of the jury.  Mem. at 19, Reply at 18; see
United States v. McKye, 734 F.3d 1104 (10th Cir. 2013) (holding

27

that whether investment notes qualified as "securities" was a

mixed question of fact and law); see also Reves v. Ernst & Young,

494 U.S. 56, 63 (1990) (holding that notes are only presumed to

be securities).

As an initial matter, Farkas's characterization of the jury

instruction is disingenuous.  The instruction actually provided

that

> [a]s used in these instructions (for the 1934 Act):
> The term "security" means any note, stock, treasury
> stock, bond, debenture, certificate of interest or
> participation in any profit-sharing agreement [], or in
> general, any instrument commonly known as a "security";
> or any certificate of interest or participation in,
> temporary or interim certificate for, receipt for, or
> warrant or right to subscribe to or purchase, any of
> the foregoing [].

Dkt. No. 262-5.

This is consistent with the statutory definition of a "security."

See 15 U.S.C. §§ 77b(a)(1) and 78c(a)(10).

> The jury was also instructed that

> The government must prove beyond a reasonable doubt . .
> . that the "scheme and artifice to defraud" [18 U.S.C.
> § 1348] described in [counts 14 through 16 of] the
> indictment had some relationship to or was connected to
> a security of Colonial BancGroup.  The government need
> not show, however, that the defendant, or anyone
> associated with him bought or sold any such securities.

Dkt. No. 262-5

The jury was not merely instructed that a "security" was

"any note," leaving the issue of whether a particular note was a

28

"security" undecided.  Accordingly, McKye is inapposite and
Farkas's reliance on it is misplaced.  On the contrary, the only
"security" at issue in this case was the stock of Colonial
BancGroup, and "stock" was expressly included in the jury
instruction defining "security."  Because the government was not
required to prove that a particular kind of note was a
"security," counsel's failure to object to the instruction
defining "security" was reasonable.  Further, any such objection
would have been overruled.  Accordingly, Farkas's ineffective
assistance of counsel claim on this issue fails.

   8. Failure to Move to Dismiss Count 1

   Farkas argues that counsel were ineffective for failing to
move to dismiss Count 1, which charged Farkas with conspiracy to
commit bank, wire, and securities fraud in violation of 18 U.S.C.
§ 1349.  Farkas argues that Section 1349 prescribes a penalty,
not a substantive offense, and as such fails to identify any
specific prohibited conduct.  Farkas also argues that because
Section 1349 does not contain any of the components of a
conspiracy, including, among others, the requirement that he
commit an overt act, it is a "non-cognizable offense."  Mem. at
19-20; Reply at 1-4.

   Farkas's argument is meritless.  A conspiracy to commit a
substantive offense is a separate crime from the substantive

29

offense itself.  Pinkerton v. United States, 328 U.S. 640, 643
(1946); United States v. Walker, 796 F.2d 43, 46 (4th Cir. 1986).
Moreover, a conspiracy under Section 1349 does not require an
overt act.  United States v. Chinasa, 489 F. App'x 682, 685 (4th
Cir. 2012).  Accordingly, Farkas can show neither that his
counsel acted unreasonably in not moving to dismiss Count 1 nor
that, had they done so, there is a reasonable probability that
the Court would have granted the motion.

> 9. Failure to Object During the Government's Summation

Farkas argues that counsel were ineffective for failing to
object to statements during the government's closing argument
that accused Farkas of lying during the trial.  Mem. at 20.

In response, the government argues that Farkas cannot show
that counsel's decision not to object to the prosecutor's
statements was objectively unreasonable; indeed, the government
argues that had counsel objected, they might have called
attention to the conflict in trial testimony and done more harm
than good.  Opp'n at 28-29.

Again, Farkas asks the Court to second-guess trial counsel's
tactical decisions, which it cannot do.  See Goodson v. United
States, 564 F.2d 1071, 1072 (4th Cir. 1977) (per curiam) ("Absent
a showing that the tactical decision of counsel was so
unreasonable in light of the need for the testimony that it

amounted to a deprivation of an attorney who acted within the range of competence demanded of attorneys in criminal cases, we are reluctant to second guess the tactics of trial lawyers.") (internal citations and quotations omitted); see also Strickland, 466 U.S. at 689 (stating that it would be improper to "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions"); Moore v. United States, 934 F. Supp. 724, 727 (E.D. Va. 1996) (stating that "[c]ourts . . . sensibly recognize that trial counsel must be granted latitude in making tactical and strategic decisions," including the decision not to make "every possible valid objection") (citing Bunch v. Thompson, 949 F.2d 1354, 1364 (4th Cir. 1991) (stating that in habeas corpus petitions, the court should "credit plausible strategic judgments" to trial counsel)).

The government's arguments are well taken, and Farkas has again failed to show either that the strategy of "letting sleeping dogs lie" by not objecting during the government's closing was unreasonable, or that, had the objection been made, it is reasonably probable that the outcome of the trial would have been different.

31

10.   Failure to Review Documents Produced by the Government

Finally, Farkas argues that counsel were ineffective when they failed to properly manage the discovery in this case, at one point rejecting the government's offer to provide discovery materials on hard drives in its native format, rather than waiting for those materials to be uploaded to a database.  Farkas also argues that his counsel failed to request a sufficient amount of time to properly prepare for trial given the volume of discovery, only delaying the start of trial until April 2011. Mem. at 21-22.

In response, the government argues that Farkas's claim is baseless, particularly given the advantage to defense counsel of a word-searchable online database containing all of the discovery.  It also argues that defense counsel met regularly with prosecutors to discuss discovery issues, as well as the government's theory of the case.  The prosecutors also provided defense counsel with their witnesses' statements and access to their forensic accountants.  Opp'n at 29-30.

Farkas's trial counsel confirm the government's assertions, stating that the discovery produced by both the government and third-parties was housed on a database, and that counsel worked "closely" with Farkas to review and organize all of the documents in preparation for trial.  Kuglar Decl. at ¶¶ 22-23; Cummings

32

Decl. at ¶ 14. Farkas's trial team included several attorneys and their staffs, all of whom had access to the discovery database and all of whom participated in the review of discovery. Kuglar Decl. at ¶ 3; Cummings Decl. at ¶¶ 14, 17, 29. Free access to the database and the ability it provided Farkas, his attorneys, and the paralegals to participate in reviewing discovery also informed counsel's strategic decision to wait for discovery to be uploaded to the database. Cummings Decl. at ¶¶ 14, 16.

The government also correctly points out that, although discovery in this case was voluminous, it was at least in part that volume that permitted Farkas's counsel to persuasively argue that the trial should be continued, first from November 2010 until February 2011, and then again from February to April 2011. The government also points out that Farkas's counsel requested a third continuance that the Court denied, a decision that was later affirmed by the Fourth Circuit. Opp'n at 31.

Farkas's broad assertion that the sheer volume of discovery somehow deprived him of his Sixth Amendment right to effective assistance of counsel is both unsupported and unsupportable. Farkas does not specifically identify any particular discovery that remained un-reviewed, nor does he provide any argument or evidence as to how that discovery might have affected the outcome

33

of his trial.  Farkas also provides no specific evidence or argument in support of his contention that his counsel's decision to wait for discovery materials to be uploaded to the database (rather than to receive them in native format) in any way hindered his defense.  In fact, it appears that counsel had good reasons to wait for the database to be compiled, see Cummings Decl. at ¶¶ 14, 16, and any delay that resulted was negligible, given that the decision to wait was made at the beginning of August 2010, nearly eight months before trial.  There is also no dispute that Farkas's trial team - including Farkas himself - assiduously reviewed the database in preparation for trial.  See Cummings Decl. at ¶¶ 14, 17, 22, 27-30, 32, 33.  Moreover, Farkas benefitted from the volume of discovery produced in his case as it allowed him to continue his trial not once, but twice, a luxury that few criminal defendants prosecuted in this district are afforded.  For all these reasons, Farkas's conclusory assertion that counsel failed to adequately review discovery or take reasonable steps to ensure they had adequate time to do so fails.

## B. Ineffective Assistance of Appellate Counsel

In applying the Strickland test to claims of ineffective assistance of appellate counsel, reviewing courts must accord counsel the "presumption that he decided which issues were most likely to afford relief on appeal."  Pruett v. Thompson, 996 F.2d

34

1560, 1568 (4th Cir. 1993).  Importantly, counsel are not obligated to assert all non-frivolous issues on appeal, as "[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review."  Jones v. Barnes, 463 U.S. 745, 752 (1983); see also Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989).  Indeed, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones, 463 U.S. at 751).

The Supreme Court has stated that although it is possible to bring a Strickland claim for ineffective assistance of appellate counsel, "it [will be] difficult to demonstrate that [appellate] counsel was incompetent," and "'[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'"  Smith v. Robbins, 528 U.S. 259, 288 (2000) (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)).

Farkas argues that his appellate counsel was ineffective for failing to raise on appeal all of the issues that his trial counsel failed to preserve, which are discussed above.  Mem. at 24-25.

35

In response, the government argues that appellate counsel would not have prevailed on any of the issues identified by Farkas.  The government further argues that any other issues cannot form the basis for an ineffective assistance of appellate counsel claim because Farkas has failed to identify them, and therefore failed to carry his burden of demonstrating either objective unreasonableness or prejudice.  Moreover, the government argues that Farkas's appellate counsel was under no obligation to raise all non-frivolous issues on appeal and that Farkas has failed to demonstrate by a preponderance of the evidence that the six issues counsel did raise were either unreasonable or resulted in any prejudice.  Opp'n at 32-33.

The government's arguments are well taken here, and for all the reasons explained above, the claims Farkas argues his appellate counsel "ignored" are not "clearly stronger" than the six issues counsel chose to pursue on appeal.  Smith, 528 U.S. at 288.  Because those claims are meritless, the presumption of reasonableness afforded appellate counsel in its selection of arguments has not been overcome and Farkas's claim of ineffective appellate counsel fails.

### C. **Brady Violations**

A defendant's right to due process is violated when the prosecution suppresses evidence that is both favorable to the

accused and material either to guilt or innocence.  Brady v.
Maryland, 373 U.S. 83, 87 (1963).  There are three components to
a Brady violation: (1) the evidence at issue must be favorable
to the accused; (2) that evidence must have been suppressed by
the State; and (3) prejudice must have ensued.  Strickler v.
Greene, 527 U.S. 263, 281-82 (1999).

Farkas argues that the prosecution suppressed statements
confirming significant monthly interest payments made by TBW to
Colonial Bank between 2007 and 2009, and that those payments
were material and favorable to Farkas's case because the
confirmed his good faith and intent and provided evidence that
TBW lawfully obtained funds from Colonial Bank.  Similarly,
Farkas argues that the government suppressed Kissick's credit
committee notes and write-ups, which were also material and
favorable to his case because they would have established that
Colonial Bank knew that servicing rights were its best
collateral with TBW and that Farkas did not have any criminal
intent.  Farkas also argues that the government never produced
the COLB and AOT agreements he allegedly breached; had they been
produced, Farkas argues that they would have shown that he never
violated any of their provisions.  Mem. at 25-27.

Farkas fails to establish any of the three components of a
Brady claim.  First, all of the evidence Farkas claims was

"suppressed" was in fact disclosed to him, reviewed by him and his counsel, and either introduced into evidence at trial or not introduced for strategic reasons.   See Kuglar Decl. at ¶¶ 11-14; Ex. 1 at 987-1006 (cross-examination of Kissick regarding credit committee notes and write-ups and the value of Colonial Bank's collateral); see also United States v. Jeffers, 570 F.3d 557, 573 (4th Cir. 2009) (stating that "there is no Brady violation if the defense is aware of the evidence in time to reasonably and effectively use it at trial"); United States v. Brown, 520 F. App'x 230, 231 (4th Cir. 2013).   Second, the evidence he claims was "suppressed" was not favorable to him because, as discussed above, evidence regarding interest payments or collateral and the COLB and AOT agreements was not exculpatory.   Finally, Farkas cannot show any prejudice, thereby failing to satisfy the third prong of the Brady test and the second prong of the Strickland test.   For all these reasons, this claim fails.

### D. Request for Discovery and Evidentiary Hearing

A district court can dismiss a Section 2255 motion without a hearing if the record conclusively shows the prisoner is not entitled to relief.   See 28 U.S.C. § 2255; United States v. Hackley, 164 F. App'x 301, 304 (4th Cir. 2006); see also Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970) ("Where the

38

files and records conclusively show that the prisoner is entitled to no relief, summary dismissal is appropriate.").

As discussed above, Farkas's various arguments are all meritless and he has presented no evidence warranting further inquiry or requiring that any credibility determinations be made. For all these reasons, Farkas's request for discovery and an evidentiary hearing will be denied.

### III. CONCLUSION

For the reasons stated above, Farkas's motions will be dismissed with prejudice, rendering moot his request for discovery and an evidentiary hearing, which are denied. An appropriate Order will be issued with this Memorandum Opinion.

Entered this _18_ day of July, 2014.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

39