IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:10-CR-200 (LMB) |
| | ) | |
| LEE BENTLEY FARKAS, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Before the Court is Lee Bentley Farkas' ("Farkas" or "defendant") Motion for Judge

Brinkema to Recuse or Disqualify Herself Pursuant to 28 U.S.C. § 455(a) [Dkt. No. 519], Nov.

19, 2015 ("§ 455 Motion"). This motion has been supplemented with additional affidavits, see

Supplemental Motion for Recusal [Dkt. No. 529], Jan. 8, 2016 ("Supp. Motion"), and the

government has filed its opposition, see Gov't's First Resp. to Def.'s Mot. To Disqualify Judge

Pursuant to 28 U.S.C. § 455 [Dkt. No. 531], Jan. 21, 2016 ("Gov't Opp'n"), to which Farkas has

replied. See Def. Farkas' Rebuttal to Gov't's First Resp. to Def.'s Mot. To Disqualify Judge

Pursuant to 28 U.S.C. § 455 [Dkt. No. 532], Jan. 28, 2016 ("Farkas Reply"). For the reasons that

follow, this motion will be DENIED.

I.    BACKGROUND

On April 19, 2011, a jury found Farkas guilty of all fourteen counts charged in relation to

the perpetration of a massive financial fraud during his tenure as chairman and principal owner

of Taylor, Bean & Whitaker ("TBW"), a large mortgage firm. See Jury Verdict [Dkt. No. 263],

Apr. 19, 2011. Specifically, Farkas was convicted of one count of Conspiracy to Commit Bank

Fraud, Wire Fraud, and Securities Fraud in violation of 18 U.S.C. § 1349; six counts of Bank

Fraud in violation of 18 U.S.C. §§ 1342 and 1344; four counts of Wire Fraud in violation of 18 U.S.C. §§ 1342 and 1343; and three counts of Securities Fraud in violation of 18 U.S.C. §§ 1342 and 1348. On June 30, 2011, he was sentenced to 360 months imprisonment, three years of supervised release, and a special assessment of $1,400. J. as to Lee Bentley Farkas [Dkt. No. 301], June 30, 2011. In addition, the Court required Farkas and his co-defendants to pay restitution in the amount of $3,507,743,557 jointly and severally to twenty victims of their financial fraud. Restitution J. [Dkt. No. 351], Sept. 26, 2011.

Farkas unsuccessfully appealed his conviction to the Fourth Circuit, which found no reversible error and affirmed the judgment. Unpublished Opinion of the USCA decided 06/20/2012 as to Lee Bentley Farkas at 1 [Dkt. No. 403], June 20, 2012. On September 19, 2013, Farkas filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [Dkt. No. 430], which was subsequently amended after he retained counsel. Both the original and amended § 2255 motions complained of ineffective assistance of counsel at both the trial and appeal stages as well as Brady violations. See Memorandum Opinion [Dkt. No. 462], July 18, 2014. In dismissing the motion, the Court issued a lengthy Memorandum Opinion addressing each ground raised. Id. The Fourth Circuit denied Farkas a certificate of appealability and summarily dismissed his appeal. See Judgment of USCA as to Lee Bentley Farkas [Dkt. No. 480], Feb. 5, 2015.

On October 9, 2015, Farkas filed a Motion to Disqualify Judge Pursuant to 28 U.S.C. § 144 [Dkt. No. 494] along with a supporting affidavit [Dkt. No. 493]. As Farkas recounts in his affidavit, this motion was prompted by a package his habeas counsel received from Janice Wolk Grenadier ("Grenadier"), a civil litigant in unrelated actions assigned to the Court, who had ruled against her. Affidavit for Disqualification of Honorable Judge Leonie M. Brinkema ¶ 18 [Dkt.

2

No. 493], Oct. 9, 2015 ("Disqual. Affidavit"); see also Grenadier v. BWW Law Group, et al.,

No. 1:14-CV-827 (E.D.Va. July 29, 2013). Included in that package were copies of the Court's

Financial Disclosure forms from 2004 through 2014. Id. In his § 144 Motion, Farkas argued that

the Court should be disqualified because she suffered a decline in the value of her investment

portfolio as a result of the global economic crisis, to which Farkas alleges he substantially

contributed. Disqual. Affidavit ¶¶ 5, 10, 11.

> On November 6, 2015, the Court denied Farkas' § 144 Motion, reasoning,

> Now, if [the Court] owned real estate in Orlando, Florida, that had been directly affected
> by what [Farkas] did, that might be a logical and proper connection between his conduct
> and the Court's personal finances. You don't have that here. You have a judge owning
> . . . mutual funds which invest in all sorts of different stuff, and you have the whole
> economy tanking because of multiple, multiple players, and as I said, because of the way
> the world works, I would be amazed if you would be able to find a federal judge who
> wouldn't have the same kind of situation.

Tr. of Proceedings Held on 11/06/2015 at 9:20-10:4 [Dkt. No. 517], Nov. 13, 2015. An appeal of

that ruling is currently pending. See Notice of Appeal [Dkt. No. 522], Nov. 24, 2015.

> On November 19, 2015, Farkas filed the pending § 455 Motion.   In the Memorandum in

Support of the § 455 Motion, Farkas largely restated the arguments raised in his § 144 Motion,

which were rejected by the Court; however, he also provided additional declarations to support

this motion.

## II.    DISCUSSION

Farkas argues that the acts of fraud for which a jury convicted him "had a direct and

substantial impact on the nation's financial crisis and economic downturn," and as a result, the

Court has a disqualifying appearance of partiality under § 455(a) due to the personal financial

losses she suffered as a result of the global financial crisis. § 455 Mot. at 1 (incorporating by

reference Disqual. Affidavit)); see also Def. Farkas' Br. in Supp. of Mot. for Judge Brinkema to

Recuse or Disqualify Herself Pursuant to 28 U.S.C. § 455 at 5 [Dkt. No. 520], Nov. 19, 2015

("Farkas Br."). To support this argument, Farkas marshals statements about the gravity of his

fraudulent conduct made by Department of Justice officials during the course of his prosecution.

Farkas Br. at 6-7. In addition, Farkas points to a statement by the Court at his sentencing hearing

that, "[t]he victims here, many of them were investors." Id. at 7. Farkas contends that because

the Court was an investor, she was necessarily his victim, which means she is obligated to recuse

herself. Id. In response, the government asserts that the instant motion is no different than the

motion under 28 U.S.C. § 144 that was denied on November 6, 2015. Gov't Opp'n at 3. In

addition, the government asserts that this motion is both untimely and insufficient as a matter of

law. Id. at 3-4.

### A. **Standard of Review**

Section 445(a) provides that a judge "shall disqualify himself in any proceeding in which

his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). To preserve the integrity of

the judicial branch, "a judge must possess neither actual nor apparent bias against a party,"

United States v. Cherry, 330 F.3d 658, 665 (4th Cir. 2003) (internal quotation marks omitted);

accordingly, "[d]isqualification is required if a reasonable factual basis exists for doubting the

judge's impartiality." In re Beard, 811 F.2d 818, 827 (4th Cir. 1987). When considering a motion

to recuse brought under 28 U.S.C. § 455(a), a court must apply the objective standard of whether

a reasonable observer "with knowledge of all of the circumstances might reasonably question the

judge's impartiality." Id.; see also Cheney v. U.S. Dist. Court for D.C., 541 U.S. 913, 924

(2004) (stating that the "recusal inquiry must be made from the perspective of a reasonable

observer who is informed of all the surrounding facts and circumstances." (internal quotation

marks omitted)).

4

The Fourth Circuit has held that judges need not recuse themselves under § 455(a) because of attenuated relationships to proceedings. Cherry, 330 F.3d at 665; see also United States v. DeTemple, 162 F.3d 279, 287 (4th Cir. 1998) (explaining that § 455(a) "does not require a judge to recuse himself because of unsupported, irrational, or highly tenuous speculation." (internal quotation marks omitted)). Indeed, a decision in favor of recusal that lacks a factual basis satisfying the requisite objective inquiry is improper; "[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1312 (2d Cir. 1988); United States v. Glick, 946 F.2d 335, 337 (4th Cir. 1991). The delicate balance entailed in "recusal decisions reflect[s] not only the need to secure public confidence through proceedings that appear impartial, but also the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." Belue v. Leventhal, 640 F.3d 567, 574 (4th Cir. 2011) (internal quotation marks omitted).

## B.  **Propriety of the Court Ruling on the Instant Motion**

As an initial matter, Farkas seems to argue in passing that a disinterested judge should consider his § 455 claim. Farkas Br. at 4. Nevertheless, this Court will reach the merits of this motion, rather than referring it to another judge. "[U]nder § 455(a), '[d]iscretion is confided in the district judge in the first instance to determine whether to disqualify himself because the judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion,' particularly when 'the district court judge has presided over (i) an extraordinarily complex litigation (ii) involving a multitude of parties (iii) for an extended period of time.'" United States v. Ciavarella, 716 F.3d 705, 720 (3d Cir. 2013) (quoting In re Kensington Int'l Ltd., 353 F.3d 211, 224 (3d Cir. 2003)); see also Aiken Cty. v. BSP Div. of

Envirotech Corp., 866 F.2d 661, 679 (4th Cir. 1989) ("Weighed against these minor [ex parte] contacts is a vast record compiled during fifty-two days of trial that thoroughly demonstrates a daily commitment to assure Envirotech and the other litigants a fair trial."). Furthermore, unlike § 144, § 455 contains no explicit mechanism for referring consideration of the motion to another judge—rather, § 455 appears to contemplate that the judge at issue should pass upon the motion by providing that a judge shall "recuse [her]self." United States v. Balistrieri, 779 F.2d 1191, 1202-03 (7th Cir. 1985).

The criminal case at hand is one that accords particularly well with the Third Circuit's explanation of why a district judge accused of bias or partiality should make a determination about the merits of a § 455 motion in the first instance. First, this case was complex; Farkas' trial spanned nine days and involved thousands of pages of documents and many hours of live witness testimony. See Trs. of Proceedings [Dkt. Nos. 235, 236, 237, 238, 239, 240, 241, 242, 243, 244], Apr. 16, 2011. Second, although Farkas was the only defendant who went to trial, there were multiple coconspirator bank officials and mortgage company executives who entered guilty pleas in connection with this case. See Restitution J. [Dkt. No. 351], Sept. 26, 2011 (listing case numbers of coconspirators). In addition, there were multiple victims, including major banks and municipalities. See United States v. Farkas, No. 1:10-CR-200 (E.D.Va. June 15, 2010). Third, there has been ongoing litigation since Farkas' indictment in June 2010, including the nine-day jury trial, a direct appeal, habeas corpus proceedings, various forfeiture disputes, and the recent motions seeking the Court's recusal or disqualification. Id. As such, in light of the Court's extensive investment of judicial resources and its long-running experience presiding over this case, it is best-situated to "appreciate the implications of those matters alleged" in the instant § 455 Motion and to decide the issues raised by defendant. Ciavarella, 716 F.3d at 720.

6

### C. **The Relation of Farkas' Prior Motion for Recusal Under 28 U.S.C. § 144 to the Present Motion**

The first substantive issue to be addressed is whether §§ 144 and 455(a) are governed by different standards. The government argues that this § 455(a) motion is governed by the same standard as Farkas' previous motion for recusal under 28 U.S.C. § 144, which was denied as lacking merit. Gov't Opp'n at 3. Attempting to demonstrate that §§ 144 and 455(a) are functionally one and the same, the government points to Farkas' allegation in his affidavit supporting his § 144 Motion that "[i]nconsistent with Judicial Cannon 3 and inconsistent with 28 U.S.C. § 455(a), Judge Brinkema failed to disclose her conflict and failed to recuse herself when she knew and believed that I was in part responsible for her personal investment losses." Gov't Opp'n at 3, n.2 (quoting Disqual. Affidavit ¶ 13). Furthermore, the government correctly highlights that virtually all of the authorities cited by Farkas in his § 144 Motion and in the present motion addressed both § 144 and § 455(a). Id. at 3. Farkas responds that § 455(a) differs from § 144 in that it addresses the appearance of impartiality whereas § 144 requires actual bias to justify disqualification. Farkas Reply at 2.

There appears to be no Fourth Circuit precedent that directly addresses these issues; however, several other circuits have held that §§ 144 and 455(a) are construed in pari materia because they use comparable language and are intended to govern the same type of conduct. See, e.g., United States v. Kelley, 712 F.2d 884, 889 (1st Cir. 1983); Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d 326, 333 (2d Cir. 1987); In re Corrugated Container Antitrust Litig., 614 F.2d 958, 965 (5th Cir. 1980) (collecting cases). Accordingly, many courts have found that both statutes are governed by the same standard of legal sufficiency. See Jones v. United States, No. 2:05-CV-164, 2005 WL 2086196, at *2 (E.D. Va. Aug. 29, 2005) ("The level of bias necessary to require disqualification under §§ 144 and 455(a) and (b)(1) is generally considered to be the same."); see

7

also Shaw v. Martin, 733 F.2d 304, 308 (4th Cir. 1984) (collapsing claims under §§ 144 and 455 and applying one standard to both).

Nevertheless, the plain language of the statutes presents a persuasive case for construing § 455(a) as precluding a broader range of conduct than that precluded by § 144. Specifically, § 144 provides for disqualification when "a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party," whereas § 455(a) directs that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In addition to the obvious procedural differences, Beard, 811 F.2d at 827 n.15, the language in § 455(a) does not require the actual personal bias or prejudice compelled by § 144; rather, it is concerned with whether there is a reasonable suggestion of such personal bias or prejudice. Therefore § 455(a) is inclusive of, but not coextensive with, the actual personal bias or prejudice necessitated for disqualification under § 144. This Court is not alone in reaching this conclusion. See, e.g., Hoffman v. Caterpillar, Inc., 368 F.3d 709, 718 (7th Cir. 2004) ("Unlike a motion to recuse under 28 U.S.C. § 455, which simply requires the reasonable appearance of bias, a motion to disqualify under § 144 requires a showing of actual bias."). Because § 455(a) is broader in scope than § 144, this Court must consider Farkas' allegations under § 455(a) despite previously rejecting them as legally insufficient under § 144.

### D. Timeliness

The next issue is the timeliness of this motion. The government asserts that this motion is untimely because Farkas was aware that the fraud he perpetrated contributed to the financial crisis and the Court's financial disclosure reports were publically available as early as 2009.

Gov't Opp'n at 5. In response, Farkas argues that he did not become aware of the contents of the relevant financial disclosure forms until July 2015 when he received them from Grenadier, and that he would not have had any reason to research the judge's finances before receiving her disclosure form.  Farkas Br. at 15; Farkas Reply at 3.

In the Fourth Circuit, "[t]imeliness is an essential element of a recusal motion. It is explicit in § 144, which requires a 'timely and sufficient affidavit.' It is judicially implied in § 455." United States v. Owens, 902 F.2d 1154, 1155 (4th Cir. 1990). This requirement exists to prevent inefficient expenditure of judicial resources and unnecessary delay and also to deter the sort of "'wait and see' tactics" that enable judge shopping. United States v. Whorley, 550 F.3d 326, 339 (4th Cir. 2008); United States v. Taggart, 983 F.2d 1059 (4th Cir. 1993). Accordingly, "motions to recuse must be filed at the first opportunity after discovery of the facts tending to prove disqualification." Sine v. Local No. 992 Int'l Bhd. of Teamsters, 882 F.2d 913, 915 (4th Cir.1989).

In Whorley, a defendant who was eventually convicted of 74 counts related to child pornography sought recusal of a district judge on the eve of trial on the basis that the judge had chaired the Attorney General's Commission on Pornography. 550 F.3d at 339.  This judge had advised counsel of this previous role during arraignment and inquired whether the defendant would seek recusal on this basis. Id. Thereafter, counsel notified the court that the defendant did not intend to seek recusal and the court invested substantial time and resources ruling on several complex pretrial issues. Id. The defendant in Whorley tried to excuse the tardiness of his recusal motion by arguing that he was not previously aware that the judge's work on the commission involved recommending and drafting child pornography legislation. Id. The Fourth Circuit affirmed the district judge's finding that the motion was untimely because the "facts underlying

9

[his] motion were available to him as a matter of public record at the time of his arraignment."
Id.

Although the facts upon which Farkas' motion is predicated were similarly available as a matter of public record, there are several circumstances that dictate a different result. First, unlike in Whorley, where the judge's inquiry at arraignment about whether his prior role chairing the commission would be problematic put the defendant on notice, there was no such exchange here. As such, the Court agrees with Farkas that he possessed no obligation to investigate the Court's personal finances and could not be said to have knowledge, constructive or otherwise, which would toll the timeliness requirement until he was alerted to the contents of the financial disclosure forms by Grenadier. Farkas Br. 14-15. Second, unlike the defendant in Whorley, who constructively possessed all of the facts underlying his recusal motion well in advance of filing it, before July 2015, Farkas only knew of those facts related to his own involvement in the financial crisis, and the crux of this motion is the supposed interaction between those facts and additional facts he learned from the Court's financial disclosure forms.

Nevertheless, Farkas' relatively short four-month delay does not automatically satisfy the requirement that a movant file "at the first opportunity" because the purpose of the requirement is both to prevent unnecessary delay and to deter underhanded litigation tactics. See Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 432 (4th Cir. 2011) (deeming a recusal motion untimely when the movant waited three months to file after learning one of the factual predicates, and only filed the day after an adverse partial summary judgment ruling). As such, the determination of whether a party filed the motion "at the first opportunity" as required for timeliness is not a mechanical one.

10

Recusal motions are untimely when the totality of the circumstances suggests that the movant rested on his or her laurels to "gather evidence of a judge's possible bias" to see whether "the proceedings went his way before using the information to seek recusal." Sine, 882 F.2d at 916. Typically, the Fourth Circuit has deemed recusal motions untimely when they are filed immediately after an adverse ruling, which suggests a party is "holding back" to allow itself the opportunity to reap the benefit of a ruling in his or her favor. See, e.g., Taggart, 983 F.2d 1059 (finding recusal motion untimely that was filed only after defendants obtained unsatisfactory rulings on their Rule 35 motions); Sine, 882 F.2d at 915 (deeming recusal motion untimely when it was filed after judge entered default judgment against movant as a discovery sanction).

In Farkas' case, he did not file any motion between the time he received the package from Grenadier in July 2015 and when he filed the § 144 Motion on October 9, 2015. See United States v. Farkas, No. 1:10-CR-200 (E.D.Va. June 15, 2010). In the meantime, the government filed a Motion for Forfeiture of Property on October 6, 2015 [Dkt. No. 489], which was briefed and heard concurrently with the § 144 Motion. Furthermore, the pending § 455 Motion was filed nearly two weeks after the government's Motion for Forfeiture of Property was granted and the § 144 Motion was denied.

Although one might argue that Farkas waited for the threat of further forfeiture to materialize before filing his § 144 Motion—especially in light of his prompt motion to hold the Court's ruling on forfeiture in abeyance until it resolved the § 144 Motion [Dkt. No. 506]—this situation fundamentally differs from one in which a movant files immediately after an adverse ruling. Indeed, even though the § 455 Motion was filed shortly after an adverse ruling on forfeiture, it appears that Farkas is attempting to get a second bite at the apple by recasting the same disqualification arguments under a different statute, rather than engaging in the sort of

11

deceitful tactics that the timeliness requirement seeks to prevent. Although filing this second

motion, which could have been brought alongside the § 144 Motion, might be unsavory and

unnecessarily wasteful of judicial resources, it is not the sort of nefarious behavior precluded by

the recusal statutes. Accordingly, the Court deems this motion timely.

### E. Sufficiency as a Matter of Law

Finally, the government contends that this motion is insufficient as a matter of law

because the Court is not considered a victim for purposes of restitution, and because there is no

allegation that the Court had any pecuniary interest in the outcome of this case. Gov't Opp'n at

5. In addition, the government asserts that the declarations submitted should have no bearing

upon the appropriateness of recusal because the declarants are unknown to the Court, and there is

no evidence proffered that they represent reasonable persons under the objective reasonable

person standard. Id. at 6.

1.  Declarations

Farkas attached six declarations[1] in support of his original § 455 Motion, see Farkas Br.,

Exs. D, E, and provided nine additional declarations with his supplemental motion. Supp.

Motion, Exs. A-I. He also withdrew four of the original declarations attached to his § 455

Motion without explanation. Id. at 2. Farkas was permitted to file the Supplemental Motion

because his counsel requested more time

> to present each of the declarants with complete copies of all documents referenced in Mr.
> Farkas' affidavit, as well as other relevant information, so that each declarant can get a
> more complete understanding of the facts and circumstances of the case and to determine

---

[1] Although the government and Farkas alternate between the terms "affidavit" and "declaration" to describe Farkas' submissions, the Court will use the term "declaration" because these submissions are not notarized. According to Black's Law Dictionary, a declaration is "[a] formal, written statement — resembling an affidavit but not notarized or sworn to — that attests, under penalty of perjury, to facts known by the declarant." Declaration, Black's Law Dictionary (10th ed. 2014).

if they each still believes [sic] that a bias and prejudice or appearance of bias or prejudice exists.

Farkas Br. at 10 n.1; see also Def. Farkas' Mot. to Hold in Abeyance for 45 Days Any Ruling on His § 455 Motion [Dkt. No. 524], Nov. 25, 2015. The Court granted this request and provided counsel 45 days in which to obtain reliable declarations. Order [Dkt. No. 527], Dec. 11, 2015. In making the request, Farkas' counsel further stipulated, "[b]ased on the need to still do this, counsel cannot at this time endorse what any of these declarants have attested to but counsel have no specific cause not to believe them." Farkas Br. at 10, n.1. Although his counsel only endorsed one of the eleven declarations,[2] Farkas argues that the declarations now make "at least a prima facie showing that a reasonable person would believe that there was an appearance of bias." Farkas Br. at 11.

Farkas' position is based on a fundamental misunderstanding of the role of affidavits or declarations in the consideration of motions brought under § 455(a). According to the Fourth Circuit, "[b]ecause § 455 places a duty directly upon the judge to evaluate his own actions, it does not require that an affidavit be filed." Beard, 811 F.2d at 827. Indeed, "[i]f an affidavit or motion is filed under § 455 seeking disqualification, the judge is not bound to accept those allegations as true." Id.

The government correctly argues that these declarations should not have any bearing upon the Court's decision because the declarants are unknown to the Court and because the legal standard for reasonableness is objective, not subjective. Gov't Opp'n at 6. In response, Farkas fails to present any argument that the personal opinions of the declarants should bear upon the

---

[2] Without providing any reason as to why they have confidence in the declaration of Jeffrey L. Stouffer, counsel stated that he "has verified the basis for and veracity of this declaration." Farkas Br. at 11. This is the only declaration attached to either the original § 455 Motion or the Supplemental Motion in which counsel has indicated confidence.

Court's decision in its role as the fact-finder. Indeed, Farkas' subsequent submissions do not cure any of the infirmities counsel initially highlighted with regard to the reliability and credibility of the declarations. Farkas Br. at 10. Counsel apparently has not changed its posture that, with the exception of the declaration submitted from Jeffrey L. Stouffer, Farkas Br. at 11, it "cannot at this time endorse what any of these declarants have attested to [sic]." Farkas Br. at 10, n.1. In Farkas' subsequent pleadings, counsel have made no statement certifying the contents of the declarations that remain from the initial submission, nor have counsel attested to the credibility of the new submissions attached to the Supplemental Motion. Farkas Br. at 10, n.1.

Although, without explanation, Farkas' counsel eventually withdrew four of the six declarations attached to the original § 455 Motion, Supp. Motion at 2, the remaining eleven declarations are only arguably admissible and clearly are not credible. As an initial matter, not one of the declarations submitted is notarized; although each contains a penalty of perjury declaration, there is no way of knowing the identity of the actual declarant. Therefore, they do not carry the same weight as they would if witnessed and notarized. More importantly, all of the declarations attached to the Supplemental Motion are made on pre-printed forms that do not provide any opportunity for the declarants to elaborate upon or explain their statements. See Supp. Motion, Exs. A-I. In attempting to provide a foundation for the declarant's supposed beliefs, this form is in essence a recitation of Farkas' § 144 affidavit and § 455 Motion, complete with the same excerpted quotations. Compare Supp. Motion, Exs. A-I, ¶ 6(c)-(g), with Farkas Br. 6-7 and Disqual. Affidavit ¶¶ 5, 6. Furthermore, each emphatically and formulaically states:

> 7. Based on my knowledge and understanding of the relevant facts and circumstances, I believe and it is my opinion that Judge Brinkema had and continues to have an actual personal bias and prejudice against Lee Farkas.
> 8. Based on my knowledge and understanding of the relevant facts and circumstances,, [sic] I believe that Judge Brinkema had and continues to have an appearance of impartiality with regard to Lee Farkas.

Supp. Motion at 2, Exs. A-I, ¶¶ 7, 8. These rote submissions are unconvincing because they provide no room for the individuality and diversity of perspectives inherent in personal opinions. This form does not merely stack the deck in favor of defendant by discouraging dissention; rather, it eschews any opportunity whatsoever for a declarant to make a statement even slightly astray of Farkas' position.

The two remaining declarations from Farkas' initial submission are similarly unreliable. Although they are not printed on the same form that makes up every declaration submitted with the Supplemental Motion, the statements from Holly L. Gouch and Jeffrey L. Stouffer are just as mechanical. Farkas Br., Exs. D, E. With the exception of the names and dates and the one sentence that makes up paragraph three, these two statements are identical down to the misspelling of the Court's first name as "Leona." The only substantive difference between the two declarations is that Ms. Gouch says that she "believe[s] that Judge Brinkema had and continues to have a bias and prejudice against the defendant based on these facts," whereas Mr. Stouffer says that he "believe[s] that Judge Brinkema's presiding over any matter involving the Defendant, [sic] might reasonably raise at a minimum an issue of the appearance of bias against the Defendant." Id. Like the declarations attached to the Supplemental Motion, these declarations do not provide fulsome explanations of the declarants' beliefs, nor does their content suggest that the declarants were free to agree or disagree with the position of defendant in making their statements.

Furthermore, the reliability of the declarations is clearly subject to significant doubt because of the way in which they were obtained. Six of the nine declarations attached to the Supplemental Motion were obtained not by Farkas' counsel, but by Grenadier, who has exhibited a pattern of accusing the judges who rule against her of bias and unethical conduct and seeking

their recusal. See, e.g., Janice Wolk Grenadier v. BWW Law Group et al., No. 14-CV-827, Mot.

for All Judges Under 28 U.S. Code § 455 [Dkt. No. 49] (E.D.Va. Dec. 17, 2014). Indeed, that

Grenadier obtained so many of these declarations raises questions about what the declarants were

told before they signed the declarations. Grenadier has highlighted the Court's personal

investments in several motions she has filed. See, e.g., Janice Wolk Grenadier v. BWW Law

Group et al., No. 14-CV-827, Mot. to Vacate All Orders by Judge Leoni [sic] M. Brinkema [Dkt.

No. 87] (E.D.Va. Jun. 24, 2015). Specifically, in one motion, Grenadier made a comparable

argument to the one Farkas now makes, accusing the Court of bias or prejudice warranting

recusal because "her financial statements alone are enough to find conflict and it is inappropriate

for her to rule on any case that has any association to [m]ortgages, [m]ortgage back [sic]

securities et al. [sic]." Janice Wolk Grenadier v. BWW Law Group et al., No. 14-CV-827, Mem.

of Law in Supp. of Judge Brinkema Recusal at 4 [Dkt. No. 97] (E.D.Va. Jul. 6, 2015). The

Fourth Circuit has summarily affirmed orders denying this motion and others raising similar

arguments. See, e.g., Janice Wolk Grenadier v. BWW Law Group et al., No. 14-CV-827, Unpub.

Op. of USCA [Dkt. No. 110] (E.D.Va. Nov. 20, 2015).

    Discounting the Grenadier declarations, Farkas has adduced no evidence that supports an

inference that the remaining three declarants, who were solicited by his counsel, are a fair

representation of a "reasonable person" because there is no evidence of what information was

provided to the declarants that contextualizes Farkas' supposed role in causing the financial

crisis. There is also no document that explains the alleged connection between the judge's

independently managed mutual funds and Farkas' fraudulent conduct. All of that information

would certainly constitute facts and circumstances of which a "reasonable person" would need to

be aware before finding an appearance of bias. Accordingly, the Court does not accord any

weight to the proffered declarations in evaluating the legal sufficiency of the allegations contained in the § 455 Motion.

   2.      Relevance of the Safe Harbor in § 455(d)(4)(i)

Although not raised by either party, there is another provision of § 455 implicated by Farkas' allegations. Under § 455(d)(4)(i), "[o]wnership in a mutual or common investment fund that holds securities is not a [disqualifying] 'financial interest' in such securities unless the judge participates in the management of the fund." The legislative purpose of this exception was to enable judges, like many Americans, to invest in securities without facing the threat of recusal in a large number of cases. Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia, 715 F.3d 501, 515 (4th Cir. 2013).

The Court's financial statements clearly display that her only investments are comprised of two mutual funds and a certificate of deposit. See Farkas Br., Ex. C. These investments clearly fall under § 455(d)(4)(i)'s bright-line definition because there is no allegation that the Court participated in the management of any of her investments. "Just as § 455(b)(4) requires disqualification when there is any financial interest, however small, so § 455(d)(4)(i) eliminates any inquiry into the size of the likely effect of a decision on the value of securities held through a mutual fund." New York City Dev. Corp. v. Hart, 796 F.2d 976, 980 (7th Cir. 1986). Even though Farkas' motion was not brought under § 455(b)(4), the applicability of the safe harbor in § 455(d)(4)(i) to the Court's investments is relevant to the allegations at hand because

> a judge whose conduct has satisfied the § 455(d)(4)(i) safe harbor will almost certainly have complied with § 455(a) by acting in a reasonable and impartial manner. See Hart, 796 F.2d at 980 (noting that using § 455(a) as a "back door . . . inquiry into the substantiality of the effect on the value of assets" held in a managed fund is inappropriate, and holding that "[a] reasonable person would not question the impartiality of a judge who holds nothing but well diversified mutual funds").

Cent. Tel. Co. of Virginia, 715 F.3d at 516.

Supreme Court <u>dicta</u> further bolsters the conclusion that holding shares in independently managed mutual funds does not create the appearance of impropriety prohibited by § 455(a). In <u>Liteky v. United States</u>, the Court explained,

> Subsection (a) [of § 455] also goes beyond (b) in another important respect: It covers <u>all</u> aspects of partiality, and not merely those specifically addressed in subsection (b). However, when one of those aspects addressed in (b) <u>is</u> at issue, it is poor statutory construction to interpret (a) as nullifying the limitations (b) provides, except to the extent the text requires.

510 U.S. 540, 553, n.2 (1994) (emphasis in original). Subsection (b)(4), which compels disqualification when a judge "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding," is clearly implicated by the allegations in this motion. Nevertheless, the specific financial investments at issue are squarely protected by the safe harbor exception in § 455(d)(4)(i), as discussed above. Accordingly, it would be "poor statutory construction" to interpret § 455(a) as nullifying the safe harbor explicitly designated by the statute.

    3.     Appearance of Bias or Prejudice

Even if the investments at issue were not explicitly protected by the safe harbor in § 455(d)(4)(i), they would not raise the appearance of bias or prejudice to a reasonable person if that person were apprised of all of the surrounding facts and circumstances. As the government correctly argues, the Court was not a "victim" of Farkas' actions entitling her to restitution, nor did she have any stake in the outcome of the litigation. The Court's personal investments did not include any direct holdings in mortgage companies, real estate in Orlando, Florida, or any other type of investment that would reveal a direct linkage to the conduct for which Farkas was convicted. Indeed, any supposed connection between the personal finances of the Court and Farkas' fraud is generously characterized as tangential and no different than that of any other

person who had invested in mutual funds before the financial crisis. "[W]here an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality." In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1313 (2d Cir. 1988).

As discussed above, the "objective standard [for § 455(a) motions] asks whether the judge's impartiality might be questioned by a reasonable, well-informed observer who assesses all the facts and circumstances." DeTemple, 162 F.3d at 286. Particularly pertinent to the allegations at hand,

> [a]s Justice (then Judge) Breyer, noted in another § 455(a) case[,] "other things being equal, the more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality." . . . But where, as here, the mere appearance of impartiality is at issue, the likelihood that a given fact will create such an appearance must depend to some extent on how commonly facts of that kind arise.

United States v. DeTemple, 162 F.3d 279, 287 (4th Cir. 1998) (quoting In re Allied–Signal Inc., 891 F.2d 967, 971 (1st Cir.1989)). A reasonable observer would not question a judge's partiality for being among the 72 percent of Americans who had investments in the stock market in 2007, especially in light of the absence of a connection between these investments and Farkas' fraudulent conduct. See Justin McCarthy, Little Change in Percentage of Americans Who Own Stocks, Gallup, Apr. 22, 2015, www.gallup.com/poll/182816/little-change-percentage-americans-invested-market.aspx.

For example, in Central Telephone Company of Virginia v. Sprint Communications Company of Virginia, the Fourth Circuit found that a judge's ownership of a party's stock by way of a common investment fund in which the judge exercised no management responsibilities did not require disqualification pursuant to § 455(a). 715 F.3d at 516. Pointing to the "small number of shares the district court judge held, the fact that the CenturyLink shares only came

into his portfolio after a series of mergers about which he was unaware, and . . . that he held the shares in an IRA managed by others," the Fourth Circuit reasoned that "a reasonable observer would have no cause to question his impartiality." Id.

Similarly, defendants in In re Certain Underwriter sought to disqualify a judge under § 455(a) on the ground that she was biased because she made remarks "during court conferences that expressed 'sadness' for her stock losses, and [divested] herself of stocks and [waived] her interests as a putative class member in order to continue presiding." 294 F.3d 297, 305 (2d Cir. 2002). The Second Circuit in Underwriter affirmed the lower court's rejection of the § 455(a) motion, reasoning that the

> district judge []actively invested in a variety of securities, including some of the IPOs at issue here. Some of those investments returned a profit, some of those investments were sold at a loss. The judge relied on a broker's advice in choosing her investments. The judge also expressed regret about losing money in a variety of different investments, not just the ones at issue here. [The judge] promptly disclosed conflicts as they were discovered, and acted quickly to meet the Moving Defendants' concerns regarding other conflicts. She waived any interest she may have had as a class member in the Securities Actions and the Antitrust Actions.

Id. at 306.

If the far more direct financial interests implicated by the allegations in Certain Underwriter and Central Telephone were insufficient to raise the appearance of partiality or bias, then the financial interests highlighted by the instant motion certainly do not. Unlike the judges in either of those cases, the Court did not hold any shares of TBW, or any other party to the litigation, directly or indirectly. Indeed, TBW was never publicly traded. Nick Timiraos & James R. Hagerty, Taylor Bean Ceases Lending, Wall St. J., Aug. 6, 2009, www.wsj.com/articles/SB124949523458308423 (describing the company as "privately held"). Rather, in stark contrast to the claims raised by the litigants in Certain Underwriter and Central Telephone about holdings that could be directly connected to parties, Farkas' allegations are at

best of a remote connection that would not raise the appearance of partiality to a reasonable person who was truly acquainted with all of the surrounding facts and circumstances.

In essence, Farkas' claim is that because he engaged in the type of conduct that, when aggregated with the reckless conduct of literally thousands of others, made up one of the many factors in bringing about the global economic downturn, a judge whose financial holdings experienced a downturn—no matter how insubstantial—has the appearance of partiality. The thinness of this reasoning is illustrated by Farkas' failure to proffer anything more than a mere correlation between his fraudulent actions and the decline in the Court's personal finances. Although he offers grandiose statements by himself and others about the magnitude of his role in bringing about the global financial crisis, any such characterization is far from reality. Indeed, the inflated nature of the comments quoted in Farkas' motion is illustrated by the absence of even a passing mention of Farkas or TBW in the United States Senate Permanent Committee on Investigations' exhaustive 630-page report on the various origins of the financial crisis. See United States Senate Permanent Subcomm. on Investigations, Wall Street and the Financial Crisis: Anatomy of a Financial Collapse (2011), www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf. Further, the Government Accountability Office ("GAO") estimated that the global financial crisis cost the U.S. economy $22 trillion, United States Gov't Accountability Office, Financial Regulatory Reform: Financial Crisis Losses and Potential Impacts of the Dodd-Frank Act (2013), www.gao.gov/assets/660/651322.pdf, which dwarfs the $2.9 billion fraud perpetrated by Farkas. Indeed, if the GAO's $22 trillion estimate is accurate, Farkas' contribution amounts to approximately 0.013 percent of the total loss to the economy. As such, one cannot reasonably conclude that the decline in the Court's retirement funds, which resulted from the global

financial crisis, "occurred as a direct result of Mr. Farkas'[] alleged acts of fraud." Farkas Br. at

7. Accordingly, the allegations contained in the § 455 Motion are insufficient as a matter of law.

III.    CONCLUSION

For the reasons stated above, Farkas' § 455 Motion will be DENIED by an appropriate

Order to be issued with this Memorandum Opinion.

Entered this  1ST day of March, 2016

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge